# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

**CULTURAL HERITAGE PARTNERS, PLLC, et al.**,

Plaintiffs,

v.

**DONALD J. TRUMP, et al.**,

Defendants.

Civil Action No. 1:25-cv-03969-DLF

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED HEARING**

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED HEARING

## TABLE OF CONTENTS

*INTRODUCTION* ............................................................................................................. *1*

*STATUTORY OVERVIEW* ........................................................................................... *2*

*FACTUAL BACKGROUND* ....................................................................................... *11*

*LEGAL STANDARD* .................................................................................................. *17*

*ARGUMENT* ............................................................................................................... *20*

   I.    **PLAINTIFFS HAVE STANDING** ............................................................. **20**

      A.   Procedural-Injury Standing ....................................................................... 21

      B.   Individual Plaintiffs (Gregory Werkheiser and Marion Werkheiser) ....................... 21

      C.   Organizational Standing (Cultural Heritage Partners, PLLC) ...................... 22

      D.   Associational Standing (DC Preservation League) .................................... 22

      E.   Informational/Participation Interests and Zone of Interests ........................ 22

      F.   Plaintiffs Have Standing for Injunctive Relief at the Preliminary-Injunction Stage .... 23

   II.    **PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS** ............................. **23**

      A.   Defendants' Failure to Comply with NEPA Is Unlawful ............................... 23

      B.   Defendants Fail to Comply with Sections 106 and 110(f) of the NHPA...................... 24

      C.   The Section 107 Exemption Does Not Relieve Defendants of Their Duties................ 28

      D.   Defendants' Actions Violate the Take Care Clause of the Constitution ................. 33

   III.    **PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT
INJUNCTIVE RELIEF** ....................................................................................... **34**

   IV.    **THE BALANCE OF EQUITIES STRONGLY FAVORS PLAINTIFFS** ............. **37**

   V.    **THE PUBLIC INTEREST SUPPORTS INJUNCTIVE RELIEF** ............................. **38**

      A.   Compliance with NEPA and NHPA Is Itself a Powerful Public Interest .................... 39

      B.   Enforcing Procedural Rights Protects the Public Interest Even When the Government
Invokes Executive Functions ......................................................................... 39

      C.   Preserving the Status Quo to Allow NEPA and NHPA Review Is Strongly in the Public
Interest................................................................................................. 40

      D.   Once Historic Fabric Is Damaged, It Cannot Be Restored ........................... 41

   VI.    **PLAINTIFFS ARE ENTITLED TO AN EXPEDITED HEARING AND TRO** .. **42**

      A.   The Immediacy of the Threat Warrants Expedited Consideration .............................. 42

      B.   A TRO Is Necessary to Preserve the Status Quo and Prevent Irreparable Harm Pending
the Hearing............................................................................................ 43

*CONCLUSION*............................................................................................................. *45*

## TABLE OF AUTHORITIES

**Cases**

*\* Amoco Production Company v. Village of Gambell*,
    480 U.S. 531 (1987)................................................................................35, 36, 39, 42

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ......................................................................18

*Armstrong v. Bush*,
    F.Supp. 816 (D.D.C. 1992) ..........................................................................20

*Blassingame v. Trump*,
    87  F.4th 1 (D.C. Cir. 2023) .........................................................................11

*\* Brady Campaign to Prevent Gun Violence v. Salazar*,
    612 F.Supp.2d 1 (D.D.C. 2009) ...............................................................41, 42

*Center for Biological Diversity v. U.S. Department of Interior*,
    563 F.3d 466 (D.C. Cir. 2009) .....................................................................37

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) ......................................................................18

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)...........................................................................18

*Citizens for Responsibility & Ethics in Washington v. U.S. Department of Homeland Security*,
    527 F.Supp.2d 76 (D.D.C. 2007) .................................................................30

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983).......................................................................................23

*CTIA – The Wireless Association v. Federal Communications Commission*, 466 F.3d 105 (D.C. Cir. 2006),
    466 F.3d 105 (D.C. Cir. 2006) ......................................................................5

*Davis v. Pension Benefit Guaranty Corporation*,
    571 F.3d 1288 (D.C. Cir. 2009) ...................................................................18

*Don't Tear It Down, Inc. v. General Services Administration*,
    401 F. Supp. 1194 (D.D.C. 1975) ................................................................44

*Environmental Defense Fund v. Corps of Engineers of U.S. Army*,
    331 F.Supp. 925 (D.D.C. 1971) ...................................................................20

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) .................................................................................22

*Foundation on Economics Trends v. Heckler,*
    756 F.2d 143 (D.C. Cir. 1985) .................................................................................42

*Fox Television Stations, Inc. v. FilmOn X LLC,*
    966 F.Supp.2d 30 (D.D.C. 2013) .............................................................................20

*Fund for Animals v. Clark,*
    27 F.Supp.2d 8 (D.D.C. 1998) .................................................................................40

*Fund for Animals, Inc. v. Espy,*
    814 F.Supp. 142 (D.D.C. 1993) ...............................................................................39

*Fund for Animals v. Norton,*
    281 F.Supp.2d 209 (D.D.C. 2003) ...........................................................................42

*Hall v. Johnson,*
    599 F.Supp.2d 1 (D.D.C. 2009) ...............................................................................42

*Havens Realty Corporation v. Coleman,*
    455 U.S. 363 (1982) .................................................................................................22

*Hunt v. Washington State Apple Advertising Commission,*
    432 U.S. 333 (1977) .................................................................................................22

* *In re Aiken County,*
    725 F.3d 255 (D.C. Cir. 2013) .................................................................................11

*Klayman v. Obama,*
    125 F.Supp.3d 67 (D.D.C. 2015) .............................................................................11

* *League of Women Voters of the United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................. *passim*

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................................................21

*Marsh v. Oregon Natural Resource Council,*
    490 U.S. 360 (1989) ..............................................................................................5, 24

*Marin Audubon Society v. Federal Aviation Administration,*
    121 F.4th 902 (D.C. Cir. 2024) ..........................................................................11, 41

\* *Massachusetts v. Environmental Protection Agency*,
    549 U.S. 497 (2007)..........................................................................21

\* *Media Matters for America v. Paxton*,
    138 F.4th 563 (D.C. Cir. 2025) .......................................................19

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ............................................................18

\* *Monsanto Company v. Geertson Seed Farms*,
    561 U.S. 139 (2010)..........................................................................37

*Muckleshoot Indian Tribe v. U.S. Forest Service*,
    177 F.3d 800 (9th Cir. 1999) ......................................................6, 40

*Munaf v. Geren*,
    553 U.S. 674 (2008)..........................................................................19

\* *National Treasury Employees Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) .........................................................11

*National Trust for Historic Preservation v. Blanck*,
    938 F.Supp. 908 (D.D.C. 1996)....................................9, 25, 27, 28

*National Wildlife Federation v. Burford*,
    835 F.2d 305 (D.C. Cir. 1987) .........................................................42

*Newsom v. Albemarle City School Board*,
    354 F.3d 249 (4th Cir. 2003) ...........................................................19

\* *Nixon v. Fitzgerald*,
    457 U.S. 731 (1982)...................................................................11, 35

\* *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Commission*,
    896 F.3d 520 (D.C. Cir. 2018) .........................................................41

*Presidio Historical Association v. Presidio Trust*,
    811 F.3d 1154 (9th Cir. 2016) ....................................................27, 28

*Qualls v. Rumsfeld*,
    357 F.Supp.2d 274 (D.D.C. 2005) ...................................................18

*R.I.L-R v. Johnson*,
    80 F.Supp.3d 164 (D.D.C. 2015) .....................................................43

* *Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)..................................................................................4, 5, 24, 39

*Save the Courthouse Committee v. Lynn*,
408 F.Supp. 1323 (D. N.Y. 1975)..................................................................41

*Sierra Club v. U.S. Army Corps of Engineers*,
645 F.3d 978 (8th Cir. 2011) .........................................................................36

* *Summers v. Earth Island Institute*,
555 U.S. 488 (2009)..................................................................................21, 36

* *United Keetoowah Band of Cherokee Indians in Oklahoma v. Federal Communications Commission*,
933 F.3d 728 (D.C. Cir. 2019) ......................................................................10

*United States v. Jabr*,
4 F.4th 97 (D.C. Cir. 2021) .....................................................................29, 30

*United States v. Jabr*,
No. 18-0105 (PLF), 2019 U.S. Dist. LEXIS 238718 (D.D.C. May 16, 2019) ...........29, 30

*University of Texas v. Camenisch*,
451 U.S. 390 (1981)..................................................................................42, 44

*Vermont Yankee Nuclear Power Corporation v. Natural Resource Defense Council, Inc.*,
435 U.S. 519 (1978)....................................................................................4, 24

* *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) ..............................................................38, 39, 44

*Washington v. Reno*,
35 F.3d 1093 (6th Cir. 1994) .........................................................................40

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982)..................................................................................37, 38

* *Winter v. Natural Resource Defense Council, Inc.*,
555 U.S. 7 (2008)........................................................................ *passim*

*Wisconsin Gas Company v. Federal Energy Regulatory Commission*,
758 F.2d 669 (D.C. Cir. 1985) (per curiam) ..............................................35, 37

* *Youngstown Sheet & Tube Company v. Sawyer*,
343 U.S. 579 (1952)..................................................................11, 34, 35

**U.S. Constitution**

U.S. Const. art. 2, § 3 .................................................................................................10, 33, 40

U.S. Const. art. 2, § 8, cl. 18 .................................................................................................10

**Statutes**

Administrative Procedure Act, 5 §§ 701–706

5 U.S.C. §§ 701–706.......................................................................................10, 21, 23

5 U.S.C. § 702 .................................................................................................10

5 U.S.C. § 704 .................................................................................................10

5 U.S.C. § 706(1) .................................................................................................10, 25

5 U.S.C. § 706(2)(A).................................................................................................10, 25

5 U.S.C. § 706(2)(C).................................................................................................10, 25

5 U.S.C. § 706(2)(D).................................................................................................10

National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h

* 42 U.S.C. § 4321.................................................................................................2, 5

* 42 U.S.C. § 4331(a) .................................................................................................2, 3

* 42 U.S.C. § 4331(b)(1) .................................................................................................3

* 42 U.S.C. § 4331(b)(4) .................................................................................................3

* 42 U.S.C. § 4332.................................................................................................5

* 42 U.S.C. § 4332(C) .................................................................................................3, 21, 33

42 U.S.C. § 4332(C)(iv)–(v).................................................................................................3

* 42 U.S.C. § 4336(b)(2) .................................................................................................3

* 42 U.S.C. § 4336e(1) ..........................................................................................4

* 42 U.S.C. § 4336e(10)(A) ....................................................................................3

National Historic Preservation Act, 54 U.S.C. §§ 54 U.S.C. §§ 300101–307108

54 U.S.C. ch. 3021 (2024) ....................................................................................6

* 54 U.S.C. § 300101 ............................................................................................6

* 54 U.S.C. § 300101(1) ........................................................................................6

54 U.S.C. § 300308 ..............................................................................................7

* 54 U.S.C. § 304101 ............................................................................................6

54 U.S.C. § 306101(a)(1) ......................................................................................8

* 54 U.S.C. § 306102(b)(2) ....................................................................................8

* 54 U.S.C. § 306107 ..................................................................................... *passim*

* 54 U.S.C. § 306108 ...........................................................................6, 21, 25, 32

* 54 U.S.C. § 307104 ...........................................................................14, 27, 28, 30

Title 18, Crimes and Criminal Procedures

18 U.S.C. § 1752 ................................................................................................29

Title 40, Public Buildings, Property, and Works

40 U.S.C. § 3305(b) ............................................................................................40

* 40 U.S.C. § 584(c) ............................................................................................40

**Public Laws**

Act Concerning the White House and Providing for the Care and Preservation of Its Historic and Artistic Contents,
       Pub. L. No. 87-287, 75 Stat. 586 (1961) ..........................................................30

National Historic Preservation Act of 1966,
Pub. L. No. 89-665, as amended by Pub. L. No. 96-515 ...................................40

**Regulations**

* 36 C.F.R. pt. 60 .................................................................................................6

* 36 C.F.R. pt. 68 .............................................................................................7, 26

36 C.F.R. § 800.1(a) ...................................................................................6, 7, 25

36 C.F.R. § 800.1(c) ......................................................................................6, 25

36 C.F.R. § 800.2(a) ............................................................................................7

36 C.F.R. § 800.2(c) ............................................................................................7

36 C.F.R. § 800.3 ................................................................................................8

36 C.F.R. § 800.4-.6 ..........................................................................................25

36 C.F.R. § 800.4(a) ............................................................................................8

36 C.F.R. § 800.4(a)(1) ........................................................................................7

36 C.F.R. § 800.4(b) ............................................................................................8

36 C.F.R. § 800.4(c) ............................................................................................8

36 C.F.R. § 800.5 ..........................................................................................8, 12

36 C.F.R. § 800.5(a)(1) ........................................................................................7

36 C.F.R. § 800.5(a)(1)-(2) ................................................................................26

36 C.F.R. § 800.5(a)(2)(ii) .......................................................................7, 12, 26

36 C.F.R. § 800.5(a)(2)(v) ..................................................................................26

36 C.F.R. § 800.5(c)(2) ........................................................................................8

36 C.F.R. § 800.6 ..........................................................................................8, 27

* 36 C.F.R. § 800.8 ..............................................................................................3

\* 36 C.F.R. § 800.10 .................................................................................9, 10, 27, 28

\* 36 C.F.R. § 800.10(a) .........................................................................................28

36 C.F.R. § 800.16(d) .............................................................................................8

36 C.F.R. § 800.16(f) ..............................................................................................7

36 C.F.R. § 800.16(i) ..............................................................................................7

36 C.F.R. § 800.16(l) ..............................................................................................7

36 C.F.R. § 800.16(y) .........................................................................................7, 26

43 C.F.R. pt. 46 .......................................................................................................4

43 C.F.R. § 46.205(c) ..............................................................................................4

43 C.F.R. § 46.205(c)(1) .........................................................................................4

43 C.F.R. § 46.215(f) ..........................................................................................4, 25

**Federal Rules of Civil Procedure**

Federal Rule of Civil Procedure 65(b) ...................................................................18

Federal Rule of Civil Procedure 65(c) ...................................................................20

**Miscellaneous**

GENERAL SERVS. ADMIN., PBS NEPA DESK GUIDE (1999) ....................................4, 25

HEATHER MCPHERRON, CONG. RSCH. SERV., R48595, LEGISLATIVE CATEGORICAL EXCLUSIONS UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT (2025) .......................................4

## INTRODUCTION

This Memorandum supports Plaintiffs' emergency motion for a temporary restraining order and preliminary injunction enjoining Defendants from cleaning, repointing, or painting or otherwise altering the exterior of the Eisenhower Executive Office Building ("EEOB") until they comply with the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and the Administrative Procedure Act ("APA"). The EEOB is a federally owned building managed by the General Services Administration ("GSA"), and it sits within a National Historic Landmark District ("NHLD") and President's Park resources overseen by the National Park Service ("NPS"), yet Defendants are moving forward at the President's personal direction without the most basic environmental or historic preservation review.

The EEOB is a National Historic Landmark ("NHL") and a contributing resource to the Lafayette Square NHLD. Constructed between 1871 and 1888 in the French Second Empire style, its monumental gray granite and slate exterior has never been painted and is a character-defining feature of both the building and the district. Altering that exterior would permanently change the appearance and harm the integrity of one of the nation's most important public buildings.

Despite this, President Trump publicly announced his intention to paint every exterior surface of the EEOB white to suit his own aesthetic preferences (the "Project"). On August 7, 2025, he posted renderings on Truth Social showing the building painted, praising how it would look in white stone. In a subsequent televised interview on The Ingraham Angle on November 10, 2025, he displayed the renderings, dismissed the existing appearance as "ugly," and boasted that he is "getting bids right now from painters," explaining that the Project will involve cleaning, repointing, and painting.

1

President Trump's statements that he is "getting bids right now from painters" indicate that the responsible federal agencies—including GSA, which manages the EEOB—are already taking concrete procurement steps to implement the Project, yet they have conducted none of the environmental or historic preservation review that NEPA and NHPA require. Defendants have provided no public notice, prepared no Environmental Assessment ("EA") or Environmental Impact Statement ("EIS"), and initiated no consultation under Section 106 or Section 110(f). Proceeding in this manner—on the President's say-so, without regard to Congress's mandatory procedures—threatens irreversible damage to an irreplaceable historic resource and violates federal law.

Plaintiffs—attorneys and preservation organizations with professional, aesthetic, and recreational ties to the EEOB and Lafayette Square—seek to preserve the status quo and to require Defendants to comply with NEPA, NHPA, and the APA before altering the building. Plaintiffs satisfy all four factors for preliminary relief: they are likely to succeed on their NEPA and NHPA claims, they face imminent irreparable harm to a NHL if Defendants proceed, the equities favor maintaining the status quo, and the public interest lies in lawful, transparent federal decision-making before irreversible alterations occur.

## STATUTORY OVERVIEW

### I.    THE NEPA

In NEPA, codified at 42 U.S.C. §§ 4321–4370h, Congress recognized the "profound impact of man's activity on the…environment," and thus created a "continuing policy" to address it. 42 U.S.C. § 4331(a). That policy commits the federal government to "create and maintain conditions under which man and nature can exist in productive harmony." *Id.* NEPA thus seeks to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." *Id*. § 4321.

Federal agencies must "use all practicable means…to improve and coordinate Federal plans, functions, programs, and resources," "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations," and "preserve important historic, cultural, and natural aspects of our national heritage." *Id.* § 4331(a), (b)(1), (4).

NEPA specifies how federal agencies must carry out these responsibilities. Principally, and "to the fullest extent possible," agencies must produce a "detailed statement"—known as an EIS—for every proposed "major Federal action [] significantly affecting the quality of the human environment." *Id*. § 4332(C). The term "major federal action" is defined as an action "subject to substantial Federal control and responsibility." *Id*. § 4336e(10)(A). Major federal actions include alterations to historic districts, iconic federal buildings, and visual changes that may impair historic values. The regulations of the Advisory Council on Historic Preservation ("ACHP") encourage early coordination of NEPA review with the review required by Section 106 of the NHPA. *See* 36 C.F.R. § 800.8.

An EIS must document and analyze the proposed action's environmental effects, any unavoidable adverse environmental effects, reasonable alternatives to the action, the relationship between "local short-term uses" of the environment and "long-term productivity," and "irreversible and irretrievable commitments of Federal resources." 42 U.S.C. § 4332(C)(iv)–(v).

If an agency does not know what the significance of an effect of a project might have on the quality of the human environment, or if the project "does not have a reasonably foreseeable significant effect," it may produce an EA rather than an EIS. *Id.* § 4336(b)(2). An EA is "a concise public document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an [EIS] is necessary." *Id.*

3

In limited circumstances, agencies may apply a categorical exclusion ("CE") and avoid developing an EIS or EA. CEs are "actions that a Federal agency has determined normally does not significantly affect the quality of the human environment," *id*. § 4336e(1), and are adopted by federal agencies after undergoing public notice and comment. HEATHER MCPHERRON, CONG. RSCH. SERV., R48595, LEGISLATIVE CATEGORICAL EXCLUSIONS UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT (2025) ("To develop these CEs, agencies have typically followed an administrative process that included public notice and opportunities for the public to comment.").

However, agencies cannot apply CEs where "extraordinary circumstances" exist, even where actions would not normally have a significant environmental effect. 43 C.F.R. § 46.205(c); GENERAL SERVS. ADMIN., PBS NEPA DESK GUIDE 3.3.1 (1999) [hereinafter "GSA NEPA Guide"]. [1] In these circumstances, "further analysis and environmental documents must be prepared for the action," 43 C.F.R. § 46.205(c)(1), through either an EA or EIS. GSA NEPA Guide 3.4.3. Extraordinary circumstances include, but are not limited to, actions that affect properties listed, or eligible for listing, on the National Register of Historic Places ("NRHP"). 43 C.F.R. § 46.215(f); GSA NEPA Guide 3.5.1.5.

In totality, whether developing an EIS or an EA, agencies must "consider every significant aspect of the environmental impact of a proposed action." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978). NEPA's provisions "require that agencies take a 'hard look' at environmental consequences" but do not dictate outcomes. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted). While an agency may

---

[1] The applicable regulations and guidance governing categorical exclusions in this case are those developed by the Department of the Interior, 43 C.F.R. pt. 46, which apply to Defendant NPS, and the PBS NEPA Desk Guide, which applies to Defendant GSA.

ultimately decide that the value of an action outweighs the costs of the negative effects it will have, *id.* at 350, it cannot avoid conducting the analysis altogether. NEPA is "action forcing," "focusing the agency's attention" so that an action's effects are not "overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id.* at 349–50. In other words, NEPA "ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

NEPA also requires federal agencies to disclose identified effects with other agencies and the public before proceeding with an action. Public participation and disclosure are key aspects of NEPA, meant to: (1) ensure that agencies have carefully and fully contemplated the environmental effects of their actions before they make decisions and (2) ensure that the public has sufficient information to review, comment on, and—if necessary—challenge these agency actions. *See* 42 U.S.C. §§ 4321, 4332. As the Supreme Court has explained, "the broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time." *Marsh*, 490 U.S. at 371. NEPA ensures that "the larger audience that may also play a role in" developing and implementing the agency's decision understands those effects. *Robertson*, 490 U.S. at 350.

## II.    THE NHPA

Congress enacted the NHPA in 1966 "to foster conditions under which our modern society and our prehistoric and historic resources can exist in productive harmony." *CTIA – The Wireless Ass'n v. Fed. Commc'ns Comm'n*, 466 F.3d 105, 115 (D.C. Cir. 2006) (quoting former 16 U.S.C. § 470-1(1), recodified at 54 U.S.C. § 300101(1)). The NHPA reflects a national policy "to foster conditions under which our modern society and our historic property can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations."

54 U.S.C. § 300101(1). The Act imposes mandatory, non-discretionary duties on all federal agencies to act as responsible trustees for the Nation's heritage. *See id*. § 300101.

To implement this mandate, the NHPA created the ACHP, an independent federal agency. *Id*. § 304101. The Act also authorized the Secretary of the Interior ("SOI") to maintain the NRHP, the official Federal list of historic districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture. *See id*. ch. 3021 (2024); 36 C.F.R. pt. 60.

### A.  <u>Section 106</u>

Section 106 of the NHPA provides that, prior to approving the expenditure of federal funds on an undertaking or issuing a federal license or other approval, an agency "shall take into account the effect of the undertaking on any historic property" and must afford the ACHP a reasonable opportunity to comment. 54 U.S.C. § 306108. The goal of this consultation process is "to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties." 36 C.F.R. § 800.1(a). The ACHP's implementing regulations reiterate that the agency official "must complete the section 106 'process *prior* to the approval of the expenditure of any Federal funds on the undertaking or *prior* to the issuance of any license." *Id*. § 800.1(c) (emphasis added).

Courts have characterized Section 106 as a "stop, look, and listen" provision: it does not dictate substantive outcomes, but it requires federal agencies to fully consider the effects of their actions on historic properties before proceeding. *See Muckleshoot Indian Tribe v. United States Forest Serv.,* 177 F.3d 800, 805 (9th Cir. 1999).

The regulations define the key concepts that govern this process. An "undertaking" is "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried

6

out with Federal financial assistance; and those requiring a Federal permit, license, or approval."
36 C.F.R. § 800.16(y). "Historic properties" are districts, sites, buildings, structures, or objects that
are listed in, or eligible for listing in, the NRHP. 54 U.S.C. § 300308; 36 C.F.R. § 800.16(l). An
"effect" is "alteration to the characteristics of a historic property qualifying it for inclusion in or
eligibility for the [NRHP]," 36 C.F.R. § 800.16(i), and an "adverse effect" occurs when an
undertaking may alter those characteristics "in a manner that would diminish the integrity of the
property's location, design, setting, materials, workmanship, feeling, or association." *Id*. §
800.5(a)(1). Adverse effects include "[a]lteration of a property including restoration, rehabilitation,
repair, maintenance, stabilization, hazardous material remediation, and provision of handicapped
access, that is not consistent with the Secretary's standards for the treatment of historic properties
(36 C.F.R. part 68) and applicable guidelines." *Id*. § 800.5(a)(2)(ii).

The regulations emphasize that "[t]he goal of consultation is to identify historic properties
potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or
mitigate any adverse effects on historic properties." *Id*. § 800.1(a). "Consultation" is "the process
of seeking, discussing, and considering the views of other participants, and, where feasible,
seeking agreement with them regarding matters arising in the section 106 process." *Id*. § 800.16(f).
The responsible agency official must ensure that the process provides consulting parties—
including the State Historic Preservation Officer ("SHPO"), local governments, Indian tribes, and
other interested parties—a reasonable opportunity to identify concerns about historic properties,
advise on their identification and evaluation, articulate views on the undertaking's effects, and
participate in resolving adverse effects. *Id*. § 800.2(a), (c).

Section 106 involves a multi-step review. As a threshold step, the agency must determine
and document the area of potential effects ("APE") for the undertaking. *Id*. § 800.4(a)(1). The APE

7

is "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." *Id*. § 800.16(d). The agency must then identify historic properties within the APE that may be affected, using an appropriate level of effort based on the undertaking's scale and context. *Id*. § 800.4(b). The agency must evaluate the historic significance of those properties and determine whether they are listed in, or eligible for listing in, the NRHP. *Id*. § 800.4(c). The agency must assess the effects of the undertaking on identified historic properties and determine whether any effects are adverse effects. *Id.* § 800.5. Where adverse effects are found, the agency must consult to resolve them—typically by developing avoidance, minimization, or mitigation measures memorialized in a Memorandum of Agreement ("MOA") or other binding instrument. *Id*. § 800.6. At each step, GSA and NPS, as the federal agencies responsible for the EEOB and the Lafayette Square NHLD, must consult with appropriate consulting parties, including the D.C. SHPO, and provide opportunities for public involvement, as required by the regulations. *Id*. §§ 800.3, 800.4(a), 800.5(c)(2), 800.6.

## B. <u>Section 110</u>

Section 110 mandates that agencies "shall assume responsibility for the preservation of historic properties" under their control and give "special consideration" to properties of national significance. 54 U.S.C. §§ 306101(a)(1), 306102(b)(2). Section 110 imposes affirmative preservation duties on federal agencies with respect to historic properties under their jurisdiction and control and more stringent requirements for protection of NHLs. *See id*. § 306107.

Section 110 obligates agencies to "assume responsibility for the preservation of historic property that is owned or controlled by the agency," *id*. § 306101(a)(1), and, in managing such property, must give "special consideration to the preservation of those values in the case of property designated as having national significance." *Id*. § 306102(b)(2).

Section 110(f) establishes a heightened standard for undertakings that may directly and adversely affect NHLs. In such cases, the responsible agency official must, "to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark. The head of the Federal agency shall afford the [ACHP] a reasonable opportunity to comment with regard to the undertaking." *Id*. § 306107. The ACHP regulations implement this obligation in 36 C.F.R. § 800.10, which requires agencies to (1) identify and evaluate alternatives to avoid, minimize, or mitigate harm to the Landmark; (2) consult with GSA, with NPS in its role as steward of NHLs, and with the ACHP when it participates; and (3) develop and document measures to minimize harm and make a record of those efforts available to the public.

For a property like the EEOB—a NHL and contributing resource to the Lafayette Square NHLD, owned and managed by GSA and within an NPS-managed historic setting—Section 106 establishes procedural consultation requirements triggered by specific federal undertakings, while Section 110 creates broader stewardship obligations for federal agencies managing historic properties under their ownership or control. Federal courts have consistently held that Section 110 does not supersede Section 106 but rather "represents an elucidation and extension of the Section 106 process but not its replacement by new and independent substantive obligations of a different kind." *Nat'l Trust for Hist. Pres. v. Blanck*, 938 F.Supp. 908, 920 (D.D.C. 1996). Compliance with one section does not automatically satisfy the mandate of the other, as they serve different purposes. Section 106 requires GSA and NPS to identify and assess effects of the proposed cleaning, repointing, and painting of the EEOB on its character-defining features and on the historic district, and to resolve any adverse effects through consultation. Section 110(f) then requires a higher standard of care by federal agencies where the undertaking may directly and adversely affect the EEOB and the surrounding historic district as NHLs. Under Section 110(f), GSA and NPS must,

to the maximum extent possible, plan and carry out the project in a way that minimizes harm to the building and its historic materials, appearance, and setting, as well as to the NHLD within which it sits. *See* 36 C.F.R. § 800.10.

## III.    THE APA

Because neither NEPA nor NHPA provide a private right of action, judicial review of federal agency action and inaction under these statutes is governed by the APA, 5 U.S.C. §§ 701–706; *see United Keetoowah Band of Cherokee Indians in Okla. v. Fed. Commc'n Comm'n*, 933 F.3d 728, 738 (D.C. Cir. 2019) (applying the APA to NEPA and NHPA claims). The APA authorizes "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," to seek federal court relief. 5 U.S.C. § 702.

Under the APA, courts may review "final agency action for which there is no other adequate remedy in a court," *id.* § 704, and may also "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). Courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," taken "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations." *Id.* §§ 706(2)(A), (C), (D).

## IV.    TAKE CARE CLAUSE OF THE U.S. CONSTITUTION

The Take Care Clause, which requires the President to ensure the faithful execution of federal laws, does not provide the Executive with boundless authority. U.S. Const. art. 2, § 3. This Clause provides the Executive with authority to enforce federal laws and to oversee the execution of those laws by subordinate figures. Critically, the Take Care Clause does not permit the President to create, suspend, or repeal laws because the Constitution grants such powers to the Legislative Branch or to otherwise take power delegated to another branch. U.S. Const. art 1, § 8, cl. 18;

*Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 587 (1952). The District Court for the District

of Columbia, in *National Treasury Employees Union v. Nixon*, held that the President does not

have unilateral authority to override statutory mandates. 492 F.2d 587, 604–05 (D.C. Cir. 1974);

*In re Aiken County,* 725 F.3d 255, 259 (D.D.C. 2013) (holding that the "President may not decline

to follow a statutory mandate or prohibition simply because of policy objections.").

An Executive cannot cite the Take Care Clause for protection when acting outside of

Executive powers. *Blassingame v. Trump*, 87 F.4th 1, 23–4 (D.C. Cir. 2023) (noting that private

conduct rather than official conduct is not subject to presidential immunity). More specifically, in

*Marin Audubon Society v. Federal Aviation Administration*, the D.C. Circuit held that the President

cannot seize the law-making power of Congress or issue orders that bypass statutory limitations.

121 F.4th 902, 914 (D.C. Cir. 2024). The President, however, can claim absolute immunity for

actions at the "outer perimeter" of his official responsibilities, as noted in *Nixon v. Fitzgerald*, 457

U.S. 731, 757 (1982), even if they are illegal or are taken in bad faith. *Klaymen v. Obama*, 125

F.Supp.3d 67, 86 (D.D.C. 2015).

## FACTUAL BACKGROUND

## I.    THE EEOB IS A NATIONAL HISTORIC LANDMARK OF SIGNIFICANCE

The building now known as the EEOB, formerly known as the Old Executive Office

Building and the State, War, and Navy Department Building, occupies the block immediately west

of the White House. Construction began in 1871 and was completed in 1888 to house the

Departments of State, War, and the Navy, consolidating those executive offices in a single

purpose-built structure. *See* Ex. 14 ¶ 4; Ex. 6.

Supervising Architect Alfred B. Mullett designed the EEOB in the French Second Empire

style, with monumental facades, mansard roofs, and richly detailed interiors. In 1969, the building

was designated a NHL and listed in the NRHP. In 1970, Lafayette Square and its surrounding

buildings, including the EEOB, were listed in the NRHP as the Lafayette Square NHLD and designated as a NHLD. *See* Ex. 14, ¶ 4; Ex. 15. The District of Columbia's Historic Preservation Review Board has reaffirmed the EEOB's status as a contributing resource within the Lafayette Square NHLD. In a staff report dated September 29, 2022, prepared in connection with an amended nomination and boundary increase for the district, the Board's Historic Preservation Office described the district as including a contributing site (Lafayette Park) and 35 contributing buildings, including the EEOB, along with contributing structures and objects. *See* Ex. 14, ¶ 6; Ex. 10.

## II.    THE EEOB'S CHARACTER-DEFINING MATERIALS AND APPEARANCE

Under the regulations at 36 C.F.R. § 800.5(a)(2)(ii), the President's plan for "cleaning, pointing, and painting" will constitute an adverse effect on the EEOB. Examples of adverse effects provided in 36 C.F.R. § 800.5 include types of alteration, restoration, rehabilitation, repair, and maintenance that are not consistent with the Secretary's standards for the treatment of historic properties and applicable guidelines. *Id.* § 800.5(a)(2)(ii). The SOI's Standards for Rehabilitation ("SOI Standards") recommend against applying paint or other coatings to masonry that has been historically unpainted or uncoated; needlessly introducing chemicals or moisture into historic materials through unnecessary cleaning; removing paint that is firmly adhered to masonry; and repointing masonry units when not needed or in a manner that does not match the original mortar content and repointing methods. Ex. 21 ¶ 18; Ex 18; Ex. 12 at 31–32.

The EEOB's exterior is constructed of gray granite with cast-iron trim and is capped by slate-covered mansard roofs. The building's massive masonry walls, multi-story colonnades, and elaborate roofline contribute to its national significance as one of the United States' foremost examples of French Second Empire civic architecture. Ex. 21 ¶ 7; Ex. 6. The exterior granite and slate have historically never been painted. The EEOB's dark gray stone exterior and purple slate mansard roof are defining aspects of its design and of the Lafayette Square NHLD's overall

character. The SOI Standards identify painting previously unpainted masonry and harsh cleaning or repointing methods as treatments that can irreversibly damage historic fabric and alter a property's historic character. *See* Ex. 21 ¶ 20; Ex 18. Put simply, to make paint adhere to polished granite requires the granite surface to be made rough through abrasion, which is not reversable.

## III.    THE EEOB'S ROLE IN THE LAFAYETTE SQUARE NHLD AND PRESIDENT'S PARK

The EEOB occupies a site long intended for executive offices adjacent to, but distinct from, the White House and its grounds, and that its current form and unpainted stone and slate appearance are integral to the historic setting of Lafayette Square and President's Park. Lafayette Square lies directly north of the White House, and the Lafayette Square NHLD encompasses the park and a frame of surrounding buildings. The EEOB defines the western edge of the district and provides a monumental backdrop to the park and the White House. Lafayette Square NHLD includes "35 contributing buildings, 7 contributing structures and 17 contributing objects for a total of 60 contributing resources." Ex. 21 ¶ 12; Ex 10.

The White House Historical Association's article "The President's Park (Give or Take a Few Acres)" explains that, from the early years of the capital, the President's House was planned as the centerpiece of a larger President's Park, with executive office buildings flanking it on the east and west. Ex. 1 ¶ 13; Ex. 8. An August 1798 map of President's Square by surveyor Robert King depicts the President's House positioned between the Treasury Department on the east and a planned building for the War, Navy, State, and Post Office departments on the west, on the site later occupied by the EEOB. *Id.*

The same article explains that, beginning with Thomas Jefferson's early nineteenth-century landscape plans, the White House grounds were fenced and landscaped as a separate precinct within the larger President's Park. Later construction of the enlarged Treasury Building in the mid-

13

nineteenth century and of the State, War, and Navy Building between 1871 and 1888 further "walled off" the President's Park and left the White House flanked by two larger executive office buildings. *Id.*

## IV.    SECTION 107 OF THE NHPA DOES NOT APPLY TO THE EEOB

While the White House and its grounds are exempt from the NHPA under Section 107, the EEOB is not exempt. The EEOB is treated as a contributing resource within the Lafayette Square NHLD and remains fully subject to federal historic preservation and environmental review requirements. Section 107 of the NHPA, as recodified, provides that "[n]othing in this division applies to the White House and its grounds, the Supreme Court building and its grounds, or the United States Capitol and its related buildings and grounds." 54 U.S.C. § 307104. The statutory exemption applies only to those specific buildings and their grounds and not to the EEOB. NPS's 2013 map of the Lafayette Square NHLD explains that, although the White House and its grounds are important to the context of the National Mall Historic District, they are "legally exempt from listing in the NRHP, according to Section 107 of the [NHPA]," and therefore are not included within the Lafayette Square NHLD boundaries. The same map depicts the EEOB as a contributing building within the Lafayette Square NHLD. Ex. 14 ¶ 6; Ex. 9. The 2022 staff report of the District of Columbia Historic Preservation Review Board on the Lafayette Square NHLD amendment and boundary increase likewise states that "the White House and White House Grounds are critical features adjacent to the historic district" but are "legally exempt from listing in the [NRHP]." Ex. 14 ¶ 6; Ex. 10 at 1. The report then describes the expanded district boundaries, without identifying the EEOB as exempt. *Id.* These documents confirm the obligations with respect to the EEOB on federal agencies under the NHPA.

## V.      PRESIDENT TRUMP'S PUBLIC STATEMENTS AND PAINTING PLAN

The President appears to be towards the end of his decision process, and the GSA and NPS may act rapidly to complete his objective. In a television interview taped on or about November 10, 2025, the President displayed renderings of the EEOB painted entirely in white and announced his intent to paint, clean, and repoint the building; he derided the gray granite ("gray is for funerals"), asserted white paint would "[bring] out the detail," and said he was "getting bids right now" ("the Project"). Ex. 14 ¶ 8; Ex. 3. When asked if painting was the only work that would occur, President Trump amended, "It's cleaning, and pointing, and painting. It needs other work too." *Id*. The President appears to be hinting at additional work beyond cleaning, pointing and painting. President Trump expressed surprise that Laura Ingraham was aware of the plan to paint the EEOB, asking, "You did you hear that? That's amazing." *Id*.

These statements illustrate that the detail and progress of plans have developed significantly since the President's public statements about the EEOB, in August 2025. At that stage, he simply shared renderings of the EEOB in white on Truth Social and commented "[t]he beautiful Executive Office Building, opposite the White House, as it would have looked in white stone but, nevertheless, is still beautiful in its original grey stone. What a great beauty it is!" This statement did not disclose that the President was considering ordering every exterior surface to be painted white. Ex. 1 ¶ 8; Ex. 2.

## VI.     LACK OF NEPA AND NHPA REVIEW

### A.   <u>No NEPA Documentation</u>

Defendants have initiated planning for cleaning, repointing, and painting the EEOB's exterior, but no EA or EIS has been prepared, and no NEPA documentation for this project appears in any GSA or NPS public docket or reading room. Ex. 1 ¶ 16; Ex. 13 ¶ 15; Ex. 14 ¶ 9. On information and belief, Defendants have not issued an EA or EIS, invoked or documented any CE,

or analyzed whether extraordinary circumstances related to effects on a NHL preclude reliance on a CE. *Id.* No NEPA-related public notice or opportunity for comment has been provided. *Id.*

### B. No Section 106 or Section 110(f) Process

Defendants have not initiated consultation under Section 106 of the NHPA: they have not defined an APE, identified affected historic properties, or made any determination of effects for the EEOB, the Lafayette Square NHLD, or other nearby listed and contributing resources. *See* Ex. 1 ¶ 16; Ex. 13 ¶ 15; Ex. 14 ¶ 9. Nor have they consulted with the ACHP, the D.C. State Historic Preservation Office, NPS, or other consulting parties, or developed any MOA or other instrument to resolve adverse effects. *See id.* On information and belief, Defendants also have not engaged in the heightened planning required by Section 110(f) to minimize harm to a NHL or consulted with NPS regarding alternatives that would avoid or reduce harm. Ex. 1 ¶ 16; Ex. 13 ¶ 15; Ex. 14 ¶ 9, 11; Ex. 21 ¶ 23.

### C. No Public Participation

Because Defendants have bypassed NEPA review and Section 106/110(f) consultation, Plaintiffs and the public have had no notice of, or opportunity to comment on, the Project and its effects. Ex. 1 ¶ 16; Ex. 13 ¶ 15; Ex. 14 ¶ 9, 11; Ex. 21 ¶ 23. No draft NEPA document has been circulated, no consulting party invitations have been issued, and no meetings or listening sessions have been convened, depriving Plaintiffs of the information and participation rights Congress intended to guarantee before irreversible work proceeds on the EEOB. Ex. 1 ¶ 16; Ex. 13 ¶ 15; Ex. 14 ¶ 9.

## VII.  DEFENDANTS' PATTERN OF MISDIRECTION AND SUDDEN EXECUTION

Press reports describe recent examples in which significant work on the White House grounds and environment moved forward quickly and without meaningful public processes. In March, President Trump stated in a televised interview that he intended to pave the Rose Garden

to address concerns about women walking in high heels; on June 11, 2025, bulldozers and other heavy equipment reportedly began removing grass and preparing the site for paving. Ex. 13 ¶ 11–12; Ex. 5. In a separate incident, President Trump announced plans in March to remove a historic magnolia tree planted to commemorate Rachel Jackson, and the tree was removed the following month. Ex. 13 ¶ 10; Ex. 4.

Against this backdrop, the President's clear desire to paint the EEOB—combined with his stated assertion that he is "getting bids right now from painters"—indicates that Defendants are likely to move quickly and with little warning, just as they did in prior projects. *See* Ex. 14 ¶ 7–8; Ex. 3; Ex. 4. Given Defendants' demonstrated pattern of rapid execution without NEPA or NHPA review, there is a substantial risk that cleaning, repointing, and painting of the EEOB will begin abruptly unless enjoined.

## LEGAL STANDARD

### I.    TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Temporary restraining orders ("TRO") and preliminary injunctions ("PI") are "extraordinary remed[ies] never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain such relief, a plaintiff must establish four elements: "[1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id*. at 20; *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).

The D.C. Circuit has typically applied a "sliding scale" approach meaning that if a Plaintiff makes "an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). After *Winter*, however, this Circuit has been reluctant to apply the sliding scale, although many other circuits have. *Compare Changji Esquel Textile Co. v. Raimondo*,

40 F.4th 716, 726 (D.C. Cir. 2022), *with Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35–37, 38 n.8 (2d Cir. 2010); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (applying a "sliding scale" test to grant injunctions, there must be "serious questions" as to the merits, the balance of hardships must tip sharply in the movant's favor, and the other *Winters* factors must be satisfied); *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (applying a "sliding scale" test that takes each factor into consideration).

The same four-factor standard governs requests for a TRO and for a PI; what differentiates a TRO is the urgency and the need to preserve the status quo until a fuller hearing can be held. *See, e.g.*, Fed. R. Civ. P. 65(b). An expedited or "emergency" hearing on such a motion is appropriate where the record demonstrates that irreparable harm is imminent and that maintaining the status quo requires prompt judicial intervention—as is the case here, where Plaintiffs allege imminent, irreversible harm to a NHL and its NHLD setting if Defendants proceed with the announced EEOB painting project without complying with NEPA and NHPA.

## II.    BURDENS OF PROOF AND THE ROLE OF EVIDENCE

Plaintiffs "bear the burdens of production and persuasion" on each of the four *Winter* factors. *Qualls v. Rumsfeld*, 357 F.Supp.2d 274, 281 (D.D.C. 2005). To meet those burdens at the preliminary-relief stage, plaintiffs may rely on "evidence that is less complete than in a trial on the merits," but the evidence they offer must nonetheless be credible. *Id*. at 281.

In considering a motion for a TRO or PI, courts evaluate the record as it exists at the time of the motion—including sworn declarations, documentary exhibits, and other materials demonstrating likelihood of success and irreparable harm. *Newsom v. Albemarle City Sch. Bd.,* 354 F.3d 249, 255 (4th Cir. 2003) (holding that the court examines the record as developed at the PI stage). Courts also consider whether the requested relief is tailored to preserve the status quo

and ensure that any ultimate decision on the merits will not be rendered meaningless. *See Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *Winter*, 555 U.S. at 24.

## III.    BALANCE OF EQUITIES AND PUBLIC INTEREST WHEN THE GOVERNMENT IS A DEFENDANT

Where the Government is a defendant, "[i]t is well settled that the balance of equities and public interest factors merge" because the Government's interest is the public interest. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). In such cases, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," while also considering "the overall public interest." *Winter*, 555 U.S. at 24, 26.

This inquiry is especially significant where, as here, Plaintiffs challenge federal actions alleged to violate NEPA, NHPA, and the APA, and seek to prevent irreparable harm to a NHL, its NHLD setting, and the public's ability to experience those historic resources. Protecting the environment and historic properties, ensuring lawful federal decision making, and maintaining public confidence that the Executive Branch complies with Congress's mandates are all strong public interests that weigh heavily in favor of preliminary relief.

## IV.    SECURITY UNDER FEDERAL RULE OF CIVIL PROCEDURE 65(C)

Federal Rule of Civil Procedure 65(c) provides that a court "may issue a [PI] or a [TRO] only if the movant gives security in an amount that the court considers proper[.]" The Rule thus grants district courts "wide discretion" in whether to require a bond and, if so, in what amount. *See, e.g.*, *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F.Supp.2d 30, 52 (D.D.C. 2013).

This Circuit has previously imposed only nominal bonds in cases where the public interest strongly favors injunctive relief or where a substantial bond would effectively bar access to equitable relief. In *Environmental Defense Fund v. Corps of Engineers of U.S. Army*, for example,

the Court required a bond of one dollar to enjoin a federal waterway project even after construction had begun. 331 F.Supp. 925, 927 (D.D.C. 1971). Likewise, in *Armstrong v. Bush*, the Court required only $100 in security because "the public interest" favored injunctive relief under the circumstances. 807 F.Supp. 816, 823 (D.D.C. 1992).

Here, Plaintiffs seek to prevent imminent and irreversible harm to the EEOB—a NHL—and its NHLD setting, and to vindicate statutory procedures designed to protect the public's interest in historic and environmental stewardship.

Plaintiffs are individuals, a small law firm, and a nonprofit organization whose resources are devoted to cultural heritage and preservation work. Given the strong public interest in preventing unlawful and irreversible damage to irreplaceable historic resources and in ensuring compliance with NEPA, NHPA, and the APA, Plaintiffs respectfully submit that the Court should waive the Rule 65(c) bond requirement or impose only a nominal bond if it grants a TRO or PI.

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING

Plaintiffs have Article III standing to seek preliminary injunctive relief. At this stage, they must make a clear showing of injury-in-fact that is concrete and particularized, and actual or imminent, fairly traceable to Defendants' conduct, and redressable by the relief requested. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs also assert procedural standing because NEPA and NHPA confer procedural rights whose unlawful denial increases the risk of harm to Plaintiffs' concrete interests in the EEOB and the Lafayette Square NHLD. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009); *Massachusetts v. Env't Prot. Agency*, 549 U.S. 497, 517–18 (2007).

A. **Procedural-Injury Standing**

NEPA requires a hard look at environmental effects—including historic and aesthetic effects—before an agency makes an irreversible commitment of resources. *See* 42 U.S.C. § 4332(C). Under Section 106, the NHPA requires agencies to identify affected historic properties, assess effects (including effects on setting, feeling, and association), and consult; Section 110(f) of the statute requires agencies, to the maximum extent possible, to minimize harm to NHLs. 54 U.S.C. §§ 306108, 306107. When the government withholds these procedures in the face of a project that threatens Plaintiffs' concrete interests, Plaintiffs suffer a cognizable procedural injury. The APA provides the right of action for enforcing these procedures. 5 U.S.C. §§ 702–706.

B. **Individual Plaintiffs (Gregory Werkheiser and Marion Werkheiser)**

The Werkheisers frequently work in the District and use and enjoy the Lafayette Square NHLD and the President's Park area, including views of and proximity to the EEOB's historic façade; they have near-term plans to do so again. Ex. 13 ¶¶ 6–7, 13; Ex. 1 ¶¶ 5–7, 17, 19. The unpainted gray granite and slate appearance of the EEOB and its contribution to the Lafayette Square NHLD are central to their aesthetic and professional enjoyment. Ex. 13 ¶¶ 6–7, 13; Ex. 1 ¶¶ 17, 19.

Defendants' public statements and planning activity (including soliciting bids and describing imminent cleaning, repointing, and painting) demonstrate a real and immediate threat to those interests; once paint is applied or aggressive surface preparation occurs, the loss of historic material and appearance is irreversible. Ex. 1 ¶ 15; Ex. 12; Ex. 18; Ex. 21 ¶ 20.

The threatened harm flows from Defendants' unreviewed federal action. A TRO and PI restoring NEPA and NHPA procedures and halting exterior work pending compliance will reduce the risk of harm and may alter the outcome by requiring avoidance, minimization, or mitigation before work proceeds, satisfying redressability. Ex. 21 ¶ 22.

**C. <u>Organizational Standing (Cultural Heritage Partners, PLLC)</u>**

CHP suffers organizational injury where Defendants' unlawful denial of NEPA and NHPA procedures frustrates CHP's mission—to uphold preservation law—and diverts resources (staff time, client counseling, outreach, and emergency advocacy) to counteract the unlawful process. Ex. 1 ¶ 3; Ex. 13 ¶ 3. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919–20 (D.C. Cir. 2015). Those resource diversions are concrete and imminent, traceable to Defendants' failure to conduct NEPA and NHPA review, and redressable by an order restoring required procedures and pausing work. Ex. 1 ¶¶ 3, 16; Ex. 13 ¶¶ 3, 14–16.

**D. <u>Associational Standing (DC Preservation League)</u>**

DC Preservation League ("DCPL") has associational standing under *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). At least one identified DCPL member regularly uses and enjoys Lafayette Square and the EEOB's historic setting and faces imminent aesthetic injury and denial of NEPA and NHPA participation rights if Defendants proceed without lawful review. *See* Ex. 14 ¶¶ 3, 9, 11, 13. Protecting the District's historic resources—especially an NHL and NHLD in the civic heart of the city—is germane to DCPL's preservation mission. *See* Ex. 14 ¶ 2. The claims are statutory and the relief sought is injunctive; neither requires individualized damages proofs or member participation in their own right.

**E. <u>Informational/Participation Interests and Zone of Interests</u>**

NEPA and NHPA ensure public disclosure and the opportunity for public input before irreversible commitments are made. The denial of timely access to information about the project, analysis of alternatives, and consultation is itself a cognizable injury when tethered to concrete aesthetic and professional interests in the place affected—as here. *See* Ex. 13 ¶¶ 6-7, 13; Ex. 1 ¶¶ 5-7, 17, 19; Ex. 14 ¶¶ 9, 11, 13. Plaintiffs' interests fall within the zone of interests of NEPA

22

(ensuring informed consideration of environmental, including historic and aesthetic, impacts) and NHPA (ensuring identification of effects on historic properties and meaningful consultation), as enforced through the APA. 5 U.S.C. §§ 702–706.

### F. **Plaintiffs Have Standing for Injunctive Relief at the Preliminary-Injunction Stage**

For prospective relief, Plaintiffs must show a real and immediate threat of injury. *See City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983). Plaintiffs have done so: Defendants have publicly described cleaning, repointing, "other work," and painting plans as well as procurement activity, creating a substantial risk of imminent, irreversible harm to the EEOB's materials and the Lafayette Square NHLD's setting if work proceeds without NEPA and NHPA review. Ex. 1 ¶¶ 17, 19; Ex. 13 ¶¶ 13; Ex. 14 ¶¶ 10, 12-13. A TRO and PI will preserve the status quo and restore the procedures Congress mandated—precisely the kind of forward-looking remedy Article III permits. Accordingly, Plaintiffs have standing to pursue a TRO and a PI.

## II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A. **Defendants' Failure to Comply with NEPA Is Unlawful**

Because the Project would alter the appearance of a NHL within a NHLD, Defendants' failure to complete an EIS or EA with opportunity for public comment violates NEPA. NEPA is a procedural statute; it requires agencies to follow a certain process, not make a certain determination. *See Robertson*, 490 U.S. at 350. Yet, it is crucial that agencies in fact follow NEPA's legally mandated procedures. The EEOB's age, historical background, and legally protected status— among other things—must be analyzed and studied in an EIS or EA. Without conducting the requisite environmental analysis, Defendants did not "consider every significant aspect of the environmental impact of a proposed action" *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 553, or "take a 'hard look' at environmental consequences." *Robertson*, 490 U.S. at 350 (citation omitted). The EEOB is a NHL, listed in the NRHP and located within the Lafayette Square NHLD. Ex. 14

¶ 4; Ex 15. The exterior granite and slate of the EEOB have historically never been painted, consistent with SOI Standards, which identify painting previously unpainted masonry and harsh cleaning or repointing methods as treatments that can irreversibly damage historic fabric and alter a property's historic character. Ex. 21, ¶ 20; Ex 18 at 168; Ex. 20.

Additionally, Defendants have robbed the public of any opportunity to comment on the activities. Public participation is a core pillar of NEPA, and the public cannot be excluded where activities will have a significant effect. 435 U.S. at 553; *Marsh*, 490 U.S. at 371. It is crucial that environmental analysis and public participation take place *before* Defendants implement any actions. Otherwise, Defendants may "act on incomplete information, only to regret its decision after it is too late to correct." 490 U.S. at 371.

Further, Defendants have not identified any CE to explain the lack of environmental review. Nor could they, because the Project would alter the appearance of a NHL within a NHLD, listed on the NRHP. Extraordinary circumstances exist that preclude reliance on CEs and require preparation of, at minimum, an EA. 43 C.F.R. § 46.215(f); GSA NEPA Guide 3.5.1.5. Defendants' failure to complete an EA or EIS is an agency action unlawfully withheld, and this Court should thus compel Defendants to undertake the first step of NEPA's procedural requirements. 5 U.S.C. § 706(1). To the extent that Defendants have conducted any analysis, "without observance of procedure required by law," Defendants' conduct is arbitrary and capricious. *Id.* § 706(2)(A), (C).

**B. Defendants Fail to Comply with Sections 106 and 110(f) of the NHPA**

Defendants have initiated planning to paint the EEOB—a NHL—without conducting *any* of the required legal review under NHPA. They have violated both the baseline procedural requirements of Section 106 and the heightened procedural mandates of Section 110(f) by failing

to consider the undertaking's adverse effects on the EEOB itself *and* on the surrounding NHLs within the Lafayette Park NHLD.

### 1. *Defendants Violated Section 106 of the NHPA*

Defendants have initiated planning for cleaning, repointing, and painting the exterior of the EEOB without following any aspect of the Section 106 process, in violation of 54 U.S.C. § 306108 and its implementing regulations. Section 106 of the NHPA mandates that, prior to approving the expenditure of federal funds on an undertaking or issuing federal approval, an agency shall take into account the effect of the undertaking on any historic property and afford the ACHP a reasonable opportunity to comment. *Id.*; 36 C.F.R. § 800.1(c). Agencies violate Section 106 when they fail to provide meaningful consultation opportunities to SHPO and ACHP before proceeding with federal undertakings. *Blanck*, 938 F.Supp. at 918. The ACHP's regulations mandate a multi-step process—identifying historic properties, assessing effects, and consulting to avoid, minimize, or mitigate adverse effects. 36 C.F.R. §§ 800.1(a), 800.1(c), 800.4–800.6. The EEOB is a NHL and a contributing resource to the Lafayette Square NHLD, bringing it squarely within the protections of Section 106.

The proposed painting of its historically unpainted granite façade and associated surface treatments constitute an "undertaking" likely to cause "adverse effects" to historic characteristics, including integrity of materials and appearance, triggering the duty to identify, assess, and resolve adverse effects through consultation. 36 C.F.R. §§ 800.16(y), 800.5(a)(1)–(2). Adverse effects also include any "[a]lteration of a property, including restoration, rehabilitation, repair, [and] maintenance, [] that is not consistent with the Secretary's standards for the treatment of historic properties (36 CFR part 68) and applicable guidelines." 36 C.F.R. § 800.5(a)(2)(ii). The regulations also stipulate that adverse effects may include the "[i]ntroduction of visual [] elements

that diminish the integrity of the property's significant historic features." 36 C.F.R. § 800.5(a)(2)(v). In short, the visual impacts of the painting of the EEOB may undermine the integrity of the entire Lafayette Park NHLD, creating adverse effects on all other NHLs within sight of the building and in the area. Yet, Defendants have completed none of the steps required under Section 106 to identify and resolve those adverse effects. They have not defined an APE. They have not engaged in a reasonable, good faith effort to identify all historic properties that will be adversely affected, including the EEOB and other landmarks within the Lafayette Park NHLD. They have not consulted with the D.C. SHPO or the ACHP, as required by the statute. They have not developed any avoidance, minimization, or mitigation measures, in direct contravention of Section 106 and its regulations. Finally, Defendants have not resolved adverse effects to the EEOB or adverse effects, including visual impacts, to other NHLs located in the APE.

### 2. Defendants Failed to Fulfill the Heightened Standard of Care Required by Section 110(f) of the NHPA

The EEOB is itself a NHL; painting its historically unpainted granite façade and altering its character-defining materials and appearance would directly and adversely affect both the building and the surrounding Lafayette Square NHLD, triggering Section 110(f)'s elevated standard and special procedures. 54 U.S.C. § 306107. As stewards of these historic properties, Defendants failed to fulfill their heightened duties when an undertaking may directly and adversely affect a NHL. Section 110(f) is a non-discretionary provision and mandates that federal agencies "to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark" and afford the ACHP a reasonable opportunity to comment. *Id.* The regulations further require consultation with NPS and development of alternatives to avoid, minimize, or mitigate harm. 36 C.F.R. §§ 800.6, 800.10. This heightened standard of care applies not only to the EEOB but to all of the NHLs located in the Lafayette Park NHLD that might be

adversely affected, including by visual impact, on account of the Defendants' alteration of the EEOB.

The Ninth Circuit has held that Section 110(f) "builds on the general consultation process set out in Section 106" but requires agencies to "thoroughly consider—rather than simply identify and catalog—prudent and feasible alternatives" to minimize harm. *Presidio Hist. Ass'n v. Presidio Trust*, 811 F.3d 1154, 1169–70 (9th Cir. 2016). Although the court found federal agencies are "not obligated to agree" with preservation experts' recommended alternatives, the court found compliance where the agency "incorporate[d] the majority of the recommendations" and "offered reasoned explanations where it deviated" from preservation experts' preferred measures to minimize harm. *Id.* at 1171. Indeed, Section 110 "represents an elucidation and extension of the Section 106 process but not its replacement," so agencies must comply with both. *Blanck*, 938 F.Supp. at 920.

Because Defendants have commenced planning and procurement steps to paint the EEOB without conducting any Section 106 consultation or undertaking the minimization-of-harm planning required by Section 110(f), they are in ongoing violation of the NHPA. They have not consulted with NPS or the ACHP to minimize harm to the EEOB, the other NHLs that may be adversely affected by the undertaking, and to the integrity of the Lafayette Park NHLD as a whole. 36 C.F.R. § 800.10(a). Defendants have not "identified and evaluated alternatives," giving them "full and reasoned consideration" as courts have required, or documented any measures to minimize harm "to the maximum extent possible," as the statute demands. 54 U.S.C. § 306107; *Presidio Hist. Ass'n*, 811 F.3d at 1170–71. Defendants have not reported publicly any measures to minimize harm, as required by 36 C.F.R. § 800.10. No such planning or consultation has occurred here.

**C.  The Section 107 Exemption Does Not Relieve Defendants of Their Duties**

*1.  Section 107 Is A Narrow, Property-Specific Exemption That Does Not Reach the EEOB or Waive Duties under the NHPA*

Section 107 of the NHPA, now codified at 54 U.S.C. § 307104, provides that "[n]othing in this division applies to the White House and its grounds, the Supreme Court building and its grounds, or the United States Capitol and its related buildings and grounds." By its terms, Section 107 is a limited carve-out for three named buildings and their "grounds." It does not mention the EEOB or any other structure.

The EEOB is a separate federal office building occupying its own lot immediately west of the White House. It was constructed between 1871 and 1888 as the State, War, and Navy Department Building and has its own legal description and federal ownership independent of the White House reservation. Ex. 1 ¶ 11; Ex. 6. The building has been individually designated as a NHL and listed in the NRHP, and it is identified as a contributing building within the Lafayette Square NHLD. Ex. 14 ¶ 4; Ex. 15. There is no textual basis in Section 107 to treat that separate, historic property individually listed on the NRHP and separately designated as a NHL as part of "the White House and its grounds."

This Court has made clear that there is a legally significant distinction between the broader "White House Complex" and the more narrowly defined "White House grounds" for purposes of 18 U.S.C. § 1752(c)(1)(A). In *United States v. Jabr*, this Court found that the "White House grounds" refers to an eighteen-acre area, while the "White House Complex" encompasses a larger geographic area bounded by "15th Street on the east, 17th Street on the west, E Street on the south, and Pennsylvania Avenue on the north." No. 18-0105 (PLF), 2019 U.S. Dist. LEXIS 238718, at *20–21, n.9 (D.D.C. May 16, 2019). On appeal, all parties agreed—and the court accepted—that the area described as "'*the White House Complex and United States Department of Treasury*

*Building and Grounds'...* ranges beyond the 'White House or its grounds' specified in" 18 U.S.C. § 1752, thereby affirming Congress did not intend to equate "White House or its grounds" with the larger "White House complex" and confirming the Treasury Building, which was at issue in this case, is located outside of the White House grounds. *United States v. Jabr*, 4 F.4th 97, 102 (D.C. Cir. 2021). The D.C. Circuit concurred with the conclusion that the statute, 18 U.S.C. § 1752, ties "restricted buildings or grounds" to a specific, historically delimited parcel, not to whatever perimeter the Executive Branch or the Secret Service may later describe as the "White House Complex." *See id.* at 100–03.

The lower court in *Jabr* specifically emphasized that Congress deliberately referred to the "White House grounds," not the "White House Complex," in federal statutes, and "[t]o read the surrounding text [of 18 U.S.C. § 1752] as referring to a larger geographic area would be contrary to that legislative choice and the statutory language." *Jabr*, 2019 U.S. Dist. LEXIS 238718, at *27. The court also specified that the boundary for the White House grounds derives from Public Law 87-287, which designated authority to NPS to administer the White House and defined the White House property as comprised of "eighteen and seven one-hundredths acres." *Id.* at *19 (citing Act Concerning the White House and Providing for the Care and Preservation of its Historic and Artistic Contents, Pub. L. No. 87-287, 75 Stat. 586 (1961)). As the court noted: "Where Congress uses the same term in the same way in two statutes with closely related goals, basic canons of statutory construction suggest a presumption that Congress intended the term to have the same meaning in both contexts." *Id.*

The EEOB does not fall within the narrow exemption provided by 54 U.S.C. § 307104, because it is not part of the eighteen-acre "White House grounds" as the court defines that term. While federal courts have recognized the EEOB as part of the "White House Complex," *Citizens*

*for Resp. & Ethics in D.C. v. U.S. Dep't of Homeland Sec.*, 527 F.Supp.2d 76, 79 n.1 (D.D.C. 2007), it remains a separate building adjacent to but outside the White House grounds proper. By contrast, the "White House grounds," as recognized in *Jabr* and in the 1961 statute, are limited to the 18.07-acre tract immediately surrounding the Executive Residence and contiguous lawn and gardens. *Jabr*, 4 F.4th at 102. The fact that federal agencies or the Secret Service may refer to the larger secured area as the "White House Complex" for operational purposes does not alter the narrower statutory term Congress actually chose.

Indeed, Congress specifically enumerated only three properties for exemption—the White House and "its grounds," the Supreme Court building and its grounds, and the Capitol and its "related buildings" and grounds—indicating an intent to limit the exemption to those specific properties rather than to provide broader exemptions for federal executive facilities. 54 U.S.C. § 307104. The EEOB, like the Treasury Building in *Jabr*, stands adjacent to but outside the statutorily defined "White House grounds." Any federal undertaking affecting the EEOB is subject to the NHPA's Section 106 consultation requirements, including the obligation to consult with the SHPO and the ACHP to assess potential effects on historic properties, and its Section 110(f) requirements for heightened care given to NHLs.

### 2. Congressional Reports, Agency Publications, Official Maps, and Nomination Documents Confirm That the EEOB Lies Outside the White House Reservation

To the extent Defendants later suggest that the EEOB is effectively part of "the White House and its grounds," that suggestion is contradicted by the government's own historic and administrative records. From the early planning of the capital, federal documents distinguish the President's House and its grounds from the flanking executive office sites. An August 1798 map of President's Square by surveyor Robert King depicts the President's House at the center of a large reservation, with the Treasury Department on the east and a separate planned executive

building on the west—the site later occupied by the State, War, and Navy Department Building, now the EEOB. Ex. 21 ¶ 11; Ex. 8. Early nineteenth-century landscape plans prepared under President Jefferson then enclosed approximately nine acres around the residence as distinct "White House grounds," while leaving the east and west executive office sites outside the fenced reservation. Ex. 21 ¶ 11; Ex. 8.

Modern designation materials draw the same distinction. A 2013 NPS "Lafayette Square Historic District" map identifies the "White House and its grounds" as "legally exempt from listing" under Section 107 and places them outside the district boundary, while showing the EEOB inside the boundary as a contributing building. Ex. 14 ¶ 6; Ex. 9. The White House grounds typically include the White House and the surrounding 18 acres, with the EEOB Grounds and Treasury Grounds considered to be separate areas. *See id.* Finally, a 2022 D.C. Historic Preservation report again describes the "White House and White House Grounds" as adjacent and "legally exempt," while listing the EEOB as a contributing resource within the Lafayette Square NHLD. Ex. 21 ¶ 12; Ex. 10. These historic documents confirm that the EEOB lies outside the White House grounds and is a separate historic property fully subject to NHPA and NEPA.

### 3. *Even If Section 107 Could Stretch to Encompass the EEOB, It Would Not Eliminate Defendants' Obligations Under Sections 106 And 110(f)*

Plaintiffs maintain that Section 107 does not apply to the EEOB. But even assuming for purposes of argument that Defendants could persuade the Court that Section 107 somehow reaches the EEOB, the exemption still would not relieve them of their statutory duties.

First, Section 106 requires federal agencies to "take into account the effect of [an] undertaking on any historic property" and to afford the ACHP a reasonable opportunity to comment. 54 U.S.C. § 306108. That obligation is triggered by effects on any historic property. Here, the Project will affect not only the EEOB but also the integrity, setting, and views of other

contributing resources in the Lafayette Square NHLD and surrounding historic properties oriented toward the EEOB. Ex. 14 ¶ 4; Ex. 15. Even if Section 107 could be stretched to lift Section 106 duties with respect to the EEOB itself, it would not eliminate Defendants' duty to identify and consider the Project's adverse effects on non-exempt historic properties.

Second, Section 110(f) requires that when an undertaking "directly and adversely affect[s] any [NHL]," the responsible agency must "to the maximum extent possible" plan and take action to minimize harm to the landmark and seek the ACHP's comments. 54 U.S.C. § 306107. The EEOB is itself a designated NHL and a contributing resource within the Lafayette Square NHLD. Ex. 14 ¶ 4; Ex. 15. Nothing in Section 107 suggests that Congress intended to suspend Section 110(f)'s heightened protections for NHLs outside of the White House and its grounds.

In short, Section 107 creates a narrow exception for the White House and its grounds. It does not encompass the EEOB, and even if it did, it would not excuse Defendants from complying with their separate obligations under NHPA Sections 106 and 110(f).

### 4. *Section 107 Does Not Create Any Exemptions for Review of the Federal Action under NEPA*

NEPA's requirements remain entirely independent of NHPA. NEPA applies to "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), and courts have long recognized that impacts to historic and cultural resources fall squarely within that mandate. NEPA is not limited to properties listed in the NRHP, and Section 107—located within NHPA—does not mention NEPA at all. Even under Defendants' most expansive reading of Section 107, they remain obliged under NEPA to take a "hard look" at the environmental, historic, and aesthetic consequences of painting and re-finishing the EEOB's historic, unpainted granite and slate exterior before irreversibly committing resources to that project. *See* Ex. 1 ¶ 15, 20–23; Ex. 12.

**D.  Defendants' Actions Violate the Take Care Clause of the Constitution**

The Take Care Clause requires the President to "take Care that the Laws be faithfully executed." U.S. Const. art. 2, § 3. When Congress has enacted statutes governing the subject, the President must follow them. Federal law regulates the renovation and management of federal buildings, including the EEOB. Altering the EEOB is governed by multiple interlocking statutory and regulatory provisions: the NHPA's requirement to consider effects on historic structures; NEPA's duty to take a hard look at environmental impacts; and the APA's notice and non-arbitrariness requirements. These are mandatory constraints—Congress's statutory floor for alterations to federal buildings.

More specifically, Congress has delegated authority over renovations and management of federal buildings to the Administrator of General Services, not the president. For instance, under 40 U.S.C. § 3305(b), it is the Administrator who can order a federal public building be altered and is subject to procedural and cost-justification requirements. In a related statute, 40 U.S.C. § 584(c) emphasizes that the Administrator's decisions regarding federal buildings must be "advantageous to the Government in terms of economy, efficiency or national security." By directing the EEOB's repainting outside those statutory requirements, President Trump acted contrary to Congress's commands, placing his authority at its lowest ebb. *Youngstown*, 343 U.S. at 635–38.

Taken as a whole, Congress codified that alterations to historical federal buildings are subject to (1) NHPA and NEPA review, (2) subject to APA-compliant reasoning, and (3) directed by the GSA Administrator and not the Executive. President Trump's directive to paint the EEOB white satisfies none of these requirements. President's Trump's directive is based on personal whim rather than the statutory bases established by Congress or by the GSA Administrator. He has not fulfilled the NHPA and NEPA review requirements. There is no apparent purpose for cost,

efficiency, or national security that could possibly justify his directive (and rather is a costly endeavor with no security purpose).

In *Youngstown*, the Supreme Court created a tripartite formula adjudging when a President is acting at its highest authority. 343 U.S. at 635–38. The President acts at his highest ebb of power when acting within his express Constitutional powers and with express or implied congressional authorization. *Id.* at 635–36. He acts within the "zone of twilight" when Congress is silent— offering neither authorization or denial—and acts upon his own independent powers. *Id.* at 636–37. Lastly, the President is at his lowest ebb of power when he acts in direct conflict with either the express or implied will of Congress and relies only on his own express constitutional powers. *Id.* at 637–38. Here, President Trump is not "taking care" to execute the laws enacted by Congress or acting within his express constitutional authority. His directive is at the lowest ebb of power and in direct conflict with congressional direction. His directive exceeds the "outer perimeter" of his executive power and is violative of the Take Care Clause. *Fitzgerald*, 457 U.S. at 757.

## III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT INJUNCTIVE RELIEF

To obtain a TRO or PI, Plaintiffs must show they are likely to suffer irreparable harm in the absence of relief. The injury must be "both certain and great; it must be actual and not theoretical," and "of such imminence that there is a clear and present need for equitable relief," and it must not be adequately compensable in money damages. *Wis. Gas Co. v. Fed. Energy Regul. Comm'n,* 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *Winter*, 555 U.S. at 22–23. As discussed in Section I above, Plaintiffs have concrete aesthetic, professional, organizational, and participation interests in the EEOB and the Lafayette Square NHLD. The harm described below will directly injure those interests, and it is certain, imminent, and irreparable.

The EEOB's exterior is original historic masonry—polished granite, slate, and historic mortar—and a character-defining feature of a National Historic Landmark. To make modern paint adhere, the stone must be abraded or chemically etched, permanently altering finishes and patina; paint then forms a vapor barrier on historically vapor-permeable stone and mortar, trapping moisture and causing cracking, spalling, and freeze–thaw damage, especially where incompatible Portland-cement mortars are present. Ex. 21 ¶ 17; Ex. 12. Once the EEOB's granite, slate, and mortar are abraded, sealed, or painted, that historic fabric cannot be restored without further loss of original material. Ex. 21 ¶ 17; Ex. 12. These permanent injuries are not compensable in money damages and will directly impair the interests identified in Section I, including the individual Plaintiffs' and DCPL members' use and enjoyment of the EEOB's historic façade and CHP's preservation mission.

Painting will also lock the EEOB into a recurring paint cycle; large masonry buildings typically must be repainted every five to seven years, imposing repeated surface preparation on historic masonry and diverting limited resources from appropriate preservation work. Ex. 1 ¶ 15; Ex. 11. Removing paint from historically unpainted masonry is itself destructive. Ex. 1 ¶ 15; Ex. 12. Courts have long recognized that such permanent damage to environmental and cultural resources constitutes irreparable harm. *Amoco*, 480 U.S. at 545.

The EEOB's dark gray stone façade is a defining visual element of both the building and the Lafayette Square NHLD; it frames views from Lafayette Square, Pennsylvania Avenue, and President's Park. Ex. 21 ¶ 12; Ex. 9. Painting the EEOB white would fundamentally change the contrast between the EEOB and the White House and alter the character of every view in which the EEOB appears. Ex. 1 ¶ 15; Ex. 12. Once those visual changes are made and experienced by the public, the loss of historic setting, feeling, and association cannot be undone—another classic

form of irreparable harm. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995–96 (8th Cir. 2011). For the Plaintiffs described in Section I—who regularly visit, work in, and study this landscape—these visual and aesthetic losses are personal, concrete injuries, not abstract concerns.

NEPA and NHPA provide procedural rights designed to protect precisely these kinds of historic and aesthetic interests. Where an irreversible action is imminent, the denial of those procedures can itself be an irreparable injury. *See Summers*, 555 U.S. at 496 (2009); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009). Defendants are carrying out the Project with no NEPA document and no Section 106 or 110(f) consultation, depriving these Plaintiffs of statutory rights to information, comment, and participation before decisions are made. Ex. 1 ¶ 16; Ex. 13 ¶ 15–16; Ex. 14 ¶¶ 9, 11, 13. Once cleaning, repointing, and painting begin, the window for meaningful NEPA/NHPA participation—and Plaintiffs' ability to use those procedures to protect the concrete interests identified in Section I—will close permanently.

The threat is imminent. President Trump has publicly announced his intention to paint the EEOB, displayed before-and-after images, and stated that he is "getting bids right now from painters" for "cleaning, and pointing, and painting." Ex. 14 ¶ 8; Ex. 3. Given Defendants' pattern of moving quickly on other White House projects without meaningful public process, Plaintiffs need not wait until scaffolding is erected and paint is being applied to seek relief. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–54 (2010). These facts demonstrate a "clear and present need for equitable relief," *Wis. Gas*, 758 F.2d at 674.

In sum, the imminent and permanent damage to the EEOB's historic materials and setting—and the simultaneous loss of NEPA and NHPA procedures that protect the concrete

interests described in Section I—meets every element of the irreparable-harm standard and warrants a TRO and PI.

## IV.    THE BALANCE OF EQUITIES STRONGLY FAVORS PLAINTIFFS

In weighing the balance of equities, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotation omitted); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Where, as here, Plaintiffs face permanent injury and Defendants can show at most modest administrative inconvenience from a temporary pause of an action aimed purely at fulfilling the President's personal aesthetic preferences, this factor favors Plaintiffs. The government has no cognizable interest in avoiding compliance with the laws Congress has enacted.

Plaintiffs' harms far outweigh any burden on Defendants. As explained above, painting and related surface work on the EEOB will permanently damage historic granite, slate, and mortar and irreversibly alter the setting of a NHL within a NHLD. Ex. 21 ¶ 14–16; Ex. 1 ¶ 15; Ex. 12. Plaintiffs will also permanently lose the NEPA/NHPA procedural protections that Congress designed to safeguard their interests in the EEOB, interests that cannot be remedied after the fact. Ex. 14 ¶ 13; Ex. 1 ¶ 16. By contrast, the only harm Defendants can assert from an injunction is delay in carrying out a discretionary, cosmetic painting project initiated at the President's personal preference. A brief pause to comply with NEPA and NHPA imposes, at most, scheduling and administrative inconvenience. That imbalance in the gravity of harms weighs decisively in Plaintiffs' favor. *See Winter*, 555 U.S. at 24–26.

Preserving the status quo causes no legally cognizable injury to Defendants; it simply keeps conditions as they are today. The EEOB has stood for more than a century with its gray, unpainted stone exterior. Ex. 14 ¶ 4; Ex. 6. Courts in this Circuit give particular weight to preserving the status quo where, as here, the requested injunction is merely designed "to maintain the status quo

pending a final determination on the merits." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). An order preventing accelerated, novel, non-urgent alterations to a landmark building imposes no comparable injury on the government.

To the extent Defendants contend they will suffer harm because they have already begun planning, soliciting bids, or tentatively scheduling work on the EEOB, any such harm is "self-inflicted" and carries little equitable weight. *See, e.g.*, *League of Women Voters*, 838 F.3d at 12–13 (agency cannot bootstrap harm from its own unlawful actions to defeat injunctive relief). Defendants chose to advance a major exterior project on a NHL without first undertaking the procedures Congress mandates. They cannot now rely on the costs of that premature decision to outweigh Plaintiffs' concrete and irreparable harms. Nor can they claim institutional injury from being required to follow NEPA and NHPA; enforcing those statutes respects, rather than undermines, the separation of powers.

In sum, Plaintiffs face permanent loss of historic fabric, setting, and statutory procedural protections; Defendants face, at most, a temporary delay in implementing a discretionary cosmetic project. The balance of equities strongly favors granting injunctive relief.

## V.    THE PUBLIC INTEREST SUPPORTS INJUNCTIVE RELIEF

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. Preserving the status quo so that Congress' procedures can run is the public interest. Courts consistently recognize that preserving historic resources, ensuring lawful and transparent federal decision-making, and maintaining the integrity of federal environmental review statutes are profound public interests and favor an injunction preventing Defendants from undertaking irreversible alterations to the EEOB without NEPA/NHPA analysis.

**A.  Compliance with NEPA and NHPA Is Itself a Powerful Public Interest**

Courts recognize the strong public interest in the government's "meticulous compliance" with the law. *See Fund for Animals, Inc. v. Espy*, 814 F.Supp. 142, 152 (D.D.C. 1993).

NEPA and NHPA are quintessential procedural statutes designed to ensure that federal agencies take a "hard look" at environmental and cultural impacts before acting. *See Robertson*, 490 U.S. at 350–51. Because these statutes guarantee public participation, agency transparency, and informed decision-making, courts repeatedly recognize that the public interest is served when agencies comply with NEPA's procedural requirements. *See e.g.*, *Fund for Animals v. Clark*, 27 F.Supp.2d 8, 15 (D.D.C. 1998) ("the public interest expressed by Congress' was frustrated by the federal defendants not complying with NEPA").

Similarly, Congress has declared that "the preservation of this irreplaceable heritage is in the public interest." Pub. L. No. 89-665, as amended by Pub. L. No. 96-515. NHPA embodies that determination by requiring agencies to identify and consider effects on historic properties, including through certain consultations. *See, e.g.*, *Muckleshoot Indian Tribe*, 177 F.3d at 805. In other words, agencies must "stop, look, and listen" before proceeding with actions that may harm historic resources. *See id.*

Following required NEPA/NHPA procedure is even more crucial, as the EEOB is a NHL, the highest designation available under federal law. Section 110(f) imposes a heightened duty on agencies to "minimize harm" to NHLs "to the maximum extent possible." 54 U.S.C. § 306107.

**B.  Enforcing Procedural Rights Protects the Public Interest Even When the Government Invokes Executive Functions**

The government may argue that the President's preferences for the building's appearance serve the public interest. But the D.C. Circuit has repeatedly emphasized that "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838

F.3d at 12. Nor is there a legitimate public interest in allowing an agency or official to avoid well-established statutory procedures. "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (citing *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). The public interest lies in orderly administration of the law and in ensuring that the Executive Branch "faithfully execute" statutes like NEPA and NHPA. *See* U.S. Const. art. 2, § 3.

The government may point to *Winter*, but that case is easily distinguishable. *Winter* involved urgent national security training needs by the U.S. Navy. 555 U.S. at 24–26. Courts in this Circuit have made clear that, absent national security concerns, *Winter* does not diminish the public interest in enforcing NEPA. *Id.* at 26 ("military interests do not always trump other considerations, and we have not held that they do")

Here, Defendants identify no national security need, emergency condition, or operational imperative requiring immediate painting of the EEOB. The President's personal aesthetic preferences do not outweigh congressionally mandated procedures.

### C. Preserving the Status Quo to Allow NEPA and NHPA Review Is Strongly in the Public Interest

Courts routinely hold that preserving the status quo pending the outcome of litigation is in the public interest where, as here, failure to do so risks irreparable environmental or cultural harm. *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F.Supp.2d 1, 24–25 (D.D.C. 2009). The D.C. Circuit also rejects the notion that mere delay to complete required procedures harms the public, emphasizing that agencies have no rightful interest in acting contrary to federal statutes. *See generally, Marin Audubon*, 121 F.4th 902; *see also League of Women Voters*, 838 F.3d at 12.

That principle applies squarely here. A brief pause to conduct NEPA and NHPA review—as Congress requires—is plainly in the public interest. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 536 (D.C. Cir. 2018).

**D.  <u>Once Historic Fabric Is Damaged, It Cannot Be Restored</u>**

Damage to historic properties constitutes a uniquely weighty public harm because historic resources, once destroyed or altered, cannot be replaced. *See, e.g.*, *Save the Courthouse Comm. v. Lynn*, 408 F.Supp. 1323, 1343 (D. N.Y. 1975) ("the act of demolition is irrevocable").

The EEOB's exterior consists of nineteenth-century stone and historic finishes that have never been painted. Painting the façade white would not simply obscure its original character; it would require abrading or chemically treating the historic granite and slate to make paint adhere, and any future paint removal would further degrade the stone. *See* Ex. 1 ¶ 15; Ex. 12. Once those original surfaces are altered, historic fabric and patina are permanently lost.

Courts recognize that environmental and historic injuries of this kind are irreparable and that the public interest weighs heavily in preventing them. The Supreme Court has emphasized that environmental injury "can seldom be adequately remedied by money damages" and "is often permanent or at least of long duration." *Amoco*, 480 U.S. at 545. Building on that principle, this Court in *Brady* held that NEPA's duties are "more than a technicality" and that the lack of adequate environmental consideration itself "looms as a serious, immediate, and irreparable injury." 612 F.Supp.2d at 24 (quoting *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985)). "When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." 612 F.Supp.2d at 24–25 (citing *Fund for Animals v. Norton*, 281 F.Supp.2d 209, 221 (D.D.C. 2003)).

Because painting the EEOB's unpainted masonry would irreversibly damage historic materials and permanently alter the character of a NHL, the public interest overwhelmingly favors

preventing any exterior surface preparation, cleaning, repointing, priming, or painting unless and until Defendants complete the NEPA and NHPA processes Congress requires. Ex. 1 ¶ 15; Ex. 12; *see also Nat'l Wildlife Fed. v. Burford,* 835 F.2d 305, 326 (D.C. Cir. 1987).

## VI.    PLAINTIFFS ARE ENTITLED TO AN EXPEDITED HEARING AND TRO

A TRO, like a PI, is an "extraordinary remedy [that is] never awarded as of right." *Winter*, 555 U.S. at 24. As the Supreme Court explained: "The purpose of a [PI] is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The same standard governs TROs and PIs. *Hall v. Johnson*, 599 F.Supp.2d 1, 3 n.2 (D.D.C. 2009).

Local Civil Rule 65.1 provides for expedited consideration of requested temporary injunctive relief. Given the Project's imminence and the risk that work could begin before the Court reaches the merits, expedited treatment is necessary to preserve the Court's ability to grant effective relief. Plaintiffs satisfy the four-factor standard and are entitled to a TRO and an expedited PI hearing.

### A.    <u>The Immediacy of the Threat Warrants Expedited Consideration</u>

Courts in this Circuit routinely expedite consideration of emergency motions where time is of the essence and the threatened harm is irreparable. *See, e.g.*, *R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 191 (D.D.C. 2015) (granting PI where ongoing harm required prompt judicial action). The Supreme Court likewise recognizes that interim equitable relief is appropriate where, absent swift intervention, challenged actions are likely to cause irreparable injury before a decision on the merits can be rendered. *See Winter*, 555 U.S. at 42.

Here, President Trump has personally unveiled and promoted his plan to paint the EEOB. He has released renderings of the entire exterior of the building in stark white on Truth Social and

declared on national television that he is "getting bids right now from painters" for a project that will involve "cleaning, and pointing, and painting." Ex. 14 ¶ 7–8; Ex. 2; Ex. 3. His own descriptions leave little doubt that this is not a tentative idea, but an active undertaking he expects to see carried out. *See* Ex. 14 ¶ 8; Ex. 3. At the same time, there is no evidence of any NEPA or NHPA process—no EA or EIS, no Section 106 or Section 110(f) consultation, and no public notice of any kind—despite this concrete planning. Ex. 1 ¶ 16; Ex. 14 ¶ 9. As detailed in the record, the Administration has recently executed significant alterations to the White House grounds on extremely short notice and with minimal public process, including the removal of the historic Jackson magnolia and rapid paving-related work in the Rose Garden. Ex. 1 ¶ 10; Ex. 4; Ex. 5. Against that backdrop, and in light of the President's statements that procurement is already underway, the risk that Defendants will move ahead with the Project before the Court can hold a standard-paced hearing is substantial and imminent, not speculative. Ex. 1 ¶ 18.

Where the threatened harm is imminent and irreversible, this Circuit has emphasized that interim relief is appropriate to prevent actions that would effectively moot the litigation or destroy the very interests plaintiffs seek to protect. *See Wash. Metro.*, 559 F.2d at 844. A prompt, expedited hearing on Plaintiffs' Motion is therefore necessary to ensure that the Court's eventual ruling is not reduced to an academic exercise over a painted and permanently altered NHL.

**B. <u>A TRO Is Necessary to Preserve the Status Quo and Prevent Irreparable Harm Pending the Hearing</u>**

Even on an expedited schedule, Defendants could move quickly to lock in the Project—by issuing or awarding contracts, authorizing work orders, erecting scaffolding, beginning surface cleaning or repointing, or applying primer or initial paint—before the Court can hear argument and issue a reasoned decision. Ex. 1 ¶ 18; Ex. 14 ¶ 7. Once such activities begin on a historic

masonry façade, the damage is immediate and effectively irreversible; no later merits ruling can restore abraded granite, painted slate, or lost patina. *See* Ex. 1 ¶ 15; Ex. 12.

The purpose of interim equitable relief is "to maintain the status quo" and to prevent harm that would "destroy the very subject matter of the litigation." *Wash. Metro*, 559 F.2d at 844; *Camenisch*, 451 U.S. at 395 (stating that the purpose of a PI is "merely to preserve the relative positions of the parties until a trial on the merits can be held"). In the NEPA/NHPA context, this Court has granted TROs and PIs to prevent agencies from irreversibly altering protected resources before the required review and consultation are complete. *See, e.g.*, *Don't Tear It Down, Inc. v. Gen. Servs. Admin.*, 401 F. Supp. 1194, 1195 (D.D.C. 1975) (granting and extending TRO, then enjoining further work affecting the integrity of historic buildings until NHPA consultation and local preservation approvals were completed, recognizing Congress' intent to ensure careful consideration of historic values before irreversible demolition proceeds).

Here, preserving the status quo means keeping the EEOB in its current, historic, unpainted condition long enough for this Court to decide whether Defendants may lawfully proceed at all. Given the EEOB's NHL status and as a contributing resource within the Lafayette Square NHLD, any exterior work or related contracting and approvals for said work would cause permanent, irreparable harm and risk mooting this case before the Court can rule on the merits. Ex. 1 ¶ 15; Ex. 12. A TRO that bars Defendants and those acting in concert with them from issuing or awarding contracts, authorizing or commencing any exterior surface preparation, cleaning, repointing, priming, painting, coating, or other physical alteration of the EEOB's exterior pending the expedited hearing is therefore necessary to preserve the status quo and the Court's ability to grant effective relief.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully requests this Court GRANT its Motion for a Preliminary Injunction, Temporary Restraining Order, and Expedited Hearing.

Dated: November 17, 2025

Respectfully submitted,

**/s/ Gregory Alan Werkheiser, Bar No. VA210**
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025,
Washington, DC 20006
Tel: (202) 567-7594
Email: greg@culturalheritagepartners.com

**/s/ Marion Forsyth Werkheiser, Bar No. 486465**
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025,
Washington, DC 20006
Tel: (202) 567-7594
Email: marion@culturalheritagepartners.com

COUNSEL FOR PLAINTIFFS