# EXHIBIT 21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CULTURAL HERITAGE PARTNERS, PLLC, et al.**, | Civil Action No. 1:25-cv-03969-DLF |
| Plaintiffs, | |
| v. | **DECLARATION OF SHARON C. PARK, FAIA, FAPT** |
| **DONALD J. TRUMP, et al.**, | |
| Defendants. | |

**DECLARATION OF SHARON C. PARK, Fellow of the American Institute of Architects (FAIA), Fellow of the Association for Preservation Technology International (FAPT)**

I, SHARON C. PARK, under 28 U.S.C. § 1746 hereby declare:

1.  My name is Sharon C. Park. I am over the age of 18 and competent to testify. I have personal knowledge of the matters stated herein and could and would testify competently thereto if called as a witness.

2.  I am a retired licensed architect, architectural historian, and preservation consultant with over 40 years of professional experience in the conservation of historic masonry buildings. I have been admitted as a Fellow of the American Institute of Architects ("FAIA") and as a Fellow of the Association for Preservation Technology International ("FAPT") based on my expertise in architecture and architectural preservation. I hold a Bachelors in Architecture (Catholic University, 1971) and a Master of Arts in American Studies with a specialty in Historic Preservation (George Washington University) in architecture and historic preservation. I am retired from the Smithsonian, Associate

**DECLARATION OF SHARON C. PARK**

Director Emerita, and have worked primarily in Washington, D.C. I have worked on the restoration of numerous National Historic Landmarks and other significant properties.

3.   I was hired by the National Park Service in 1980, starting as a reviewer of historic tax credit projects and served as the Chief of Technical Preservation Services, a position I held from 1997 to 2007. During my 27-year history with the National Park Service, serving as Chief of Technical Preservation Services, I was the primary author of numerous technical bulletins and Preservation Briefs outlining best practices for preservation. These published documents, under my guidance, were driven by the Secretary of the Interior's Standards for Preservation.

4.   My initial position at the Smithsonian was as a preservation officer in the Office of Planning Design and Construction. In that position I was responsible for technical review of infrastructure improvements and preservation approaches of the Smithsonian's more than 40 historic buildings including five National Historic Landmark buildings and sites on the Mall in Washington, D.C., and other areas.  I was part of the team establishing preservation treatments for the masonry of the Smithsonian Institution Building (Castle), the Arts and Industries Building, the Carnegie Mansion in NYC, the Old Patent Office Building (American Art and Portraiture), and the Renwick Gallery – all National Historic Landmarks under my care. In addition, I was the U.S. Representative to the International Center for the Study of Preservation and Restoration of Cultural Property ("ICCROM") from 2009 to 2017. ICCROM sets standards and training internationally for buildings of the caliber of both local as well as landmark buildings, such as the Eisenhower Executive Office Building ("EEOB").

**DECLARATION OF SHARON C. PARK**

5.  I have spent 40 years of my career evaluating the condition of historic masonry, developing treatment recommendations consistent with the Secretary of the Interior's Standards for Rehabilitation, and overseeing restoration projects. I have also managed the Historic Tax Credit Program for rehabilitating historic buildings to which all applicants must adhere, including review of grants or other public or private means of funding especially for National Historic Landmarks, our highest designation of significance of national heritage buildings and sites.

6.  I submit this declaration at the request of Plaintiffs to explain why painting the EEOB would irreparably damage its historic fabric and setting. The opinions expressed herein are based on my expertise and on my review of publicly available documents cited below.

7.  The EEOB, originally called the State, War, and Navy Department Building, is one of the nation's most important examples of French Second Empire civic architecture. According to the U.S. General Services Administration's web page titled "Eisenhower Executive Office Building, Washington, DC" (updated January 16, 2025), the building was constructed between 1871 and 1888, designed by Supervising Architect Alfred B. Mullett, and designated a National Historic Landmark in 1969. The page states that the exterior consists of granite walls with cast-iron trim and slate roofs. A true and correct copy of the GSA page is attached as Exhibit 6.

8.  The GSA has described the EEOB as "the most elaborate building in the [agency's] inventory." At the time of its completion, it was one of the largest office buildings in Washington, D.C. A true and correct copy of that statement, which can be found on page

**DECLARATION OF SHARON C. PARK**

87 of the publication titled "U.S. GSA, *Extending the Legacy: GSA Historic Building Stewardship*, 2011," is attached as Exhibit 16.

9.  To my knowledge, the granite exterior walls and slate roof elements of the EEOB have never previously been painted; they appear to be unpainted. Historically, the aesthetic values of these materials and their value and cost would typically mean that their builders would not paint these materials.

10. Granite and slate are both exterior coverings that require little ongoing maintenance compared with painted materials. The GSA describes slate as a "permanent material that is waterproof, fireproof, resistant to climatic changes, and requires no preservative coatings or paint, and no cleaning, resulting in lower insurance premiums, higher property values, little or no maintenance costs, and a high salvage value." A true and correct copy of that state is attached as Exhibit 19 at 1.

11. The White House Historical Association's (the "Association") press release dated December 13, 2023, announcing its "Palace of State" podcast episode, calls the EEOB a "masterpiece of Second Empire style" and notes that its granite, slate, and cast-iron exterior has stood for more than 150 years and has survived threats of demolition and alteration. A true and correct copy of that press release is attached as Exhibit 7 at 1–2. Another article by the Association, "The President's Park (Give or Take a Few Acres)," (Apr. 1, 2010), explains that the President's Park was planned to include executive office buildings flanking the White House and that Thomas Jefferson la1ter fenced off the White House grounds, leaving the executive office site (now the EEOB) outside that precinct. A true and correct copy of that article is attached as Exhibit 8. These documents

**DECLARATION OF SHARON C. PARK**

underscore the building's national significance and its integral relationship to the White

House complex.

12. Federal preservation documents confirm that the EEOB is subject to the National Historic

Preservation Act. A draft National Park Service map of the Lafayette Square Historic

District (May 2013) explains that the White House and its grounds are legally exempt

under Section 107 of the Act but shows the Old Executive Office Building (the EEOB) as

a contributing building within the district. A true and correct copy of that map is attached

as Exhibit 9. The District of Columbia Historic Preservation Review Board's staff report

for the Case No. 22-13, the Lafayette Square Historic District (Additional Documentation

and Boundary Increase), dated September 29, 2022, similarly states that the White House

and its grounds are exempt but lists the Old Executive Office Building among the

contributing buildings. A true and correct copy of that map is attached as Exhibit 10.

Because the EEOB is a National Historic Landmark and a contributing resource to the

Lafayette Square NHLD, any work affecting its exterior is subject to Section 106 and

Section 110(f) of the NHPA.

13. The EEOB's historic character depends on its unpainted gray granite and slate exterior.

Granite is a dense, nonporous stone that, when polished, has a naturally smooth surface.

Slate is a fine-grained, slightly porous metamorphic stone. Both materials have

performed well for more than 140 years precisely because they have been allowed to

breathe and have not been coated. Painting these materials would require altering their

surfaces and would dramatically change their appearance.

14. Under all the preservation standards and technical guidance with which I am familiar and

to which I have contributed, historic masonry buildings are to be maintained in their

**DECLARATION OF SHARON C. PARK**

original materials and not coated or otherwise painted. One reason for masonry to remain
unpainted is because painting a building that was not originally painted is an action that
changes the building's historic character by introducing an appearance different from
how the building has traditionally looked over time. Painting a historic masonry building
is therefore an adverse effect that damages one of the characteristics, the exterior wall
appearance, that contributes towards its eligibility for the National Register of Historic
Places.

15. Another reason that preservation standards and technical guidance recommend against
painting or otherwise sealing or coating masonry is because these activities commonly
lead to future moisture entrapment and deterioration. There is a long history of masonry
buildings suffering future deterioration after being painted.

16. The Secretary of the Interior's Standards for Rehabilitation caution against painting
masonry that has historically been unpainted and warn that such treatments, as well as
abrasive cleaning or improper repointing, can irreversibly damage historic materials.

17. To make paint adhere to polished granite or slate, the surface must be mechanically
abraded (through sanding or grinding) or chemically etched to create a profile for the
coating. Abrasion destroys the original finish and exposes the stone to accelerated
weathering. Chemical etching (with acids or alkalis) can open pores and create staining or
weakening. Once the stone's finish has been altered, it cannot be restored without
removal of additional material, resulting in permanent loss of historic fabric. These
concerns are reflected in preservation guidance such as Anne E. Grimmer's *The Cleaning
and Waterproof Coating of Masonry Buildings* (1984), a publication of the National Park
Service's Technical Preservation Services, which explains that painting previously

**DECLARATION OF SHARON C. PARK**

unpainted masonry can trap moisture and cause spalling and that chemical paint removal can further damage the stone. A true and correct copy of this publication is attached as Exhibit 12.

18. Painting slate or granite creates a vapor-impermeable barrier. Because slate and historic lime-based mortars are designed to allow moisture to migrate through the wall assembly, applying paint traps moisture behind the coating. Trapped moisture freezes and thaws, leading to cracking, scaling, and spalling of the stone. The Link Solutions article "How to Rejuvenate Old Slate Stone with Paint" (2025) notes that slate's porosity makes it vulnerable to cracking and spalling when moisture becomes trapped beneath paint; the article also describes the need for chemical treatments and sanding to prepare slate for painting, which alters its surface. A true and correct copy of that article is attached as Exhibit 17. If painting proceeds, the building will require ongoing maintenance; a 2025 article by the Federal Performance Contracting Coalition titled "How Often Should You Repaint Your Commercial Property?" advises that large commercial buildings should be repainted every five to seven years, meaning the EEOB would be placed on a continual repainting cycle. A true and correct copy of that article is attached as Exhibit 11.

19. Repointing the EEOB with incompatible mortars would likewise damage the masonry. The building's original mortar likely contains lime and natural hydraulic cement, which are softer and more vapor permeable than modern Portland cement. Using a hard, impermeable mortar in repointing can trap moisture and cause stresses that lead to cracking and spalling of adjacent stone. Cleaning with high-pressure water or abrasive blasting will erode the surface and force water into the stone. Painting over repointed joints would further exacerbate moisture problems. Preservation standards require that

**DECLARATION OF SHARON C. PARK**

mortar composition and cleaning methods be compatible with the original materials. The EEOB's masonry is a complex and delicate system that has functioned successfully without coatings for more than a century; altering that system risks irreversible failure.

20. Under the regulations at 36 C.F.R. § 800.5(a)(2)(ii), the President's plan for "cleaning, pointing, and painting" will constitute an adverse effect on the EEOB. Examples of adverse effects provided in 36 CFR 800.5 include types of alteration, restoration, rehabilitation, repair, and maintenance that are not consistent with the Secretary's standards for the treatment of historic properties and applicable guidelines. 36 CFR 800.5(a)(2)(ii). The SOI Standards recommend against applying paint or other coatings to masonry that has been historically unpainted or uncoated; needlessly introducing chemicals or moisture into historic materials through unnecessary cleaning; removing paint that is firmly adhered to masonry; and repointing masonry units when not needed or in a manner that does not match the original mortar content and repointing methods. *See* Exhibit 18 at 168. Guidance from the U.S. GSA for repairing slate roofs states that "color and appearance shall match existing as closely as possible." A true and correct copy of that statement is attached as Exhibit 20.

21. Painting the EEOB would also damage the historic setting of the Lafayette Square NHLD. The building's dark gray stone façade provides a visual contrast to the white limestone of the White House and anchors the west side of the square. Repainting it white would dramatically alter the district's views and the public's experience of President's Park. Such a change would diminish the integrity of setting, feeling, and association that contribute to the district's National Historic Landmark status.

**DECLARATION OF SHARON C. PARK**

22. If the EEOB were painted, the damage would be permanent and not compensable in money damages. Once historic granite and slate have been abraded, sealed, or coated, the original surfaces and patina cannot be restored. Removal of paint from polished stone risks staining, profiling, and loss of material, and cannot reverse the impact on the building's appearance. Furthermore, painting would commit the government to recurring maintenance expenditures and would divert funds from appropriate preservation work.

23. To my knowledge, no environmental assessment, environmental impact statement, or Section 106 consultation has been conducted for the proposed EEOB project. In my professional opinion, the project constitutes an undertaking with the potential to directly and adversely affect a National Historic Landmark, requiring consultation pursuant to Section 106 and Section 110(f) and analysis under NEPA. Proceeding without such review risks irreversible harm to one of the nation's most significant historic buildings and to the Lafayette Square NHLD.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 17, 2025, in Arlington, Virginia.

_____

Sharon C. Park, FAIA, FAPT

**DECLARATION OF SHARON C. PARK**