## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CULTURAL HERITAGE PARTNERS, PLLC, et al.**, | Civil Action No. 1:25-cv-03969-DLF |
| Plaintiffs, | |
| v. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| **DONALD J. TRUMP, et al.**, | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ................................................................................................................... 1

PROCEDURAL AND FACTUAL BACKGROUND ............................................................. 3

STANDARD OF REVIEW ..................................................................................................... 5

I.    Preliminary Injunction Standard ............................................................................... 5

II.   Standard of Review Under the APA .......................................................................... 6

I.    Plaintiffs Have Standing, the Case Is Ripe, and Defendants' Voluntary "Pause" Does
      Not Moot the Dispute ................................................................................................. 7
      A.  Plaintiffs meet Article III through concrete and procedural harms. ............................ 7
      B.  The APA authorizes review and remedies for Plaintiffs' NEPA and NHPA claims. ... 8
      C.  NEPA's "proposal" and NHPA's "undertaking" thresholds are met; these are ripe,
          project-specific challenges, not abstract policy disputes. ............................................. 9
      D.  Defendants' time-limited "pause" and litigation declarations do not satisfy the
          voluntary cessation standard or eliminate the live controversy. ................................... 11

II.   Plaintiffs Are Likely to Succeed on Their NEPA and NHPA Claims ......................... 12
      A.  NEPA: The President's painting plan requires environmental review now. ............... 12
      B.  NHPA: Painting the EEOB is a federal "undertaking" that triggers Sections 106 and
          110(f). ............................................................................................................................. 14

III.  The Court can Remedy Violations of the APA and Separation of Powers ................. 18
      A.  NEPA and NHPA duties are discrete, mandatory actions reviewable under the APA. 18
      B.  Relief properly runs against agencies, but the President is a proper party and Count V
          should not be dismissed. ................................................................................................. 18
      C.  The Take Care Clause requires fidelity to NEPA, NHPA, and appropriations statutes—
          not freedom from them. .................................................................................................. 20
      D.  Appropriations law and the Antideficiency Act confirm the painting project cannot
          lawfully proceed—whether funded by appropriations or private money. .................... 21

IV.   The Remaining Preliminary Injunction Factors Strongly Favor Plaintiffs ............... 22
      A.  Plaintiffs face irreparable harm from both the physical painting of a National Historic
          Landmark and the loss of NEPA and NHPA procedures. ............................................ 22
      B.  The balance of equities favors preserving the status quo over Defendants' self-inflicted
          complaints about delay. .................................................................................................. 23

V.    Defendants' Silence on Key Points Confirms the Need for Relief ............................... 24

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Building & Construction Trades Department, AFL-CIO v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002) ..........................................................................20, 21

* *Center for Biological Diversity v. U.S. Fish & Wildlife Service,*
  146 F.4th 1144 (D.C. Cir. 2025) .......................................................................... 7

*Chamber of Commerce of the United States v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) .............................................................................19

*Citizens Against Rails-to-Trails v. Surface Transportation Board,*
  267 F.3d 1144 (D.C. Cir. 2001) ............................................................................. 6

* *Citizens for Responsibility & Ethics in Washington v. Trump,*
  302 F.Supp.3d 127 (D.D.C. 2018) .......................................................................20

*City of Erie v. Pap's A.M.,*
  529 U.S. 277 (2000) .............................................................................................12

*Clapper v. Amnesty International USA,*
  568 U.S. 398 (2013) ............................................................................................. 8

*Dalton v. Specter,*
  511 U.S. 462 (1994) .............................................................................................20

*Davis & Associates v. District of Columbia,*
  501 F.Supp.2d 77 (D.D.C. 2007) .........................................................................22

* *Don't Tear It Down, Inc. v. General Services Administration,*
  401 F.Supp. 1194 (D.D.C. 1975) .........................................................................10

* *Franklin v. Massachusetts,*
  505 U.S. 788 (1992) .............................................................................................19

* *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*
  528 U.S. 167 (2000) .....................................................................................7, 8, 11

*Global Health Council v. Trump,*
  153 F.4th 1 (D.C. Cir. 2025) ................................................................................20

*Grand Canyon Trust v. Williams,*
  38 F.Supp.3d 1073 (D. Ariz. 2014) ................................................................8, 18

* *Hale v. Executive Office of the President,*

784 F.Supp.3d 127 (D.D.C. 2025) ...................................................................... 11

*Hopkins v. Women's Division, General Board of Global Ministries*,
238 F.Supp.2d 174 (D.D.C. 2002) .................................................................. 7, 24

* *In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) ............................................................... 19, 20, 21

*In re Navy Chaplaincy*,
534 F.3d 756 (D.C. Cir. 2008) ............................................................................ 8

*Kendall v. United States ex rel. Stokes*,
37 U.S. 524 (1838) ................................................................................ 19, 20, 21

* *Kleppe v. Sierra Club*,
42 U.S. 390 (1976) ...................................................................................... 12, 13

* *League of Women Voters of the United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .............................................................................. 24

* *Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......................................................................................... 6

*Marsh v. Oregon Natural Resource Council*,
490 U.S. 360 (1989) .......................................................................................... 8

*Muckleshoot Indian Tribe v. U.S. Forest Service*,
177 F.3d 800 (9th Cir. 1999) ............................................................................. 6

*Munaf v. Geren*,
553 U.S. 674 (2008) .......................................................................................... 5

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) ....................................................................... 19

*National Park Hospitality Association v. Department of Interior*,
538 U.S. 803 (2003) ........................................................................................ 11

*National Treasury Employees Union v. United States*,
444 F.Supp.3d 108 (D.D.C. 2020) ................................................................... 22

* *National Trust for Historic Preservation v. Blanck*,
938 F.Supp. 908 (D.D.C. 1996) ........................................................ 6, 10, 14, 15

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................ 24

*Norton v. Southern Utah Wilderness Alliance*,
   542 U.S. 55 (2004) .................................................................................... *Passim*

* *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Commission*,
   896 F.3d 520 (D.C. Cir. 2018) ........................................................................ 23

*People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*,
   797 F.3d 1087 (D.C. Cir. 2015) ....................................................................... 7

* *Presidio Hist. Association v. Presidio Trust*,
   811 F.3d 1154 (9th Cir. 2016) ....................................................................... 15

*Seven County Infrastructure Coalition v. Eagle County*,
   605 U.S. 168 (2025) ...................................................................................... 6

*Save the Courthouse Committee v. Lynn*,
   408 F.Supp. 1323 (D. N.Y. 1975) .............................................................. 10, 14

*Seila Law LLC v. Consumer Financial Protection Bureau*,
   591 U.S. 197 (2020) .................................................................................. 20, 21

* *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission*,
   481 F.2d 1079 (D.C. Cir. 1973) ................................................................... 9, 12

*Sierra Club v. Costle*,
   657 F.2d 298 (D.C. Cir. 1981) ..................................................................... 20, 21

*Sierra Club v. Marsh*,
   872 F.2d 497 (1st Cir. 1989) ........................................................................ 10

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) ...................................................................................... 8

* *Sierra Club v. Peterson*,
   717 F.2d 1409 (D.C. Cir. 1983) ................................................................... 9, 12

* *Sierra Club v. U.S. Department of Agriculture*,
   777 F.Supp.2d 44 (D.D.C. 2011) .................................................................... 6

* *United States v. Jabr*,
   4 F.4th 97 (D.C. Cir. 2021) .......................................................................... 17

* *United States v. Jabr*,
   No. 18-0105 (PLF), 2019 U.S. Dist. LEXIS 238718 (D.D.C. May 16, 2019).................... 17

* *Winter v. Natural Resource Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................ 5, 6

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 701–706

5 U.S.C. § 551(13) ................................................................................................ 6

5 U.S.C. § 702 ................................................................................................... 6, 8

5 U.S.C. § 704 ..................................................................................................... 6

* 5 U.S.C. § 706(1) .............................................................................. 6, 8, 18, 24

5 U.S.C. § 706(2)(A) .......................................................................................... 24

* 5 U.S.C. § 706(2)(D) ......................................................................... 6, 8, 18, 24

The Antideficiency Act, 31 U.S.C. § 1341, § 1342, §§ 1349–1351 and §§ 1511–1519

* 31 U.S.C. 1341(a)(1)(A)-(B) ............................................................................ 21

National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h

* 42 U.S.C. § 4332(C) ..................................................................................... 9, 12

42 U.S.C § 4332(C)(iii) ...................................................................................... 13

* 42 U.S.C. § 4336e(12) .............................................................................. 9, 12, 13

National Historic Preservation Act, 54 U.S.C. §§ 54 U.S.C. §§ 300101–307108

54 U.S.C. § 300320 ........................................................................................ 9, 14

* 54 U.S.C. §§ 302101–102 ................................................................................. 16

* 54 U.S.C. § 304108(a) ...................................................................................... 17

* 54 U.S.C. § 304108(c) ...................................................................................... 18

* 54 U.S.C. § 306107 ..................................................................................... 15, 16

* 54 U.S.C. § 306108 .......................................................................................... 14

* 54 U.S.C. § 307104 .......................................................................................... 16

Title 40, Public Buildings, Property, and Works

40 U.S.C. § 3305 ............................................................................................................ 22

**Public Laws and Reorganization Plans**

Act Concerning the White House and Providing for the Care and Preservation of Its Historic and
Artistic Contents,
      Pub. L. No. 87-286, 75 Stat. 586 (1961) ...................................................... 16, 17

Reorganization Plan No. 18 of 1950,
      64 Stat. 1270 .................................................................................................... 16

**Regulations**

36 C.F.R. pt. 65 .............................................................................................................. 16

36 C.F.R. § 800.3(a) ....................................................................................................... 14

36 C.F.R. §§ 800.3–800.6 .............................................................................................. 14

* 36 C.F.R. § 800.10 ................................................................................................. 15, 16

36 C.F.R. § 800.14(c) ..................................................................................................... 18

36 C.F.R. § 800.16(y) ................................................................................................... 9, 14

48 C.F.R. § 2.101 ........................................................................................................... 10

48 C.F.R. § 14.404-1 ...................................................................................................... 13

**Federal Rules of Civil Procedure**

Federal Rule of Civil Procedure 19(a)(1) ...................................................................... 16

**Miscellaneous**

Brianna Tucker, *Trump administration agrees not to paint the Eisenhower building before 2026*,
WASH. POST (Nov. 19, 2026), https://wapo.st/48keCCo ................................................... 5

Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Oct. 31, 2025, at 1:24PM ET),
https://truthsocial.com/@realDonaldTrump/posts/115469942090837414 ........................ 4

Gabe Gutierrez et al., *White House's entire East Wing to be demolished 'within days' officials say*,
NBC NEWS, (Oct. 22, 2025), https://shorturl.at/DWCrt ................................................... 4

Luke Broadwater, *Inside Trump's Push to Make the White House Ballroom as Big as Possible*, N.Y. TIMES (Nov. 29, 2025), https://www.nytimes.com/2025/11/29/us/politics/trump-white-house-ballroom.html# ....................................................................................................................2

Nardine Saad & Kwasi Gyamfi Asiedu, *What we know about White House plans for an 'Arc de Trump'*, BBC, (Oct. 16, 2025), https://shorturl.at/ddinh ....................................................................4

*White House Announces White House Bathroom Construction to Begin,* THE WHITE HOUSE, (July 31, 2025), https://shorturl.at/agksM ....................................................................................................4

Zac Anderson, *Trump adds Kennedy Center, Lincoln bathroom to DC Makeover*, USA TODAY, (Aug. 22, 2025), https://shorturl.at/IBAyF ..............................................................................................4

## INTRODUCTION

This case could end quickly if the General Services Administration ("GSA") simply did the job Congress gave it. As Mydelle Wright—GSA's former senior official who oversaw the Eisenhower Executive Office Building ("EEOB") for nearly two decades and literally wrote the book on it—explains, that job includes starting public and expert review under the National Environmental Policy Act ("NEPA") and the National Historic Preservation Act ("NHPA") and coordinating with the National Park Service ("NPS") on effects to this National Historic Landmark ("NHL") before irreversible decisions are made. If GSA followed those obligations, everyone—including the President—would benefit from an open, informed process. Plaintiffs, the public, and experts could help the President to achieve many of his stated goals for a brighter, cleaner EEOB. The only universally condemned idea is painting the building, which GSA's own guidance rejects.

Twenty-five (25) of the Nation's foremost experts in historic preservation, law, architecture, building conservation, and management have stepped forward to offer sworn declarations to the court affirming one or more of these facts. First, the EEOB is fully subject to required processes under NEPA and NHPA. Second, the GSA should have initiated NEPA and NHPA processes as soon as the agency became aware that the President was contemplating alterations to the EEOB, and the delay is injurious to the public. Third, painting the EEOB will result in permanent, irreparable harm to the building.

GSA has not begun the required consultation, and the record shows why: agency leadership has not restrained the President. The White House will not confirm he will honor even GSA's short

pause, and GSA will not say when—or whether—it will initiate NEPA and NHPA processes. That continuing failure to act is the irreparable harm Plaintiffs and the public now experience.[1]

Congress put the EEOB in GSA's custody, with pre-alteration duties, and charged NPS with protecting NHLs. The President is not free to step around that framework by treating a federal building as personal property—privately "getting bids from painters" or directing subordinates to move a project forward outside the law. His involvement does not shield GSA, NPS, or any implementing agency from judicial review when they ignore statutory duties.

Defendants wave away the President's statements as casual remarks. They were not. In the same interview where he said he was "getting bids right now," he displayed professional renderings of the EEOB painted white—public evidence of planning and vendor engagement already underway. His recent history underscores the risk: he assured the public the East Wing would not be harmed for his ballroom; shortly thereafter the East Wing was demolished with no meaningful public process.[2] GSA now tells the Court it has not solicited bids—an action far along in planning—while the White House has not denied the President's account. The only way to reconcile those facts is that project planning is proceeding off the books. Either way, there is not "nothing to review" or "nothing to enjoin."

Nor does GSA's temporary pause on applying paint solve the problem. The pause covers only certain "physical actions" for a short period. GSA does not commit to initiating NEPA or NHPA during that window; does not promise to refrain from planning, design, or procurement while physical work is on hold; and says nothing about what happens when the pause expires.

---

[1] *See* Luke Broadwater, *Inside Trump's Push to Make the White House Ballroom as Big as Possible*, N.Y. TIMES (Nov. 29, 2025), https://www.nytimes.com/2025/11/29/us/politics/trump-white-house-ballroom.html#.
[2] *See id.*

Meanwhile, the White House has made plain the President does not view himself as bound by ordinary statutory guardrails. The record shows an active project advancing in the dark, without the public processes Congress required.

The Court need not issue an order directly against the President. It can issue a narrower remedy that still protects the building and the public: require GSA (and, as appropriate, NPS) to begin to carry out the NEPA and NHPA consultation processes that the statutes mandate and that the current approach bypasses. That step would halt ongoing procedural violations, invite public and expert input, ensure compliance with federal law, and give the Court and the public visibility into whatever project is actually being developed.

Defendants' theory, if accepted, would have sweeping consequences far beyond the EEOB. GSA itself calls the EEOB the most complex structure in its portfolio. Historic places nationwide depend on the same protections. Under Defendants' view, any president could announce a major federal project, lean on or bypass agencies, and then claim NEPA, NHPA, and the Administrative Procedure Act ("APA") do not apply, because no final paper has been signed. That is not how the statutes, "final agency action," or separation of powers work.

This Court has the authority—and the obligation—to prevent agencies from avoiding their duties by doing nothing. Plaintiffs ask only for an order compelling Defendants to start the processes they have unlawfully refused to begin.

## PROCEDURAL AND FACTUAL BACKGROUND

Completed in 1888 with a granite and slate exterior, the EEOB has historically been maintained by cleaning the granite and repointing mortar to preserve its intended appearance and integrity. In 1966, Congress enacted NHPA; in 1969, the Secretary of the Interior ("SOI") listed the EEOB on the National Register of Historic Places. Congress then passed NEPA in 1969 (signed in 1970), adding complementary protections for historic resources. In 1971, the SOI designated

the EEOB an NHL—reserved for properties of exceptional national significance, based in part on its distinctive architecture—and added it to the Lafayette Square National Historic Landmark District ("Lafayette Square NHLD"), further heightening its protections. *See* Exhibit 7.

Beginning in July 2025 President Trump began making frequent public statements and Truth Social posts outlining plans to dramatically alter portions of the White House and its surrounding historic landscape—including building a ballroom nearly twice the size of the White House, removing the Lincoln bathroom, and constructing an "Arc de Trump" near the Lincoln Memorial.[3] On July 31, 2025, he assured the public the ballroom "would not interfere with the current [White House] building."[4] On August 7, 2025, he posted a photo of the EEOB with a white stone rendering, calling it "beautiful… in its original grey stone" and suggesting how it "would have looked in white stone." *See* ECF No. 7-4. On August 22, 2025, he said of the EEOB: "It's such a beautiful building, but it doesn't look it."[5]

Then, between October 21 and 23, 2025, contractors—without public notice—demolished the entire White House East Wing at the President's direction. *See* ECF No. 7-6.

On November 10, 2025, in an interview on Fox's "Ingraham Angle" (aired November 12), the President discussed the EEOB, showed professional renderings with the exterior painted stark white, called its appearance "ugly," and said: "I am getting bids right now from painters."

---

[3] *See* Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Oct. 31, 2025, at 1:24PM ET), https://truthsocial.com/@realDonaldTrump/posts/115469942090837414; Nardine Saad & Kwasi Gyamfi Asiedu, *What we know about White House plans for an 'Arc de Trump'*, BBC, (Oct. 16, 2025), https://shorturl.at/ddinh; Zac Anderson, *Trump adds Kennedy Center, Lincoln bathroom to DC Makeover*, USA TODAY, (Aug. 22, 2025), https://shorturl.at/IBAyF; *White House Announces White House Bathroom Construction to Begin,* THE WHITE HOUSE, (July 31, 2025), https://shorturl.at/agksM.

[4] *See* Gabe Gutierrez et al., *White House's entire East Wing to be demolished 'within days' officials say*, NBC NEWS, (Oct. 22, 2025), https://shorturl.at/DWCrt.

[5] *See* Anderson, *supra* note 3.

Defendants do not dispute these statements.[6] *See* ECF No. 7-5. On November 14, 2025, Plaintiffs filed the Complaint. ECF No. 1. Three days later, they moved for a TRO, preliminary injunction, and expedited hearing, with supporting memorandum, declarations, and exhibits. ECF Nos. 7–7-23. On November 18, GSA PBS Acting Commissioner Andrew Heller submitted a declaration ("First Heller Decl.") stating GSA would not paint the EEOB before December 31, 2025. ECF No. 11-1 ¶¶ 3–4. That day, the Court set a briefing schedule and a December 8 hearing. Minute Order (Dec. 2, 2025). On November 19, the Washington Post reported the White House declined to confirm the President would honor GSA's assurance and derided Plaintiffs as suffering "Trump Derangement Syndrome."[7]

Defendants filed their Opposition. ECF No. 15. A second Declaration from Mr. Heller extended GSA's pause to March 1, 2026, ECF No. 15-1 ("Second Heller Decl.") but did not say whether the President would honor it, did not commit to initiating NHPA or NEPA processes, did not contest the President's statement that he "is getting bids right now," and stated only that GSA itself has not solicited bids. Plaintiffs file this Reply today.

## STANDARD OF REVIEW

### I.    Preliminary Injunction Standard

Plaintiffs must make a "clear showing" that relief is warranted because a preliminary injunction is an "extraordinary" remedy. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008); *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). Courts consider: (1) likelihood of success on the

---

[6] Plaintiffs used a professional transcription service that improperly rendered the President's use of the word "if" as "when" when he was discussing his plans. Defendants correctly spotted the error, but it has no legal significance. The operative phrase for the legal triggers under NEPA and NHPA is "I am getting bids right now from painters" because it shows that the President (not GSA), is getting bids (a late stage of planning), right now (the act is in progress) from painters (vendors whose services pose a direct threat to the integrity of the NHL.)

[7] Brianna Tucker, *Trump administration agrees not to paint the Eisenhower building before 2026*, WASH. POST (Nov. 19, 2026), https://wapo.st/48keCCo.

merits; (2) likelihood of irreparable harm; (3) the balance of equities; and (4) the public interest. *Winter*, 555 U.S. at 20. Plaintiffs meet this standard: they are likely to succeed, face imminent irreparable harm, and the equities and public interest favor preserving the status quo.

## II.  Standard of Review Under the APA

The APA permits suit by a "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Where statutes like NEPA and NHPA lack a private right of action, review is available for "final agency action," including "failure to act." *Id*. §§ 551(13), 704. Courts "compel agency action unlawfully withheld or unreasonably delayed" when an agency fails to take a discrete, legally required action, and "hold unlawful and set aside" actions taken "without observance of procedure required by law." *Id*. §§ 706(1); 706(2)(D); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

Courts reviewing an existing NEPA document or past NHPA action apply the APA's deferential "arbitrary and capricious" standard. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 804 (9th Cir. 1999); *Nat'l Tr. for Hist. Pres. v. Blanck*, 938 F.Supp. 908, 920–22 (D.D.C. 1996).

By contrast, whether an agency has unlawfully failed to act—as here, refusing to complete an environmental document or conduct consultation—is a legal question. *See Seven Cnty.*, 605 U.S. at 180–81; *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392–94 (2024). When an agency concludes "that NEPA is wholly inapplicable to its actions," that threshold determination is not entitled to deference and is reviewed de novo. *Sierra Club v. U.S. Dep't of Agric.*, 777 F.Supp.2d 44, 54 (D.D.C. 2011); *see also Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150–51 (D.C. Cir. 2001).

## ARGUMENT

I.    **Plaintiffs Have Standing, the Case Is Ripe, and Defendants' Voluntary "Pause" Does Not Moot the Dispute**

A.    <u>**Plaintiffs meet Article III through concrete and procedural harms.**</u>

Defendants do not contest Plaintiffs' associational, organizational, or procedural standing;[8] their opposition focuses only on individual standing of Gregory Werkheiser and Marion Werkheiser and claims Plaintiffs' "sole alleged injury is aesthetic" and "remote, speculative, conjectural, or hypothetical" to support jurisdiction. ECF No. 15 at 21, 28. That misreads both Article III and this record.

Gregory Werkheiser and Marion Werkheiser regularly visit and experience the White House complex, Lafayette Square NHLD, President's Park, and the area around the EEOB. G. Werkheiser Decl. ¶¶ 5–7, 13 (ECF No. 7-15); M. Werkheiser Decl. ¶¶ 5–7, 17, 19 (ECF No. 7-3). Their supplemental declarations explain how cleaning, repointing, and painting the EEOB's granite exterior would permanently alter the historic character and views they value and share with others for aesthetic *as well as* recreational, professional, and education purposes—including on planned future visits in early 2026. M. Werkheiser Supp. Decl. ¶¶3–6 (Exhibit 1); G. Werkheiser Supp. Decl. ¶¶ 17–37 (Exhibit 2). The courts recognize these as classic, site-specific injuries qualifying as injury in fact. *See Friends of the Earth, Inc. v. Laidlaw Envt. Servs. (TOC), Inc.*, 528

---

[8] Defendants are silent on Plaintiffs' other bases for standing. They do not contest any Plaintiff's procedural standing under NEPA and NHPA; DC Preservation League's ("DCPL") associational standing (based on an identified member who regularly uses and interprets views of the EEOB and Lafayette Square NHLD); or DCPL's organizational standing (injury to the organizations themselves through diversion of staff and attorney time and frustration of mission). Those unrebutted allegations easily satisfy this Circuit's standards for associational standing, *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157 (D.C. Cir. 2025), and organizational standing, *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093–95 (D.C. Cir. 2015). Having had a full opportunity to respond and chosen not to, Defendants have effectively conceded these grounds for standing. *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F.Supp.2d 174, 178 (D.D.C. 2002).

U.S. 167, 181–83 (2000); *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972). Defendants' decision to label them "sole[ly]…aesthetic," ECF No. 15 at 28, confirms standing; it does not defeat it.

Defendants' principal standing cases are inapposite. *Clapper v. Amnesty International USA*, 568 U.S. 398, 409–15 (2013), turned on a speculative chain of contingencies in the foreign intelligence context. *In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008), involved ideological disagreement with internal promotion policies divorced from concrete, individualized harm. Here, Plaintiffs challenge a concrete federal project—cleaning, repointing, and painting the exterior of a granite NHL they see, use, and study—publicly announced by the President who is "getting bids right now from painters" and advanced outside any NEPA or NHPA process. That is not "remote, speculative, conjectural, or hypothetical." It is exactly the kind of imminent, site-specific harm Article III recognizes.

**B.  The APA authorizes review and remedies for Plaintiffs' NEPA and NHPA claims.**

Defendants next argue there is "no [final agency] action that is ripe for judicial review." ECF Nos. 15 at 8; 23–26; 29. This misunderstands both the APA and Plaintiffs' claims.

Plaintiffs bring their NEPA and NHPA claims through the APA. *See* 5 U.S.C. § 702; ECF Nos. 1; 71. The APA directs courts to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside agency action" taken "without observance of procedure required by law." 5 U.S.C. §§ 706(1), (2)(D). NEPA's obligation to prepare an environmental document for proposed major federal actions, and NHPA's obligations to initiate § 106 consultation and, for NHLs, § 110(f) planning, are discrete, mandatory duties that attach once the statutory triggers are met. When an agency fails to undertake a required step—an "agency action unlawfully withheld"— any resulting approval can be set aside under § 706(2)(D). *See Norton*, 542 U.S. at 64, 73; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989); *Grand Canyon Tr. v. Williams*, 38 F.Supp.3d 1073, 1083 (D. Ariz. 2014).

Plaintiffs do not ask this Court to supervise an abstract "beautification program" or opine on hypothetical future painting. They challenge Defendants' failure to initiate NEPA and NHPA §§ 106 and 110(f) for the President's concrete plan to clean, repoint, and paint the EEOB's exterior and seek (1) an order compelling GSA and NPS to begin those processes and (2) an injunction barring physical or contractual steps toward painting until review is complete—standard APA remedies. The statute does not shrink to a single "final agency action" tied to a contract or finished NEPA document, and GSA's and NPS's refusal to start required procedures in the face of presidential project planning is reviewable agency inaction. *See Norton*, 542 U.S. at 64.

**C.  NEPA's "proposal" and NHPA's "undertaking" thresholds are met; these are ripe, project-specific challenges, not abstract policy disputes.**

Defendants argue that Plaintiffs' claims are unripe because GSA has not yet issued a solicitation, awarded a contract, or commenced physical work to clean, paint, or repoint the EEOB, and because "and *the President* has said it may not happen." ECF No. 15 at 23–25 (emphasis added). That is not how NEPA or NHPA works.

NEPA is triggered as soon as an agency has jurisdiction over a proposal for a major federal action with a known objective and is preparing to choose among ways of accomplishing it—so that environmental review can meaningfully inform the decision. 42 U.S.C. §§ 4332(C), 4336e(12); *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1094 (D.C. Cir. 1973); *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983). NEPA's "point of commitment" doctrine exists precisely to prevent agencies from postponing review until after they have made project commitments. *Peterson*, 717 F.2d at 1414.

NHPA is similarly triggered once there is a federal "undertaking"—a proposed project, activity, or program carried out by or on behalf of a federal agency, or requiring federal approval, that may affect historic properties. 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y). Courts have

repeatedly emphasized that § 106 consultation and § 110(f) planning must occur early in the planning process, before a project begins. *See Blanck*, 938 F.Supp. at 919–24; *Don't Tear It Down, Inc. v. Gen. Servs. Admin.*, 401 F.Supp. 1194, 1199 (D.D.C. 1975).

The facts here easily clear those thresholds. The President has publicly declared the EEOB's appearance as "ugly" and in need of a facelift, unveiled professional renderings showing its gray granite façade painted a bright white, and announced that he is "getting bids right now from painters" to implement that design. *See* ECF No. 7-5. In federal procurement practice, soliciting bids does not occur at the daydreaming stage; it follows a determination that the agency needs the work done and intends to contract for it, subject only to limited cancellation authority. *See* 48 C.F.R. § 2.101 ("Acquisition begins at the point when agency needs are established").

Taken together, these facts show a concrete proposal: a defined goal (painting to "beautify" the building), a chosen method (cleaning, repointing, and painting the EEOB's exterior stone), and active steps toward procurement (getting bids) to implement that decision. This is the "proposal for" a "major Federal action" and an "undertaking" with potential adverse effects on an NHL— exactly the point at which NEPA and NHPA require agencies to stop and comply. *See Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989); *Blanck*, 938 F.Supp. at 921–24; *Save the Courthouse Comm. v. Lynn*, 408 F.Supp. 1323, 1342–44 (D. N.Y. 1975).

GSA acknowledged that it has "jurisdiction and responsibility" for cleaning, repointing, and painting the EEOB's exterior. ECF Nos. 15 at 19–20; 11-1 ¶ 3. That authority is delegated by Congress to GSA, not to the President. It matters not that GSA may be trailing behind the President in planning for this project; GSA must insist that the President's activities comply with the requirements of NHPA and NEPA, and failure to timely do so constitutes agency inaction.

Under D.C. Circuit ripeness doctrine, Plaintiffs raise fit, project-specific legal questions, not "abstract disagreements over administrative policies." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003). They challenge a concrete federal project at a concrete site they use and care about and seek only to require the government to comply with NEPA and NHPA before committing further. Waiting would cause Plaintiffs obvious hardship: untimely NEPA and NHPA procedures would be irretrievably lost, and preparatory work could begin that permanently damages the EEOB's historic fabric. Plaintiffs need not "wait for the sword to fall" before seeking relief. *Hale v. Exec. Off. of the President*, 784 F.Supp.3d 127, 147 (D.D.C. 2025).

### D. Defendants' time-limited "pause" and litigation declarations do not satisfy the voluntary cessation standard or eliminate the live controversy.

Defendants misapply the voluntary cessation doctrine. The conduct Plaintiffs challenge is GSA's and NPS's refusal to initiate NEPA and NHPA procedures for the EEOB painting project— not the act of putting paint on stone. That unlawful failure to begin review has never stopped, and Defendants' "pause" does not address it at all.

Under *Laidlaw*, "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." 528 U.S. at 189–90. The case only becomes moot if it is "absolutely clear" that the challenged behavior "cannot reasonably be expected to recur," and the government bears a "heavy burden" to make that showing. *Id*. at 189.

Heller's Declarations do not come close to meeting that burden. Here, Defendants have not even purported to cease the conduct at issue: they continue planning and advancing the painting scheme while declining to commence NEPA review or NHPA consultation. A short, revocable promise not to undertake certain "physical actions" before March 1, 2026, says nothing about that ongoing statutory violation. At most, the pause confirms that Defendants can tolerate delay in physical implementation. That supports, rather than undercuts, a tailored injunction preserving the

status quo and compelling lawful process. There remains "effectual relief" for this Court to grant—

ordering NEPA and NHPA compliance and preventing implementation absent that review—so the

case is not moot. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287–88 (2000).

## II.    Plaintiffs Are Likely to Succeed on Their NEPA and NHPA Claims

### A.    <u>NEPA: The President's painting plan requires environmental review now.</u>

#### 1.    *NEPA is triggered by a "proposal for" a major federal action, at the planning stage, not by the first stroke of paint.*

NEPA's core command is that agencies must prepare an environmental document for any

"proposal for…major Federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(C). The timing rule is built into the statute: environmental review

must occur early enough that it "can practically serve as an input into the decision making process"

and before the agency reaches the "point of commitment." *Scientists' Inst.*, 481 F.2d at 1094;

*Peterson*, 717 F.2d at 1414. Congress' 2023 amendments codify this longstanding understanding,

defining "proposal" to mean a stage when a project within the agency's jurisdiction has a goal,

there is consideration of one or more alternative ways to achieve that goal, and the agency can

meaningfully evaluate its effects if it were to be implemented. 42 U.S.C. § 4336e(12). Agencies

may not evade NEPA by insisting on perfect specificity; they must analyze environmental

consequences and reasonable alternatives "with appropriate allowances for the inexactness of all

predictive ventures." *Kleppe v. Sierra Club*, 427 U.S. 390, 402 n.14 (1976).

#### 2.    *The President's defined goal, renderings, and "getting bids" statement show a proposal—not idle musing.*

On these facts, the statutory "proposal" is easily met. The President announced that the

EEOB is "ugly," announced a specific goal of "beautifying" it, and selected a defined method:

cleaning, repointing, and painting the historic granite exterior. He has publicly displayed

professional renderings of the EEOB painted bright white—prepared by design professionals—

and stated that he is "getting bids right now from painters." ECF Nos. 7-1 at 11, 25; 7-5. That is a proposal: the decisionmaker has a goal, is preparing to choose among ways to achieve it, and can meaningfully evaluate environmental effects. 42 U.S.C. § 4336e(12).

These steps are far beyond "mere contemplation." *Kleppe*, 427 U.S. at 405. *Kleppe* makes clear that agencies cannot postpone NEPA until every operational detail is fixed; they must proceed "with appropriate allowances for the inexactness of all predictive ventures." *Id*. at 402 n.14. Here, the means (painting the stone white) and the objective (a "beautified" façade) are already fixed; only implementation details remain.[9]

Defendants argue since GSA has not yet "issued solicitations for a contract," there is no NEPA proposal. ECF No. 15 at 23–26. In her declaration, Mydelle Wright identifies the 11 steps that the President and GSA should follow for this project to be compliant with the law. The requirement to commence NHPA and NEPA consultation begins at step 4. Exhibit 5 ¶ 51. Soliciting bids is part of step 9. NEPA does not make a formal solicitation or contract award the trigger; it requires analysis well before the Government commits to that course.

### 3. By moving into procurement without an environmental document, Defendants violate NEPA's timing and alternatives requirements.

Because NEPA has been triggered, the absence of any environmental document for the painting project is a straightforward violation. Defendants report no analysis of the effects of cleaning, repointing, and painting on the EEOB, its NHL status, or its role in the Lafayette Square NHLD and President's Park, and have considered no "reasonable range of alternatives" to painting, 42 U.S.C. § 4332(C)(iii), such as conservation-based cleaning, targeted stone repair, or non-

---

[9] Federal procurement practice underscores the point. The government does not seek bids for a defined scope of work unless it has identified its need and decided, at least programmatically, to pursue that work—subject only to narrow cancellation authority for "compelling reasons." 48 C.F.R. § 14.404-1. Announcing that the Government is "getting bids" is therefore strong evidence that the proposal has moved from "whether" to "how" and "by whom."

invasive lighting and interpretive measures. Nor have they made any such analysis available for public comment. Courts routinely enjoin agency actions where, as here, officials attempt to commit to a course of action affecting a historic resource without following NEPA. *Save the Courthouse*, 408 F.Supp. at 1342–44. Defendants' insistence that they can continue planning, refining, and taking bids for painting while postponing NEPA until after March 2026 flips the statute on its head. NEPA requires environmental review *now*, when the project is still in the planning and procurement stage, before Defendants make irretrievable commitments and the stone is altered.

## B. <u>NHPA: Painting the EEOB is a federal "undertaking" that triggers Sections 106 and 110(f).</u>

### 1. *Any painting of the EEOB's exterior is a federal undertaking that may affect historic properties, triggering Section 106 consultation.*

NHPA defines "undertaking" to include any "project, activity, or program" that is "under the direct or indirect jurisdiction of a Federal agency," including those carried out "by or on behalf of a Federal agency," "with Federal financial assistance," or those "requiring a Federal permit, license, or approval." 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y). Advisory Council on Historic Preservation ("ACHP") regulations require agencies to determine whether a proposed action is an undertaking and has the potential to affect historic properties. 36 C.F.R. § 800.3(a).

Defendants concede that GSA has "jurisdiction and responsibility" over cleaning, repointing, and painting the EEOB's exterior. ECF Nos. 15 at 19–20; 11-1 ¶ 3. They do not dispute that the EEOB is an NHL and contributes to the Lafayette Square NHLD. ECF Nos. 7-1 at 11, 19, 22–24, 26, 35, 38, 41–42, 54; 7-16 ¶¶ 4, 6, 10. Painting the exterior of a granite NHL is a textbook federal undertaking with the potential to adversely affect historic properties, triggering § 106 consultation requirements. *See* 54 U.S.C. § 306108; 36 C.F.R. §§ 800.3–800.6.

Defendants' only answer is to call painting "maintenance" and insist that, because no contract has been signed, there is no undertaking yet. ECF No. 15 at 12–13. But as *Blanck* makes

clear, "ongoing and routine activities such as maintenance and repair may rise to the level of undertakings" when they may affect historic properties, and NHPA procedures "must be applied to ongoing Federal actions as long as" the agency can still alter its impact. 938 F. Supp. at 920–21 (cleaned up). *Blanck* also emphasizes that "merely because a statutory requirement is described as 'procedural' does not render it any less meaningful or mandatory." *Id.* at 925–26. Painting the EEOB is not routine maintenance; it is a major intervention with obvious potential to damage character-defining stone and the setting of an NHLD.

### 2. Because the EEOB is a National Historic Landmark, Section 110(f) requires advance planning "to the maximum extent possible" to minimize harm.

Section 110(f) imposes a heightened duty when an undertaking may "directly and adversely affect" an NHL. In that circumstance, the responsible agency must, "[t]o the maximum extent possible," "undertake such planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C. § 306107. To comply with § 110(f), agencies must demonstrate record of "a deliberate, considered decisionmaking process to assess, consider and plan for the preservation needs of the Historic District." *Blanck,* 938 F.Supp at 924. The Ninth Circuit in *Presidio Hist. Ass'n v. Presidio Trust,* 811 F.3d 1154, 1169–70 (9th Cir. 2016), similarly held that § 110(f) requires agencies to "thoroughly consider—rather than simply identify and catalog—prudent and feasible alternatives to minimize harm." Defendants have not begun this heightened planning, much less satisfied it. They have identified no alternatives or mitigation, and they have not consulted with NPS or the ACHP, despite its special role under § 110(f). 36 C.F.R. § 800.10. They have not engaged with Plaintiffs' expert evidence that painting will cause severe and irreversible damage to the EEOB's granite and the integrity of the Lafayette Square NHLD. *See* Exs. 5, 13; ECF No. 7-23. Their only "plan" is to delay visible work into 2026 and continue moving

the project forward. That is the opposite of planning "to the maximum extent possible" to minimize harm to an NHL.

### 3. NPS is a mandatory party in this action.

Defendants are correct in one respect: Reorganization Plan No. 18 of 1950 transferred "all functions with respect to the operation, maintenance, and custody" of the EEOB to GSA. Reorg. Plan No. 18 of 1950 § 2, 64 Stat. 1270, 1270–71. That answers only who runs the building day to day; it does not eliminate NPS's role under NHPA, including Section 110(f), now codified at 54 U.S.C. § 306107, which requires "the head of the responsible Federal agency" to "the maximum extent possible" minimize harm to an NHL and afford the ACHP a reasonable opportunity to comment. The National Historic Landmarks program is administered by the Secretary through NPS. *See* 54 U.S.C. §§ 302101–102; 36 C.F.R. pt. 65; 36 C.F.R. § 800.10. Any order implementing § 110(f) for the EEOB necessarily implicates NPS's statutory responsibilities, making NPS and Acting Director Bowron required parties under Fed. R. Civ. Pro. 19(a)(1).

### 4. The EEOB falls outside Section 107's narrow White House exemption.

Section 107 does not exempt the EEOB from NHPA. Section 107 provides that "[n]othing in [NHPA] applies to the White House and its grounds, the Supreme Court building and its grounds, or the United States Capitol and its related buildings and grounds." 54 U.S.C. § 307104. Congress expressly extended the exemption for the Capitol to "related buildings;" it did not do so for the White House. The EEOB is nowhere mentioned.

The statutory phrase "White House and its grounds" is not a blank check. As Defendants admit, "[w]hile the White House and President's Park are an administrative unit within the National Park System, the EEOB is not part of that administrative unit." ECF No. 15 at 20. Public Law 87-286 places under NPS's jurisdiction "eighteen and seven one hundredths acres" defined

as the White House and grounds—a parcel that does not include the EEOB. Pub. L. No. 87-286, 75 Stat. 586 (1961).

The only judicial decision to define "White House and its grounds" for closely related purposes—the *Jabr* line of cases—likewise limited the term to the roughly eighteen-acre NPS-administered parcel. *See United States v. Jabr*, 2019 WL 13110682, at *19 n.9 (D.D.C. May 16, 2019), aff'd, 4 F.4th 97, 102 (D.C. Cir. 2021). The D.C. Circuit held that the Treasury Building, flanking the White House to the east, was not part of the White House grounds for purposes of a similar criminal trespass rule. 4 F.4th at 102. The EEOB flanks the White House on the west and stands in a parallel relationship to the mansion; Treasury is out, and so is the EEOB.

Agency practice confirms that understanding. NPS mapping and documentation distinguish the White House and its exempt grounds from the EEOB and Treasury. A 2022 NPS amendment to the Lafayette Square NHLD boundary explicitly includes the EEOB and Treasury within the district while excluding the White House complex "because [it is] legally exempt from listing…pursuant to Section 107." Exs. 1 ¶ 17; 21 at 5. The EEOB Historic Condition Report likewise assumes that GSA actions affecting the building would undergo § 106 review. Exs. 1 ¶ 13; 18 at III-3.

Defendants ignore the statute's language, case law, agency practice, and other documents, and point to a single document to argue that EEOB is exempt from review. A 1994 Programmatic Agreement ("PA") Defendants cite cannot expand § 107's exemption. ECF No. 15 at 12. It is a contract implementing § 106, not an Act of Congress. To the extent it suggests the EEOB is part of "the White House grounds," that reading conflicts with statutory text, judicial construction, and subsequent agency practice. *See* Ex. 16 ¶¶ 4–6. Congress delegated regulatory authority to the ACHP solely to interpret § 106 of NHPA. 54 U.S.C. § 304108(a). All other NHPA provisions,

including § 107, are subject to the interpretive jurisdiction of the Secretary of the Interior and the Director of NPS, not ACHP. Therefore, a random statement in a PA signed 31 years ago that "The [ACHP] recognizes the Old Executive Office Building as part of 'the White House and its grounds' pursuant to Section 107" is entitled to no deference, especially since neither NPS nor the Interior Department were parties to that PA.[10] In any event, the PA does not relieve Defendants of having to comply with § 110(f)'s separate, heightened duty for NHLs. Thus, the EEOB is subject to NHPA, and Defendants' attempt to treat it as exempt fails.

**III.    The Court can Remedy Violations of the APA and Separation of Powers**

    **A.    <u>NEPA and NHPA duties are discrete, mandatory actions reviewable under the APA.</u>**

      As discussed above, NEPA's environmental document duties and NHPA's §§ 106 and 110(f) duties are discrete, mandatory obligations, not broad programmatic goals. Once NEPA's "proposal" and NHPA's "undertaking" thresholds are met for the EEOB painting project, GSA and any other responsible agencies are required to perform those procedures. Failure to do so is "agency action unlawfully withheld" under 5 U.S.C. § 706(1), and any steps taken to advance painting without those procedures—including planning, procurement, and approvals—are "without observance of procedure required by law" under § 706(2)(D). That is well within the scope of APA review. *See Norton*, 542 U.S. at 64, 73; *Grand Canyon Tr.*, 38 F.Supp.3d at 1083.

    **B.    <u>Relief properly runs against agencies, but the President is a proper party and Count V should not be dismissed.</u>**

      Defendants argue that no court may award injunctive or declaratory relief concerning the President's official conduct and that Plaintiffs therefore "cannot succeed" on any claim against him. ECF No. 15 at 16–18. That misstates both what Plaintiffs seek and what the cases hold. Plaintiffs' core claims are statutory NEPA, NHPA, and APA claims against GSA, NPS, and related

---

[10] Although the NHPA does authorize the ACHP to issue exemptions, 54 U.S.C. § 304108(c), that process was not invoked or followed in this case. *See* 36 C.F.R. § 800.14(c).

officials, and the operative preliminary relief they seek runs against those agencies—not the President's day-to-day decisions. That is the ordinary channel for review of presidentially driven policy: suits against subordinate officers implementing the President's wishes. *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992); *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). Nothing in *Franklin* or *Newdow v. Roberts* forecloses such agency-focused relief. *See* 505 U.S. at 802–03; 603 F.3d 1002, 1013 (D.C. Cir. 2010).

Defendants jump from the premise that injunctions against a President are "extraordinary" to the conclusion that he must be dismissed. That does not follow. Plaintiffs do not bring APA claims against the President; those claims run only against GSA and NPS. Count V instead alleges a narrow Take Care violation: the President may not direct subordinates to carry out this project in defiance of NEPA, NHPA, and appropriations law. The Take Care Clause imposes a duty to enforce these statutes, not a personal exemption from them. *See In re Aiken Cnty.*, 725 F.3d 255, 259–60 (D.C. Cir. 2013); *Kendall v. United States ex rel. Stoke*s, 37 U.S. 524, 613 (1838).

Defendants read *Franklin* and *Newdow*—citing *Newdow*'s statement that "[w]ith regard to the President, courts do not have jurisdiction to enjoin him," 603 F.3d at 1013—as barring any relief that touches the President's compliance with law. Those cases addressed attempts to draw courts into broad, ongoing supervision of presidential policy. Here, Count V serves a narrow function: it asks the Court to declare—and, if necessary, to give effect through relief against subordinate officers—that the President may not direct GSA and NPS to carry out this project in violation of governing statutes. That is the kind of constraint *Kendall* and *Aiken County* contemplate: courts may not manage the President's schedule, but they may enforce Congress's commands so his "supervision" does not become a license to set statutes aside.

*Dalton v. Specter* and *Global Health Council v. Trump* likewise do not require dismissing Count V. They hold that plaintiffs cannot manufacture a constitutional claim by relabeling a purely statutory dispute. 511 U.S. 462, 474 (1994); 153 F.4th 1, 16–17 (D.C. Cir. 2025). Plaintiffs have done the opposite: they pursue NEPA, NHPA, and APA claims against the agencies and use Count V only as a narrow backstop where the President personally initiates and drives a project in a way that threatens to override those duties. Decisions noting that Take Care claims are "open to debate," do not hold them categorically non-justiciable. *See Citizens for Resp. & Ethics in D.C. v. Trump*, 302 F.Supp.3d 127, 130 (D.D.C. 2018). At a minimum, Defendants have not shown that Count V is so insubstantial or remedially barred that the President must be dismissed; the Court can grant preliminary relief against the agencies now and address Count V on a fuller record later.

### C. <u>The Take Care Clause requires fidelity to NEPA, NHPA, and appropriations statutes—not freedom from them.</u>

Defendants also recast Plaintiffs' Take Care theory as an attempt to obtain a "general order[] compelling compliance with broad statutory mandates," *Norton*, 542 U.S. at 66–67, and stress that NEPA and NHPA bind "the head of any Federal agency" and "agencies," not the President. Plaintiffs agree that those statutes impose duties on GSA and NPS, which is why the main causes of action and requested injunction run against those agencies. The Take Care Clause does not duplicate those duties; it requires the President to respect them and forbids him from using his supervisory authority to induce his subordinates to disregard them for this favored project. *See Aiken Cnty.*, 725 F.3d at 259–60; *Kendall*, 37 U.S. at 613.

Defendants' own "supervision" cases underscore that point. *Seila Law LLC v. Consumer Financial Protection Bureau*, *Building & Construction Trades Department v. Allbaugh*, and *Sierra Club v. Costle* recognize presidential authority to "'supervise and guide'" executive officers, but only "to the extent permitted by law." *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295

F.3d 28, 32 (D.C. Cir. 2002) (*quoting Sierra Club v. Costle*, 657 F.2d 298, 406 n.524 (D.C. Cir. 1981)). *Costle*, in particular, framed White House involvement as a means of achieving faithful execution of the Clean Air Act, not circumventing it; EPA's ultimate decision still had to rest on statutory criteria, not extra-statutory presidential preferences. 657 F.2d at 405–08, n.524. *Seila Law* likewise grounds presidential control in the duty to "take Care that the Laws be faithfully executed," not in a power to suspend them. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213 (2020). Read together with *Kendall* and *Aiken County*, these authorities support Plaintiffs' framing: the President may press GSA and NPS to move quickly and may coordinate their work, but he cannot use that supervision to erase NEPA, NHPA, or appropriations constraints. Plaintiffs' core claims therefore proceed, as they should, through APA and statutory causes of action against GSA and NPS, with Count V operating only as a narrow constitutional safeguard against presidential direction to disregard those laws in carrying out this project.

### D. <u>Appropriations law and the Antideficiency Act confirm the painting project cannot lawfully proceed—whether funded by appropriations or private money.</u>

The record now squarely presents an appropriations and Antideficiency Act issue, even if Plaintiffs did not label it as such. The President publicly stated he is "getting bids right now from painters," while the Second Heller Decl. asserts GSA has "not issued solicitations for a contract." ECF No. 15-1 ¶ 5. Together, these facts sharpen the existing dispute: whether Defendants may advance the painting project at all without a lawful appropriation and within Congress's limits.

The Antideficiency Act prohibits federal officials from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund" and from "involv[ing] the government in a contract or obligation for the payment of money before an appropriation is made" unless authorized by law. 31 U.S.C. §§ 1341(a)(1)(A)–(B). Any step toward contracts or other payment obligations must be backed by a valid congressional

appropriation, and none exists for painting the EEOB. Capital projects on federal buildings are subject to statutory cost thresholds and approvals. *See* 40 U.S.C. § 3305. Contracts entered without appropriations authority are void. *See, e.g.*, *Davis & Assocs. v. District of Columbia*, 501 F.Supp.2d 77, 80 (D.D.C. 2007); *Nat'l Treasury Emps. Union v. United States*, 444 F.Supp.3d 108, 112 (D.D.C. 2020). If the Administration is indeed "getting bids right now from painters" without a lawful appropriation, it is moving toward obligations that risk violating the Act.

Potential private funding changes nothing. Painting the EEOB still requires federal authorization and falls under GSA and NPS jurisdiction. Allowing private actors to alter an NHL is federal action subject to NEPA, NHPA, and appropriations limits. The President cannot turn work on federal property into a personal project by saying donors will pay for it.

## IV.    The Remaining Preliminary Injunction Factors Strongly Favor Plaintiffs

### A.    <u>Plaintiffs face irreparable harm from both the physical painting of a National Historic Landmark and the loss of NEPA and NHPA procedures.</u>

The harms at issue are irreparable in both their physical and procedural dimensions, and they fall squarely on Plaintiffs. Physically, Plaintiffs will suffer permanent injury to their aesthetic, recreational, professional, educational, and organizational interests if the EEOB is damaged. Plaintiffs' experts and NPS masonry guidance agree that painting the EEOB's stone—especially with the power-washing, chemical cleaning, and repointing Defendants' plans would require— would permanently damage its historic masonry by removing original material, trapping moisture, accelerating deterioration, and fundamentally altering the appearance that supports its individual NHL designation and its role in the Lafayette Square NHLD. *See* Exs. 5, 13. Once that damage occurs, it cannot be undone; paint and mismatched mortar cannot be removed without further loss of historic fabric, and Plaintiffs' ability to experience and use the EEOB and its setting in their current historic condition is gone for good.

On the procedural side, the loss of NEPA and NHPA processes is itself irreparable harm to Plaintiffs. Once Defendants move beyond the planning stage without preparing an environmental document and without conducting §§ 106 and110(f) processes for this project, Plaintiffs' rights to informed review, consultation, and participation—rights they rely on to protect their concrete interests in the EEOB and Lafayette Square NHLD—are permanently lost. Courts have recognized that when statutory procedures are designed to safeguard concrete interests in a specific place, the denial of those procedures constitutes irreparable harm. *See, e.g.*, *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 536–37 (D.C. Cir. 2018).

**B.** **The balance of equities favors preserving the status quo over Defendants' self-inflicted complaints about delay.**

Defendants identify no operational, security, or safety need for immediate work on the EEOB. Instead, they label this suit "premature," describe any painting as a future aesthetic change, and contend that GSA's promise to take no action before March 1, 2026, renders the balance of harms "at most neutral." ECF No. 15 at 27. That is not the kind of concrete hardship that can outweigh the harms at issue here. By contrast, Plaintiffs face the permanent loss of irreplaceable historic fabric and the continued denial of statutory procedures Congress enacted to protect exactly this sort of place. Any incremental burden on GSA from conducting environmental review and §§ 106 and 110(f) consultation results from Defendants' own decision to advance a painting scheme without doing that work upfront. Congress expected agencies to budget, schedule, and staff NEPA and NHPA compliance as part of their ordinary responsibilities.

An injunction here simply preserves the status quo: the EEOB remains unpainted, and Defendants are free to undertake lawful planning and review. The equities do not favor letting an unlawful, aesthetics-driven project disregard statutory safeguards. The public interest lies in faithful execution of environmental and preservation laws and in protecting irreplaceable historic

resources. The public interest and the balance of equities "merge" where, as here, the government is a party. *Nken v. Holder*, 556 U.S. 418, 435–36 (2009). In that posture, there is "generally no public interest in the perpetuation of unlawful agency action," and there is a "substantial public interest in having governmental agencies abide by the federal laws." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12–13 (D.C. Cir. 2016). That principle has particular force here. The EEOB is one of the Nation's most recognizable public buildings—an individually designated NHL anchoring the Lafayette Square NHLD next to the White House. The public has a strong interest in ensuring that decisions about such a site are made transparently, with full NEPA/NHPA compliance, not through back-channel "beautification" efforts that treat those statutes as optional. Protecting the EEOB's character-defining granite and the historic setting of Lafayette Square while the Court adjudicates the merits furthers both the rule of law and the preservation values Congress embedded. The public interest therefore weighs strongly in favor of preliminary relief.

## V.    Defendants' Silence on Key Points Confirms the Need for Relief

Defendants' opposition leaves several of Plaintiffs' central arguments essentially unanswered. In this Circuit, when a party fails to respond to an argument, the Court may treat that point as conceded. *See Hopkins*, 238 F.Supp.2d at 178. Here, Defendants recast the APA solely as a vehicle for arbitrary-and-capricious review of "final agency action" under 5 U.S.C. § 706(2)(A) and never grapple with Plaintiffs' independent theories under §§ 706(1) and 706(2)(D) to compel unlawfully withheld NEPA and NHPA processes and to remedy agency inaction taken without observance of procedure required by law. *See* ECF No. 15 at 13–14. They address only individual standing and label Plaintiffs' "sole alleged injury" as aesthetic, while ignoring everything else. *Id.* at 28; *see supra*, n.8. They relegate § 110(f) to the background and never confront the heightened "maximum extent possible" duty that follows from the EEOB's status as an individually designated NHL within the Lafayette Square NHLD. *See* ECF No. 15 at 11–12. And although they

acknowledge that NEPA and NHPA bind "the head of any Federal agency" and "all agencies of the Federal Government," they offer no coherent explanation for why painting, cleaning, and repointing the exterior of this federally owned landmark under GSA's jurisdiction would not be an NHPA "undertaking" or a NEPA "major Federal action," relying instead on the claim that there is "nothing for this Court to enjoin" because GSA has promised a temporary pause and has not yet issued solicitations or awarded a contract. *See id.* at 8, 11, 1–3, 23. Defendants' strategy is not to meet Plaintiffs' legal theories on their own terms, but to deny that a project exists at all. That denial cannot be squared with the President's public statement that he is "getting bids right now from painters," Defendants' own concessions that GSA has statutory authority over cleaning, repointing, and painting the EEOB's exterior, or the carefully limited Heller Declarations, which pause only certain "physical actions" for a short period while saying nothing about planning, design, procurement, or NEPA and NHPA compliance going forward. *See* Exs. 1, 2, 5, 13. In light of Defendants' silence on Plaintiffs' core APA, standing, and NEPA/NHPA trigger arguments— and the active painting concept being advanced outside any public process—the Court may treat those points as conceded and should grant the requested preliminary relief to preserve the status quo while the merits are adjudicated.

## CONCLUSION

Taken together, the government's failure to answer core arguments, its continued planning and procurement for painting, and its time-limited, litigation-driven "pause" confirm a live controversy. A preliminary injunction is necessary to preserve the status quo, prevent irreparable harm to Plaintiffs and the public's interest in this NHL, and ensure that NEPA, NHPA, and appropriations law—not reactive assurances or personal aesthetics—govern any decision to alter the EEOB's historic exterior. For these reasons, Plaintiffs ask the Court to grant their Motion for Preliminary Injunction.

Dated: December 2, 2025

Respectfully submitted,
**/s/ Gregory Alan Werkheiser, Bar No. VA210**
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025,
Washington, DC 20006
Tel: (202) 567-7594
Email: greg@culturalheritagepartners.com

**/s/ Marion Forsyth Werkheiser, Bar No. 486465**
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025,
Washington, DC 20006
Tel: (202) 567-7594
Email: marion@culturalheritagepartners.com

**/s/ Jessie Danielle Young Barrington, Bar No.
100685 (VA)**
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025,
Washington, DC 20006
Tel: (202) 567-7594
Email: jessie@culturalheritagepartners.com
*Pro Hac Vice Admission Pending*

**/s/ Lydia Dexter, Bar No. 233151 (OR)**
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025,
Washington, DC 20006
Tel: (202) 567-7594
Email: lydia@culturalheritagepartners.com
*Pro Hac Vice Admission Pending*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on Plaintiffs via CM/ECF electronic notice.

/s/ *Gregory Alan Werkheiser*
*GREGORY ALAN WERKHEISER*
Attorney for Plaintiffs