# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CULTURAL HERITAGE PARTNERS, PLLC, et al.**, | Civil Action No. 1:25-cv-03969-DLF |
| Plaintiffs, | |
| v. | **SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER** |
| **DONALD J. TRUMP, et al.**, | |
| Defendants. | |

**<u>SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER
AS AN INDIVIDUAL AND AS AN OWNER OF CULTURAL HERITAGE PARTNERS,
PLLC</u>**

I, GREGORY ALAN WERKHEISER, under 28 U.S.C. § 1746, hereby declare on my own behalf and on behalf of Cultural Heritage Partners, PLLC ("CHP"):

1. My name is Gregory Alan "Greg" Werkheiser. I have personal knowledge of the matters stated herein. I previously submitted a declaration dated November 17, 2025, in support of Plaintiffs' motion for a temporary restraining order and preliminary injunction. I submit this supplemental declaration to provide additional detail relevant to Article III standing in light of the standards articulated by the Supreme Court and the U.S. Court of Appeals for the D.C. Circuit.

2. I earned a B.A. in government from the College of William and Mary (1996) and a J.D. from the University of Virginia School of Law (2000).

3. I have practiced law for twenty-five years. Since 2010, I have been a founder and equity partner of Cultural Heritage Partners, PLLC ("CHP"), an international law firm. Our practice involves representing governments, Tribal Nations, civil society organizations,

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

Doc ID: e2ce7775a88ba375fde5f8ab44a65f52d890cb50

preservation associations, and families on matters involving the protection and preservation of architecture, archaeology, art, antiquities, landscapes, burial grounds, sacred places, and cultural practices. The greatest volume of our practice involves federal permitting review arising under the National Environmental Policy Act ("NEPA") and the National Historic Preservation Act ("NHPA").

4. In 2023, my work was acknowledged with a premier honor in our field: The Simons Medal of Excellence, previously awarded to King Charles III, among others.

5. I have lectured at law schools on cultural heritage law topics, and I have keynoted numerous relevant conferences including, for example, The Gonzaga Law School Human Rights Conference in Florence, Italy in 2024, on the topic of cultural heritage as a human right.

6. In 2016, our firm was tasked with organizing the U.S. government's commemoration of the 50th anniversary of passage of NHPA, which resulted in the largest coalition of agencies, Tribal Nations, and state and local preservation groups ever organized for any purpose, and which examined the extraordinary impact on the nation's historic character resulting from faithful enforcement of that law by leaders of both major political parties.

7. I cofounded ARCUS, a 10-month leadership development fellowship program for emerging leaders in our field, the pedagogy and curriculum for which included examination of NEPA and NHPA and their vital roles in sustaining a national preservation movement, which program was later adopted by the American Association for State and Local History.

8. I cofounded the Lawyers' Committee for Cultural Heritage Preservation ("LCCHP"), a nonprofit organization of lawyers, law students, and interested members of the public

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

Doc ID: e2ce7775a88ba375fde5f8ab44a65f52d890cb50

who have joined together to promote the preservation and protection of cultural heritage resources in the United States and internationally, responding to a need for legal education and advocacy in the legislative, judicial, and policy execution arenas...and so that one day I can retire, passing the torch to advocates with greater talents.

9. For two decades, while practicing law, I also founded and led institutes dedicated to reimagining and teaching nonpartisan civic education in America. The Carnegie Foundation for the Advancement of Teaching kindly recognized me as among the nation's leading civic educators. *See* Colby, et al., *Educating for Democracy: Preparing Undergraduates for Responsible Civic Engagement* (THE CARNEGIE FOUNDATION FOR THE ADVANCEMENT OF TEACHING) (2007). The pedagogy and curriculum for these efforts included examining the important role that citizens have a right to play in instances where federal law requires government agencies to consult stakeholders potentially adversely impacted by proposed government action.

10. I am cofounder and co-owner of ARtGlass, a technology company that over the last decade has become a global leader in bringing wearable augmented reality ("AR") to heritage tourism. ARtGlass software and services have helped cultural sites deploy engaging and educational storytelling experiences to millions of visitors with 3D and 360-degree digital content layered through transparent "smartglasses" over visitors' real-world views. Last month, ARtGlass announced that it would develop an AR tour of the White House's former East Wing, viewable from public lands outside the White House gates, to attempt to rescue some of the history of the structure demolished to make room for a new ballroom.

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

Doc ID: e2ce7775a88ba375fde5f8ab44a65f52d890cb50

A. **Article III standards and why I am providing details of my use and enjoyment of the Eisenhower Executive Office Building ("EEOB")**

11. I understand that Article III requires a plaintiff to demonstrate an injury in fact that is concrete, particularized, and actual or imminent; that the injury is fairly traceable to the challenged conduct; and that it is likely, not merely speculative, that the injury will be redressed by judicial relief. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1156 (D.C. Cir. 2025) (relying on *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021), and *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

12. I further understand that, in the environmental context, the Supreme Court and the D.C. Circuit require more than a generalized interest in proper enforcement of the law or a vague desire to visit a place "some day." The Courts have found the standard met when a plaintiff shows a particularized interest in the enforcement of specific law or laws and real-world use of the affected area and concrete plans to continue that use. *See Ctr. for Biological Diversity*, 146 F.4th at 1157–58 (crediting a member's pattern of prior visits and plans to return, while distinguishing more general intentions in *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).

13. To satisfy those requirements, I provide the details below about my past use of the EEOB and its surrounding historic district, my concrete plans to return, and the way my experience of the building and ability to share it with family, friends, colleagues, students, and future preservation movement leaders depends on its current and historic exterior appearance.

14. I also explain how CHP's mission, business prospects, and professional credibility, the preservation goals of our clients across the country, and the credibility of the profession

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

Doc ID: e2ce7775a88ba375fde5f8ab44a65f52d890cb50

of a U.S. preservation lawyer depend on continued enforcement of key preservation provisions in two specific laws: NHPA and NEPA, which will be fundamentally undermined by the example of the government's top officials bypassing their responsibilities under those laws, the physical manifestation of which will be white paint covering one of America's most significant buildings in what is arguably its most recognized historic district.

15. I also understand that redressability requires that the relief requested be likely to lessen or remedy my and CHP's injuries. In my view, if the Court enjoins the General Services Administration ("GSA") from proceeding with the EEOB painting project unless and until all Defendants comply with NEPA and NHPA, that relief will:

    a. Affirm that the two specific laws that are the cornerstones of preservation in the United States and around which I have built my career remain in force as Congress intended;

    b. Reduce directly the risk that the EEOB's historic materials and appearance will be irreversibly changed before I can continue to visit and share it with others; and

    c. Restore my opportunity to participate in NEPA and NHPA processes so that I can advocate for alternatives that avoid permanent harm to this National Historic Landmark.

16. Based on my legal training and experience, and on the facts described above, I believe that the injuries CHP and I will suffer if planning for EEOB painting is allowed to proceed "off the books" and the building subsequently loses its historic exterior appearance and integrity, which includes the loss of the ability to share the building as it now looks with my family, friends, and colleagues, and the denial of my procedural

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

rights to participate in required review—are concrete, particularized, and imminent; fairly traceable to Defendants' actions; and likely to be redressed by the declaratory and injunctive relief Plaintiffs seek.

**B.  My use and enjoyment of the EEOB and its surroundings**

17.  The EEOB has been a special place to me for 35 years. I first encountered the landmark building on June 27, 1990. I was 16 years old, had won statewide in a national essay contest and was invited to the White House to meet First Lady Barbara Bush, appear on C-SPAN, and tour the White House and the EEOB. The impressiveness of the EEOB stuck with me, and I dreamt of one day leaving the mountains of Pennsylvania to work in Washington, D.C.

18.  When I was 21 years old, I was invited to work in the EEOB, helping to craft speeches for First Lady Hillary R. Clinton and President Clinton. I spent substantial time in that building and its surroundings, and I became familiar not only with its historic interiors and materials but also with the reasons for and style of its distinctive exterior appearance, its relationship to the White House, and its role in the Lafayette Square National Historic Landmark District ("Lafayette Square NHLD") and President's Park.

19.  During a decade living and/or working in the District of Columbia for law firms or civil society organizations, I walked through or had meetings in the Lafayette Square NHLD almost daily.

20.  Before I knew that one could have a career as a cultural heritage lawyer, the evidence of thoughtful care for the integrity and historic appearance of the EEOB by dedicated government staff, especially through periods where its design was considered by some to be out of fashion, had a profound impact on me.

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

21. I have brought friends, family, colleagues, and students to the EEOB regularly throughout the subsequent decades, including my parents and siblings, and more recently my daughter and nieces. Attached are representative samples of many photographs taken over decades of visits, ranging from 1995 through earlier this month. A true and correct copy of these photos are attached as Exhibit 3.

22. I share with my companions during these visits the EEOB's political, architectural, and historic significance; its symbolism as a prominent American preservation success story; and the way its gray stone façade, mansard roofs, and richly detailed exterior, along with the Treasury Building, also in gray stone, frame and form a deliberate visual counterpoint to the stark white of the White House, elevating the visual impact of the White House itself.

23. Over the last five years, I have traveled to Washington, D.C., at least monthly on average, excluding during the height of the COVID pandemic, typically staying downtown. During these visits, I routinely spend time in the area encompassing the White House, Lafayette Square NHLD, President's Park, and the EEOB.

24. Since my formative experience working in the EEOB, I make a point of returning to the EEOB and its surroundings. I walk along routes such as Pennsylvania Avenue NW between 18th and 15th Streets NW; 17th Street NW along the west side of the White House; and the sidewalks immediately adjacent to the EEOB, which provide direct views of the EEOB's unpainted gray granite façade, slate roofs, and ornate Second Empire details.

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

25. These visits are not incidental; they are an important part of my experience in Washington. The exterior façade, especially, is an important lynchpin for my memories over three and a half decades.

26. Showing the building as it looks today and telling its story in that setting are central ways that I personally enjoy and appreciate this historic place.

27. My law firm has maintained offices in Washington, D.C. for most of its 15-year existence. Today, CHP has offices at 1717 Pennsylvania Avenue NW, 2/10ths of a mile from the EEOB. While I reside in Richmond, Virginia, I travel regularly to Washington, D.C. in my capacity as a partner at CHP for meetings, speaking engagements, and an array of other professional activities, many of which take place in or proximate to buildings in the Lafayette Square NHLD. I also travel to this area for projects related to ARtGlass and when asked to speak on topics related to civic leadership and democracy.

28. I use the EEOB preservation story setting in my professional life. When I speak with clients, law students, and colleagues about federal stewardship obligations for historic properties, I can use the EEOB as a real-world example: its original, unpainted stone exterior; how its relationship to the White House and Lafayette Square expresses a particular historical vision of the executive branch; and how preserving the building's fabric and appearance reflects a commitment to our shared history.

29. Lest my passion for the EEOB give the impression of a personal obsession, I note that Defendants have expressed similar appreciation. President Trump said he thinks it is one of the nation's most beautiful buildings (except that it isn't pure white). ECF No.7-5 at 3. The GSA has described the EEOB as "the most elaborate building in the [agency's] inventory." ECF No. 7-18 at 87.

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

Doc ID: e2ce7775a88ba375fde5f8ab44a65f52d890cb50

30. I anticipate continuing this pattern of frequent use and enjoyment of the EEOB. I have several planned trips to Washington, D.C. in January, February, and March 2026–not including those related to this matter–during which I will walk through Lafayette Square, visit the area around the EEOB, and show it to family members, friends, or colleagues. Beyond those dates, I expect to continue traveling to Washington, D.C. regularly in connection with my professional activities and to continue revisiting the EEOB and sharing it with others.

**C. How painting the EEOB would injure my aesthetic and experiential interests**

31. My aesthetic and experiential enjoyment of the EEOB and its surroundings is bound up with the building's current exterior appearance: gray, unpainted granite walls, slate roofs, cast-iron trim, and other materials and details that visually distinguish it from the White House and anchor the Lafayette Square NHLD.

32. The ability to return to the EEOB and see it as the same building where I once worked and have been repeatedly inspired, and to show that same building—visually intact—to family, friends, and colleagues, is central to my experience of this historic place. Seeing the building's authentic stone exterior as I remember it is part of what makes those visits meaningful to me.

33. Neither I nor CHP oppose, and in fact, I heartily support appropriate cleaning and repointing of mortar of the EEOB in accordance with preservation standards set forth by the federal government. Last week I took dozens of photos of the EEOB exterior and documented a number of areas in need of eventual attention, including grime from city traffic, water and rust stains on some pillars, walls, and steps, and rust showing through the black painted ironwork. A true and correct copy of these photographs are attached as

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

Exhibit 4. Each of these common issues been addressed previously in ways that do no harm to the building, and, in fact, would help the president achieve much of his vision of bringing shine to the building. I would also support the president exploring alterations to make the building appear brighter, including adding removable white sheers in each of the 1,570+ windows, and converting all exterior uplighting bulbs to brighter lumens, creating a white appearance and lighting areas that appear dark because of the complexity of the façade. I oppose improper cleaning and repointing and painting of granite under any circumstances, and I oppose denial of the consultation process required for consideration of such acts.

34. If Defendants proceed with improperly cleaning, repointing, and/or painting the EEOB white, they will permanently alter the building's historic materials and appearance. When I walk through Lafayette Square or stand in President's Park, I will no longer see the building as it has been for 150 years. Instead, I will see a painted building that no longer reflects the same materials or contrasts with the White House in the way it does now. This desire to retain and respect the original intent of the designer, when altering it would be permanent and is unnecessary, goes to the heart of what it means to value the past, in all its imperfect forms.

35. That change to the EEOB's appearance will significantly diminish my personal enjoyment and sense of connection to the EEOB. I will no longer be able to show my family and friends the building as it looked when I worked there, or to tell its full story in the same visual context. The painting would therefore impair the way I experience and share this place, both emotionally and historically.

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

36. The change would also impair my professional use of the EEOB as an example of successful preservation. When I talk with clients, students, and colleagues about the building, I can currently point to its unpainted granite and slate exterior as a model of preserving original materials and character. If the building is painted, it will instead become a globally recognized example of what can go wrong when preservation principles and legal protections are disregarded.

37. Based on my knowledge of preservation standards, once the EEOB's unpainted granite and slate are abraded and coated, the original finish cannot be restored. The building would be committed to a repeating cycle of repainting and paint removal, likely causing additional harm over time. That permanent loss of historic material and appearance would be an irreversible injury to the specific place that I repeatedly visit and plan to keep visiting.

38. As a preservation attorney and frequent user of this historic setting, I rely on NEPA and NHPA to ensure that federal agencies:

    a.  Evaluate environmental and historic-preservation impacts before acting; and

    b.  Provide the public with notice and opportunities to comment and consult when projects may affect historic properties.

39. Neither I nor CHP has received any notice of NEPA or NHPA review for the EEOB repainting project. To my knowledge, no environmental assessment, environmental impact statement, Section 106 consultation, or Section 110(f) process has been initiated. As a result, I and other members of the public have been denied the chance to review information about the project, to propose alternatives, and to advocate for measures that could avoid or minimize harm before any irreversible work begins.

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

40. If Defendants initiated NEPA and NHPA review for the EEOB project, I would participate by reviewing environmental and historic preservation documents, submitting written comments, and engaging in any available Section 106 and Section 110(f) consultations, including meetings or site visits. Those procedures are important to me professionally as well as personally.

41. Upon information and belief, many Americans would also participate in the consultation processes afforded by federal law. Anecdotally, more than 1,145 readers took time to comment on The Washington Post's webpage after it reported on this lawsuit--in just the first hours after publication. The newspaper's embedded AI-powered summary states: "The comments overwhelmingly criticize President Trump's proposal to paint the Eisenhower Executive Office Building white, highlighting concerns about the historical and architectural significance of the building. Many commenters express frustration with Trump's focus on aesthetic changes rather than more pressing presidential duties, and they view the proposal as part of a pattern of tasteless and damaging alterations to historic sites. There is a strong sentiment that such actions are a misuse of resources and a disregard for the preservation of national heritage." *See* Jonathon Edwards, *Preservationists sue Trump over plans to paint Eisenhower* building, WASH. POST (Nov. 14, 2025), https://wapo.st/48uCNhQ. By my firm's last count, exactly zero (0) of the 1,145 comments support the president or GSA moving forward with the idea, let alone without the required federal process. [The comments are also a testament to Americans' creative use of language to convey the same sentiment 1,000 different and entertaining ways.]

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**

I declare under penalty of perjury that the foregoing is true and correct. Executed on 2

December, 2025, in Richmond, Virginia.

*Greg Werkheiser*

_____

Gregory Alan Werkheiser, Partner
Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, D.C. 20006

**SUPPLEMENTAL DECLARATION OF GREGORY ALAN WERKHEISER**