# **EXHIBIT 5**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CULTURAL HERITAGE PARTNERS, PLLC, et al.**, | Civil Action No. 1:25-cv-03969-DLF |
| Plaintiffs, | |
| v. | **DECLARATION OF MYDELLE WRIGHT** |
| **DONALD J. TRUMP, et al.**, | |
| Defendants. | |

## DECLARATION OF MYDELLE WRIGHT

I, Mydelle Wright, under 28 U.S.C. § 1746 hereby declare:

1. My name is Mydelle Wright. I am over the age of 18 and competent to testify. I have personal knowledge of the matters stated herein and could and would testify competently thereto if called as a witness.

**CREDENTIALS**

2. I am a preservationist, historic preservation specialist, buildings design specialist, and art historian with 32 years of professional experience in the management, restoration, and preservation of historic masonry buildings.

3. I retired in 2024 as a senior administrator for the General Services Administration's ("GSA") historic buildings portfolio. For a total of 18 years, I was principal on the team responsible for the stewardship, restoration, and management of the Eisenhower Executive Office Building ("EEOB").

4. In 2009, I created GSA's Office of Planning & Design Quality ("OPDQ"), National Capital Region. I served as Founding Director of OPDQ from 2010 through 2024. In this role, I

established and directed a center of expertise responsible for design quality of GSA's largest real estate portfolio. I led a staff of architects, engineers, urban planners, interior designers, historic preservationists, fine art specialists, and environmental compliance experts providing design direction and technical review for projects from inception through delivery. I provided policy analysis regarding GSA engagement with local jurisdictions, the White House, other federal agencies, and community organizations on design and planning issues. I directed interpretation and stewardship programs for historic buildings, public art, and fine arts collections.

5. I served as Founding Director of the EEOB Preservation Office (1983-1986). In this position I launched the award-winning maintenance program for the EEOB; directed the formulation of a long-term master plan for its adaptive use; initiated restoration of most significant decorative interiors; consulted on maintenance projects including exterior, mechanical, electrical, and security repairs and alterations of potential impact to historic integrity; managed the ongoing collection of supporting archival materials; developed exhibits and launched public tour programs; and produced a variety of publications, including The Old Executive Office Building, A Victorian Masterpiece, published in 1984.

6. I won numerous awards for my work to restore and maintain the EEOB, including the 1985 National Trust for Historic Preservation's Preservation Honor Award; the 1986 Executive Office of the President Office of Administration's Director's Award for Distinguished Service; the 1987 American Institute of Architects Washington Chapter Award; the 1988 Presidential Design Awards' Federal Design Achievement Award; two 1990 GSA Design Excellence Awards; and a 2014 GSA Design Excellence Award. These awards recognized

**DECLARATION OF MYDELLE WRIGHT**

my leadership of the EEOB restoration program, the restoration of the Secretary of the Navy's Office, and the restoration of the West Rotunda.

7. In recent years I served as the GSA Administrator's representative on the National Capital Planning Commission, Washington, D.C. where I chaired the Urban Design Task Force, and on the National Capital Memorial Advisory Commission, Washington, D.C.

8. After my retirement, GSA lauded my career contributions to the agency and the American people in a public statement.

9. Between my service at the White House and my tenure with GSA, I held additional employments that inform my understanding of issues in this matter, including Curator for Exhibitions and Design for the National Building Museum and Director of the Design Arts Program for the National Endowment for the Arts.

10. I have engaged in additional professional activities to advance my field, including serving as U.S. Delegate to the International Center for the Study of Preservation and Restoration of Cultural Property in Rome, Italy, and serving as speaker and panelist at numerous conferences of leading architectural and preservation professional associations.

11. I earned a Bachelor of Arts degree and completed all coursework for a Master of Arts degree, both in Art History, from George Washington University. My coursework included subjects relevant to the legal processes in place to ensure compliance with federal standards for preservation.

**PURPOSE**

12. As perhaps the person longest and most deeply involved in historic preservation efforts of EEOB in the modern era, I deeply care about this building, its historic condition, and its preservation for current and future generations.

**DECLARATION OF MYDELLE WRIGHT**

13. I submit this declaration to explain: (a) the historical importance of the EEOB and its exterior design; (b) why any meaningful application of required federal processes will lead to the inevitable conclusion that preparing the EEOB exterior for painting, and actually painting it, will irreparably damage its historic fabric and setting; (c) how the process of considering alterations to the EEOB works when it follows the law; (d) why the President's solicitation of professional renderings of a painted EEOB—which he showed on national television—and bids from contractors for painting the EEOB—which he stated he was already receiving, when coupled with GSA's disclaimer it has initiated no process pursuant to the requirements of the National Environmental Policy Act ("NEPA") and the National Historic Preservation Act ("NHPA"), raise serious concerns; and (e) why the failure to initiate these processes (and not just the threat of painting itself) do not follow legally required preservation/consultation processes.

14. The opinions expressed herein are based on my expertise and on my review of publicly available documents cited below.

**ABOUT THE EEOB**

15. The EEOB, originally named the State, War, and Navy Department Building and previously called the Old Executive Office Building, is arguably one of the Nation's most important examples of French Second Empire civic architecture. According to the GSA's web page titled *Eisenhower Executive Office Building, Washington, DC* (updated January 16, 2025), the building was constructed between 1871 and 1888, designed by Supervising Architect Alfred B. Mullett, and designated a National Historic Landmark in 1969. At the time of its completion, it was one of the largest office buildings in Washington,

**DECLARATION OF MYDELLE WRIGHT**

Doc ID: efcce702f8f8973c054f980bf5e73690130e0345

D.C. ECF No. 7-18. GSA confirms that the exterior consists of granite walls with cast-iron trim and slate roofs. *See* ECF No. 7-8.

16. The GSA's publication *Extending the Legacy: GSA Historic Building Stewardship*, 2011, has described the EEOB as "the most elaborate building in the [agency's] inventory," which includes more than 8,500 buildings. ECF No. 7-18 at 87.

17. The White House Historical Association's (the "Association") press release dated December 13, 2023, announcing its "Palace of State" podcast episode, calls the EEOB a "masterpiece of Second Empire style" and notes that its granite, slate, and cast-iron exterior has stood for more than 150 years and has survived threats of demolition and alteration. ECF No. 7-9 at 1–2.

18. According to the Executive Office of the President's 1984 publication of which I was an author and editor, *The Old Executive Office Building: A Victorian Masterpiece*, the building's primary architect, Alfred Mullett, deliberately selected a pinkish granite from Maine for the exterior granite for the basement and a gray granite from the Green Quarry just north of Richmond, Virginia for the rest of the exterior walls and described the result as a "pleasing contrast." A true and correct copy of that publication is attached as Exhibit 6 at 25.

19. The color, texture, marks of workmanship, and overall appearance of the granite and the slate are important character-defining features of the EEOB facade as described in the 1969 National Register Nomination for the EEOB. A true and correct copy of that publication is attached as Exhibit 7.

**DECLARATION OF MYDELLE WRIGHT**

**EEOB WILL BE IRREPARABLY DAMAGED IF IMPROPERLY CLEANED OR REPOINTED, PREPARED FOR PAINTING, AND PAINTED**

20. Based on my extensive professional experience developing, participating in, and leading restoration, repair, and alteration projects for the EEOB, any activity conducted on the EEOB without careful research, public and expert consultation, testing, evaluation, and compliance with the Secretary of Interior ("SOI") Standards for Rehabilitation has the significant potential to adversely affect the building.

21. The EEOB's granite exterior walls and slate roof have never been painted. Historically, builders do not paint these materials for at least four reasons: 1) damage to aesthetic appearance, 2) high cost, 3) damage to long-term integrity, and 4) reduction in long-term value.

22. One reason for masonry to remain unpainted is because painting a building that was not originally painted is an action that changes the building's historic character by changing its original appearance. Painting a historic masonry building is therefore an adverse effect that damages the exterior wall and roof appearance, characteristics that contribute to its eligibility for the National Register of Historic Places. The appearance of these materials on the EEOB, including color and construction details that would be obscured by painting, are important character-defining features of the EEOB. Indeed, the EEOB's historic character depends on its unpainted gray granite and slate exterior.

23. The granite and slate used in the construction of the EEOB are expensive relative to other construction materials that are commonly painted, the investment of which would be obscured and diminished with painting.

24. Granite is a dense, nonporous stone that has a naturally smooth surface. Slate is a fine-grained, slightly porous metamorphic stone. Both materials have performed well for more

than 150 years precisely because they have been allowed to breathe and have not been coated. Painting these materials would require altering their surfaces through the preparatory abrasion and painting and would dramatically change their performance.

25. Granite and slate are exterior coverings that require little ongoing maintenance compared with painted materials. Indeed, the GSA's own technical guideline *Specifications for Slate Shingles* describes slate as a "permanent material that is waterproof, fireproof, resistant to climatic changes, and requires no preservative coatings or paint, and no cleaning, resulting in lower insurance premiums, higher property values, little or no maintenance costs, and a high salvage value." ECF No. 7-21 at 1.

26. Under all the preservation standards and technical guidance with which I am familiar historic masonry buildings are to be maintained in their original materials and not coated or otherwise painted.

27. The SOI Standards for Rehabilitation caution against painting masonry that has historically been unpainted and warn that such treatments, as well as abrasive cleaning or improper repointing, can irreversibly damage historic materials.

28. GSA's own technical procedures and guidance warn of the damage caused by inappropriate cleaning, repointing, and painting. The technical procedures titled *Granite: Characteristics, Uses And Problems* notes that mortar chipping and spalling (flaking of exterior surfaces) can be caused by repairs, especially the use of a too-hard pointing mortar; that improper chemical cleaning can cause efflorescence of soluble salts on the granite (where cloudy white deposits form on the surface, which are unsightly and difficult and expensive to remove); and that applications of water-repellent coatings (such as paint)

**DECLARATION OF MYDELLE WRIGHT**

cause flaking of the granite by trapping moisture beneath the surface. A true and correct copy of that publication is attached as Exhibit 8 at 2–5

29. The document *Guidelines for Using High Pressure Cleaning Equipment on Masonry* acknowledges that "For typical masonry cleaning, the pressure rating can range from 500 to 1,000 psi. NOTE: FOR OLDER AND DELICATE SURFACES, MUCH LOWER PRESSURES MUST BE USED." A true and correct copy of that publication is attached as Exhibit 9 at 2.

30. GSA guidance for repairing slate roofs states that "[c]olor and appearance shall match existing as closely as possible." A true and correct copy of that publication is attached as Exhibit 10 at 2.

31. Based on my experience, to make paint adhere to granite or slate, the surface must be mechanically abraded (through sanding or grinding) or chemically etched to create a profile for the coating. Abrasion destroys the original finish and exposes the stone to accelerated weathering. Chemical etching (with acids or alkalis) can open pores and create staining or weakening.

32. Once the stone's finish has been altered by painting, it cannot be restored without removal of additional material, resulting in permanent loss of historic fabric. These concerns are reflected in preservation guidance such as Anne E. Grimmer's *The Cleaning and Waterproof Coating of Masonry Buildings* (1984), a publication of the National Park Service's Technical Preservation Services, which explains that painting previously unpainted masonry can trap moisture and cause spalling and that chemical paint removal can further damage the stone. ECF No. 7-14 at 35, 41–42. There is a long history of masonry buildings suffering future deterioration after being painted.

**DECLARATION OF MYDELLE WRIGHT**

Doc ID: efcce702f8f8973c054f980bf5e73690130e0345

33. Painting slate or granite creates a vapor-impermeable barrier. Because slate and historic lime-based mortars are designed to allow moisture to migrate through the wall assembly, applying paint traps moisture behind the coating. Trapped moisture freezes and thaws, leading to cracking, scaling, and spalling of the stone. Repointing the EEOB with incompatible mortars would likewise damage the masonry. The building's original mortar likely contains lime and natural hydraulic cement, which are softer and more vapor permeable than modern Portland cement. Using a hard, impermeable mortar in repointing can trap moisture and cause stresses that lead to cracking and spalling of adjacent stone. Cleaning with high-pressure water or abrasive blasting will erode the surface and force water into the stone. Painting over repointed joints would further exacerbate moisture problems. Preservation standards require that mortar composition and cleaning methods be compatible with the original materials. The EEOB's masonry is a complex and delicate system that has functioned successfully without coatings for more than a century; altering that system risks irreversible failure.

34. If painting proceeds, the building will require ongoing maintenance; a 2025 article by the Federal Performance Contracting Coalition titled "How Often Should You Repaint Your Commercial Property?" advises that large commercial buildings should be repainted every five to seven years, meaning the EEOB would be placed on a continual repainting cycle. *See* ECF No. 7-13. Given the enormity of the EEOB, scaffolding will be constantly present – and note: even the use of the scaffolding attached to the building to conduct any planned work can irreparably damage the granite exterior.

35. Based on my extensive professional experience developing, participating in, and leading restoration, repair, and alteration projects for the EEOB, paint on the EEOB is likely to

**DECLARATION OF MYDELLE WRIGHT**

Doc ID: efcce702f8f8973c054f980bf5e73690130e0345

degrade in appearance much faster than on buildings meant to be painted given the iron content in the granite exterior. Iron inclusions of this type are known to leach out of buildings and discolor the stone and will discolor any paint coating over it—with stains that will look like rust or dirt. In my estimation, the building will require repainting much more frequently than every five years to ensure consistent color free from staining; the building could potentially need to be repainted every 2–4 years.

36. Based on my extensive professional experience developing, participating in, and leading restoration, repair, and alteration projects for the EEOB, the cost for each repainting would be high given the size and complexity of this building, likely $20 million or more. Repeating this expense every few years for the life of the building would be an egregious and unnecessary expense for the U.S. taxpayers. Further, such a large and recurring expense would inevitably result in worse preservation outcomes for other buildings in the National Capital region given the shift of GSA resources to this unneeded expense.

37. Painting the EEOB would also damage the visual setting of the historic properties from which the EEOB is visible, such as the Lafayette Square National Historic Landmark District ("NHLD"). The building's gray stone façade provides a visual contrast to the White House and anchors the west side of the square with the Treasury Building helping to complete the visual framing the White House on the East side. Painting the EEOB white would dramatically alter the district's views and the public's experience of President's Park. Such a change would diminish the integrity of setting, feeling, and association that contribute to the district's National Historic Landmark status, and in doing, diminish the importance of the White House itself in the visual hierarchy of the entire site.

**DECLARATION OF MYDELLE WRIGHT**

38. The EEOB is also visible from historic properties located within the National Register-listed Financial Historic District, the Seventeenth Street Historic District, the National Mall, the Pennsylvania Avenue National Historic Site, and the Washington Monument and Grounds Historic District. A true and correct copy of that map is attached as Exhibit 11. Alteration to the EEOB color will not only affect the EEOB, but it will also have an adverse effect on the other historic properties.

39. If the EEOB were painted, the damage would be permanent and not compensable in money damages. Once historic granite and slate have been abraded, sealed, or coated, the original surfaces and patina cannot be restored. Removal of paint from stone risks staining, profiling, and loss of material, and cannot reverse the impact on the building's integrity. Furthermore, painting would commit the government to recurring maintenance expenditures and would divert funds from appropriate preservation work.

**EEOB IS SUBJECT TO THE NHPA**

40. Because the EEOB is a National Historic Landmark and a contributing resource to the Lafayette Square NHLD, any work affecting its exterior is subject to Section 106 and Section 110(f) of the NHPA.

41. Numerous federal preservation documents confirm that exploration of alterations to the EEOB is subject to the NHPA. In the 1984 publication, for which I was the editor and a contributing author, *The Old Executive Office Building: A Victorian Masterpiece*, the Executive Office of the President's Office of Administration recognized that the then named OEOB had survived threats of alteration, and then stated:

> Today, however, the future of the OEOB is secure. Protected by federal laws set forth in the Historic Preservation Act of 1966, the building and its site were placed on the National Register of Historic Places in 1971 and on the District of Columbia Inventory of Historic Sites by the Historic

**DECLARATION OF MYDELLE WRIGHT**

Doc ID: efcce702f8f8973c054f980bf5e73690130e0345

> Landmarks Office in 1972, status which protects it from any future proposals for major alteration, reconstruction, or demolition and provides for its preservation as an historic monument and important cultural resource.

Exhibit 6 at 29.

42. In 2007 in preparation for the extensive modernization of the EEOB the Executive Office of the President published a commemorative booklet titled *Eisenhower Executive Office Building: Modernization and Restoration*. This document states, "Protected by the National Historic Preservation Act of 1966, the EEOB and its site were placed on the National Register of Historic Places in 1971 and on the District of Columbia Inventory of Historic Sites by the Historic Landmarks Office in 1972." A true and correct copy of that publication is attached as Exhibit 12 at 3.

43. A draft National Park Service map of the Lafayette Square Historic District from May of 2013 explains that while the White House and its grounds are legally exempt from NHPA requirements under Section 107 of the Act, but the EEOB is a contributing building within the District (and therefore not a primary building covered by the exemption). ECF No. 7-11.

44. The 1970 National Historic Register of Historic Places ("NHRP") nomination form specifically lists the EEOB as part of the southwest corner of the Lafayette Square Historic District. It separately states that the White House is omitted from the district. ECF No. 7-17 at 3.

45. District of Columbia Historic Preservation Review Board's staff report for Case No. 22-13, the Lafayette Square Historic District (Additional Documentation and Boundary Increase), dated September 29, 2022, similarly states that the White House and its grounds are exempt, but does not exclude the EEOB from the district. *See* ECF No. 7-12.

**DECLARATION OF MYDELLE WRIGHT**

Doc ID: efcce702f8f8973c054f980bf5e73690130e0345

45. Because the EEOB is a National Historic Landmark and a contributing resource to the Lafayette Square National Historic Landmark District ("Lafayette Square NHLD"), any work affecting its exterior is subject to Section 106 and Section 110(f) of the NHPA.

46. Additionally, during my tenure as Director of the OPDQ from 2010 to 2024, it was GSA's policy to treat all EEOB projects, both interior and exterior, as subject to the NHPA and Section 106. All projects also included rigorous design development and review.

**ISSUES WITH THE PRESIDENT'S STATEMENTS REGARDING MODIFICATIONS TO THE EEOB**

47. Under the regulations at 36 C.F.R. § 800.5(a)(2)(ii), the president's plan for cleaning, repointing, and painting the EEOB will undoubtedly constitute an adverse effect on the EEOB. Examples of adverse effects provided in the regulations include types of alteration, restoration, rehabilitation, repair, and maintenance that are not consistent with the SOI Standards for Rehabilitation and applicable guidelines. 36 CFR § 800.5(a)(2)(ii). The SOI Standards recommend against applying paint or other coatings to masonry that has been historically unpainted or uncoated, needlessly introducing chemicals or moisture into historic materials through unnecessary cleaning, removing paint that is firmly adhered to masonry, and repointing masonry units when not needed or in a manner that does not match the original mortar content and repointing methods. *See* ECF No. 7-20 at 168.

48. In my professional opinion, painting the EEOB constitutes an undertaking with the potential to directly and adversely affect a National Historic Landmark, as well as adjacent NHLs and historic districts that require consultation pursuant to Section 106 and Section 110(f) and analysis under NEPA. Getting bids without such review risks irreversible harm to one of the Nation's most significant historic buildings and to the Lafayette Square NHLD.

**DECLARATION OF MYDELLE WRIGHT**

49. I have read the GSA declaration that attests that GSA has not initiated any such consultation. To my knowledge and based on GSA's declarations, no environmental assessment, environmental impact statement, or Section 106 consultation has been conducted for the proposed EEOB project.

50. And yet I have seen the president, during an interview with a Fox News host, show a professionally rendered mock-up of the EEOB painted white. In the same interview, the president also said that he was already requesting bids for the painting work. These are both indications that the NHPA and NEPA consultation processes should already be underway at the GSA. Instead, it suggests that early decisions are happening outside the normal GSA-led NEPA and NHPA process.

51. In my decades of professional experience leading compliance with federal consultation requirements for buildings, including the EEOB, the following is how a lawful process should be undertaken in this matter:

    a. The president tells his Executive Office staff that he wants to explore painting every exterior surface of the EEOB white;

    b. The president's staff contacts the GSA Administrator, who then discusses the proposed project with the GSA's preservation team leaders;

    c. GSA preservation team leaders quickly advise that such a plan constitutes a major federal action and undertaking with potential adverse effects to a National Historic Landmark;

    d. GSA preservation team leaders initiate the research and consultation processes required by NHPA and NEPA. Under NEPA, GSA preservation team leaders determine whether to produce an Environmental Impact Statement ("EIS") or to

**DECLARATION OF MYDELLE WRIGHT**

      begin with an Environmental Assessment ("EA") that may be followed by an EIS, depending on the results;

e. That process proceeds over a matter of many months, and involves inviting experts from inside and outside of the government, as well as the public, to weigh in. It includes consultation with the National Park Service and the Advisory Council on Historic Preservation to ensure all possible planning is conducted to minimize harm to the EEOB as a National Historic Landmark and to any other affected National Historic Landmarks. This planning and consultation process is documented, made available to the public for comment, and revised as GSA responds to comments and incorporates feedback;

f. Experts explore technically and economically feasible alternatives to help the president achieve the project's purpose and, including his broader aim of improving the building's aesthetics. Alternatives may include cleaning and repointing the building using appropriate methods or suggesting reversible decorative treatments, such as installing translucent white sheers on the interior of the more than 1,500 windows to dramatically brighten the appearance while allowing natural light inside. They provide guidance on how all of these activities can be carried out properly, in compliance with NHPA and NEPA and in accordance with the government's own official standards;

g. If GSA determines that the proposal will adversely affect historic properties, it executes a Memorandum of Agreement ("MOA"), negotiated among government agencies and public consulting parties, that details the measures to avoid, minimize, and mitigate any adverse effects. The MOA also outlines how unanticipated

**DECLARATION OF MYDELLE WRIGHT**

      adverse effects will be handled pursuant to the NHPA. Consistent with the MOA, or the preferred alternative that does not adversely affect historic properties, GSA staff then outline a project plan identifying standards, protocol, timetables, and a budget;

  h. If GSA develops an EA and determines there will be no significant impact on the human environment, it issues a Finding of No Significant Impact. If it determines there will be a significant impact, it develops an EIS to examine the project's effects more fully, including potential mitigation measures. If GSA develops an EIS initially, then issues a Record of Decision stating which alternative it chooses and what mitigation measures will be implemented;

  i. Once a budget is established, the GSA begins the open bid process for the design, and once it identifies a qualified contractor, it beings a complex review process;

  j. Design quality undergoes a rigorous review process by both the NCPC and the CFA, including a three-stage review at 15% (concept), 35% (preliminary design), and then finally at 95% (final design). When both the NCPC and the CFA approve the final design, GSA authorizes work to proceed;

  k. The work may commence under the strict supervision of career professionals.

52. Because the GSA disclaims having initiated any of the required consultation processes required by NHPA or NEPA, one is left to conclude that the President is driving this process out of the usual legal/process order. While the President did not say he has issued a contract as yet (and he has no authority to do so), reviewing bids is, as reflected in the outline above, far past the point at which GSA should have commenced its processes for legal compliance with NHPA and NEPA.

**DECLARATION OF MYDELLE WRIGHT**

**URGENT NEED TO PROTECT THE EEOB**

53. The lack of required public consultation personally affects me given my strong feelings for this building. To be clear, the harm to the American people does not begin when painters open the first can of paint, it begins in the denial of this required process, a denial that seems well underway and threatens to be permanent should the president proceed as his has on other renovation projects of late. I have heard from other former GSA and White House staff who served alongside me that they feel similarly.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 2 December, 2025, in  Fort Collins , Colorado .

_____
Mydelle Wright

**DECLARATION OF MYDELLE WRIGHT**

Doc ID: efcce702f8f8973c054f980bf5e73690130e0345