UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CULTURAL HERITAGE PARTNERS,
PLLC, *et al.*,

            Plaintiffs,

    v.

GENERAL SERVICES
ADMINISTRATION, *et al.*,

           Defendants.

Case No. 1:25-cv-03969-DLF

**DEFENDANTS' MEMORANDUM OF POINTS & AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN
THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 3

PROCEDURAL BACKGROUND ..................................................................................... 4

LEGAL BACKGROUND ................................................................................................. 5

     A.    National Historic Preservation Act ..................................................... 5

     B.     National Environmental Policy Act ................................................... 6

     C.    Administrative Procedure Act............................................................ 7

STANDARDS OF REVIEW .............................................................................................. 7

ARGUMENT ..................................................................................................................... 9

     PLAINTIFFS' CLAIMS ARE MOOT ...................................................................... 9

    II.    PLAINTIFFS LACK ARTICLE III STANDING...................................................... 10

        A.    Plaintiffs' Asserted Injuries Are Neither Particularized Nor Imminent ................................................................................................. 10

        B.    Plaintiffs' Alleged Injuries are Not Traceable to the Agency Defendants ........................................................................................ 16

        C.    Plaintiffs' Alleged Injuries Are Not Redressable ..................................... 18

    III.    PLAINTIFFS LACK A CAUSE OF ACTION................................................... 20

        A.    Presidential Action is Not Reviewable Under the APA ........................... 20

        B.    Plaintiffs Have Not Identified a Final Agency Action or a Failure to Act.................................................................................................... 22

            1.    Plaintiffs Have Not Identified a Final Agency Action.................. 22

            2.    Plaintiffs Have Not Identified a Discrete Action Defendants Have Failed to Take ............................................................ 24

        C.    Plaintiff's "Constitutional" Claim Is a Statutory Claim in Disguise ........ 27

    IV.    IN ANY EVENT, PLAINTIFFS' CLAIMS FAIL ON THE MERITS.................................... 29

i

A.      The EEOB Is Exempt from the NHPA Under Section 107, so NHPA Consultation Is Not Required......................................................... 29

B.      Even if the NHPA Applies, No Consultation Duty Has Been Triggered......................................................................................... 32

C.      No Major Federal Action Triggered NEPA ............................................. 33

CONCLUSION................................................................................................................ 35

# TABLE OF AUTHORITIES

**Cases**

*Abhe & Svoboda, Inc. v. Chao,*
  508 F.3d 1052 (D.C. Cir. 2007) .............................................................................. 8

*Already, LLC v. Nike, Inc.,*
  568 U.S. 85 (2013) ..................................................................................................... 9

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) .............................................................................. 8

*Am. First Legal Found. v. Greer,*
  153 F.4th 1311 (D.C. Cir. 2025) ............................................................................ 18

*Am. Legion v. Am. Humanist Ass'n,*
  588 U.S. 29 (2019) ................................................................................................... 12

*Am. Petroleum Inst. v. EPA,*
  683 F.3d 382 (D.C. Cir. 2012) .............................................................................. 10

*Armstrong v. Exec. Off. of the President,*
  90 F.3d 553 (D.C. Cir. 1996) ................................................................................ 21

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................................. 8, 27

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .................................................................................................. 8

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................................ 22

*Calton v. Babbitt,*
  147 F. Supp. 2d 4 (D.D.C. 2001) .......................................................................... 24

*Citizens for Resp. & Ethics in Wash. v. Trump,*
  302 F. Supp. 3d 127 (D.D.C. 2018) ................................................................. 19, 28

*City of Alexandria. v. Slater,*
  198 F.3d 862 (D.C. Cir. 1999) ................................................................................ 5

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ........................................................................................... 11, 15

*Clarke v. United States,*
  915 F.2d 699 (D.C. Cir. 1990) ................................................................................ 9

*Comm. of 100 on Fed. City v. Foxx,*
  87 F. Supp. 3d 191 (D.D.C. 2015) ........................................................................ 34

*Ctr. for Biological Diversity v. Fed. Aviation Admin.*,
    No. 23-1204, 2025 WL 2643458 (D.D.C. Sept. 15, 2025) ...................................... 6

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009) ...................................................................... 25, 33

*Curran v. Holder*,
    626 F. Supp. 2d 30 (D.D.C. 2009) ...................................................................... 7

*Dalton v. Specter*,
    511 U.S. 462 (1994) ........................................................................... 20, 27, 28

*Delaware Riverkeeper Network v. FERC*,
    753 F.3d 1304 (D.C. Cir. 2014) ....................................................................... 33

*Doe 2 v. Trump*,
    319 F. Supp. 3d 539 (D.D.C. 2018) ................................................................. 19

*Envt'l Def. Fund v. FERC*,
    (*EDF*), 2 F.4th 953 (D.C. Cir. 2021) .......................................................... 12, 13

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................................................ 15

*Food & Water Watch v. FERC*,
    28 F.4th 277 (D.C. Cir. 2022) ......................................................................... 12

*Food & Water Watch v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ......................................................................... 15

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ........................................................................... 18, 19, 20

*Freedom Republicans, Inc. v. FEC*,
    13 F.3d 412 (D.C. Cir. 1994) ........................................................................... 16

*Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*,
    No. 25-12873, 2025 WL 2598567 (11th Cir. Sept. 4, 2025) ............................ 25

*Glob. Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025) ...................................................................... 27, 28

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ........................................................................................ 11

*Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*,
    466 F. Supp. 3d 100 (D.D.C. 2020) ................................................................. 21

*Ipsen Biopharmaceuticals, Inc. v. Becerra*,
    678 F. Supp. 3d 20 (D.D.C. 2023) ................................................................... 16

*Jerome Stevens Pharm., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005) ......................................................................... 8

*Karst Env't. Educ. & Prot., Inc. v. EPA*,
   475 F.3d 1291 (D.C. Cir. 2007) ..................................................................... 7, 32

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ........................................................................................... 8

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................... 1

*Lujan v. Nat'l Wildlife Fed.*,
   497 U.S. 871 (1990) ......................................................................................... 23

*Marsh v. ONRC*,
   490 U.S. 360 (1989) ........................................................................................... 7

*Marshall Cnty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) ......................................................................... 9

*McMillan Park Comm. v. Nat'l Cap. Plan. Comm'n*,
   968 F.2d 1283 (D.C. Cir. 1992) ......................................................................... 5

*Mehneh v. Rubio*,
   No. 25-5001, 2026 WL 125973 ..................................................................... 9, 25

*Mississippi v. Johnson*,
   71 U.S. 475 (1866) ..................................................................................... 18, 28

*Montanans for Multiple Use v. Barbouletos*,
   568 F.3d 225 (D.C. Cir. 2009) ......................................................................... 24

*Murphy v. Hunt*,
   455 U.S. 478 (1982) ........................................................................................... 9

*N.Y. Republican State Comm. v. SEC*,
   927 F. 3d 499 (D.C. Cir. 2019) ....................................................................... 11

*Nat'l Min. Ass'n v. Fowler*,
   324 F.3d 752 (D.C. Cir. 2003) ........................................................................... 5

*Nat'l Parks Conservation Ass'n v. Semonite*,
   916 F.3d 1075 (D.C. Cir. 2019) ......................................................................... 6

*Nat'l Taxpayers Union, Inc. v. United States*,
   68 F.3d 1428 (D.C. Cir. 1995) ......................................................................... 16

*Nat'l Tr. for Historic Pres. v. Blanck*,
   938 F. Supp. 908 (D.D.C. 1996) ................................................................... 6, 33

*Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell*,
   77 F. Supp. 3d 103 (D.D.C. 2015) ..................................................................... 8

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ................................................................... 18, 19

*Norton v. SUWA*,
    542 U.S. 55 (2004)..................................................................................... 24

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*,
    656 F. Supp. 3d 137 (D.D.C. 2023).................................................... 11, 13

*Pub. Citizen v. Off. of U.S. Trade Representatives*,
    970 F.2d 916 (D.C. Cir. 1992)................................................................ 25

*Pub. Citizen, Inc. v. FERC*,
    92 F.4th 1124 (D.C. Cir. 2024).................................................................. 9

*Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003)................................................................ 24

*Rushforth v. Council of Econ. Advisers*,
    762 F.2d 1038 (D.C. Cir. 1985)............................................................. 21

*Satanic Temple v. Labrador*,
    149 F.4th 1047 (9th Cir. 2025)............................................................... 15

*Save Long Beach Island v. U.S. Dep't of the Interior*,
    663 F. Supp. 3d 1 (D.D.C. 2023)........................................................... 34

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
    605 U.S. 168 (2025)................................................................................... 7

*Sierra Club v. FERC*,
    153 F.4th 1295 (D.C. Cir. 2025)............................................................... 7

*Sierra Club v. FERC*,
    827 F.3d 59 (D.C. Cir. 2016)................................................................... 12

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)................................................................................... 15

*Soucie v. David*,
    448 F.2d 1067 (D.C. Cir. 1971)............................................................. 21

*Statewide Bonding, Inc. v. Dep't of Homeland Sec.*,
    980 F.3d 109 (D.C. Cir. 2020)............................................................... 20

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998)..................................................................................... 7

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)................................................................................. 11

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)................................................................................. 11

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996)............................................................... 19

vi

*Sweetland v. Walters*,
   60 F.3d 852 (D.C. Cir. 1995) ............................................................... 21

*Texas v. United States*,
   523 U.S. 296 (1998) ............................................................................. 10

*Town of Fairview v. U.S. Dep't of Transp.*,
   201 F. Supp. 2d 64 (D.D.C. 2002) ...................................................... 13

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ............................................................................. 13

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) ................................................................. 7

*United States v. Jabr*,
   No. CR 18-0105 (PLF), 2019 WL 13110682 (D.D.C. May 16, 2019) ............ 31

*Washington v. Off. of Admin.*,
   566 F.3d 219 (D.C. Cir. 2009) ....................................................... 21, 22

*Wildlife v. Andrus*,
   627 F.2d 1238 (D.C. Cir. 1980) ............................................................ 33

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
   165 F.3d 43 (D.C. Cir. 1999) ................................................................ 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................................. 28

**Statutes**

16 U.S.C. 470g .......................................................................................... 30

18 U.S.C. § 1752(a)(1) ............................................................................... 31

40 U.S.C. § 3305 .......................................................................................... 4

42 U.S.C. § 4332 ........................................................................................ 19

42 U.S.C. § 4332(2)(C) .............................................................................. 33

42 U.S.C. § 4332(C) ..................................................................................... 7

42 U.S.C. § 706(1) ..................................................................................... 24

5 U.S.C. § 702 ............................................................................................ 20

5 U.S.C. § 704 ...................................................................................... 20, 22

5 U.S.C. § 706(1) ................................................................................... 7, 20

5 U.S.C. § 706(2)(A) ................................................................................... 7

5 U.S.C. § 706(2)(D) ................................................................................... 7

54 U.S.C. § 300320 ........................................................................................................ 5

54 U.S.C. § 302101 ...................................................................................................... 17

54 U.S.C. § 302102 ...................................................................................................... 17

54 U.S.C. § 306108 ................................................................................................. 19, 26

54 U.S.C. § 307104 ..................................................................................... 5, 29, 31, 32

64 Stat. 1270 (1950) ..................................................................................................... 16

Pub. L. No. 100-461, 102 Stat. 2268 (1998) ................................................................. 4

**Rules**

Fed. R. Civ. P. 12(b)(1) .............................................................................................. 2, 8

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 2, 27

Fed. R. Civ. P. 12(d) ...................................................................................................... 8

Fed. R. Civ. P. 56(a) ................................................................................................... 2, 8

**Regulations**

36 C.F.R. § 800.1(c) ........................................................................................ 14, 26, 32

36 C.F.R. § 800.10(c) ................................................................................................... 18

36 C.F.R. § 800.2 ......................................................................................................... 17

36 C.F.R. Part 65 .......................................................................................................... 17

**Other Authorities**

42 Fed. Reg. 62,895 (Dec. 12, 1977) ........................................................................... 22

H.R. Rep. No. 1457, 96th Cong., 2d Sess. 36 (1980) *reprinted in* 1980 U.S.C.C.A.N. 6378 ........ 6

## INTRODUCTION

Plaintiffs seek to superintend executive decision-making on White House grounds based on the President's statement that he may—at some unknown and hypothetical future time—paint the Eisenhower Executive Office Building ("EEOB"). Plaintiffs have not hidden their extraordinary request—an injunction ordering agency leadership to "restrain[] the President." *See* Dkt. No. 16 at 1; *see also* Hr'g Tr. 7:6–8 (Dec. 8, 2025) ("We are asking you to enjoin the President."). Plaintiffs' claims fail on the merits. But to even reach the merits would plunge this Court into a separation-of-powers thicket that the judiciary has long avoided. The Court should instead dismiss this case.

For starters, the Court should dismiss this suit because the President has voluntarily committed to engage in the exact analyses Plaintiffs seek. The President has decided in his discretion that the Office of Administration ("OA") within the Executive Office of the President ("EOP") will voluntarily comply with NEPA and the NHPA before deciding whether to proceed with a Presidential project to clean, repoint, and paint the EEOB's granite exterior. That gives Plaintiffs all the relief they seek, so this lawsuit is moot.

Mootness aside, Plaintiffs' claims fail under each element of the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). On injury in fact, the President's musings about a hypothetical painting project do not cause Plaintiffs any actual or imminent injury. Because no decision to paint the EEOB has been made, any injury that could possibly flow from such a decision is speculative—not actual or imminent. That alone resolves this action. But if more were needed, Plaintiffs cannot trace their alleged injuries to either the National Park Service ("NPS") or the General Services Administration ("GSA") defendants. Instead, the hypothetical future action Plaintiffs challenge would be the President's action. But courts

lack jurisdiction to enjoin—or to issue a declaratory judgment against—the President, so any alleged injuries are not redressable. Plaintiffs thus lack standing.

Even if their claims were not moot, and they could identify a defendant against whom they have standing to seek relief, Plaintiffs' claims would fail for want of a cause of action. Plaintiffs' NEPA and NHPA claims can only be brought under the Administrative Procedure Act ("APA"), but Plaintiffs fail to identify *agency* action, much less *final* agency action. The President is not an "agency" under the APA. And even if there were a proper agency defendant, Plaintiffs fail to identify a "final" agency action—they instead challenge an *idea* that may or may not come to pass. And they have failed to identify—as they must to support a failure-to-act claim—a discrete duty that any of the Federal Defendants is required to undertake. Plaintiffs cannot avoid these problems by rebranding their statutory claims as constitutional ones under the Take Care Clause.

Finally, Plaintiffs' claims fail on the merits. Their NHPA claims fail because the EEOB is part of "the White House and its grounds" and is therefore exempt under Section 107 of the Act, and because there has been no approval of "the expenditure of any Federal funds" that would trigger the obligation to consult. As for their NEPA claim, there has been no "major federal action" to which the statute applies. And even if a major federal action were in the offing, there has been no "irretrievable commitment of resources" that would trigger an obligation to analyze environmental effects.

In short, Plaintiffs' claims fail at every turn. The Court should dismiss Plaintiffs' complaint for lack of subject-matter jurisdiction and for failure to state a claim or, in the alternative, enter summary judgment in Defendants' favor. *See* Fed. R. Civ. P. 12(b)(1), (6); Fed. R. Civ. P. 56(a).

## FACTUAL BACKGROUND

For the first 67 years of its existence, the EEOB was known as the State, War, and Navy Department Building.[1] Over time, the Departments outgrew the EEOB, and they departed in 1918 (Navy), 1938 (War), and 1949 (State). Those agencies were replaced by the White House Bureau of the Budget and other White House staff as tenants. *Id.* Today the EEOB hosts the EOP and other Executive Branch employees who assist and advise the President in the execution of his constitutional office, including various components that comprise the EOP, such as the White House Office, the Office of the Vice President, the Office of Management and Budget, and the National Security Council. *See* Decl. of Heather Martin, Deputy Assistant to the President ¶ 3 (Jan. 29, 2026) (attached as Ex. A) ("Martin Decl."); Decl. of Matthew Quinn, Deputy Director of the Secret Service ¶ 7 (Jan. 29, 2026) (attached as Ex. B) ("Quinn Decl.").[2] Because of its operational connection with the White House, it serves as extension of that building. Martin Decl. ¶¶ 3–6; Quinn Decl. ¶¶ 7–9.

In a November 2025 television interview, the President expressed his interest in cleaning, repointing, and painting the EEOB white to match the adjacent White House. In that interview, the President also indicated that he did not know whether the project would be undertaken. He was asked "and when is that planned for?" and responded, "I don't even know if I'm going to do it yet."[3]

---

[1]    https://www.gsa.gov/real-estate/historic-preservation/explore-historic-buildings/find-a-building/eisenhower-executive-office-building-washington-dc (last visited Jan. 29, 2026).

[2]    *See also* https://obamawhitehouse.archives.gov/node/354981 (last visited Jan. 29, 2026).

[3]    *See* https://www.foxnews.com/video/6385030226112 at 2:00–2:07 (last visited Jan. 29, 2026).

As the President's consideration of projects at the EEOB has progressed, on January 29, 2026, EOP's Office of Administration ("OA") and the GSA entered into a Memorandum of Understanding ("MOU") regarding responsibility for a presidential project to clean, repoint, and paint the EEOB ("the Project"). OA and the GSA agreed that each has statutory authority to paint the EEOB. 5th Decl. of Andrew Heller, Acting Commissioner of the Public Buildings Service, GSA ¶ 5 & Attach. A (Jan. 29, 2026) (attached as Ex. C) ("Heller Decl."); Martin Decl. ¶ 9 & Attach. A; *see also* 40 U.S.C. § 3305 (GSA authority); Pub. L. No. 100-461, 102 Stat. 2268 § 590 (Oct. 1, 1998) (OA authority). As reflected in the MOU, as of January 29, 2026, OA will manage the Project at the EEOB, to the extent the President decides to pursue the Project.

OA has voluntarily committed to engage in NEPA and NHPA analyses, and to not authorize or engage in the Project until the completion of those processes. Martin Decl. ¶¶ 10–12.

## PROCEDURAL BACKGROUND

Plaintiffs bring five claims, alleging violations of NEPA, Sections 106 and 110(f) of the NHPA, the APA, and Article II, Section 3, of the United States Constitution, which requires the President to "take Care that the Laws be faithfully executed." Dkt. No. 1, Compl. ¶¶ 75–129. On November 17, 2025, Plaintiffs filed a motion for a temporary restraining order, preliminary injunction, and expedited hearing . Dkt. No. 7, Pls.' Mot. for Temp. Restraining Order, Prelim. Inj., and Expedited Hr'g ("PI Motion"). After a hearing and three declarations from GSA committing not to paint the EEOB for the next several months, Plaintiffs withdrew their PI Motion. Dkt. No. 24. As directed by the Court's Minute Order of December 12, 2025, Defendants file this Motion to Dismiss or Motion for Summary Judgment in the alternative.

## LEGAL BACKGROUND

### A.    National Historic Preservation Act

Section 106 of the NHPA is "essentially a procedural statute" that does not impose substantive standards but "requires that agencies 'take into account the effect of an undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register of Historic Places.'" *City of Alexandria. v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999) (alteration omitted) (citing 16 U.S.C. § 470(f) (1999), *recodified at* 54 U.S.C. § 306108 (2014)). The NHPA defines an undertaking as any "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency." 54 U.S.C. § 300320. Section 201 of the NHPA establishes the Advisory Council on Historic Preservation ("ACHP"), which promotes the preservation, enhancement, and sustainable use of the nation's diverse historic resources, and advises the President and Congress on national historic preservation policy." *See* ACHP    Strategic    Plan    (https://www.achp.gov/sites/default/files/2022-04/StrategicPlan-Graphic_040922-final.pdf) (last visited Jan. 29, 2026); *see also McMillan Park Comm. v. Nat'l Cap. Plan. Comm'n*, 968 F.2d 1283, 1285 (D.C. Cir. 1992) (describing consultation requirements). ACHP is additionally charged with promulgating regulations to implement the NHPA. S*ee Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 754 (D.C. Cir. 2003).

Section 107 of the NHPA exempts certain federal buildings, including the White House and its grounds, from operation of the statute, including Section 106. *See* 54 U.S.C. § 307104. In a 1994 Programmatic Agreement between GSA, ACHP, and the D.C. State Historic Preservation Office ("SHPO") regarding historic preservation in GSA's National Capital Region, ACHP "recognize[d] the Old Executive Office Building as part of 'the White House and its grounds' pursuant to Section 107 of the [NHPA]." Dkt. No. 15-2 at 3 (1994 Programmatic Agreement). In connection

with the EEOB Modernization Project during the 2000s and a temporary screening facility in 2013, GSA also determined that the EEOB was exempt from the NHPA under Section 107.[4]

Section 110(f) of the NHPA "provides that for any project 'directly and adversely affecting any National Historic Landmark,' the agency must 'to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark.'" *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1088 (D.C. Cir. 2019) (quoting 54 U.S.C. § 306107), *amended on reh'g in part*, 925 F.3d 500 (D.C. Cir. 2019). As with Section 106, courts have held that this provision is not a substantive mandate and instead sets a heightened procedural standard for potential impacts on National Historic Landmarks. *See Nat'l Tr. for Historic Pres. v. Blanck*, 938 F. Supp. 908, 922 (D.D.C. 1996), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999) (finding Section 110 "cannot be read to create new substantive preservationist obligations separate and apart from the overwhelmingly procedural thrust of the NHPA"). When a building is listed, an agency has "a higher standard of care . . . when considering undertakings that may directly and adversely affect National Historic Landmark." *Id.* at 921 (citing H.R. Rep. No. 1457 at 36–38, 96th Cong., 2d Sess. 36 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378, 6399).

B.    **National Environmental Policy Act**

NEPA is a purely procedural statute which ensures that "agencies are fully informed of the environmental consequences of their decisions." *Ctr. for Biological Diversity v. Fed. Aviation Admin.*, No. 23-1204, 2025 WL 2643458, at *1 (D.D.C. Sept. 15, 2025). To comply with NEPA, an agency prepares a document assessing the environmental impacts of "major Federal actions

---

[4]    *See, e.g.*, https://www.ncpc.gov/files/Dwight_D._Eisenhower_Executive_Office_Building_EEOB_Temporary_Screening_Facility_Submission_Materials_7488_May2013.pdf (last visited Jan. 29, 2026); https://www.ncpc.gov/docs/actions/2008June/Eisenhower_Exec_Bldg_Modernization_PhaseIII_delegated_6315_Jun2008.pdf (last visited Jan. 29, 2026).

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Under NEPA, the "role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one. The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 185 (2025) (citation omitted). NEPA "does not require an agency to make the decision that the reviewing judges 'would have reached had they been members of the decisionmaking unit of the agency.'" *Sierra Club v. FERC*, 153 F.4th 1295, 1305 (D.C. Cir. 2025).

### C.    Administrative Procedure Act

Because the NHPA and NEPA do not provide a private right of action, Plaintiffs rely on the APA for their statutory claims. *See Karst Env't. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007). The APA supplies a "limited cause of action for parties adversely affected by agency action," *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006), and authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside" final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law," 5 U.S.C. § 706(1), (2)(A), (2)(D); *Marsh v. ONRC*, 490 U.S. 360, 378 (1989).

### STANDARDS OF REVIEW

Before addressing the merits of Plaintiffs' complaint, the Court must determine whether it has subject-matter jurisdiction. *See Steel Co. v. Citizens for a Better Environment* 523 U.S. 83, 94–95 (1998). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance." *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (citation modified). "[I]t is presumed that a cause lies outside [the federal courts']

limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence that the Court possesses jurisdiction. In reviewing a Rule 12(b)(1) motion, "the Court 'may consider materials outside of the pleadings.'" *Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell*, 77 F. Supp. 3d 103, 108 (D.D.C. 2015) (citing *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)).

To survive a Rule 12(b)(6) motion, Plaintiffs must allege "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts accept all well-pleaded facts as true and draw all reasonable inferences in Plaintiffs' favor, but they need not accept conclusory allegations or unreasonable factual inferences as true. *See Iqbal*, 556 U.S. at 678. In evaluating a Rule 12(b)(6) motion, "the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (citation modified). If, on a motion under Rule 12(b)(6), "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When assessing a motion for summary judgment in a matter brought under the APA, however, "the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). In such cases, the complaint "actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action."

*Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). Therefore, "[t]he entire case on review is a question of law, and only a question of law." *Id.*

**ARGUMENT**

This Court should dismiss Plaintiffs' complaint, or award summary judgment in favor of the Defendants, because Plaintiffs' claims are moot, they lack Article III standing, they have no cause of action, and they cannot establish any duty that applies to Defendants under the NHPA or NEPA.

## I.    PLAINTIFFS' CLAIMS ARE MOOT.

A claim is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). "'Even where litigation poses a live controversy when filed,' a federal court must 'refrain from deciding the dispute if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1127–28 (D.C. Cir. 2024) (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc)) (alterations omitted). "A case becomes moot and must be dismissed for lack of jurisdiction "when, by virtue of an intervening event, a court … cannot grant any effectual relief whatever in favor of the appellant." *Mehneh v. Rubio*, No. 25-5001, 2026 WL 125973, at *1, __ F.4th ___ (D.C. Cir. Jan. 16, 2026) (citation omitted).

The only relief Plaintiffs request is an order declaring Defendants to be in violation of the NHPA, NEPA, and the APA, compelling Defendants to comply with those procedural statutes, and enjoining Defendants from painting the EEOB until they have done so. *See* Compl. ¶ 5, Prayer for Relief ¶ B (requesting an injunction "unless and until [Defendants] have fully complied with

9

NEPA, NHPA (including Sections 106 and 110(f)), and the APA"). But the President, through OA, is now doing the very thing Plaintiffs ask the Court to order—NHPA and NEPA compliance. Specifically, the OA has voluntarily agreed to consult with the ACHP on behalf of the President and to analyze any environmental effects of a painting project before the President decides whether to proceed with the Project at the EEOB. Martin Decl. ¶ 11. Because EOP is voluntarily undergoing the very procedures Plaintiffs seek, there is simply nothing left for this Court to order. Plaintiffs' claims are moot, and this Court should dismiss for that reason.[5]

## II.    PLAINTIFFS LACK ARTICLE III STANDING.

Setting mootness aside, Plaintiffs' lack standing because they have not alleged, much less established, injury in fact; their alleged harms are not traceable to NPS or GSA; and the Court cannot redress their purported injuries by injunctive or declaratory relief against the President.

### A.    Plaintiffs' Asserted Injuries Are Neither Particularized Nor Imminent.

Plaintiffs Gregory and Marion Werkheiser ("Werkheisers")—founding members and equity partners of Plaintiff Cultural Heritage Partners, PLLC ("CHP"), *see* Compl. ¶¶ 9–10—allege that Defendants' hypothetical plan to paint the EEOB without complying with NEPA and the NHPA will impair their "aesthetic, recreational, professional, and educational" interests. *See* Compl. ¶¶ 71, 74. Likewise, Plaintiff DC Preservation League ("DPL") alleges associational standing, *see* Compl. ¶ 12, arguing that at least one of its (unnamed) members would have standing based on his or her "long-standing interests in the preservation of the White House complex" and

---

[5]    Until this ongoing NEPA and NHPA compliance is complete and a decision about how to improve the EEOB is made, there is nothing for Plaintiffs to challenge. Challenging this ongoing process now is no answer—courts routinely find claims unripe for adjudication if they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted). Indeed, "prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012).

"surrounding historic districts." *See* Compl. ¶¶ 12, 73. CHP, on the other hand, alleges organizational standing, arguing that the possibility that the President may paint the EEOB without the required review processes impairs its "advocacy relating to NEPA and NHPA compliance for federal actions affecting historic properties." Compl. ¶ 72. None of these injuries suffice to show standing.

       ***Article III and Associational Standing.*** Plaintiffs are challenging *future* conduct, so they must show that some concrete harm is either "certainly impending" or that there is a "substantial risk" it will occur, which in the standing context means that it must be "sufficiently imminent." *N.Y. Republican State Comm. v. SEC*, 927 F. 3d 499, 504 (D.C. Cir. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–14 (2013) (internal citation omitted), and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *see also Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 151 (D.D.C. 2023) (requirement to allege "sufficiently imminent" harm is "hard to meet where the harm-causing event is still subject to regulatory processes and approvals" (internal quotation marks omitted)). And because DPL relies on associational standing, which is satisfied if one of the association's "members would otherwise have standing to sue in their own right," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), DPL's unnamed member must allege an injury-in-fact that likewise meets Article III's particularity and imminence requirements.[6] Both the Werkheisers and DPL fail to meet those requirements.

---

[6]     Plaintiffs have also asserted procedural injuries, but standalone procedural injuries are insufficient to confer Article III standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Rather, Plaintiffs' alleged procedural injuries, stemming from an alleged failure to comply with NEPA and the NHPA, *see* Compl. ¶ 74, must be tied to concrete interests. Here, those alleged interests are alleged aesthetic harms, so their alleged procedural harms rise and fall with their alleged aesthetic harms.

Because the Werkheisers and DPL allege aesthetic harms from the proposed activities, including painting the EEOB, they must show that "[their] specific aesthetic interests" are harmed, by describing their particular "use[] and enjoy[ment] [of] the land" beyond "mere incidental viewership," and they must further identify how they will have to "alter[ their] behavior." *Envt'l Def. Fund v. FERC ("EDF")*, 2 F.4th 953, 969–70 (D.C. Cir. 2021). Thus, the D.C. Circuit has found standing existed where a plaintiff alleged that construction of a pipeline over property where he frequently fished, boated, and hunted would diminish his ability to do those things. *Sierra Club v. FERC*, 827 F.3d 59, 66 (D.C. Cir. 2016); *see also Food & Water Watch v. FERC*, 28 F.4th 277, 283–84 (D.C. Cir. 2022) (finding standing where construction would cause noise and pollution that would impair "financial value" and "peaceful enjoyment" of nearby property). But it concluded that a plaintiff lacked standing to vindicate an aesthetic interest when she did "not even allege that she c[ould] see the new [construction] from her property," which was more than "half a mile" away, and attested only that "she must look at an 'eyesore' several times per week while driving past."[7] *EDF*, 2 F.4th at 969–70. She had "neither altered her behavior nor explained why she has any particularized connection to the land," thus reducing her "alleged aesthetic injuries" to "nothing more than generalized grievances, which cannot support standing." *Id.*

The mere prospect of painting the EEOB without the Werkheisers' preferred process does not constitute a concrete injury. The Werkheisers have not shown that they use the EEOB in a way that is unique from the general public. They have suffered no financial harm to their property. Nor have they plausibly suffered discomfort from the possibility that the EEOB will be painted in the

---

[7]     The D.C. Circuit found "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing." *EDF*, 2 F.4th at 970; *see also Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 84 (2019) (Gorsuch, J., concurring in the judgment) ("Offended observer standing cannot be squared with this Court's longstanding teachings about the limits of Article III.").

same way a public nuisance plaintiff might suffer if she were exposed to an offensive odor or toxic smog. And the Werkheisers can easily avoid any alleged aesthetic discomfort by not going to the White House complex to view the EEOB—they live almost a hundred miles away in Richmond, Virginia. Compl. ¶¶ 9–10. Their asserted harm is that a future tour, at an unstated time, may be impacted. How? It is not clear. Given that millions of schoolchildren, families, and civic associations tour D.C. and its government buildings each year, this is practically the definition of an injury common to the general public. "Viewed in full frame," their "alleged aesthetic injuries reflect nothing more than generalized grievances, which cannot support standing." *EDF*, 2 F.4th at 969–70.

Even assuming the Werkheisers' aesthetic injuries are sufficiently particularized, Plaintiffs fail to establish that any such injury is "certainly impending" or "sufficiently concrete." *Pharm. Rsch.*, 656 F. Supp. 3d at 150–51. The President's preliminary idea to improve the EEOB is neither "certainly impending" nor "sufficiently concrete." The President himself said he does not "even know if [he is] going to do it yet."[8] Federal courts are not in the business of "adjudicate[ing] hypothetical or abstract disputes." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021).

The Werkheisers seize on the President's statement that he was "getting bids" as evidence that a painting project is imminent. *See* Compl. ¶¶ 48, 125. But getting bids, like feasibility studies and other pre-planning activities that inform future government action, is not government action. *See, e.g.*, *Town of Fairview v. U.S. Dep't of Transp.*, 201 F. Supp. 2d 64, 76 (D.D.C. 2002) (no major federal action when considering funding because government's "actions did not indicate a

---

[8]    *See* https://www.foxnews.com/video/6385030226112 at 2:00–2:07 (last visited Jan. 29, 2026).

'firm commitment' to fund project"); 36 C.F.R. § 800.1(c) (NHPA allows non-destructive planning before Section 106 process). Indeed, the "bids" were just rough estimates of the cost to paint an unidentified concrete building in D.C. of approximately the EEOB's size, without identifying the building, the specifics of the project, or the unique security needs it would have. Heller Decl. ¶¶ 8–13. These quotes could not have even been accepted—extensive future work by both the government and potential contractor(s) to solicit, prepare, and review an actual, formal proposal would be required. Even assuming these rough estimates could somehow constitute a solicitation of bids from painters, such a solicitation is a far cry from a decision to paint the EEOB or a commitment of resources to the same. Even the President confirmed that he was only exploring the idea. *See supra* n.3.

The missing elements of President Trump's hypothetical "plan" are fatal to the Werkheiser's' standing: there is no indication of the painting materials to be used; the method of application; the scaffolding to be erected; the power-washing, cleaning, or repointing, to be undertaken; the contractors to hire; or any other predicate steps necessary to actualize a painting project. In short, there is nothing to suggest that President Trump's nascent proposal to paint the EEOB is moving toward implementation. Rather, GSA sought and received informal estimates for cleaning and/or painting of the EEOB—some of them internal—to determine the range of potential costs. Heller Decl. ¶ 8–12. The only other thing GSA subsequently did with those informal estimates was give them some of them to EOP for informational purposes. *Id.* ¶ 8.

The Werkheisers invite this Court to assume that the 'missing' NEPA and NHPA compliance causes them harm. Not so. Rather, it shows that no decision on how to improve the EEOB is imminent, and thus no action has been taken that would trigger any obligations to conduct NEPA or NHPA analysis. Indeed, Defendants' attached declarations confirm that any decision to paint

the EEOB will be informed by administrative processes that have yet to occur and information that has yet to be considered. Heller Decl. ¶¶ 7, 15; Martin Decl. ¶¶ 7, 9. And OA has committed to voluntarily comply with NEPA and the NHPA before proceeding with any project. *See* discussion *supra*. For these reasons, the Werkheisers fail to allege any certainly impending or even sufficiently imminent harm sufficient to support standing. *See Clapper*, 568 U.S. at 410–14.

   ***Organizational Standing***. To determine if an organization has standing to sue in its own right, courts conduct the same inquiry as in the case of an individual plaintiff. *Food & Water Watch v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). "An organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Rather, an organization must show that the defendant's conduct "directly affected and interfered with [its] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Here, CHP must show that the challenged action "curtail[s its] ability to support its members" or to "provide information or advocacy" on its historic preservation work. *See Satanic Temple v. Labrador*, 149 F.4th 1047, 1054 (9th Cir. 2025) ("A plaintiff must show far more than simply a setback to the organization's abstract social interests." (quoting *Hippocratic Med.*, 602 U.S at 394)).

   CHP alleges that the "proposed repainting of the EEOB and failure to follow NEPA and NHPA will directly impair" its ability "to use its office location and the surrounding historic setting" to advocate for "NEPA and NHPA compliance for federal actions affecting historic properties." Compl. ¶ 72. But the mere risk that Defendants will paint the EEOB without complying with NEPA or the NHPA does not affect CHP's "core business activities." *Hippocratic Med.*, 602 U.S.at 395; *see also Satanic Temple v. Labrador*, 149 F.4th at 1054. Nor is CHP's alleged interest in "advocating for NEPA and NHPA compliance" sufficient to establish interference with

its "core business activities." Rather, it is "the type of abstract concern that does not impart stand-ing." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995).

> **B.    Plaintiffs' Alleged Injuries are Not Traceable to the Agency Defend-ants.**

Plaintiffs also suffer a traceability problem with respect to the agency defendants. To meet the traceability requirement, a plaintiff must show a "causal nexus between the agency action and the asserted injury." *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 678 F. Supp. 3d 20, 30 (D.D.C. 2023), aff'd, 108 F.4th 836 (D.C. Cir. 2024) (citing *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994)). As for the agency defendants, no such nexus exists here.

To begin, NPS and Acting Director Bowron[9] have no role in managing the EEOB. NPS does not have administrative jurisdiction over the EEOB and has had no management responsibil-ity over the EEOB since 1950. The Reorganization Plan No. 18 of 1950 transferred "[a]ll functions with respect to the operation, maintenance, and custody" of federal buildings to GSA, with certain exceptions not relevant here. Reorg. Plan No. 18 of 1950, § 2, 64 Stat. 1270, 1270–71. GSA re-mains generally responsible for those functions at the EEOB to this day; however, it would not be responsible or otherwise involved in any future decision to move forward with the Project at the EEOB. Heller Decl. ¶ 5 & Attach. A; Martin Decl. ¶ 9 & Attach. A.

While the White House and President's Park are an administrative unit within the National Park System, the NPS does not have administrative jurisdiction over the EEOB. *See* Dkt. No. 15-3 ¶¶ 5–11. The EEOB is not within the National Park System and is not a National Park System resource. *Id.* Plaintiffs concede that jurisdiction over the EEOB was transferred to GSA, Dkt. No. 7-1 at 12 (Pls' Mem.). at 12, but contend that they may nevertheless pursue their claims against

---

[9]    Ms. Bowron's full title is "NPS Comptroller, exercising the delegated authority of the Di-rector" of the NPS. For brevity, this brief refers to her as "Acting Director."

the NPS solely by virtue of the fact that the EEOB is a National Historic Landmark and sits within a National Historic Landmark District ("NHLD"). *See* Compl. ¶¶ 38–39; Pls.' Mem. at 12. But the fact that the EEOB sits within a National Historic Landmark District ("NHLD"), *see* Compl. ¶¶ 38–39, does not render NPS a proper defendant in this suit.

Plaintiffs cite no authority in support of their position that they can maintain a claim against the NPS based solely on a property's status as an NHL. Nor can they. Indeed, such an unprecedented claim would allow any litigant to assert a claim against NPS in any lawsuit involving an alleged adverse effect to any of the over 2,600 designated NHLs nationwide, a result plainly not supported by the NHPA or any of its implementing regulations.[10]

Plaintiffs first point to the text of Section 110(f), but that does not apply to NPS because it cannot be "the responsible federal agency" with respect to a property over which it lacks jurisdiction. Any NHPA compliance, to the extent it applies—which it does not, is the responsibility the "action agency" responsible for the "undertaking"—not NPS. *See* 36 C.F.R. § 800.2 ("It is the statutory obligation of the Federal agency to fulfill the requirements of section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance."). Plaintiffs next point to the fact that the Secretary of the Interior, through NPS, administers the National Historic Landmarks program, but none of the authorities cited by Plaintiffs in support of their claim prescribe any statutory or regulatory responsibilities that could give rise to a claim against NPS here. *See* 54 U.S.C. §§ 302101 (authorizing the Secretary to expand and maintain the National Register of Historic Places), 302102 (including NHLs on the National Register of Historic Places); 36 C.F.R. Part 65 (regulations prescribing the criteria for

---

[10]     *See* National Historic Landmarks Program, https://www.nps.gov/orgs/1582/index.htm (last visited Jan. 29, 2026).

and process for designation of NHLs); 36 C.F.R. § 800.10(c) (requiring notice to the Secretary of

Section 106 consultations involving NHLs and an invitation the Secretary to participate in such

consultations, and providing a process to request a report from the Secretary). If Plaintiffs' argu-

ment that NPS's role makes NPS a necessary party because it may be consulted under NHPA

Section 110 were true, it would mean NPS would be a necessary party to every NHPA lawsuit

filed anywhere. This is not a proper result. NPS is no more a necessary party than the ACHP or

SHPO, who also play consultative roles. Because there is no cognizable relief that the Court could

grant Plaintiffs in relation to NPS and Acting Director Bowren, it should dismiss them as parties

to this lawsuit.

Similarly, Plaintiffs' alleged injuries are not traceable to GSA. First, EOP has determined

that its OA will oversee implementation of the Project, should the President decide to go forward,

including any necessary environmental and historical review processes. Heller Decl. ¶ 5 & At-

tach. A; Martin Decl. ¶ 9 & Attach. A. Further, the President is the decisionmaker as to whether

painting will occur at all. *See* Martin Decl. ¶¶ 7–12. So, GSA is not in charge of decision-making

or implementation. *See id.* ¶¶ 7–9; Heller Decl. ¶¶ 5, 15. Plaintiffs therefore have not—and can-

not—establish the necessary nexus between their injuries and the GSA defendants. *See Am. First

Legal Found. v. Greer*, 153 F.4th 1311, 1315 (D.C. Cir. 2025) (noting fatal traceability problem

because any injury was "plainly traceable" to another entity and not the defendant).

### C.  Plaintiffs' Alleged Injuries Are Not Redressable.

That leaves the President. And Plaintiffs ask this Court to preemptively enjoin the President

from taking a non-ministerial action. But as the Supreme Court has made clear, federal courts lack

jurisdiction to "enjoin the President is the performance of his official duties." *Mississippi v. John-*

*son*, 71 U.S. 475, 501 (1866); *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (same);

*see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President,

courts do not have jurisdiction to enjoin him."). As this Court has explained, "[s]ound separation-of-power principles counsel the Court against granting these forms of relief against the President directly." *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018), citing *Franklin*, 505 U.S. at 802–03. Indeed, in *Franklin*, the Supreme Court affirmed the presumptive unavailability of injunctive relief against the President for performance of his official duties, noting that "in general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" 505 U.S. at 802–03 (quoting *Mississippi*, 71 U.S. at 501).

The same principle applies to declaratory relief, because a "court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." *Newdow*, 603 F.3d at 1012; *see also Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) ("Although the following discussion is couched in terms of our ability to grant injunctive relief against the President, similar considerations regarding a court's power to issue relief against the President himself apply to Swan's request for a declaratory judgment."). And, to the extent any exception to this rule pre-dating *Franklin* survives at all, it is limited to claims seeking to mandate ministerial actions, not the prospective injunctive relief Plaintiffs seek. *See Citizens for Resp. & Ethics in Wash. v. Trump*, 302 F. Supp. 3d 127, 130 (D.D.C. 2018) (discussing the distinction between ministerial and policy-making acts in *Mississippi*, 71 U.S. 475, *aff'd*, 924 F.3d 602 (D.C. Cir. 2019).

The conclusion that courts may not grant equitable relief against the President applies with particular force here because Plaintiffs fail to allege any statutory duty that applies to him. Plaintiffs allege violations of NEPA and NHPA, *see* Compl., Counts I–III, but these statutes govern "[t]he head of any Federal agency," 54 U.S.C. § 306108, and "all agencies of the Federal Government," 42 U.S.C. § 4332, not the President. Plaintiffs also allege a violation of the APA, *id.*, Count IV, but the APA provides a cause of action to review "final *agency* action," not presidential

action. *See* 5 U.S.C. § 704; *Franklin*, 505 U.S. at 796 ("President is not an agency within the meaning of the [APA]."). The lack of a legally redressable claim against the President is fatal to Plaintiffs' standing.

### III.   PLAINTIFFS LACK A CAUSE OF ACTION.

Even if Plaintiffs' claims were justiciable, Plaintiffs would still lack a cause of action to assert those claims. Nearly all of Plaintiffs' claims rely on the APA. Compl. ¶¶ 75–112. But the APA supplies a cause of action to challenge only final agency action, including an agency's failure to act. *Statewide Bonding, Inc. v. Dep't of Homeland Sec.*, 980 F.3d 109, 114 (D.C. Cir. 2020); 5 U.S.C. §§ 702, 706(1). The hypothetical future project to paint the EEOB is neither agency action nor final. It would be conducted—if at all—by the President through OA, which is not an agency. And a television interview about a hypothetical project that may or may not occur is far from *final* because it does not reflect the consummation of any decisionmaking process; nor does it have legal consequences. And Plaintiffs have not identified, much less adequately alleged, any discrete, mandatory duty that an agency failed to perform. Although Plaintiffs purport to press a constitutional claim under the Take Care Clause, it is well established that a plaintiff cannot avoid statutory limits on review by repackaging alleged statutory violations by the President as constitutional ones. For all these reasons, Plaintiffs lack a cause of action.

#### A.   Presidential Action is Not Reviewable Under the APA.

Plaintiffs' APA claims fail because they do not identify an *agency* action whatsoever. The APA does not provide a vehicle for Plaintiffs to challenge the *President*'s interest in beautifying the EEOB. The APA supplies a cause of action for persons aggrieved by agency action, but not all federal officials or entities are "agencies" under the APA. "The President is not an 'agency' under that Act." *Dalton v. Specter*, 511 U.S. 462, 476 (1994) (citation omitted); *see Franklin*, 505 U.S.

at 800–01 (declining to find APA cause of action against President "[o]ut of respect for the separation of powers and the unique constitutional position of the President"). Neither are staff components of the EOP that lack "substantial independent authority" and exist merely to assist the President in carrying out his responsibilities. *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971); *see Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 565 (D.C. Cir. 1996) (National Security Council is not an agency); *Sweetland v. Walters*, 60 F.3d 852, 854–55 (D.C. Cir. 1995) (per curiam) (Executive Residence is not an agency); *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042 (D.C. Cir. 1985) (Council of Economic Advisors is not an agency); *see also Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100, 107 (D.D.C. 2020) (calling "substantial independent authority" the "touchstone") (quoting *Soucie*, 448 F.2d at 1073).

Any future project to paint the EEOB on behalf of the President would be directed by the OA, the lead tenant of the EEOB, Martin Decl. ¶ 3, and an "advise and assist" component of EOP. OA will voluntarily comply with the NHPA and NEPA, should the Project go forward, *id.* ¶¶ 10–12. There is no need to undertake a first-principles analysis of whether OA is an agency under the APA. The D.C. Circuit has squarely held that OA is *not* an agency. *Citizens for Resp. & Ethics in Washington v. Off. of Admin.*, 566 F.3d 219, 224–26 (D.C. Cir. 2009) ("*CREW*"). That precedent controls. [11]

As the D.C. Circuit explained in *CREW*, OA was chartered "to perform tasks that are entirely operational and administrative in nature." 566 F.3d at 224. OA "provide[s] common administrative support and services to all units within [the EOP]," and "shall, upon request, assist the

---

[11]    *CREW* is a FOIA case, but the definition of an "agency" under FOIA is broader than under the APA. *Elec. Priv. Info. Ctr.*, 466 F. Supp. 3d at 107 ("[A]ll APA agencies are FOIA agencies, but not vice-versa."). Thus, if an EOP component is not an "agency" under FOIA, it is not an "agency" under the APA.

White House Office in performing its role of providing those administrative services which are primarily in direct support of the President." *Id.* at 224 (alteration in original) (quoting Exec. Order No. 12,028, 42 Fed. Reg. 62,895, 62,895 (Dec. 12, 1977). The Court noted that OA's services include "procurement" and "supply services" and that those services extend (through "interagency agreements") to supporting "non-EOP entities—including the Navy, the Secret Service, and the General Services Administration . . . if they work at the White House complex in support of the President and his staff." *Id.* The Court concluded that because OA only "performs or is authorized to perform . . . operational and administrative support for the President and his staff, . . . OA lacks substantial independent authority and is therefore not an agency." *Id.*

Because OA is not an agency, its actions and inactions are not reviewable under the APA. Thus, a hypothetical final decision by the President to paint the EEOB through an OA-directed project would not be reviewable under the APA; nor, for the same reasons, would a failure-to-act claim alleging some deficiency in OA's compliance with NEPA or the NHPA. Plaintiffs therefore lack a cause of action under the APA.

**B.      Plaintiffs Have Not Identified a Final Agency Action or a Failure to Act.**

**1.   Plaintiffs Have Not Identified a Final Agency Action.**

Even if Plaintiffs' claims were properly brought against an agency rather than the President, they would fail because Plaintiffs have not identified, as they must, a *final* agency action. An action can only be brought under the APA where there is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Two conditions must be satisfied for agency action to be "final." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* (citation modified). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Id.* at

178 (citation modified). This requires a final agency action to have "an actual or immediately threatened effect." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 894 (1990).

For the same reasons that Plaintiffs cannot establish concreteness and imminence for standing purposes, Plaintiffs have not identified a final agency action. Plaintiffs allege "on information and belief" that Defendants "have formulated a plan to repaint the EEOB" and "have begun or are preparing to begin concrete steps to implement that plan," steps which "constitute 'agency action' within the meaning of the APA." Compl. ¶ 79. It appears that the "information and belief" on which Plaintiffs rely is the preliminary statement made by the President in passing about a project that may or may not ever occur, and belatedly, unsourced allegations about purported plans to demolish other buildings.[12]

Even if justiciable under the APA (which it is not), and even if the conduct could be attributed to an agency, the President's mention of a possible, future painting project at the EEOB demonstrates, at most, that the President has given preliminary thought to whether the EEOB may or may not be painted. Mere consideration of a hypothetical action, like the solicitation of informal cost estimates or the creation of a visual mockup, do not represent the consummation of a decision-making process or the required irretrievable and irreversible commitment of resources. *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999). Nor do they determine rights or obligations or cause legal consequences. *See Nat'l Wildlife Fed'n*, 497 U.S. at 894 (noting that such preparatory actions do not have "an actual or immediately threatened effect"). Such prepara-

---

[12]    Plaintiffs' declarant Mydelle Wright's allegations about four other buildings in D.C., none of which are the EEOB, are inaccurate. *See* Dkt. 18-1. As Mr. Heller stated in his Third Declaration, GSA is instead operating processes for disposal of those properties out of federal ownership, in compliance with all statutory mandates. *See* Dkt. No. 21-1 ¶¶ 8–11, 13, 15.

tory activities, without more, are not final agency action under the APA. *See, e.g., Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*, 324 F.3d 726, 731 (finding "a statement of the agency's intention to make a preliminary determination" was not final agency action).

The fact that GSA sought informal estimates for a hypothetical painting project of a building in the District of Columbia with the EEOB's stone exterior and size dimensions does not change this result. Heller Decl. ¶¶ 8–13. GSA provided EOP with the general cost information that it received or generated itself, *see id.* ¶ 8, but it never issued solicitations for a contract, executed a contract, selected a contractor, or drafted design or construction drawings related to such work, Dkt. No. 15-1 ¶ 5. GSA's work in collecting estimates for a cleaning and painting project similar to the EEOB was at best tentative in nature and was thus not final agency action. *See Calton v. Babbitt*, 147 F. Supp. 2d 4, 8–9 (D.D.C. 2001) (finding challenge to speculative actions based on future conduct not before the court are not final agency action).

### 2.  Plaintiffs Have Not Identified a Discrete Action Defendants Have Failed to Take.

Nor are Plaintiffs rescued by their brief references to the APA provision that authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 42 U.S.C. § 706(1). Plaintiffs have failed to plead, as they must, a discrete agency action that GSA (assuming it is a proper defendant) is required to undertake. As the Supreme Court has explained, "a 'failure to act' is properly understood to be limited . . . to a *discrete* action," and "the only agency action that can be compelled under the APA is action legally *required.*" *Norton v. SUWA*, 542 U.S. 55, 63 (2004). A complaint must therefore "identify a legally required, discrete act that the [agency] has failed to perform—a threshold requirement for a § 706 failure-to-act claim." *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 227 (D.C. Cir. 2009).

The purported failures to act identified by Plaintiffs include "failing to initiate, conduct, and complete the NEPA process before proceeding with planning and implementation of the EEOB repainting project," Compl. ¶ 82; "proceeding with planning, approval, and implementation of the EEOB undertaking without first complying with [NHPA] Section 106 and its implementing regulations," Compl. ¶ 96, "fail[ing] to comply with Section 110(f)'s heightened requirements for National Historic Landmarks," Compl. ¶ 105; failing to consult with external parties or prepare documentation, Compl. ¶ 106; and "fail[ing] to initiate and complete legally required environmental and historic preservation review processes before advancing" purported plans at the EEOB, Compl. ¶ 113. None of these meet the Supreme Court's exacting standards for failure to act.

Here, where deliberations concerning a potential painting project at the EEOB are preliminary and no final decision has been made, there is no discrete duty that Defendants can be compelled to undertake under NEPA, the NHPA, or otherwise. Any duties that may or may not eventually be owed under NEPA or the NHPA have simply not yet been triggered. *See Pub. Citizen v. Off. of U.S. Trade Representatives*, 970 F.2d 916, 919–21 (D.C. Cir. 1992) ("[T]he Supreme Court has clearly stated that judicial intervention is not proper just because the time to start work preparing an EIS has arrived . . . [C]ourts routinely dismiss NEPA claims in cases where agencies are merely contemplating a particular course of action but have not actually taken any final action at the time of suit.").[13] For a duty under those statutes to become mandatory, it must have accrued through an agency's irretrievable commitment of resources. *See Ctr. for Biological Diversity v.*

---

[13]     Outside the D.C. Circuit, the Eleventh Circuit recently cited *Public Citizen* favorably in holding that failure to prepare an EIS by itself is not "final agency action" subject to judicial review. *Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567, at *5 (11th Cir. Sept. 4, 2025); *see also id.* at *9 ("But, having not yet formally 'committed to funding that project,' the Federal Defendants have taken no 'major federal action' subjecting them to the procedural requirements of NEPA." (citation omitted)).

*U.S. Dep't of Interior,* 563 F.3d 466, 480 (D.C. Cir. 2009) ("[A]n agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in "'irreversible and irretrievable commitments of resources' to an action that will affect the environment.'") (citation omitted). Here, no commitment of resources has been made at all—except the commitment of resources to defend against this premature litigation. Rather than committing resources to painting the EEOB, preliminary information gathering activities, such as getting ballpark cost estimates from painters, preserve full discretion for a future decision whether or not to paint.

Likewise, there has been no failure to act under the NHPA even if it applied here (which it does not), because an agency is required to "take into account the effect of [an] undertaking on any historic property" only "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 54 U.S.C. § 306108. Here, no expenditures have been approved for an EEOB painting project, so there has been no failure to act under the NHPA. The President's preparatory actions are exactly the sort of "nondestructive project planning activities before completing compliance with section 106" that the ACHP's NHPA regulations contemplate. 36 C.F.R. § 800.1(c).

In nonetheless alleging that mandatory duties have accrued, Plaintiffs rely on threadbare allegations that, "[o]n information and belief, Defendants have begun to formulate and advance the EEOB repainting project in response to the President's publicly announced plan to paint the building white and his statement that he is 'getting bids right now from painters.'" Compl. ¶ 115 (citation omitted). If this were enough to create final agency action under the APA, every time a President or Cabinet Secretary gave a speech announcing a plan or speculating about an initiative—no matter how nebulous, futuristic, or aspirational—a cause of action for failure to do procedural paperwork would have accrued. That cannot be right.

Further, GSA has neither formulated nor advanced any EEOB repainting project, much less approved expenditures or irretrievably committed resources so as to trigger a failure-to-act claim. *See* Dkt. No. 15-1 ¶ 5; *see also* Heller Decl. ¶ 15. And OA, which would now implement the Project at the EEOB in accordance with the MOU, Heller Decl. ¶ 5 & Attach. A and Martin Decl. ¶ 9 & Attach. A, has now affirmatively committed to complete NEPA review and NHPA consultation before proceeding with any such project. Martin Decl. ¶ 11. Despite this evidence to the contrary, Plaintiffs allege that there is a committed plan already underway to paint the EEOB. *See* Compl. ¶¶ 1, 3, 48, 68, 78–79, 82, 84, 89, 93, 96, 102, 108. The Court is not required to accept as true Plaintiffs' conclusory allegations and unwarranted factual deductions, *see Iqbal*, 556 U.S. at 678, and it should decline to do so here.

For all these reasons, there is no final agency action for the Court to review under the APA, and no discrete agency action the Court could compel an agency to undertake. The Court should therefore dismiss Plaintiffs' claims for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

### C.    Plaintiff's "Constitutional" Claim Is a Statutory Claim in Disguise.

Without any statutory cause of action against the President, Plaintiffs are left with their purported constitutional claim. *See* Compl. ¶¶ 122–29. Plaintiffs allege that President Trump violated the Take Care Clause of the Constitution in that he "personally directed . . . a federal project to . . . repaint the exterior of the EEOB . . . without regard to the procedures mandated by NEPA and NHPA," *id.* ¶ 125, and directed his subordinates "to bypass or disregard those statutes' requirements," *id.* ¶ 127. But the courts have "rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review." *Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025) (citing *Dalton v. Specter*, 511 U.S. 462 (1994)), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025). Because Plaintiffs' Take Care Clause claim rests on the argument that the President is exceeding his statutory authority, no

implied cause of action under the Constitution is available—Plaintiffs need a statutory cause of action, and, for reasons given above, they do not have one.

In *Dalton v. Specter*, the Supreme Court rejected the proposition "that every action by the President . . . in excess of his statutory authority is *ipso facto* in violation of the Constitution." 511 U.S. at 472. *Dalton* "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* The Constitution is implicated if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But if a claim "simply alleg[es] that the President has exceeded his statutory authority," it is not a "constitutional" claim, and a plaintiff needs a statutory right of action. *Id.* at 473. The D.C. Circuit recently applied *Dalton* to a claim asserting that the government impounded funds in violation of the separation of powers. *See Glob. Health Council v. Trump*, 153 F.4th at 13 . Despite its styling, the dispute was "fundamentally statutory because the alleged constitutional violation is predicated on the underlying alleged statutory violations," *i.e.*, whether the failure to spend the funds violated the appropriations acts or the Impoundment Control Act. *Id.* at 15 n.11.

Even if Plaintiffs' Take Care Clause claim were truly a constitutional claim, it is doubtful, at best, that it provides an avenue for direct relief against the President. *See Citizens for Resp. & Ethics in Wash.,*, 302 F. Supp. 3d at 130 ("[*Mississippi v. Johnson*, 71 U.S. 475 (1866)] can be fairly read to suggest that a Take Care Clause claim is outright nonjusticiable.").

Plaintiffs lack a statutory cause of action to assert their claims. And their attempt to invoke an implied cause of action under the Constitution fails because their Take Care Clause claim is

predicated on alleged statutory violations. Because Plaintiffs neither allege nor establish any other basis for a cause of action, the Court should dismiss their suit.

## IV.    IN ANY EVENT, PLAINTIFFS' CLAIMS FAIL ON THE MERITS.

Even if justiciable, Plaintiffs' claims fail because the EEOB is part of the White House grounds and therefore exempt from the NHPA, and because there is no major federal action that would trigger NEPA.

### A.    The EEOB Is Exempt from the NHPA Under Section 107, so NHPA Consultation Is Not Required.

Although the EOP's Office of Administration has committed to undergo historic preservation consultation with the ACHP, this is purely voluntary because the EEOB is not subject to any consultation requirement under the NHPA. Martin Decl. ¶ 11. Plaintiffs therefore cannot state a claim under the NHPA. Section 107 of the NHPA exempts certain federal buildings, including "the White House and its grounds," from the obligation to consult under Section 106. *See* 54 U.S.C. § 307104.

In a 1994 Programmatic Agreement between GSA, the ACHP, and the D.C. SHPO regarding historic preservation in GSA's National Capital Region, the Council "recognizes the Old Executive Office Building as part of 'the White House and its grounds' pursuant to Section 107 of the [NHPA]." Dkt. No. 15-2 at 3 (1994 Programmatic Agreement). Accordingly, various, prior improvements to the EEOB have not undergone NHPA consultation. For example, a multiyear modernization project in the mid-2000s to upgrade the EEOB's HVAC, security, and masonry, among other things, was not subjected to the NHPA.[14] Likewise, in 2013, GSA erected a temporary screening facility at the EEOB and again found, consistent with the Programmatic Agreement, that

---

[14]    *See, e.g.*, https://www.ncpc.gov/docs/actions/2008June/Eisenhower_Exec_Bldg_Modernization_PhaseIII_delegated_6315_Jun2008.pdf (last accessed Jan. 29, 2026).

the EEOB was exempt from the NHPA under Section 107.[15] The application for the screening facility was signed by Plaintiffs' declarant, Mydelle Wright, who noted that while the EEOB was "historically significant," "it will not require Section 106 consultation" under the NHPA because it "is exempt from the Act (16 U.S.C. 470g)."[16] Time and again, the relevant federal and state historic review boards—the ACHP and DC SHPO—have determined that the EEOB is part of the White House grounds and is therefore exempt from the NHPA. In contrast, Plaintiffs offer no example of the NHPA applying to the EEOB over the past 50 years.

This history reflects the practical reality that the EEOB is an integral part of the White House complex. The EEOB is adjacent to the West Wing, and individuals who work in the West Wing and EEOB have different levels of access to the two buildings, either through security badges that allow free access to both buildings or through the easy submission of "badge swap" requests to the United States Secret Service by EOP employees who need clearance to access the West Wing on an as needed basis. *See* Martin Decl. ¶ 5. In fact, a "substantial number of individuals assigned to EEOB are authorized to enter not just to the EEOB, but also the White House itself." Quinn Decl. ¶ 8. "This is attributable to the fact that a significant number of these individuals are organizationally assigned to, and perform duties for, the Executive Office of the President and other offices that are principally located within the White House." *Id*. Specifically, the EEOB supports presidential operations as the office for myriad White House staff, the Office of the Vice President, the Office of Management and Budget, the National Security Council, and other EOP components. Martin Decl. ¶ 3. "The Vice President also has offices in both the West Wing and the

---

[15]    *See, e.g.*, https://www.ncpc.gov/files/Dwight_D._Eisenhower_Executive_Office_Building_EEOB_Temporary_Screening_Facility_Submission_Materials_7488_May2013.pdf.(last accessed Jan. 29, 2026).

[16]    *See id.*

EEOB." Quinn Decl. ¶ 8. The EEOB is plainly an extension of the White House given its physical proximity and its functional role as the office building of the President's staff. *See, e.g.*, Martin Decl. ¶¶ 3–6; Quinn Decl. ¶¶ 7–11. A functional analysis is in keeping with the structure of the exemption provision, which respects the separation of powers by exempting the grounds of the Supreme Court and the Capitol as well as the White House. 54 U.S.C. § 307104

Plaintiffs focus on Park Service maps created for a distinct purpose—as an educational and functional tool for visitors—consistent with NPS's mission. Plaintiffs' elision of these two distinct categories is misguided. The NPS park unit denominated "The White House and President's Park" is designed to enable NPS to manage the site, to oversee public access, and to promote public education, whereas the NHPA's demarcation of "the White House and its grounds" exists to pre-serve presidential control over the central complex of the Executive Branch.

Lacking any evidence that the EEOB is excluded from the White House grounds, Plaintiffs rely on an unpublished decision in a criminal case involving a different statute (18 U.S.C. § 1752(a)(1)) and a different building (the Treasury Building). Dkt. No. 7-1, Pls.' Mem. in Support of Mot. for Temp. Restraining Order, Prelim. Inj., and Expedited Hr'g at 28–29 (citing *United States v. Jabr*, No. CR 18-0105 (PLF), 2019 WL 13110682, at *1 (D.D.C. May 16, 2019)). But *Jabr* does not dictate a different result. *Jabr* involved the application of a criminal statute con-cerned with securing "the White House or its grounds" from unlawful disturbances—not historic preservation. The district court found that the meaning of "White House or its grounds" for the purpose of that criminal statute did not include the Treasury Building. *Id*. at *7. But the Treasury Building's relationship to the White House is entirely different from the EEOB's. Accessing the White House from the Treasury Building or other locations outside the White House grounds in-volves security requirements that do not apply when accessing the White House from the EEOB.

*See* Martin Decl. ¶¶ 4–6. And the Treasury Building serves primarily to provide office space to employees of an agency, not to staffers of the President.

As part of "the White House and its grounds," the EEOB is exempt from the NHPA under Section 107 of the statute. 54 U.S.C. § 307104.

### B.    Even if the NHPA Applies, No Consultation Duty Has Been Triggered.

Even if the Court were to reach the merits and determine that the NHPA is applicable to the EEOB, Plaintiffs' NHPA claim would still fail. There has been no federal undertaking triggering NHPA review. *See Karst Env't Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1296 (D.C. Cir. 2007) ("[J]ust as the 'final agency action' in a NEPA claim must be a 'major federal action,' the 'final agency action' in an NHPA claim must be a 'federal undertaking.'"). Plaintiffs' identification of a federal undertaking to paint the EEOB is based on speculation. Compl. ¶ 125; Hr'g Tr. 12:18–22 (Dec. 8, 2025) ("THE COURT: 'And right now, the basis of your claim that there's an undertaking is the statement that the [P]resident made on Fox News?' [Plaintiffs' counsel]: 'In addition to holding up the professionally drawn renderings, yes.'").

And even if Plaintiffs could point to a federal undertaking, they would not be able to show that Defendants have failed to comply with the NHPA. While the ACHP regulations require that the agency *complete* the Section 106 process "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license," 36 C.F.R. § 800.1(c), they do not establish when the ACHP process must *begin*. As with NEPA, the decision of when to begin NHPA compliance—assuming *arguendo* that NHPA compliance is required—should be left to the discretion of the entity responsible for the undertaking. GSA has attested multiple times in this lawsuit that there is currently no EEOB painting project for which GSA could commence an NHPA consultation. Dkt. No. 15-1 ¶ 5; Heller Decl. ¶¶ 7, 15. And OA, which has now assumed responsibility for any such consultation, is only now beginning it. Martin Decl. ¶¶ 10–12. A fortiori, there

is no project for which the expenditure of federal funds has been approved. Heller Decl. ¶ 11 (no expenditure of funds has been approved).[17]

### C.    No Major Federal Action Triggered NEPA.

For similar reasons, Plaintiffs' argument that the President's remarks in a Fox News interview triggered GSA's NEPA obligations is likewise incorrect, because there has been no major federal action activating NEPA's purely procedural obligations. *See* 42 U.S.C. § 4332(2)(C); *cf.* Compl. ¶ 125. The mere *possibility* that an agency will take some action "significantly affecting the quality of the human environment," someday, does not constitute a major federal action. Certainly, that point has not yet been reached; the President still has not decided whether to proceed with the Project, let alone the scope of the Project. For NEPA to be triggered, there must be an actual concrete proposal, not mere speculative discussion, and "[o]nly when an agency reaches the point in its deliberations when it is ready to propose a course of action need it be ready to produce an impact statement." *Defs. of Wildlife v. Andrus*, 627 F.2d 1238, 1243 (D.C. Cir. 1980).

Even if Plaintiffs could identify a major federal action on the horizon, they would not be able to establish a violation of NEPA. "[A]n agency's NEPA obligations mature only once it reaches a critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) (internal quotation marks omitted). No NEPA process is required where there has been no irretrievable commitment of resources to the project. *See Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1318 (D.C. Cir. 2014) (NEPA, of course, does not require agencies to commence NEPA reviews of projects not actually proposed.").

---

[17]    For the same reasons, Plaintiffs' Section 110(f) claim fails. Section 106 and 110(f) claims are reviewed under the same procedural standards. *See Nat'l Tr. for Historic Pres. v. Blanck*, 938 F. Supp. 908, 921 (D.D.C. 1996), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999).

Because any NEPA obligations, to the extent any are ever triggered, have not yet matured, neces-sarily, no agency has failed to comply with NEPA.[18]

The President's preview of renderings and his statement that he was "getting bids right now from painters" does not transform an idea into something requiring NEPA review. *See supra* Section V.C.–E.; *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 206 (D.D.C. 2015) (holding that "an agency may take ancillary steps towards a project before completing environ-mental review so long as NEPA review is complete before the agency makes an 'irreversible and irretrievable commitment of resources" (citation omitted)); *see also Save Long Beach Island v. U.S. Dep't of the Interior*, 663 F. Supp. 3d 1, 6–8 (D.D.C. 2023) (finding that the designation of five wind energy areas without any NEPA review was unripe because the designation did not authorize any surface-disturbing activities). While agencies must initiate NEPA review before making an irretrievable commitment of resources, the President's offhand remarks do not commit *any* resources, irretrievably or otherwise. GSA has explained that it "has not authorized or engaged in the physical actions of power washing/cleaning, painting, or repointing the EEOB" and "has not issued solicitations for a contract, executed a contract, selected a contractor, or drafted design or construction drawings related to such work." Dkt. No. 15-1 ¶ 5; *see also* Heller Decl. ¶¶ 7, 15. Thus, even if Plaintiffs were to surmount the numerous threshold barriers to their claims, *see supra* Sections V.A.–E., the Court should dismiss their complaint for failure to state a claim for which the Court could grant relief.

---

[18]    And the President cannot have failed to prepare a NEPA analysis, because he is not an agency under the APA or NEPA.

## CONCLUSION

The Court should dismiss this case. Although there are several threshold grounds on which the Court may do so, there is one common refrain: Plaintiffs are not challenging a final plan from an agency but an inchoate idea of the President. Plaintiffs' theory of the case is not merely legally insupportable—it presents fundamental separation-of-powers issues. This matter should therefore be dismissed.

Dated: January 29, 2026

Respectfully submitted,

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General

Marissa Piropato
Deputy Chief, Natural Resources Section

*/s/ Michelle Ramus*
Michelle Ramus
Mark Widerschein
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Michelle.Ramus@usdoj.gov
Mark.Widerschein@usdoj.gov

*Counsel for Defendants*