UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CULTURAL HERITAGE PARTNERS, PLLC, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>　　　　　Defendants. | Case No. 1:25-cv-03969-DLF |

**DEFENDANTS' MEMORANDUM OF POINTS & AUTHORITIES
<u>IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 3

PROCEDURAL BACKGROUND ....................................................................................... 4

LEGAL BACKGROUND ................................................................................................... 5

    I.     National Historic Preservation Act .................................................................... 5

    II.    National Environmental Policy Act ................................................................... 7

    III.   Administrative Procedure Act ............................................................................ 7

STANDARDS OF REVIEW .............................................................................................. 8

ARGUMENT ...................................................................................................................... 9

    I.     Plaintiffs' Claims Are Moot ............................................................................... 9

    II.    Plaintiffs Lack Article III Standing .................................................................. 11

        A.    Plaintiffs' Asserted Injuries Are Neither Particularized nor Imminent .... 11

        B.    Plaintiffs' Alleged Injuries Are Not Traceable to the Agency
            Defendants ................................................................................................. 19

        C.    Plaintiffs' Alleged Injuries Are Not Redressable .................................... 21

    III.   Plaintiffs Lack a Cause of Action .................................................................... 22

        A.    Presidential Action is Not Reviewable Under the APA ........................... 23

        B.    Plaintiffs Have Not Identified a Final Agency Action or a Failure to
            Act ............................................................................................................. 25

            1.    Plaintiffs Have Not Identified a Final Agency Action ................. 25

            2.    Plaintiffs Have Not Identified a Discrete Action Defendants
                 Have Failed to Take .................................................................... 27

        C.    Plaintiffs Have Not Plead an *Ultra Vires* Claim .................................... 31

        D.    Plaintiffs' "Constitutional" Claim Is a Statutory Claim in Disguise ........ 32

    IV.   In Any Event, Plaintiffs' Claims Fail on the Merits ............................................ 33

A.    The EEOB Is Exempt from the NHPA Under Section 107, so NHPA Consultation Is Not Required.................................................................. 33

B.    Even if the NHPA Applies, No Consultation Duty Has Been Triggered............................................................................................. 36

C.    No Major Federal Action Triggered NEPA............................................. 37

D.    GSA Has Not Unlawfully Delegated Authority To OA ........................... 39

E.    Even if *Ultra Vires* Review Were Available, Plaintiffs' Claims Would Fail ............................................................................................ 40

CONCLUSION........................................................................................................ 41

## TABLE OF AUTHORITIES

**Cases**

*Abhe & Svoboda, Inc. v. Chao*,
 508 F.3d 1052 (D.C. Cir. 2007) ................................................................................................ 9

*Already, LLC v. Nike, Inc.*,
 568 U.S. 85 (2013) .................................................................................................................... 9

*Am. First Legal Found. v. Greer*,
 153 F.4th 1311 (D.C. Cir. 2025) .............................................................................................. 20

*Am. Legion v. Am. Humanist Ass'n*,
 588 U.S. 29 (2019) .................................................................................................................. 13

*Am. Petroleum Inst. v. EPA*,
 683 F.3d 382 (D.C. Cir. 2012) ................................................................................................ 11

*Armstrong v. Exec. Off. of the President*,
 90 F.3d 553 (D.C. Cir. 1996) .................................................................................................. 23

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ............................................................................................................ 8, 30

*Banneker Ventures, LLC v. Graham*,
 798 F.3d 1119 (D.C. Cir. 2015) ................................................................................................ 9

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) .................................................................................................................. 8

*Bennett v. Spear*,
 520 U.S. 154 (1997) ................................................................................................................ 25

*Calton v. Babbitt*,
 147 F. Supp. 2d 4 (D.D.C. 2001) ............................................................................................ 26

*Centro de Trabajadores Unidos v. Bessent*,
 No. 25-5181, 2026 WL 503310 (D.C. Cir. Feb. 24, 2026) ..................................................... 27

*Changji Esquel Textile Co. v. Raimondo*,
 40 F.4th 716 (D.C. Cir. 2022) ................................................................................................. 41

*Citizens for Resp. & Ethics in Wash. v. Trump*,
 302 F. Supp. 3d 127 (D.D.C. 2018) ................................................................................... 21, 33

*Citizens for Resp. & Ethics in Washington v. Off. of Admin.*,
 566 F.3d 219 (D.C. Cir. 2009) ....................................................................................... 22, 24, 25

*City of Alexandria. v. Slater*,
 198 F.3d 862 (D.C. Cir. 1999) .................................................................................................. 5

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ........................................................................................................... 12, 17

*Clarke v. United States*,
915 F.2d 699 (D.C. Cir. 1990) .................................................................................. 10

*Comm. of 100 on Fed. City v. Foxx*,
87 F. Supp. 3d 191 (D.D.C. 2015) ............................................................................ 38

*Ctr. for Biological Diversity v. FAA*,
No. 23-1204, 2025 WL 2643458 (D.D.C. Sept. 15, 2025) ........................................ 7

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ........................................................................... 29, 38

*Curran v. Holder*,
626 F. Supp. 2d 30 (D.D.C. 2009) .............................................................................. 8

*Dalton v. Specter*,
511 U.S. 462 (1994) ............................................................................................ 23, 32

*Defs. of Wildlife v. Andrus*,
627 F.2d 1238 (D.C. Cir. 1980) ............................................................................... 37

*Delaware Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014) ............................................................................... 38

*Doe 2 v. Trump*,
319 F. Supp. 3d 539 (D.D.C. 2018) .......................................................................... 21

*EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997) ................................................................................... 9

*Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*,
466 F. Supp. 3d 100 (D.D.C. 2020) .......................................................................... 24

*Envt'l Def. Fund* v. *FERC*,
2 F.4th 953 (D.C. Cir. 2021) ............................................................... 12, 13, 14, 15

*Equal Rights Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ............................................................................... 18

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ............................................................................................ 18, 19

*Fed. Express Corp. v. United States Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ............................................................................ 31, 41

*Food & Water Watch v. FERC*,
28 F.4th 277 (D.C. Cir. 2022) .................................................................................. 13

*Food & Water Watch v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ................................................................................. 18

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .................................................................................... 21, 22, 23

v

*Freedom Republicans, Inc. v. Fed. Election Comm'n*,
13 F.3d 412 (D.C. Cir. 1994)....................................................................................... 19

*Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*,
No. 25-12873, 2025 WL 2598567 (11th Cir. Sept. 4, 2025)...................................... 29

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025)................................................................................. 32, 33

*Griffith v. FLRA*,
842 F.2d 487 (D.C. Cir. 1988)................................................................................... 41

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977).................................................................................................. 12

*Ipsen Biopharmaceuticals, Inc. v. Becerra*,
678 F. Supp. 3d 20 (D.D.C. 2023)............................................................................ 19

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*,
402 F.3d 1249 (D.C. Cir. 2005).................................................................................. 8

*Karst Env't. Educ. & Prot., Inc. v. EPA*,
475 F.3d 1291 (D.C. Cir. 2007)............................................................................. 7, 36

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*,
909 F.3d 446 (D.C. Cir. 2018).................................................................................... 9

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994).................................................................................................... 8

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)................................................................................. 1, 14, 16, 17

*Lujan v. Nat'l Wildlife Fed.*,
497 U.S. 871 (1990).............................................................................................. 25, 26

*Marsh v. Or. Nat'l Res. Council*,
490 U.S. 360 (1989).................................................................................................... 8

*McMillan Park Comm. v. Nat'l Cap. Plan. Comm'n*,
968 F.2d 1283 (D.C. Cir. 1992).................................................................................. 6

*Mehneh v. Rubio*,
164 F.4th 928 (D.C. Cir. Jan. 16, 2026) .................................................................. 10

*Mississippi v. Johnson*,
71 U.S. 475 (1866).............................................................................................. 21, 33

*Montanans for Multiple Use v. Barbouletos*,
568 F.3d 225 (D.C. Cir. 2009).................................................................................. 28

*Murphy v. Hunt*,
455 U.S. 478 (1982).................................................................................................... 9

vi

*N.Y. Republican State Comm. v. SEC*,
   927 F. 3d 499 (D.C. Cir. 2019) ................................................................. 12

*Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell*,
   77 F. Supp. 3d 103 (D.D.C. 2015) ............................................................... 8

*Nat'l Min. Ass'n v. Fowler*,
   324 F.3d 752 (D.C. Cir. 2003) .................................................................... 6

*Nat'l Parks Conservation Ass'n v. Semonite*,
   916 F.3d 1075 (D.C. Cir. 2019) .................................................................. 6

*Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*,
   No. CV 25-4316 (RJL), 2026 WL 533420 (D.D.C. Feb. 26, 2026) ........................................ 23

*Nat'l Tr. for Historic Pres. v. Blanck*,
   938 F. Supp. 908 (D.D.C. 1996) ........................................................ 6, 7, 37

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ................................................................ 21

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ............................................................................. 27

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. 665 (2025) .................................................................. 31, 40, 41

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) .................................................................. 31

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*,
   656 F. Supp. 3d 137 (D.D.C. 2023) ........................................................ 12, 15

*Pub. Citizen v. Off. of U.S. Trade Representatives*,
   970 F.2d 916 (D.C. Cir. 1992) .................................................................. 29

*Pub. Citizen, Inc. v. FERC*,
   92 F.4th 1124 (D.C. Cir. 2024) ................................................................. 10

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
   324 F.3d 726 (D.C. Cir. 2003) .................................................................. 26

*Rushforth v. Council of Econ. Advisers*,
   762 F.2d 1038 (D.C. Cir. 1985) ................................................................ 23

*Satanic Temple v. Labrador*,
   149 F.4th 1054 (9th Cir. 2025) ................................................................ 18

*Save Long Beach Island v. U.S. Dep't of the Interior*,
   663 F. Supp. 3d 1 (D.D.C. 2023) ............................................................... 38

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
   605 U.S. 168 (2025) ............................................................................. 7

*Sierra Club v. FERC*,
   153 F.4th 1295 (D.C. Cir. 2025)............................................................................. 7

*Sierra Club v. FERC*,
   827 F.3d 59 (D.C. Cir. 2016).................................................................................. 13

*Sierra Club v. Morton*,
   405 U.S. 727 (1972)................................................................................................ 14

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976).................................................................................................. 18

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971)........................................................................ 23, 24

*Statewide Bonding, Inc. v. Dep't of Homeland Sec.*,
   980 F.3d 109 (D.C. Cir. 2020)................................................................................ 22

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998).................................................................................................... 8

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)................................................................................... 12, 14, 17

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)................................................................................................ 12

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996)................................................................................ 21

*Sweetland v. Walters*,
   60 F.3d 852 (D.C. Cir. 1995).................................................................................. 23

*Texas v. United States*,
   523 U.S. 296 (1998)................................................................................................ 10

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021)................................................................................................ 15

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006).................................................................................. 7

*United States v. Jabr*,
   No. CR 18-0105 (PLF), 2019 WL 13110682 (D.D.C. May 16, 2019).............. 35, 36

*Voinche v. Obama*,
   428 F. App'x 2 (D.C. Cir. 2011).............................................................................. 22

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
   165 F.3d 43 (D.C. Cir. 1999).................................................................................. 26

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)................................................................................................ 32

viii

**Statutes**

16 U.S.C. § 470g ............................................................................................................... 34

18 U.S.C. § 1752(a)(1) ...................................................................................................... 35

40 U.S.C. § 121(d) ............................................................................................................ 39

40 U.S.C. § 121(d)(1) .......................................................................................................... 5

40 U.S.C. § 3305 .................................................................................................................. 4

42 U.S.C. § 4332 ............................................................................................................... 22

42 U.S.C. § 4332(2)(C) ................................................................................................. 7, 37

5 U.S.C. § 702 ................................................................................................................... 22

5 U.S.C. § 704 ............................................................................................................. 22, 25

5 U.S.C. § 706(1) ...................................................................................................... 8, 22, 27

5 U.S.C. § 706(2)(A) ........................................................................................................... 8

5 U.S.C. § 706(2)(D) ........................................................................................................... 8

54 U.S.C. § 300320 .............................................................................................................. 5

54 U.S.C. § 302101 ........................................................................................................... 20

54 U.S.C. § 302102 ........................................................................................................... 20

54 U.S.C. § 306108 ..................................................................................................... 22, 29

54 U.S.C. § 307104 ................................................................................................... passim

Pub. L. No. 100-461, 102 Stat. 2268 (Oct. 1, 1998) ............................................ 4, 40, 41

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................................................... 3, 8

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 3, 31

**Regulations**

36 C.F.R. § 800.1(c) ...................................................................................................... 30, 37

36 C.F.R. § 800.10(c) ........................................................................................................ 20

36 C.F.R. Part 65 ............................................................................................................... 20

ix

**Other Authorities**

133 Cong. Rec. 36572 (Dec. 19, 1987) .................................................................................. 40

42 Fed. Reg. 62,895 (Dec. 12, 1977) .................................................................................. 24

H.R. Rep. No. 96-1457 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378 ......................................... 7

x

**INTRODUCTION**

Plaintiffs seek to superintend executive decision-making on White House grounds based on the President's statement that he may paint the Eisenhower Executive Office Building ("EEOB"). Plaintiffs have not hidden their extraordinary request—an injunction ordering agency leadership to "restrain[] the President." *See* Dkt. No. 16 at 1; *see also* Hr'g Tr. 7:6–8 (Dec. 8, 2025) ("We are asking you to enjoin the President."); Dkt. No. 34, Am. Compl., Prayer for Relief ¶¶ F–G (seeking to enjoin all Defendants including the President). Plaintiffs' claims fail on the merits. But to even reach the merits would plunge this Court into a separation-of-powers thicket that the judiciary has long avoided. The Court should instead dismiss this case.

For starters, the Court should dismiss this suit because the President has voluntarily committed to engage in the exact analyses Plaintiffs seek, and those processes are underway. The President has decided in his discretion that the Office of Administration ("OA") within the Executive Office of the President ("EOP") will voluntarily comply with the NHPA and NEPA before deciding whether to proceed with a Presidential project to clean, repoint, and/or paint the EEOB's granite exterior. That gives Plaintiffs all the relief they seek, so this lawsuit is moot. To the extent they challenge the results of administrative processes have not concluded, Plaintiffs' case is also unripe.

Mootness and ripeness aside, Plaintiffs' claims fail under each element of the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). On injury in fact, the President's musings about a hypothetical painting project do not cause Plaintiffs any actual or imminent injury. Nor does the General Services Administration's solicitation of rough price estimates for a notional painting project cause actual or imminent injury to Plaintiffs. Because no decision to paint the EEOB has been made, any injury that could possibly flow from

1

such a decision is speculative—not actual or imminent. That alone resolves this action. But if more were needed, Plaintiffs cannot trace their alleged injuries to either the National Park Service ("NPS") or the General Services Administration ("GSA") defendants. Instead, the hypothetical future action Plaintiffs challenge would be the President's action, through OA. But courts lack jurisdiction to enjoin—or to issue a declaratory judgment against—the President, so any alleged injuries are not redressable. Plaintiffs thus lack standing.

Even if their claims were not moot and unripe, and they could identify a defendant against whom they have standing to seek relief, Plaintiffs' claims would fail for want of a cause of action. Plaintiffs' NHPA and NEPA claims can only be brought under the Administrative Procedure Act ("APA"), but Plaintiffs fail to identify *agency* action, much less *final* agency action. The President is not an "agency" under the APA. And even if there were a proper agency defendant, Plaintiffs fail to identify a "final" agency action—they instead challenge an *idea* that may or may not come to pass. And they have failed to identify—as they must to support a failure-to-act claim—a discrete duty that any of the Federal Defendants is required to undertake. Plaintiffs cannot avoid these problems by rebranding their statutory claims as *ultra vires* or constitutional challenges.

Finally, Plaintiffs' claims fail on the merits. Their NHPA claims fail because the EEOB is part of "the White House and its grounds" and is therefore exempt under Section 107 of the Act, and because there has been no approval of "the expenditure of any Federal funds" that would trigger the obligation to consult. As for their NEPA claim, there has been no "major federal action" to which the statute applies. And even if a major federal action were in the offing, there has been no "irretrievable commitment of resources" that would trigger an obligation to analyze environmental effects.

2

In short, Plaintiffs' claims fail at every turn. The Court should dismiss Plaintiffs' Amended Complaint for lack of subject-matter jurisdiction and for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), (6) .

**FACTUAL BACKGROUND**

The EEOB is an office building adjacent to the White House that hosts Executive Branch employees who assist and advise the President in the execution of his constitutional office, including employees of the OA, which is the lead tenant. *See* Decl. of Heather Martin, Deputy Assistant to the President, Dkt. No. 27-2 ¶ 3 (Jan. 29, 2026) ("1st Martin Decl."). Other components of the EOP that have offices within the EEOB include the White House Office, Office of the Vice President, Council of Economic Advisors, National Security Council, Office of Management and Budget, Office of Science and Technology Policy, Office of the National Drug Control Policy, Office of the National Cyber Director, and the Council on Environmental Quality. *Id.*

In a November 2025 television interview, the President expressed an interest in cleaning, repointing, and painting the EEOB white to match the adjacent White House. However, in that same interview, the President also indicated that he did not know whether the project would be undertaken. He was asked "and when is that planned for?" and responded, "I don't even know if I'm going to do it yet."[1]

Following this passing expression of interest by the President in such a project, GSA sought and received informal, external estimates for a hypothetical painting project at an unspecified building in the District of Columbia with the EEOB's stone exterior and size dimensions, but

---

[1]     *See* https://www.foxnews.com/video/6385030226112 at 2:00–2:07 (last visited Mar. 13, 2026). Plaintiffs incorporate the interview by reference into their Amended Complaint. *See* Am. Compl. ¶ 65.

3

without identifying the EEOB or its security requirements. GSA also prepared its own internal estimate for comparison reasons. 5th Decl. of Andrew Heller, Acting Commissioner of the Public Buildings Service, GSA, Dkt. No. 27-4 ("5th Heller Decl.").

As the President's consideration of potential projects at the EEOB has progressed, on January 29, 2026, OA and GSA entered into a Memorandum of Understanding regarding responsibility for a potential presidential project to clean, repoint, and paint the EEOB ("the Project"), should the President decide to proceed. *See* 5th Heller Decl., Attach. A, Memorandum of Understanding (Jan. 29, 2026); 1st Martin Decl., Attach. A, Memorandum of Understanding (hereinafter, "MOU"); *see also* 40 U.S.C. § 3305 (GSA authority); Pub. L. No. 100-461, 102 Stat. 2268 § 590 (Oct. 1, 1998) (OA authority). OA and the GSA agreed that each has statutory authority to paint the EEOB. As reflected in the MOU, as of January 29, 2026, OA would manage the Project at the EEOB, to the extent the President decides to pursue it.

OA has voluntarily committed to engage in NHPA and NEPA analyses, and to not authorize or implement the Project until the completion of those processes, if at all. 1st Martin Decl. ¶¶ 10–12. As of the date of filing, no decision on whether to proceed with any Project at the EEOB has been made, and OA is in the early stages of those processes, which will inform the President's decision. Second Decl. of Heather Martin ¶¶ 5–13 ("2d Martin Decl.") (attached as Exhibit A).

## PROCEDURAL BACKGROUND

Plaintiffs filed their initial complaint on November 14, 2025, alleging violations of NEPA, Sections 106 and 110(f) of the NHPA, the APA, and Article II, Section 3, of the United States Constitution, which requires the President to "take Care that the Laws be faithfully executed." Dkt. No. 1, Compl. (original) ¶¶ 75–129. On November 17, 2025, Plaintiffs filed a motion for a

temporary restraining order, preliminary injunction, and expedited hearing. Dkt. No. 7, Pls.' Mot. for Temp. Restraining Order, Prelim. Inj., and Expedited Hr'g. After a hearing and three declarations from GSA committing not to paint the EEOB for the next several months, Plaintiffs withdrew their motion. Dkt. No. 24. As directed by the Court's Minute Order of December 12, 2025, Defendants filed a Motion to Dismiss or Motion for Summary Judgment in the alternative. Dkt. No. 27.

On February 19, 2026, following an emergency status conference requested by Plaintiffs and at the direction of the Court, Plaintiffs filed an Amended Complaint that mooted Defendants' original Motion to Dismiss. The Amended Complaint pleads seven claims that largely parallel the claims in the original complaint but adds claims challenging the MOU and GSA's alleged delegation to OA pursuant to 40 U.S.C. § 121(d)(1). *See* Am. Compl. ¶¶ 108–73. Pursuant to the Court's Minute Order of February 23, 2026, Defendants now file this Motion to Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and Rule 12(b)(6).

## LEGAL BACKGROUND

### I.    National Historic Preservation Act

Section 106 of the NHPA is "essentially a procedural statute" that does not impose substantive standards but "requires that agencies 'take into account the effect of an undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register of Historic Places.'" *City of Alexandria. v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999) (alteration omitted) (citing 16 U.S.C. § 470(f) (1999), *recodified at* 54 U.S.C. § 306108 (2014)). The NHPA defines an undertaking as any "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency." 54 U.S.C. § 300320; *see*

5

*also McMillan Park Comm. v. Nat'l Cap. Plan. Comm'n*, 968 F.2d 1283, 1285 (D.C. Cir. 1992) (describing consultation requirements). Section 201 of the NHPA establishes the Advisory Council on Historic Preservation ("ACHP"), which promotes the preservation, enhancement, and sustainable use of the nation's diverse historic resources, and advises the President and Congress on national historic preservation policy." *See* ACHP Strategic Plan (https://www.achp.gov/ sites/default/files/2022-04/StrategicPlan-Graphic_040922-final.pdf) (last visited Mar. 13, 2026). ACHP is additionally charged with promulgating regulations to implement the NHPA. S*ee Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 754 (D.C. Cir. 2003).

Section 107 of the NHPA exempts certain federal buildings, including the White House and its grounds, from operation of the statute, including Section 106. *See* 54 U.S.C. § 307104. In a 1994 Programmatic Agreement between GSA, ACHP, and the D.C. State Historic Preservation Office ("SHPO") regarding historic preservation in GSA's National Capital Region, ACHP "recognize[d] the Old Executive Office Building as part of 'the White House and its grounds' pursuant to Section 107 of the [NHPA]." Dkt. No. 15-2 at 3 ("1994 Programmatic Agreement").

Section 110(f) of the NHPA "provides that for any project 'directly and adversely affecting any National Historic Landmark,' the agency must 'to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark.'" *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1088 (D.C. Cir. 2019) (quoting 54 U.S.C. § 306107), *amended on reh'g in part*, 925 F.3d 500 (D.C. Cir. 2019). As with Section 106, courts have held that this provision is not a substantive mandate and instead sets a heightened procedural standard for potential impacts on National Historic Landmarks. *See Nat'l Tr. for Historic Pres. v. Blanck*, 938 F. Supp. 908, 922 (D.D.C. 1996), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999) (finding Section 110 "cannot be read to create new substantive preservationist obligations separate and apart from

the overwhelmingly procedural thrust of the NHPA"). When a building is listed, an agency has "a higher standard of care . . . when considering undertakings that may directly and adversely affect National Historic Landmark." *Id.* at 921 (citing H.R. Rep. No. 1457 at 36–38, 96th Cong., 2d Sess. 36 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378, 6399).

## II.     National Environmental Policy Act

NEPA is a purely procedural statute which ensures that "agencies are fully informed of the environmental consequences of their decisions." *Ctr. for Biological Diversity v. FAA*, No. 23-1204, 2025 WL 2643458, at *1 (D.D.C. Sept. 15, 2025). To comply with NEPA, an agency prepares a document assessing the environmental impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under NEPA, the "role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one. The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 185 (2025) (citation omitted). NEPA "does not require an agency to make the decision that the reviewing judges 'would have reached had they been members of the decisionmaking unit of the agency.'" *Sierra Club v. FERC*, 153 F.4th 1295, 1305 (D.C. Cir. 2025).

## III.    Administrative Procedure Act

Because the NHPA and NEPA do not provide a private right of action, Plaintiffs rely on the APA for their statutory claims. *See Karst Env't. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007). The APA supplies a "limited cause of action for parties adversely affected by agency action," *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006), and authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside" final agency actions found to be "arbitrary, capricious, an abuse of

7

discretion, or otherwise not in accordance with law" or "without observance of procedure required by law," 5 U.S.C. § 706(1), (2)(A) , (2)(D) ; *Marsh v. Or. Nat'l Res. Council*, 490 U.S. 360, 378 (1989).

## STANDARDS OF REVIEW

Before addressing the merits of Plaintiffs' Amended Complaint, the Court must determine whether it has subject-matter jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). A motion to dismiss under Rule 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance." *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (citation modified). "[I]t is [] presumed that a cause lies outside [the federal courts'] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence that the Court possesses jurisdiction. In reviewing a Rule 12(b)(1) motion, "the Court 'may consider materials outside of the pleadings.'" *Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell*, 77 F. Supp. 3d 103, 108 (D.D.C. 2015) (citing *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)).[2]

To survive a Rule 12(b)(6) motion, Plaintiffs must allege "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts accept all well-pleaded facts as true and draw all reasonable inferences in Plaintiffs' favor, but they need not accept conclusory allegations or unreasonable factual inferences as true. *See Iqbal*, 556 U.S. at 678. In evaluating a Rule 12(b)(6) motion, "the court may consider the facts alleged in the complaint,

---

[2]    Accordingly, the Court may review the Heller and Martin declarations, as well as the MOU, in assessing its jurisdiction.

documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (citation modified); *see also EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, we may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice.").[3]

**ARGUMENT**

This Court should dismiss Plaintiffs' Amended Complaint because Plaintiffs' claims are moot and unripe, they lack Article III standing, they have no cause of action, and they cannot establish any duty that applies to Defendants under the NHPA or NEPA.

## I.    Plaintiffs' Claims Are Moot

Plaintiffs' claims are moot to the extent they challenge GSA's activities concerning EEOB modernization. A claim is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). "'Even where litigation poses a live controversy when filed,' a federal court must 'refrain from deciding the dispute if events

---

[3]    While Plaintiffs did not attach a transcript of the President's interview, the MOU, or the Defendants' declarations to their Amended Complaint, a "district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015). This allows the Court to consider these documents, given that Plaintiffs specifically reference them throughout the Amended Complaint. *See, e.g.*, Am. Compl. ¶¶ 65–67, 70, 170 (the President's interview); *id.* ¶¶ 5, 11–15, 74, 80–81, 103, 144, 153, 160–65, 170–73 (the MOU); *id.* ¶ 121 (3rd Heller Decl., Dkt. No. 21-1); and *id.* ¶¶ 68–72 (5th Heller Decl.). Similarly, "[a]mong the information a court may consider on a motion to dismiss are 'public records subject to judicial notice.'" *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018). The 1994 Programmatic Agreement between the GSA, DC SHPO, and ACHP, is a public record subject to judicial notice. Accordingly, the Court can consider all these documents without converting this motion to a motion for summary judgment.

have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1127–28 (D.C. Cir. 2024) (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc)) (alterations omitted). "A case becomes moot and must be dismissed for lack of jurisdiction "when, by virtue of an intervening event, a court . . . cannot grant any effectual relief whatever in favor of the appellant." *Mehneh v. Rubio*, 164 F.4th 928, 931 (D.C. Cir. Jan. 16, 2026) (citation omitted).

Plaintiffs' NHPA and NEPA claims are moot, because they seek a declaratory judgment that painting the EEOB is unlawful without first complying with the Sections 106 and 110(f) of NHPA and with NEPA, Am. Compl. Prayer for Relief ¶¶ A, D, E, and a series of injunctive orders regarding the same, *id.* ¶¶ F, H, I. But GSA would not participate in the Project, and the President, through OA, is now doing the very thing Plaintiffs ask the Court to order—NHPA and NEPA compliance. Specifically, OA has voluntarily agreed to consult under the NHPA on behalf of the President and to analyze under NEPA any environmental effects of a painting project before the President decides whether to proceed with the Project. 1st Martin Decl. ¶ 11. Plaintiffs seek a Section 106 process, Am. Compl. ¶ 127, but that process is already underway. Plaintiffs seek an EA or EIS, Am. Compl. ¶ 114, but that process, too, is already underway. Because OA is voluntarily undergoing the very procedures Plaintiffs seek, there is simply nothing left for this Court to order. In short, Plaintiffs seek an advisory opinion. Plaintiffs' claims are moot, and this Court should dismiss for that reason.[4]

---

[4]    Until this ongoing NHPA and NEPA compliance is complete and a decision about how to improve the EEOB is made, there is nothing for Plaintiffs to challenge. Challenging this ongoing process now is no answer—courts routinely find claims unripe for adjudication if they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted). Indeed, "prudential

To the extent Plaintiffs eventually contest the future results of the NHPA and NEPA compliance processes, such claims would only ripen into a potentially justiciable dispute when those processes are complete.

## II.     Plaintiffs Lack Article III Standing

Mootness aside, Plaintiffs lack standing because they have not alleged, much less established, injury in fact; their alleged harms are not traceable to NPS or GSA; and the Court cannot redress their purported injuries by injunctive or declaratory relief against the President.

### A.     Plaintiffs' Asserted Injuries Are Neither Particularized nor Imminent.

Plaintiffs Gregory and Marion Werkheiser ("Werkheisers")—founding members and equity partners of Plaintiff Cultural Heritage Partners, PLLC ("CHP"), *see* Am. Compl. ¶¶ 11–12—allege that Defendants' hypothetical plan to paint the EEOB without complying with NEPA and the NHPA will impair their "aesthetic, recreational, professional, and educational" interests. *See id.* ¶¶ 6, 11–12. It is clear from the Amended Complaint that alleged aesthetic harms are the underpinning of the Werkheisers other alleged harms. *See id.* Likewise, Plaintiff DC Preservation League ("DCPL") alleges associational standing, *see id.* ¶ 14, arguing that at least one of its (unnamed) members would have standing because she "regularly uses and enjoys the EEOB and its surrounding historic districts and intends to continue doing so," *see id.* CHP, on the other hand, alleges organizational standing, arguing that "the challenged MOU and Project impair [its] professional activities and procedural interests in ensuring lawful federal review" and its ability to use the EEOB "and its surroundings in its preservation practice," and "diminish the professional and economic value of its office location." *Id.* ¶ 13. None of these injuries suffice to show standing.

---

ripeness ensures that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012).

***Individual and Associational Standing.*** Plaintiffs allege *future* injury based on *future* conduct, so they must show that some concrete harm is either "certainly impending" or that there is a "substantial risk" it will occur, which in the standing context means that it must be "sufficiently imminent." *N.Y. Republican State Comm. v. SEC*, 927 F. 3d 499, 504 (D.C. Cir. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–14 (2013) (internal citation omitted), and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *see also Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 151 (D.D.C. 2023) (requirement to allege "sufficiently imminent" harm is "hard to meet where the harm-causing event is still subject to regulatory processes and approvals" (internal quotation marks omitted)). And because DCPL relies on associational standing, which is satisfied if (among other things) one of the association's "members would otherwise have standing to sue in their own right," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), DCPL's unnamed member must allege an injury-in-fact that likewise meets Article III's particularity and imminence requirements.[5] Both the Werkheisers and DCPL fail to meet those requirements.

The Werkheisers

Because the Werkheisers allege aesthetic harms from the proposed activities, including painting the EEOB, they must show that "[their] specific aesthetic interests" are harmed, by describing their particular "use[] and enjoy[ment] [of] the land" beyond "mere incidental viewership," and they must further identify how they will have to "alter[ their] behavior." *Envt'l*

---

[5]    Plaintiffs have also asserted procedural injuries, but standalone procedural injuries are insufficient to confer Article III standing. *Summers v. Earth Island Inst*., 555 U.S. 488, 496 (2009). Rather, Plaintiffs' alleged procedural injuries, stemming from an alleged failure to comply with NEPA and the NHPA, *see* Am. Compl. ¶ 10, must be tied to concrete interests. Here, those alleged interests are alleged aesthetic harms, so their alleged procedural harms rise and fall with their alleged aesthetic harms.

12

*Def. Fund v. FERC* ("*EDF*"), 2 F.4th 953, 969–70 (D.C. Cir. 2021). Thus, the D.C. Circuit has found standing existed where a plaintiff alleged that construction of a pipeline over property where he frequently fished, boated, and hunted would diminish his ability to do those things. *Sierra Club v. FERC*, 827 F.3d 59, 66 (D.C. Cir. 2016); *see also Food & Water Watch v. FERC*, 28 F.4th 277, 283–84 (D.C. Cir. 2022) (finding standing where construction would cause noise and pollution that would impair "financial value" and "peaceful enjoyment" of nearby property). But it concluded that a plaintiff lacked standing to vindicate an aesthetic interest when she did "not even allege that she c[ould] see the new [construction] from her property," which was more than "half a mile" away, and attested only that "she must look at an 'eyesore' several times per week while driving past."[6] *EDF*, 2 F.4th at 969–70. She had "neither altered her behavior nor explained why she has any particularized connection to the land," thus reducing her "alleged aesthetic injuries" to "nothing more than generalized grievances, which cannot support standing." *Id*.

The mere prospect of painting the EEOB without the Werkheisers' preferred process does not constitute a concrete injury. The Werkheisers have not shown that they use the EEOB in a way that is unique from the general public. They have suffered no financial harm to their property. Nor have they plausibly suffered discomfort from the possibility that the EEOB will be painted, just as a public nuisance plaintiff fails to allege concrete harm based upon the possibility of future exposure to an offensive odor or toxic smog. And the Werkheisers can easily avoid any alleged aesthetic discomfort by not going to the White House complex to view the EEOB—they live almost a hundred miles away in Richmond, Virginia. Am. Compl. ¶¶ 11–12. Their asserted harm

---

[6]     The D.C. Circuit found "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing." *EDF*, 2 F.4th at 970; *see also Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 84 (2019) (Gorsuch, J., concurring in the judgment) ("Offended observer standing cannot be squared with this Court's longstanding teachings about the limits of Article III.").

is that future visits, in "March 2026 and thereafter" at unstated times, may be impacted. *Id.* How? It is not clear. They certainly do not allege that the EEOB will not be there to visit. Given that millions of schoolchildren, families, and civic associations visit D.C. and its government buildings each year, this is practically the definition of an injury common to the general public. "Viewed in full frame," their "alleged aesthetic injuries reflect nothing more than generalized grievances, which cannot support standing." *EDF*, 2 F.4th at 969–70 (holding that the "alleged aesthetic injuries reflect nothing more than generalized grievances, which cannot support standing"). Additionally, the Werkheisers' vague profession of intending to visit the EEOB in March 2026 and thereafter "is simply not enough." *Lujan*, 504 U.S. at 564 (citation modified). "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of . . . actual or imminent injury." *Id.* (quotation marks omitted) (emphasis in original); *see also Summers*, 555 U.S. at 496 ("This vague desire to return is insufficient to satisfy the requirement of imminent injury.").

At most, the allegations in the Amended Complaint establish that the Werkheisers plan to return to D.C. in March 2026 and at other undetermined dates after that, and that they may (or may not) see the EEOB during at least one of these trips. But even if they visit the EEOB at some time in March 2026, they will not suffer any injury because the EEOB will not have been painted. 2d Martin Decl. ¶ 8 (indicating the NHPA process will not conclude prior to July 9, 2026, at the earliest). Moreover, the Werkheisers have not identified a "specific and concrete plan" to lead visits to the EEOB, *Summers*, 555 U.S. at 495, much less explain how any hypothetical painting would affect those visits, *see EDF*, 2 F.4th at 969 (finding no injury because the plaintiff failed to explain why "her planned uses of the land have been foreclosed by the construction"). *See also Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (holding that environmental group lacked

14

standing because it failed to show that its members "use[d]" the affected area in a "way that would be significantly affected by the proposed actions of the respondents"). In short, painting the EEOB would not require the Werkheisers to "alter[] [their] behavior" in any way, such as by affecting their ability to continue visiting the area or educating others on historical preservation. *EDF*, 2 F.4th at 970.[7]

In all events, any aesthetic injury is also too speculative—and thus not sufficiently imminent—given that no decision to paint the EEOB has been made. The President's preliminary idea to improve the EEOB is not "certainly impending." *Pharm. Rsch.*, 656 F. Supp. 3d at 150-51. The President himself said he does not "even know if [he is] going to do it yet."[8] Moreover, OA committed that it will not authorize or take any action to implement the Project unless and until two conditions are met: 1) the NHPA and NEPA processes have been completed, and 2) the President directs it to paint the EEOB. 1st Martin Decl. ¶¶ 11–12. Neither has occurred, and the NHPA and NEPA processes are in early stages. Federal courts are not in the business of "adjudicat[ing] hypothetical or abstract disputes." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021).

The Werkheisers seize on the President's statement that he was "getting bids" as evidence that a painting project is imminent. *See* Am. Compl. ¶ 66. But "getting bids"—or more particularly in this case, obtaining ballpark cost projections—is part of a deliberative process that may or may not result in a decision to act. Like feasibility studies and other pre-planning activities that inform

---

[7]    The Werkheisers also allege that painting the EEOB would harm their "professional" interests in the area. *See* Am. Compl. ¶¶ 11–12. But they provide no information on how they would suffer professional harm. *See generally id.*

[8]    *See* https://www.foxnews.com/video/6385030226112 at 2:00–2:07 (last visited Mar. 13, 2026).

potential government action, the solicitation of cost estimates does not imply that the estimated work will necessarily occur. *Lujan*, 504 U.S. at 564. Indeed, the "bids" were just rough estimates of the cost to paint an unidentified concrete building in D.C. of approximately the EEOB's size, without identifying the building, the specifics of the project, or the unique security needs it would have. 5th Heller Decl. ¶¶ 8–13. These quotes could not even have been accepted—extensive future work by both the government and potential contractor(s) to solicit, prepare, and review an actual, formal proposal would be required. Even assuming these rough estimates could somehow constitute a solicitation of bids for a particular project, such a solicitation is a far cry from a decision to paint the EEOB or a commitment of resources to the same. Even the President confirmed that he was only exploring the idea. *See supra* n.1.

The missing elements of the hypothetical "plan" are fatal to the Werkheisers' standing: there is no indication of the painting materials to be used; the method of application; the scaffolding to be erected; the power-washing, cleaning, or repointing, to be undertaken; the contractors to hire; or any other predicate steps necessary to actualize a painting project. Rather, GSA sought and received informal estimates for cleaning and/or painting of the EEOB—some of them internal— to determine the range of potential costs. 5th Heller Decl. ¶¶ 8–12. The only other thing GSA subsequently did with those informal estimates was give some of them to EOP for informational purposes. *Id.* ¶ 8. Nor does the entry into an MOU between GSA and OA change the analysis. The MOU merely describes OA and GSA's legal authorities and assigns responsibility for the Project to OA, *if* the President later chooses to advance the Project. It does not indicate that such a project will actually occur.

The Werkheisers invite this Court to assume that the 'missing' NHPA and NEPA compliance causes them harm. Not so. The fact that NHPA and NEPA compliance is still in

16

progress shows only that the predicate to any painting decision remains to be completed. Indeed, Defendants' previously filed declarations confirm that any decision to paint the EEOB will be informed by administrative processes that are only just now getting underway, and information that has yet to be considered. 5th Heller Decl. ¶¶ 7, 15; 1st Martin Decl. ¶¶ 7, 9, 2d Martin Decl. ¶¶ 5–13. For these reasons, the Werkheisers fail to allege any certainly impending or even sufficiently imminent harm to support standing. *See Clapper*, 568 U.S. at 410–14. Plaintiffs want a court order "requiring statutory" compliance so that they can participate in public processes, but the Defendants have already committed to comply with applicable statutes and allow public comment. Plaintiffs suffer no procedural injury where the processes they allege must be completed are already underway.

DCPL

DCPL lacks associational standing for much the same reason. Indeed, DCPL fails to even submit a declaration from one of its members alleging imminent injury to the member's aesthetic interests. Instead, similar to the allegations made by the Werkheisers, DCPL alleges that its Executive Director "regularly uses and enjoys the EEOB and its surrounding historic district and intends to continue doing so." Am. Comp. ¶ 14. DCPL also alleges that its Executive Director had "concrete plans to return in February 2026." *Id.* Those allegations fall far short of providing the information needed to establish imminent injury. *See Lujan*, 504 U.S. at 564; *Summers*, 555 U.S. at 495–96. And, like the Werkheisers, if she did visit in February 2026, she did not suffer an injury because the EEOB had not been painted. DCPL's associational injury is also too speculative for the reasons given above.

***Organizational Standing***. Unlike DCPL, CHP relies on organizational standing. To determine if an organization has standing to sue in its own right, courts conduct the same inquiry

17

as in the case of an individual plaintiff. *Food & Water Watch v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). "An organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Rather, an organization must show that the defendant's conduct "directly affected and interfered with [its] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). "A mere setback to [an organization's] abstract social interests is not sufficient." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). Nor is it enough for an organization to rely on the diversion of its resources to education or advocacy. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).

CHP alleges, in barebones and conclusory fashion, that "the challenged MOU and Project impair [its] professional activities and procedural interests in ensuring lawful federal review" and its ability to use the EEOB "and its surroundings in its preservation practice," and "diminish the professional and economic value of its office location." Am. Compl. ¶ 13. But CHP never explains how painting the EEOB without complying with the NHPA or NEPA would affect its "core business activities." *Hippocratic Med.*, 602 U.S. at 395; *see also Satanic Temple v. Labrador*, 149 F.4th 1047, 1054 (9th Cir. 2025). Nor can CHP establish organizational standing by "advocat[ing] for compliance with NEPA and NHPA," Am. Compl. ¶ 13, or "expend[ing] additional time and resources to explain the damage to clients and to advocate for remediation," Dkt. No. 7-3 ¶ 17." *See also* Am. Compl. ¶ 13. Organizational standing cannot rest on a plaintiff's alleged diversion of resources to education and advocacy. *Food & Water Watch*, 808 F.3d at 919. Most astonishingly, DCPL argues that it has manufactured standing in this lawsuit simply by litigating it, because they have diverted attorney time and firm resources to this case. Am. Compl.

18

¶ 13. But a plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Hippocratic Med.*, 602 U.S. at 394.

## B.    Plaintiffs' Alleged Injuries Are Not Traceable to the Agency Defendants.

Plaintiffs also suffer a traceability problem with respect to the agency defendants. To meet the traceability requirement, a plaintiff must show a "causal nexus between the agency action and the asserted injury." *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 678 F. Supp. 3d 20, 30 (D.D.C. 2023), *aff'd*, 108 F.4th 836 (D.C. Cir. 2024) (citing *Freedom Republicans, Inc. v. Fed. Election Comm'n*, 13 F.3d 412, 418 (D.C. Cir. 1994)). As for the agency defendants, no such nexus exists here.

To begin with, NPS and Acting Director Bowron[9] have no role in managing the EEOB. NPS does not have administrative jurisdiction over the EEOB and has had no management responsibility over the EEOB since 1950. *See* Dkt. No. 15-3 ¶¶ 5–11. The Reorganization Plan No. 18 of 1950 transferred "[a]ll functions with respect to the operation, maintenance, and custody" of federal buildings to GSA, with certain exceptions not relevant here. Reorg. Plan No. 18 of 1950, § 2, 64 Stat. 1270, 1270–71.

Plaintiffs contend that they may pursue their claims against the NPS because the EEOB is a National Historic Landmark and sits within a National Historic Landmark District ("NHLD"). *See* Am. Compl. ¶¶ 18–19, 99, 101, 124, 134. This does not render NPS a proper defendant in this suit. Indeed, such an unprecedented claim would allow any litigant to assert a claim against NPS in any lawsuit involving an alleged adverse effect to any of the over 2,600 designated NHLs nationwide, a result plainly not supported by the NHPA or any of its implementing regulations.

---

[9]    Ms. Bowron's full title is "NPS Comptroller, exercising the delegated authority of the Director" of the NPS. For brevity, this brief refers to her as "Acting Director."

Although the Secretary of the Interior, through NPS, does administer the National Historic Landmarks program, none of the authorities cited by Plaintiffs prescribe any statutory or regulatory responsibilities that could give rise to a claim against NPS here. *See* 54 U.S.C. § 302101 (authorizing the Secretary to expand and maintain the National Register of Historic Places), *id.* § 302102 (including NHLs on the National Register of Historic Places); 36 C.F.R. Part 65 (regulations prescribing the criteria for and process for designation of NHLs); 36 C.F.R. § 800.10(c) (requiring notice to the Secretary of Section 106 consultations involving NHLs and an invitation to the Secretary to participate in such consultations, and providing a process to request a report from the Secretary). Because there is no cognizable relief that the Court could grant Plaintiffs in relation to NPS and Acting Director Bowren, the Court should dismiss them as parties to this lawsuit.

Plaintiffs' alleged injuries are also not traceable to GSA. GSA would not be responsible or otherwise involved in any future decision to move forward with the Project at the EEOB. *See* MOU. First, the President has determined that its OA would oversee implementation of the Project, should the President decide to go forward, including any necessary environmental and historical review processes. *See* MOU. Further, the President is the decisionmaker as to whether painting will occur at all pursuant to OA's authority. *See* 1st Martin Decl. ¶¶ 7–12. So, GSA is not in charge of decision-making or implementation. *See id.* ¶¶ 7–9; 5th Heller Decl. ¶¶ 5, 15. Plaintiffs therefore have not—and cannot—establish the necessary nexus between their injuries and the GSA defendants. *See Am. First Legal Found. v. Greer*, 153 F.4th 1311, 1315 (D.C. Cir. 2025) (noting fatal traceability problem because any injury was "plainly traceable" to another entity and not the defendant).

### C.    Plaintiffs' Alleged Injuries Are Not Redressable.

That leaves the President, who Plaintiffs seek to preemptively enjoin from taking a non-ministerial action. But as the Supreme Court has made clear, federal courts lack jurisdiction to "enjoin the President is the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (same); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him."). As this Court has explained, "[s]ound separation-of-power principles counsel the Court against granting these forms of relief against the President directly." *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018), citing *Franklin*, 505 U.S. at 802–03. Indeed, in *Franklin*, the Supreme Court affirmed the presumptive unavailability of injunctive relief against the President for performance of his official duties, noting that "in general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" 505 U.S. at 802–03 (quoting *Mississippi*, 71 U.S. at 501).

The same principle applies to declaratory relief, because a "court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." *Newdow*, 603 F.3d at 1012; *see also Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) ("Although the following discussion is couched in terms of our ability to grant injunctive relief against the President, similar considerations regarding a court's power to issue relief against the President himself apply to Swan's request for a declaratory judgment."). To the extent any exception to this rule pre-dating *Franklin* survives at all, it is limited to claims seeking to mandate ministerial actions, not the prospective injunctive relief compelling the discretionary action that Plaintiffs seek. *See Citizens for Resp. & Ethics in Wash. v. Trump*, 302 F. Supp. 3d 127, 130 (D.D.C. 2018)

21

(discussing the distinction between ministerial and policy-making acts in *Mississippi*, 71 U.S. 475).

The conclusion that courts may not grant equitable relief against the President applies with particular force here because Plaintiffs fail to allege any statutory duty that applies to him. Plaintiffs allege violations of the NHPA and NEPA, *see* Am. Compl., Counts I–III, but these statutes govern "[t]he head of any Federal agency," 54 U.S.C. § 306108, and "all agencies of the Federal Government," 42 U.S.C. § 4332, not the President. Plaintiffs also allege a violation of the APA, *id.*, Count IV, but the APA similarly provides a cause of action to review "final *agency* action," not presidential action. *See* 5 U.S.C. § 704; *Franklin*, 505 U.S. at 796 ("President is not an agency within the meaning of the [APA]."). The lack of a legally redressable claim against the President is fatal to Plaintiffs' standing. Nor would the President's use of OA for the Project change this analysis. OA, which exists to advise and assist the President, is not an agency within the meaning of the APA. *See Citizens for Resp. & Ethics in Washington v. Off. of Admin.* ("*CREW*"), 566 F.3d 219, 224 (D.C. Cir. 2009);[10] *accord Voinche v. Obama*, 428 F. App'x 2, 3 (D.C. Cir. 2011).

## III.    Plaintiffs Lack a Cause of Action.

Even if Plaintiffs' claims were justiciable, Plaintiffs would still lack a cause of action to assert those claims. Nearly all of Plaintiffs' claims rely on the APA. Am. Compl. ¶¶ 108–66. But the APA supplies a cause of action to challenge only final agency action, including an agency's failure to act. *Statewide Bonding, Inc. v. Dep't of Homeland Sec.*, 980 F.3d 109, 114 (D.C. Cir. 2020); 5 U.S.C. §§ 702, 706(1) . The hypothetical future project to paint the EEOB is neither agency action nor final. It would be conducted—if at all—by the President through OA, which is

---

[10]      *See infra* n.11

not an agency under the APA. And a television interview about a hypothetical project that may or may not occur is far from *final* because it does not reflect the consummation of any decisionmaking process; nor does it have legal consequences. Nor is the MOU, which merely internally assigns roles regarding a potential project, a commitment that such a project will occur. And Plaintiffs have not identified, much less adequately alleged, any discrete, mandatory duty that an agency failed to perform. Although Plaintiffs purport to press a constitutional claim under the Take Care Clause, it is well established that a plaintiff cannot avoid statutory limits on review by repackaging alleged statutory violations by the President as constitutional ones. For all these reasons, Plaintiffs lack a cause of action.

### A. Presidential Action is Not Reviewable Under the APA.

Plaintiffs' APA claims fail because—aside from the MOU discussed below—they do not identify an *agency* action whatsoever. The APA does not provide a vehicle for Plaintiffs to challenge the *President*'s interest in beautifying the EEOB. *Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*, No. CV 25-4316 (RJL), 2026 WL 533420, at *1 (D.D.C. Feb. 26, 2026). The APA supplies a cause of action for persons aggrieved by agency action, but not all federal officials or entities are "agencies" under the APA. "The President is not an 'agency' under that Act." *Dalton v. Specter*, 511 U.S. 462, 476 (1994) (citation omitted); *see Franklin*, 505 U.S. at 800–01 (declining to find APA cause of action against President "[o]ut of respect for the separation of powers and the unique constitutional position of the President"). Neither are staff components of the EOP that lack "substantial independent authority" and exist merely to assist the President in carrying out his responsibilities. *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971); *see Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 565 (D.C. Cir. 1996) (National Security Council is not an agency); *Sweetland v. Walters*, 60 F.3d 852, 854–55 (D.C. Cir. 1995)

(per curiam) (Executive Residence is not an agency); *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042 (D.C. Cir. 1985) (Council of Economic Advisors is not an agency); *see also Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100, 107 (D.D.C. 2020) (calling "substantial independent authority" the "touchstone") (quoting *Soucie*, 448 F.2d at 1073)).

Any future project to paint the EEOB on behalf of the President would be directed by the OA, the lead tenant of the EEOB, 1st Martin Decl. ¶ 3, and an "advise and assist" component of EOP. In fact, OA has already initiated the processes to voluntarily comply with the NHPA and NEPA, so that such compliance will be in place should the President decide to paint the EEOB. *Id.* ¶¶ 10–12. There is no need to undertake a first-principles analysis of whether OA is an agency under the APA. The D.C. Circuit has squarely held that OA is *not* an agency within the meaning of the statute. *CREW*, 566 F.3d at 224–26. That precedent controls.[11]

As the D.C. Circuit explained in *CREW*, OA was chartered "to perform tasks that are entirely operational and administrative in nature." 566 F.3d at 224. OA "provide[s] common administrative support and services to all units within [the EOP]," and "shall, upon request, assist the White House Office in performing its role of providing those administrative services which are primarily in direct support of the President." *Id.* at 224 (alteration in original) (quoting Exec. Order No. 12,028, 42 Fed. Reg. 62,895, 62,895 (Dec. 12, 1977). The Court noted that OA's services include "procurement" and "supply services" and that those services extend (through "interagency agreements") to supporting "non-EOP entities—including the Navy, the Secret Service, and the General Services Administration . . . if they work at the White House complex in support of the

---

[11]    *CREW* is a FOIA case, but the definition of an "agency" under FOIA is broader than under the APA. *Elec. Priv. Info. Ctr.*, 466 F. Supp. 3d at 107 ("[A]ll APA agencies are FOIA agencies, but not vice-versa."). Thus, if an EOP component is not an "agency" under FOIA, it is not an "agency" under the APA.

President and his staff." *Id.*  The Court concluded that because OA only "performs or is authorized to perform . . . operational and administrative support for the President and his staff, . . . OA lacks substantial independent authority and is therefore not an agency." *Id.*

Because OA is not an agency within the meaning of the APA, its actions and inactions are not reviewable under the APA. Thus, a hypothetical final decision by the President to paint the EEOB through an OA-directed project would not be reviewable under the APA; nor, for the same reasons, would a failure-to-act claim alleging a failure to undertake required NEPA or the NHPA compliance. Plaintiffs therefore lack a cause of action under the APA.

**B.      Plaintiffs Have Not Identified a Final Agency Action or a Failure to Act.**

**1.      Plaintiffs Have Not Identified a Final Agency Action.**

Even if Plaintiffs' claims were properly brought against an agency rather than the President, they would fail because Plaintiffs have not identified, as they must, a *final* agency action. An action can only be brought under the APA where there is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Two conditions must be satisfied for agency action to be "final." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* (citation modified). "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (citation modified). This requires a final agency action to have "an actual or immediately threatened effect." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 894 (1990).

For the same reasons that Plaintiffs cannot establish concreteness and imminence for standing purposes, Plaintiffs have not identified a final agency action. Plaintiffs allege that "Defendants' concrete planning and pre-approval actions . . . constitute both a major federal action

25

and a federal undertaking, and thus 'agency action.'" Am. Compl. ¶ 144. Plaintiffs are wholly mistaken—preliminary planning by its very nature is not final.

Even if justiciable under the APA (which it is not), and even if the conduct could be attributed to an agency, the President's mention of a possible, future painting project at the EEOB demonstrates, at most, that the President has given preliminary thought to whether the EEOB may or may not be painted. Mere consideration of a hypothetical action, like the solicitation of informal cost estimates or the creation of a visual mockup, do not represent the consummation of a decision-making process or the required irretrievable and irreversible commitment of resources. *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999). Nor do they determine rights or obligations or cause legal consequences. *See Lujan*, 497 U.S. at 894 (noting that such preparatory actions do not have "an actual or immediately threatened effect"). Such preparatory activities, without more, are not final agency action under the APA. *See, e.g.*, *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (finding "a statement of the agency's intention to make a preliminary determination" was not final agency action).

The fact that GSA sought informal estimates for a hypothetical painting project of a building in the District of Columbia with the EEOB's stone exterior and size dimensions does not change this result. 5th Heller Decl. ¶¶ 8–13. GSA provided EOP with the general cost information that it received as well as the internal, comparison information that it generated itself, *see id.* ¶ 8, but it never issued solicitations for a contract, executed a contract, selected a contractor, or drafted design or construction drawings related to such work. Dkt. No. 15-1 ¶ 5. GSA's work in collecting estimates for a cleaning and painting project similar to the EEOB was at best tentative in nature and was thus not final agency action. *See Calton v. Babbitt*, 147 F. Supp. 2d 4, 8–9 (D.D.C. 2001)

26

(finding challenge to speculative actions based on future conduct not before the court are not final agency action).

Nor is GSA's participation in the MOU a final agency action that can be challenged under the APA. *See, e.g.*, Am. Compl. ¶ 153. The MOU does not transfer any authority from GSA to OA, as Plaintiffs allege. *Id.* Rather, it is a formal recognition that both OA and GSA have independent authority to paint the EEOB, and a reflection of those entities' understanding that, if the Project moves forward, it will be under OA's authority. The MOU is internal and conditional in nature, and no legal consequences flow from GSA's acknowledgement of authority that OA has independent of the MOU. *See Centro de Trabajadores Unidos v. Bessent*, No. 25-5181, 2026 WL 503310, at *12, __ F.4th___ (D.C. Cir. Feb. 24, 2026) (finding an MOU not to be a final agency action where it "merely clarifies . . . existing duties' under a statute"). This conclusion is all the more true where no decision has been made to paint the EEOB. Because the MOU merely documents the parties' understanding that OA would undertake the Project under its existing authority *if* it proceeds, the MOU is by definition not final agency action.

### 2.    Plaintiffs Have Not Identified a Discrete Action Defendants Have Failed to Take.

Nor are Plaintiffs rescued by their brief references to the APA provision that authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Plaintiffs have failed to plead, as they must, a discrete agency action that GSA (assuming it is a proper defendant) is required to undertake. As the Supreme Court has explained, "a 'failure to act' is properly understood to be limited . . . to a *discrete* action," and "the only agency action that can be compelled under the APA is action legally *required.*" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004). A complaint must therefore "identify a legally required, discrete act

that the [agency] has failed to perform—a threshold requirement for a § 706 failure-to-act claim." *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 227 (D.C. Cir. 2009).

The purported failures to act identified by Plaintiffs include "proceeding with Project activities beyond the point of commitment . . . without observing procedures required by NEPA," Am. Compl. ¶ 115; "proceeding with Project activities for a federal undertaking that will adversely affect a historic property without first completing Section 106 review," *id.* ¶ 127, and "failing to comply with Section 110(f) before advancing the Project," *id.* ¶ 136. None of these meet the Supreme Court's exacting standards for failure to act claims, because they cannot identify any step Defendants have taken that would trigger obligations under the NHPA or NEPA.

Plaintiffs make sweeping, unsupported allegations about the status of the hypothetical painting project. Most tellingly, they say "concrete planning and pre-approval actions-including but not limited to cost estimating, contractor coordination, procurement preparation, and execution of the challenged MOU" are so far along in the process that NHPA and NEPA obligations attach. But each of those purported actions is inherently preliminary, as confirmed by the terminology used: "pre-approval," "estimating," "coordination," "preparation." To find that an agency must conduct a NHPA and NEPA process every time it undertakes exploratory work would rewrite those statutes and deter the cautious investigatory steps that precede many agency decisions. If this were enough to create final agency action under the APA, every time a President or Cabinet Secretary gave a speech outlining a future initiative—no matter how nebulous or aspirational—a cause of action for failure to do procedural paperwork would accrue. That is not how the NHPA or NEPA actually operate. Where deliberations are preliminary and no final decision has been made, Defendants have no discrete duty that can be compelled under the NHPA, NEPA, or

28

otherwise. Any duties that may or may not eventually be owed under the NHPA or NEPA have simply not yet been triggered.

For an agency to incur a duty under NEPA, it must first make an irretrievable commitment of resources. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) ("[A]n agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in "'irreversible and irretrievable commitments of resources' to an action that will affect the environment.'" (citation omitted)). Here, no commitment of resources has been made at all—except the commitment of resources to defend against this premature litigation. Rather than committing resources to painting the EEOB, preliminary information gathering activities, such as getting ballpark cost estimates, preserve full discretion for a future decision whether or not to paint. *See Pub. Citizen v. Off. of U.S. Trade Representatives*, 970 F.2d 916, 919–21 (D.C. Cir. 1992) ("[T]he Supreme Court has clearly stated that judicial intervention is not proper just because the time to start work preparing an EIS has arrived . . . [C]ourts routinely dismiss NEPA claims in cases where agencies are merely contemplating a particular course of action but have not actually taken any final action at the time of suit.").[12]

Likewise, there has been no failure to act under the NHPA even if it applied here (which it does not), because an agency is required to "take into account the effect of [an] undertaking on any historic property" only "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 54 U.S.C. § 306108. Here, no expenditures

---

[12]    Outside the D.C. Circuit, the Eleventh Circuit recently cited *Public Citizen* favorably in holding that failure to prepare an EIS by itself is not "final agency action" subject to judicial review. *Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567, at *5 (11th Cir. Sept. 4, 2025); *see also id*. at *9 ("But, having not yet formally 'committed to funding that project,' the Federal Defendants have taken no 'major federal action' subjecting them to the procedural requirements of NEPA." (citation omitted)).

29

have been approved for an EEOB painting project, so there has been no failure to act under the NHPA. The ACHP's regulations implementing Section 106 contemplate this very type of "nondestructive project planning activities" before compliance with Section 106 must be completed. 36 C.F.R. § 800.1(c). Plaintiffs wholly fail to acknowledge this allowance under the regulations, which is fatal to their claim that nondestructive project planning activities trigger a requirement to have completed Section 106 analysis.

GSA has neither irretrievably committed resources to painting the EEOB nor approved expenditures for such a project. *See* Dkt. No. 15-1 ¶ 5; *see also* 5th Heller Decl. ¶ 15. Because GSA has incurred no obligation to act, there is no action this Court could compel GSA to undertake. Plaintiffs therefore cannot state a failure to act claim.

But of course, these arguments are all academic, given that OA, not GSA, would implement the Project, should the President decide to move forward, and OA has affirmatively committed to complete NHPA consultation and NEPA review before proceeding. 1st Martin Decl. ¶ 11.[13] A failure to act claim is squarely defeated where the very action sought is underway. Nor should the Court countenance Plaintiffs' unfounded speculation, despite this evidence to the contrary, that there is a committed plan already in process to paint the EEOB. *See* Am. Compl. ¶¶ 1, 3, 48, 68, 78–79, 82, 84, 89, 93, 96, 102, 108. The Court is not required to accept as true Plaintiffs' conclusory allegations and unwarranted factual deductions, *see Iqbal*, 556 U.S. at 678, and it should decline to do so here.

---

[13]    Plaintiffs complain that these commitments are not in the MOU. Am. Compl. ¶ 81. It is not clear why Plaintiffs believe a sworn statement filed alongside the MOU would be less binding than if the language were in the MOU, but any such assertion is meritless.

For all these reasons, there is no final agency action for the Court to review under the APA, and no discrete agency action the Court could compel an agency to undertake. The Court should therefore dismiss Plaintiffs' claims for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

### C.    Plaintiffs Have Not Plead an *Ultra Vires* Claim.

Count V of the Amended Complaint attacks the purported delegation from GSA to OA in the MOU. Though it is labeled "APA Ultra Vires (Unlawful Delegation)," Am. Compl. at 40, a review of the claim itself makes clear that they have pled no such cause of action. Instead, it is a standard APA claim, and the Court should not engage in *ultra vires* review.

An *ultra vires* claim is inherently non-statutory. *See Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022). It is available only when exacting conditions are met: "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Id.* (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

Here, Plaintiffs' own operative complaint forecloses *ultra vires* review. As they note, "the APA provides a remedy" regarding the purported delegation. Am. Compl. ¶ 149. *Ultra vires* review is not available where statutory review is available. The Supreme Court has rejected attempts to "dress up a typical statutory-authority argument as an *ultra vires* claim." *Nuclear Regul. Comm'n v. Texas* ("*NRC*"), 605 U.S. 665, 682 (2025). To the extent Plaintiffs have any claims that the MOU was unlawful—and as described below they do not—the APA is the only vehicle available.

31

**D.    Plaintiffs' "Constitutional" Claim Is a Statutory Claim in Disguise.**

Plaintiffs likewise fail in their attempts to plead a constitutional claim against the President. *See* Am. Compl. ¶¶ 167–73. Plaintiffs allege that President Trump violated the Take Care Clause of the Constitution in that he "personally directed . . . a federal Project to . . . paint the exterior of the EEOB . . . without regard to the procedures mandated by NEPA and NHPA," *id.* ¶ 170, and directed his subordinates "to bypass or disregard those statutes' requirements," *id.* ¶ 172. But the courts have "rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review." *Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025) (citing *Dalton v. Specter*, 511 U.S. 462 (1994)), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025). Because Plaintiffs' Take Care Clause claim rests on the argument that the President is exceeding his statutory authority, no implied cause of action under the Constitution is available—Plaintiffs need a statutory cause of action, and, for reasons given above, they do not have one.

In *Dalton v. Specter*, the Supreme Court rejected the proposition "that every action by the President . . . in excess of his statutory authority is *ipso facto* in violation of the Constitution." 511 U.S. at 472. *Dalton* "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* The Constitution is implicated if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But if a claim "simply alleg[es] that the President has exceeded his statutory authority," it is not a "constitutional" claim, and a plaintiff needs a statutory right of action. *Id.* at 473. The D.C. Circuit recently applied *Dalton* to a claim asserting that the government impounded funds in violation of the separation of powers. *See Glob.*

32

*Health Council*, 153 F.4th at 13. Despite its styling, the dispute was "fundamentally statutory because the alleged constitutional violation is predicated on the underlying alleged statutory violations," *i.e.*, whether the failure to spend the funds violated the appropriations acts or the Impoundment Control Act. *Id.* at 15 n.11.

Even if Plaintiffs' Take Care Clause claim were truly a constitutional claim, it is doubtful, at best, that it provides an avenue for direct relief against the President. *See Citizens for Resp. & Ethics in Wash.,*, 302 F. Supp. 3d at 130 ("[*Mississippi v. Johnson*, 71 U.S. 475 (1866)] can be fairly read to suggest that a Take Care Clause claim is outright nonjusticiable.").

Plaintiffs lack a statutory cause of action to assert their claims. And their attempt to invoke an implied cause of action under the Constitution fails because their Take Care Clause claim is predicated on alleged statutory violations. Because Plaintiffs neither allege nor establish any other basis for a cause of action, the Court should dismiss their suit.

## IV.    In Any Event, Plaintiffs' Claims Fail on the Merits.

Even if justiciable, Plaintiffs' claims fail because the EEOB is part of the White House grounds and therefore exempt from the NHPA, and because there is no major federal action that would trigger NEPA. The claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

### A.    The EEOB Is Exempt from the NHPA Under Section 107, so NHPA Consultation Is Not Required.

Defendants are voluntarily consulting under the NHPA, but even if they were not, Plaintiffs would be unable to state a claim under that statute. Section 107 of the NHPA exempts certain federal buildings, including "the White House and its grounds," from the obligation to consult under Section 106. *See* 54 U.S.C. § 307104. The EEOB is on the White House grounds, and Plaintiffs offer no example of the NHPA applying to the EEOB since its enactment.

In the 1994 Programmatic Agreement between GSA, the ACHP, and the D.C. SHPO regarding historic preservation in GSA's National Capital Region, ACHP "recognizes the Old Executive Office Building as part of 'the White House and its grounds' pursuant to Section 107 of the [NHPA]." Dkt. No. 15-2 at 3. In accordance with this exemption, various prior improvements to the EEOB have not undergone NHPA consultation. For example, a multiyear modernization project in the mid-2000s to upgrade the EEOB's HVAC, security, and masonry, among other things, was not subjected to the NHPA. Likewise, in 2013, GSA erected a temporary screening facility at the EEOB and again found, consistent with the Programmatic Agreement, that the EEOB was exempt from Section 106 of the NHPA under Section 107.[14] The application for the screening facility was signed by Plaintiffs' declarant, Mydelle Wright, who noted that while the EEOB was "historically significant," "it will not require Section 106 consultation" under the NHPA because it "is exempt from the Act (16 U.S.C. 470g)."[15]

This history reflects the practical reality that the EEOB is an integral part of the White House complex. The EEOB is adjacent to the West Wing, and individuals who work in the West Wing and EEOB have different levels of access to the two buildings, either through security badges that allow free access to both buildings or through the easy submission of "badge swap" requests to the United States Secret Service by EOP employees who need to access the West Wing on an

---

[14]    *See, e.g.*,    https://www.ncpc.gov/files/Dwight_D._Eisenhower_Executive_Office_ Building_EEOB_Temporary_Screening_Facility_Submission_Materials_7488_May2013.pdf (last accessed Mar. 13, 2026). Because the 1994 Programmatic Agreement and 2013 NCPC proceedings are public records of government activities not subject to factual dispute, the Court can take judicial notice of these records without converting the motion to a motion for summary judgment. *See supra* n.3.

[15]    *See* https://www.ncpc.gov/files/Dwight_D._Eisenhower_Executive_Office_Building_ EEOB_Temporary_Screening_Facility_Submission_Materials_7488_May2013.pdf    (last accessed Mar. 13, 2026).

as needed basis. *See* 1st Martin Decl. ¶ 5. In fact, a "substantial number of individuals assigned to the EEOB are authorized to enter not just the EEOB, but also the White House itself." Decl. of Matthew C. Quinn, U.S. Secret Service Deputy Director, Dkt. 27-3 ¶ 8. "This is attributable to the fact that a significant number of these individuals are organizationally assigned to, and perform duties for, the Executive Office of the President and other offices that are principally located within the White House." *Id*. The EEOB functions as an extension of the White House given its physical proximity and its role as the office building of the President's staff, including providing regularly-used ceremonial office space for the Vice President and the Second Lady. *See, e.g.*, 1st Martin Decl. ¶¶ 3–6.[16] A functional analysis is in keeping with the structure of the exemption provision, which respects the separation of powers by exempting the grounds of the Supreme Court and the Capitol as well as the White House. 54 U.S.C. § 307104.

Plaintiffs focus on Park Service maps created for a distinct purpose—as an educational and functional tool for visitors—consistent with NPS's mission. Plaintiffs' elision of these two distinct categories is misguided. The NPS park unit denominated "The White House and President's Park" is designed to enable NPS to manage the site, to oversee public access, and to promote public education, whereas the NHPA's exemption of "the White House and its grounds" exists to preserve presidential control over the central complex of the Executive Branch.

Lacking any evidence that the EEOB is excluded from the White House grounds, Plaintiffs rely on an unpublished decision in a criminal case involving a different statute (18 U.S.C. § 1752(a)(1)) and a different building (the Treasury Building). Am. Compl. ¶ 44 (citing *United States v. Jabr*, No. CR 18-0105 (PLF), 2019 WL 13110682, at *1 (D.D.C. May 16, 2019)). But

---

[16]    *See also* https://www.nps.gov/places/000/information-panel-dwight-d-eisenhower-executive-office-building.htm (last visited Mar. 13, 2026); https://www.whitehousehistory.org/second-spouses (last visited Mar. 13, 2026).

*Jabr* does not dictate a different result. *Jabr* involved the application of a criminal statute concerned with securing "the White House or its grounds" from unlawful disturbances—not historic preservation. The district court found that the meaning of "White House or its grounds" for the purpose of that criminal statute did not include the Treasury Building. *Jabr*, 2019 WL 13110682, at *7. But the Treasury Building's relationship to the White House is entirely different from the EEOB's. Accessing the White House from the Treasury Building or other locations outside the White House grounds involves security requirements that do not apply when accessing the White House from the EEOB. *See* 1st Martin Decl. ¶¶ 4–6. And the Treasury Building serves primarily to provide office space to employees of an agency, not to staffers of the President.

As part of "the White House and its grounds," the EEOB is exempt from the NHPA under Section 107 of the statute. 54 U.S.C. § 307104.

### B.      Even if the NHPA Applies, No Consultation Duty Has Been Triggered.

For similar reasons, even if the Court were to reach the merits and determine that the NHPA is applicable to the EEOB, Plaintiffs' NHPA claim would still fail. There has been no federal undertaking triggering NHPA review. *See Karst Env't Educ. & Prot., Inc.*, 475 F.3d at 1296 ("[J]ust as the 'final agency action' in a NEPA claim must be a 'major federal action,' the 'final agency action' in an NHPA claim must be a 'federal undertaking.'"). Plaintiffs argue that Defendants' allegedly "concrete planning and pre-approval actions—including, but not limited to, cost estimating, contractor coordination, procurement preparation, and execution of the challenged MOU—constitute both a major federal action and a federal undertaking." Am. Compl. ¶ 144. But these pre-planning activities reveal only the Government's consideration of a possible *future* undertaking, not the development of a definite plan. Plaintiffs do not, and cannot, identify any point at which Section 106 compliance responsibilities attach.

36

While the ACHP regulations require that the agency *complete* the Section 106 process "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license," 36 C.F.R. § 800.1(c), they do not establish when the ACHP process must *begin*. The decision of when to begin NHPA compliance—assuming *arguendo* that such compliance is required—should be left to the discretion of the entity responsible for the undertaking. As GSA has attested, it never committed to any painting project at the EEOB. 5th Heller Decl. ¶ 11 (stating no expenditure of funds has been approved). And OA, which has now assumed responsibility for the Project, *see* MOU, is only now beginning its analysis, as a matter of voluntary compliance, not because any NHPA obligation has been triggered.[17]

### C.    No Major Federal Action Triggered NEPA.

For similar reasons, Plaintiffs' argument that "concrete planning and pre-approval actions" triggers NEPA, Am. Compl. ¶ 112, is likewise incorrect, because there has been no major federal action activating NEPA's purely procedural obligations. *See* 42 U.S.C. § 4332(2)(C). Preliminary consideration combined with the mere *possibility* that an agency will take some action "significantly affecting the quality of the human environment," someday, does not constitute a major federal action. Even if the President were an agency—and he is not—nothing he said would constitute major federal action. The President still has not decided whether to proceed with any painting project, let alone the scope of the project. For NEPA to be triggered, there must be an actual concrete proposal, not mere speculative discussion, and "[o]nly when an agency reaches the point in its deliberations when it is ready to propose a course of action need it be ready to produce an impact statement." *Defs. of Wildlife v. Andrus*, 627 F.2d 1238, 1243 (D.C. Cir. 1980).

---

[17]    For the same reasons, Plaintiffs' Section 110(f) claim fails. Section 106 and 110(f) claims are reviewed under the same procedural standards. *See Nat'l Tr. for Historic Pres.*, 938 F. Supp. at 921.

Even if Plaintiffs could identify a major federal action on the horizon, they would not be able to establish a violation of NEPA. "[A]n agency's NEPA obligations mature only once it reaches a critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) (internal quotation marks omitted). No NEPA process is required where there has been no irretrievable commitment of resources to the project. *See Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1318 (D.C. Cir. 2014) (NEPA, of course, does not require agencies to commence NEPA reviews of projects not actually proposed."). Because any NEPA obligations, to the extent any are ever triggered, have not yet matured, necessarily, no agency has failed to comply with NEPA.[18]

The President's preview of renderings, his statement that he was "getting bids right now from painters," and GSA's rough estimates, do not transform an idea into something requiring NEPA review. *See supra* Section IV.C.; *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 206 (D.D.C. 2015) (holding that "an agency may take ancillary steps towards a project before completing environmental review so long as NEPA review is complete before the agency makes an 'irreversible and irretrievable commitment of resources" (citation omitted)); *see also Save Long Beach Island v. U.S. Dep't of the Interior*, 663 F. Supp. 3d 1, 6–8 (D.D.C. 2023) (finding that the designation of five wind energy areas without any NEPA review was unripe because the designation did not authorize any surface-disturbing activities). While agencies must initiate NEPA review before making an irretrievable commitment of resources, the President's offhand remarks do not commit *any* resources, irretrievably or otherwise, and GSA has explained that it

---

[18]    And the President cannot have failed to prepare a NEPA analysis, because he is not an agency under the APA or NEPA.

"has not authorized or engaged in the physical actions of power washing/cleaning, painting, or repointing the EEOB," 5th Heller Decl. ¶ 7, and "[has] not issued solicitations for a contract, executed a contract, selected a contractor, or drafted design or construction drawings related to [such work]," 3d Heller Decl. ¶ 16. And as the MOU makes clear, any future painting project is hypothetical and undefined; it certainly is not something to which the President, OA, or GSA has committed. Thus, even if Plaintiffs were to surmount the numerous, threshold barriers to their claims, *see supra* Sections I.–III., the Court should dismiss the Amended Complaint for failure to state a claim for which the Court could grant relief.

### D.    GSA Has Not Unlawfully Delegated Authority To OA.

Plaintiffs allege that GSA has unlawfully delegated authority to OA. Plaintiffs have failed to state a claim, because the plain text of the MOU makes clear that there has been no delegation. The only reference to delegation is conditional: "***should*** the President decide to move forward with the Project . . . GSA ***would*** delegate any and all necessary authority for the Project to OA." MOU at 1–2 (emphasis added). Instead, GSA and OA simply acknowledged their respective, independent statutory authorizations.

Plaintiffs note that pursuant to 40 U.S.C. § 121(d), "the Administrator [of GSA] may delegate authority conferred on the Administrator by this subtitle to an official in the General Services Administration or to the head of another federal agency." Am. Compl. ¶ 150. However, this statute is irrelevant, because GSA has not delegated any authority—much less statutory authority—to OA. And there may be no need for GSA to delegate any authority to OA. As the MOU states, "the Director of [OA] has separate and independent statutory authority" to engage in "preservation, restoration, renovation, rehabilitation, or historic furnishing of the [EEOB]." MOU

39

at 1, citing Section 590, P.L. 100-461, 102 Stat. 2268 (Oct. 1, 1998).[19] If a delegation from GSA to OA does occur in the future, Plaintiffs will have the opportunity to challenge its validity at that time. Accordingly, Plaintiffs have failed to state a claim as to GSA's purported delegation.

### E.    Even if *Ultra Vires* Review Were Available, Plaintiffs' Claims Would Fail.

Plaintiffs do not state an *ultra vires* claim, because they concede the availability of an adequate statutory remedy. *See supra* at Section III.C. But even if they had stated an *ultra vires* claim, it would fail. An *ultra vires* claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC*, 605 U.S. at 681–82 (citation omitted). Plaintiffs cannot show that GSA "has taken action entirely in excess of its delegated powers," *id.* at 681 (citation modified), because GSA has not yet delegated (and may never delegate) any powers to OA. The MOU refers to a potential delegation of authority to OA that "would" occur only if such a delegation were "necessary." MOU ¶ 3. Contrary to Plaintiffs' arguments, there has been no "consummation of GSA's decision to transfer Project authority. . . ." Am. Compl. ¶ 153.

Plaintiffs also have not established that a hypothetical cleaning, repointing or painting project at the EEOB, implemented by OA at the President's direction, would be "contrary to a

---

[19]    In 1977, President Carter established the Office of Administration (OA) when he signed Executive Order 12028. Among other things, this empowered OA to provide "common administrative support and services to all units within the Executive Office of the President" ("EOP"), including any such support or service which "will achieve financial savings and increase efficiency through centralization of the supporting service." One such service, historically, has been facilities management. This historical role is consistent with OA's current relationship with GSA. OA is the lead tenant and administratively controls the EEOB. 1st Martin Decl. ¶ 3. The independent statutory authority to modify the EEOB was created by Congress in response to a request from OA for authority to renovate the EEOB in lieu of GSA. *See, e.g.*, 133 Cong. Rec. 36572 (Dec. 19, 1987) (letter from OA Director to Sen. Stevens, seeking authority "for this and future Administrations to receive gifts from the public in order to renovate and refurbish the [EEOB]; and discussing why "custody of the gifts should reside with the Director of [OA]" because "it is important that we not separate the management responsibility from the authority to accept gifts. We believe it would be efficient to have the maintenance and restoration functions reside with one individual.").

specific prohibition in a statute," as required to pursue an *ultra vires* claim. *NRC*, 605 U.S. at 681 (citation modified). Plaintiffs allege that "Section 590 does not provide OA with independent authority to implement and oversee major alterations to the EEOB or to assume compliance responsibilities under NEPA and the NHPA." Am. Compl. ¶ 155. But Plaintiffs point to no "specific prohibition" in that statute, and none exists. To the contrary, Section 590 expressly authorizes OA both to "accept" and to "utilize" gifts for the "renovation" of the EEOB, and it imposes no limit on how EEOB may exercise this statutory authority. Pub. L. No. 100-461, § 590. To the extent Plaintiffs argue for a narrower statutory interpretation, they do not justify an *ultra vires* claim. *Ultra vires* review is *not* available to correct "mere legal" error. *Fed. Express*, 39 F.4th at 764; *see Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) ("Garden-variety errors of law or fact are not enough."). "'Only error that is patently a misconstruction of the Act, that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).

For all these reasons, Plaintiffs' attempts to plead an *ultra vires* claim fall far short.

## CONCLUSION

The Court should dismiss this case. Although there are several threshold grounds on which the Court may do so, there is one common refrain: Plaintiffs are not challenging a final plan from an agency but an inchoate idea of the President which may or may not ever occur. If it does, Plaintiffs will receive the NEPA and NHPA processes they purport to seek. Plaintiffs' theory of the case is not merely legally insupportable—it presents fundamental separation-of-powers issues. Plaintiffs' Amended Complaint should therefore be dismissed.

* * *

41

Dated: March 13, 2026

Respectfully submitted,

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General

Marissa Piropato
Deputy Chief, Natural Resources Section

*/s/ Michelle Ramus*
Michelle Ramus
Mark Widerschein
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Michelle.Ramus@usdoj.gov
Mark.Widerschein@usdoj.gov

*Counsel for Defendants*