**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **CULTURAL HERITAGE PARTNERS, PLLC**, **et al.**, | Civil Action No. 1:25-cv-03969-DLF |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| **DONALD J. TRUMP**, **et al.**, | |
| Defendants. | *Oral Argument Requested* |

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

STATUTORY OVERVIEW ..................................................................................................... 3

    I.    The Administrative Procedure Act, 5 U.S.C. §§ 701–706 .................................................. 3

    II.    The National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h ................................. 3

    III.    The National Historic Preservation Act, 54 U.S.C. §§ 300101–307108 ........................... 4

    IV.    The Take Care Clause of the Constitution ......................................................................... 5

FACTUAL BACKGROUND .................................................................................................... 6

LEGAL STANDARD .............................................................................................................. 10

ARGUMENT ........................................................................................................................... 10

    I.    Defendants repeatedly and continuously violate the Administrative Procedure Act. ....... 11

        a.    The MOU Is a Final Agency Action That Is Ripe for Judicial Review. ...................... 12

        b.    The MOU Is *Ultra Vires* Because GSA Lacks Statutory Authority to Delegate Project Control to a Non-Agency Entity. ....................................................................................... 14

            i.    GSA Lacks Statutory Authority to Delegate to OA Because OA Is Not a Federal Agency Within the Meaning of 40 U.S.C. § 121(d)(1). ...................................................... 14

            ii.    Section 590 Does Not Give OA Independent Authority Over the Project, and the Legislative History Confirms That Congress Withheld That Authority Deliberately. ....... 17

        c.    Even If the MOU Were Permissible, GSA Was Required to Complete NEPA and NHPA Review Before Executing It. ............................................................................................... 19

        d.    Defendants Triggered NEPA and NHPA Obligations Months Before the MOU Was Signed. ............................................................................................................................... 20

            iii.    The Project Is a NEPA Proposal, Because Defendants Have a Defined Goal, Are Actively Pursuing the Means of Achieving It, and Can Meaningfully Evaluate Its Effects. 21

            iv.    The Project Is a Federal Undertaking, and Defendants Must Complete Section 106 and Section 110(f) Review Before Any Further Project Action. ..................................... 24

    II.    Plaintiffs Have Article III Standing: Their Injuries Are Concrete, Particularized, Imminent, Traceable to Defendants, and Fully Redressable. .................................................. 26

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page i**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

a.    The Werkheisers, Ms. Miller, and Mr. Peck Have Suffered Concrete, Particularized Aesthetic and Professional Injuries That the Project Will Directly and Irreparably Harm... 26

b.    Plaintiffs' Injuries Are Imminent: Defendants' Own Filings Confirm the Project Is on a Defined and Active Timeline. .............................................................................................. 29

c.    CHP and DCPL Have Organizational Standing Because Defendants' Conduct Has Injured Their Core Institutional Interests and Forced a Diversion of Resources. ................ 31

d.    Plaintiffs' Injuries Are Directly Traceable to Defendants' Conduct, and the Relief Plaintiffs Seek Will Fully Redress Those Injuries. ................................................................ 33

III.    DEFENDANTS CANNOT INVOKE THE NHPA SECTION 107 EXEMPTION BECAUSE THEY HAVE NOT CARRIED THEIR BURDEN OF PROOF FOR THAT EXCEPTION. ................................................................................................................................ 35

IV.    The President Violates the Take Care Clause by Directing Federal Officials to Carry Out the Project in Defiance of Statutes Congress Has Duly Enacted. .............................................. 40

V.    OA's Unenforceable Voluntary Promises Do Not Satisfy the Heavy Burden of the Voluntary Cessation Doctrine and Do Not Moot This Case. .................................................... 42

CONCLUSION .................................................................................................................................. 44

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page ii**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

## TABLE OF AUTHORITIES

**Cases**

*Action Alliance of Senior Citizens v. Heckler*,
    789 F.2d 931 (D.C. Cir. 1986) .........................................................................................32

*Air Excursions LLC v. Yellen*,
    66 F.4th 272 (D.C. Cir. 2023) ..........................................................................................10

*Already, LLC v. Nike, Inc.,*
    568 U.S. 85 (2013).............................................................................................................43

*American School of Magnetic Healing v. McAnnulty,*
    187 U.S. 94 (1902).............................................................................................................18

*\*Anacostia Watershed Society v. Babbitt*,
    871 F.Supp. 475 (D.D.C. 1994) .......................................................................13, 19, 20, 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................................10

*\*Bennett v. Spear*,
    520 U.S. 154 (1997).............................................................................................12, 13, 14

*Blassingame v. Trump*,
    87 F.4th 1 (D.C. Cir. 2023) ..............................................................................................41

*Boritz v. United States*,
    685 F.Supp.2d 113 (D.D.C. 2010) ....................................................................................10

*Center for Biological Diversity v. Department of Interior*,
    563 F.3d 466 (D.C. Cir. 2009) .....................................................................................22, 23

*Centro de Trabajadores Unidos v. Bessent*,
    167 F.4th 1218 (D.C. Cir. 2026) .......................................................................................13

*Ciba-Geigy Corp. v. Environmental Protection Agency*,
    801 F.2d 430 (D.C. Cir. 1986) ..........................................................................................13

*Citizens Against Rails-to-Trails v. Surface Transportation Board*,
    267 F.3d 1144 (D.C. Cir. 2001)...........................................................................................4

*Citizens for Responsibility & Ethics in Washington, D.C. v. Trump*,
    302 F.Supp.3d 127 (D.D.C. 2018) .....................................................................................42

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS - Page iii**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

*Citizens for Responsibility & Ethics in Washington, D.C. v. Office of Administration
   566 F.3d 219, 223–34 (D.C. Cir. 2009) ...................................................................15, 18

City of Erie v. Pap's A.M.,
   529 U.S. 277 (2000).......................................................................................................44

Dallas Safari Club v. Bernhardt,
   518 F.Supp.3d 535 (D.D.C. 2021) .................................................................................21

Dalton v. Specter,
   511 U.S. 462 (1994).......................................................................................................42

DC Preservation League v. Board of Trustees of the John F. Kennedy Center for the Performing Arts,
   Civil Action No. 1:26-cv-00981-CRC (D.D.C. Mar. 23, 2026)......................................9

DC Preservation League v. General Services. Administration,
   No. 1:26-cv-00032-JDB (D.D.C. Jan. 7, 2026) ............................................................21

DC Preservation League v. U.S. Department of the Interior,
   Case No. 1:26-cv-00477 (D.D.C. Feb. 13, 2026) ...........................................................9

Don't Tear It Down, Inc. v. General Services Administration,
   401 F.Supp. 1194 (D.D.C. 1975) ...................................................................................25

Environmental Defense Fund v. Federal Energy Regulatory Commission,
   2 F.4th 953 (D.C. Cir. 2021) .........................................................................................28

*Equal Rights Ctr. v. Post Properties, Inc.,
   633 F.3d 1136 (D.C. Cir. 2011)..........................................................................31, 32, 33

*Food & Drug Administration v. Alliance for Hippocratic Medicine,
   602 U.S. 367 (2024)................................................................................................31, 32

Food & Water Watch, Inc. v. Vilsack,
   808 F.3d 905 (D.C. Cir. 2015) ...............................................................................31, 32

*Friends of the Earth v. Laidlaw Environmental Services. (TOC), Inc.,
   528 U.S. 167 (2000)...............................................................................................29, 42

Federal Trade Commission v. Morton Salt Company,
   334 U.S. 37 (1948)........................................................................................................36

Global Health Council v. Trump,
   153 F.4th 1 (D.C. Cir. 2025) .........................................................................................42

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page iv**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

*Government of Canal Zone v. Burjan*,
596 F.2d 690, 693–94 (5th Cir. 1979) ...............................................................38

*Hale v. Executive Office of the President*,
784 F.Supp.3d 127 (D.D.C. 2025) ....................................................................31

\*Havens Realty Corp. v. Coleman,
455 U.S. 363 (1982).............................................................................28, 31, 32

\*Halverson v. Slater,
129 F.3d 180 (D.C. Cir. 1997) .........................................................................15

*Hunt v. Washington State Apple Advertising Commission*,
432 U.S. 333 (1977)..........................................................................................28

\*In re Aiken County,
725 F.3d 255 (D.D.C. 2013) .......................................................................41, 42

\*Kendall v. United States ex rel. Stokes,
37 U.S. 524 (1838)......................................................................................41, 42

\*Kleppe v. Sierra Club,
427 U.S. 390 (1976)..........................................................................................23

*Leedom v. Kyne*,
358 U.S. 184 (1958)..........................................................................................19

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)................................................................................4, 36, 39

\*Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992)...........................................................................26, 27, 29, 30

*Marbury v. Madison*,
5 U.S. 137 (1803)..............................................................................................39

*Marin Audubon Society v. Federal Aviation Administration*,
121 F.4th 902 (D.C. Cir. 2024) ....................................................................6, 41

*Massachusetts v. Environmental Protection Agency*,
549 U.S. 497 (2007)..........................................................................................26

*Matter of Argus Secure Technology*, LLC,
B-419422, B-419422.2, 2021 CPD ¶ 84 (Comp. Gen. Feb. 22, 2021).............15

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS - Page v**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

*Milner v. Department of Navy*,
    562 U.S. 562 (2011)................................................................................18

*Mississippi v. Johnson*,
    71 U.S. 475 (1866)................................................................................42

*National Harbor GP, LLC v. Government of D.C.*,
    121 F.Supp.3d 11 (D.D.C. 2015) ...........................................................10

*National Labor Relations Board v. Kentucky River Community. Care, Inc.*,
    532 U.S. 706 (2001)................................................................................36

*National Small Shipment Traffic Conference, Inc. v. Civil Aeronautics Board*,
    618 F.2d 819 (D.C. Cir. 1980) ...............................................................18

*National Treasury Employees. Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) .....................................................6, 40, 41

*\*National Trust For Historic Preservation v. Blanck*,
    938 F.Supp. 908 (D.D.C. 1996) .......................................................24, 25

*National Trust For Historic Preservation v. National Park Service*,
    Civil Action No. 25-4316 (D.D.C. Dec. 29, 2025) ....................................8

*Natural Resource Defense Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) .................................................................20

*New Hampshire v. Ramsey*,
    366 F.3d 1 665 (1st Cir. 2004) ...............................................................37

*Nuclear Regulatory Commission v. Texas*,
    605 U.S. 665 (2025)................................................................................18

*Public Citizen, Inc. v. Federal Energy Regulatory Commission*,
    92 F. 4th 1124 (D.C. Cir. 2024)..............................................................43

*Rhea Lana, Inc. v. Department of Labor*,
    824 F.3d 1023 (D.C. Cir. 2016) .............................................................13

*Robertson v. Methow Valley Citizen Council*,
    490 U.S. 332 (1989)..................................................................................3

*Russello v. United States*,
    464 U.S. 16 (1983)................................................................................37

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page vi**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

*Scientists' Institute For Public Information, Inc. v. Atomic Energy Commission,
    481 F.2d 1079 (D.C. Cir. 1973) ...............................................................4, 20, 24, 32

Seven County Infrastructure Coalition. v. Eagle County,
    605 U.S. 168 (2025)..........................................................................................4

Sierra Club v. Federal Energy Regulatory Commission,
    827 F.3d 59 (D.C. Cir. 2016) ....................................................................27, 29

*Sierra Club v. Jewell,
    764 F.3d 1 (D.C. Cir. 2014) ............................................................... in passim

Sierra Club v. Morton,
    405 U.S. 727 (1972)........................................................................................29

Sierra Club v. Peterson,
    717 F.2d 1409 (D.C. Cir. 1983) .................................................................4, 23

Sierra Club v. U.S. Department of Agriculture,
    777 F.Supp.2d 44 (D.D.C. 2011) ....................................................................4

Soucie v. David,
    448 F.2d 1067 (D.C. Cir. 1971) .....................................................................15

Spann v. Colonial Village, Inc.,
    899 F.2d 24 (D.C. Cir. 1990) .........................................................................32

Spokeo, Inc. v. Robins,
    578 U.S. 330 (2016)........................................................................................26

*Summers v. Earth Island Institute,
    555 U.S. 488 (2009)..............................................................................26, 28, 29

United Keetoowah Band of Cherokee Indians in Oklahoma v. Federal Communications
Commission,
    933 F.3d 728 (D.C. Cir. 2019) .........................................................................3

United States v. First City National Bank of Houston,
    386 U.S. 361 (1967)........................................................................................36

United States v. Jabr,
    2019 WL 13110682, (D.D.C. May 16, 2019) ....................................5, 36, 37, 40

United States v. Jabr,
    4 F.4th 97 (D.C. Cir. 2021) .......................................................................5, 40

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page vii**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

*United States v. Lesh*,
 107 F.4th 1239, 1243–44 (10th Cir. 2024) ................................................................38

*United States v. Wong Kim Bo*,
 472 F.2d 720 (5th Cir. 1972) ......................................................................................37

*U.S. Army Corps of Engineers v. Hawkes Company*,
 578 U.S. 590 (2016) ....................................................................................................13

*Youngstown Sheet & Tube v. Sawyer*,
 343 U.S. 579 (1952) .................................................................................................5, 40

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 701–706

5 U.S.C. §§ 701–706.......................................................................................................3

5 U.S.C. § 702.................................................................................................................3

5 U.S.C. § 704...............................................................................................................12

*5 U.S.C. § 706(1) ...........................................................................................3, 12, 20, 21

*5 U.S.C. § 706(2)(A)................................................................................................3, 12

*5 U.S.C. § 706(2)(C)..................................................................................3, 12, 14, 16

*5 U.S.C. § 706(2)(D)......................................................................................3, 12, 20, 21

Title 40, Public Buildings, Property, and Works

40 U.S.C. § 102(4) .......................................................................................................15

40 U.S.C. § 102(5) .......................................................................................................15

40 U.S.C. § 121(d)(1) ..................................................................................................14

40 U.S.C. § 8901..........................................................................................................10

40 U.S.C. § 8903..........................................................................................................10

National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h

42 U.S.C. §§ 4321–4370h..............................................................................................3

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page viii**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

42 U.S.C. § 4332.................................................................................................................4

42 U.S.C. § 4332(C) ...................................................................................................3, 4, 21

42 U.S.C. § 4332(C)(v) ......................................................................................................23

42 U.S.C. § 4336(b)(2) .........................................................................................................4

42 U.S.C. § 4336a(c).............................................................................................................4

42 U.S.C. § 4336e(12) ..............................................................................................4, 21, 22

National Historic Preservation Act, 54 U.S.C. §§ 54 U.S.C. §§ 300101–307108

54 U.S.C. §§ 54 U.S.C. §§ 300101–307108 .......................................................................4

54 U.S.C. § 300101...............................................................................................................4

54 U.S.C. § 300320..........................................................................................................4, 25

54 U.S.C. § 302101.............................................................................................................34

54 U.S.C. § 302102.............................................................................................................34

54 U.S.C. § 304108(a) ........................................................................................................38

54 U.S.C. § 304108(c) ........................................................................................................39

54 U.S.C. § 306107.........................................................................................................5, 24

54 U.S.C. § 306108..............................................................................................4, 5, 24, 25

54 U.S.C. § 307104...................................................................................................5, 35, 36, 40

## Public Laws and Reorganization Plans

Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1989,
    Pub. L. No. 100-461, 102 Stat. 2268 § 590(a) (Oct. 1, 1988)............................................17

Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1989,
    Pub. L. No. 100-461, 102 Stat. 2268 § 590(c) (Oct. 1, 1988)................................17, 18, 19

Pub. L. No. 87-287, 75 Stat. 586 (1961).................................................................................36, 37

Reorg. Plan No. 18 of 1950 § 2, 64 Stat. 1270 ............................................................................34

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS - Page ix**

**Regulations**

36 C.F.R. pt. 65 ................................................................................................................34

36 C.F.R. § 800.1(a) ........................................................................................................25

36 C.F.R. § 800.1(c) ....................................................................................................24, 25

36 C.F.R. § 800.10 .......................................................................................................5, 24, 34

36 C.F.R. § 800.10(c) ......................................................................................................34

36 C.F.R. § 800.14(c)........................................................................................................39

36 C.F.R. § 800.16(y).......................................................................................................4

**Constitution**

U.S. Const. art 1, § 8, cl. 18 .........................................................................................5, 40

*U.S. Const. art. 2, § 3 ..................................................................................................5, 40

**Executive Orders**

Exec. Order No. 12,028, 42 Fed. Reg. 62895 (Dec. 12, 1977).......................................................15

**Books and Treatises**

Restatement (Second) of Contracts § 203................................................................................16

**Internet Sources**

Joel Beall, *They rescued D.C.'s munys. Then Trump took over. Inside the fight between the president and public golf,* GOLF DIGEST (Feb. 25, 2026), https://perma.cc/44ZR-VT7W ..............9

Ben Dreith, *Everything you need to know about Trump's White House plans*, DEZEEN (Feb. 20, 2026), https://perma.cc/T3VG-LSTZ ................................................................................8

*Christopher Columbus statue Trump added near White House is replica of one downed by protesters*, CBS NEWS (Mar. 23, 2026), https://perma.cc/G8TA-RKPT .......................................10

Gary Grumbach & Dareh Gregorian, *Conservation groups sue to block Trump efforts to 'hastily gut' the Kennedy Center*, NBC NEWS (Mar. 23, 2026), https://perma.cc/DXS3-BVAW.............8, 9

Gabe Gutierrez, et. al., *White House's entire East Wing to be demolished 'within days,' officials say*, NBC NEWS (Oct. 22, 2025), https://perma.cc/A9ZB-XJU2....................................................8

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page x**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

*The Ingraham Angle,* "Seen and Unseen," Fox News, https://perma.cc/5KPJ-8GK6 ..............7, 22

Betsy Klein, *Top architectural and historic preservation groups sue Trump over Kennedy Center plans*, CNN (Mar. 23, 2026) https://perma.cc/PAK5-5ATV ..........................................................8

Safiyah Riddle, *Golfers sue over Trump's overhaul of 100-year-old public course so it doesn't become 'another private playground for the privileged and powerful,'* FORTUNE (Feb. 14, 2026), https://perma.cc/9RLA-4272 ...........................................................................................................9

Karen Travers, et. al., *Entire East Wing expected to be demolished as soon as this weekend, sources say*, ABC NEWS (Oct. 22, 2025), https://perma.cc/53QB-TDVL.......................................8

Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 1, 2026, 6:21 PM), https://truthsocial.com/@realDonaldTrump/posts/115997939705121174 ......................................9

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 13, 2026, 1:43 PM), https://truthsocial.com/@realDonaldTrump/posts/116223100937937927 ......................................9

**Miscellaneous**

133 Congressional Record, Volume 133 ........................................................................................17

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page xi**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

**INTRODUCTION**

The Eisenhower Executive Office Building ("EEOB") is among the most historically and architecturally significant federal structures in the United States. A plan to paint, clean, and repoint its entire exterior a bright white ("the Project") is now well underway. Defendants' Motion to Dismiss, ECF No. 38, and accompanying Memorandum in Support, ECF No. 38-1,[1] ask this Court to treat the Project as too speculative for judicial review. But their own submissions contradict that characterization. The Second Declaration of Heather Martin ("Second Martin Declaration"), ECF No. 38-2, confirms that Defendants' own witness has identified imminent and defined timelines for the Project, including the development of an Environmental Assessment, submissions to the Commission of Fine Arts ("CFA") and the National Capital Planning Commission ("NCPC"), and determinations for consultation. These are the precise agency decisions and approvals that the National Environmental Policy Act ("NEPA") and the National Historic Preservation Act ("NHPA") require before a project of this magnitude may lawfully proceed. This controversy is live and ripe, and Plaintiffs[2] are entitled to a ruling on the merits.

Defendants also simultaneously argue that the Office of Administration's ("OA") voluntary steps toward compliance under NEPA and NHPA render this case moot, while insisting that OA is not a federal agency subject to the Administrative Procedure Act ("APA"). Defendants cannot have it both ways. If OA is not an agency, then its voluntary measures carry no legal force and cannot substitute for the compliance obligations that Congress imposed on GSA and NPS. Voluntary

---

[1] Defendants are Donald J. Trump in his official capacity as President of the United States; the General Services Administration ("GSA"); Edward Forst in his official capacity as GSA Administrator; the National Park Service ("NPS"); and Jessica Bowron in her official capacity as NPS Comptroller.

[2] Plaintiffs are Cultural Heritage Partners, PLLC ("CHP"); Gregory Alan Werkheiser; Marion Forsyth Werkheiser; and DC Preservation League ("DCPL").

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 1**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

assurances untethered to enforceable legal obligations do not moot a case, and OA's informal gestures toward compliance do not satisfy the voluntary cessation doctrine, which requires a showing that the challenged conduct cannot reasonably be expected to reoccur.

Plaintiffs have standing under Article III, have stated viable causes of action, and are entitled to judicial relief. Defendants urge the Court to avoid what they describe as a "separation-of-powers thicket." ECF No. 38-1 at 11. This framing mischaracterizes Plaintiffs' claims. Plaintiffs do not ask the Court to intrude on executive prerogatives; they ask the Court to enforce two distinct and independently sufficient sets of obligations. First, the procedural mandates that Congress imposed on federal agencies through NEPA and NHPA are nondiscretionary, and judicial review under the APA exists precisely to ensure that agencies do not evade or disregard them. Second, the Take Care Clause of the Constitution independently requires that the Executive faithfully execute those laws. Defendants' position implicates both.

Accepting Defendants' position would have consequences that extend well beyond this case. If an agency can avoid its statutory obligations simply by delegating project authority to a non-agency entity, or by falsely asserting that the entity possesses independent authority, then NEPA and NHPA become optional. Any agency could sidestep congressionally mandated environmental and historic preservation review through a single act of delegation. That is not the law. The statutory framework Congress chose reflects a deliberate choice to require early and meaningful consideration of environmental and historical impacts by federal agencies, precisely so that those considerations can inform decisionmaking before commitments are locked in and irreversible harm occurs. Judicial review under the APA is the mechanism Congress provided to enforce that framework. The Take Care Clause reinforces that framework at the constitutional level.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 2**

Defendants' Motion to Dismiss should be denied. Plaintiffs' claims are justiciable, Plaintiffs have standing, and this Court has both the authority and the obligation to ensure that federal agencies fulfill the duties Congress assigned them.

## STATUTORY OVERVIEW

### I.  THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 701–706

The APA authorizes "a person suffering legal wrong because of agency action"—which includes agency *inaction*—to seek relief in federal court. 5 U.S.C. § 702. Because NEPA and NHPA do not provide a private right of action, judicial review of federal agency action and inaction under these statutes is governed by the APA. *See, e.g.*, *United Keetoowah Band of Cherokee Indians in Okla. v. Fed. Commc'n Comm'n*, 933 F.3d 728, 738 (D.C. Cir. 2019) (applying the APA to NEPA and NHPA claims).

The APA provides a remedy to "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law[.]" 5 U.S.C. §§ 706(1), (2)(A), (C), (D).

### II.  THE NATIONAL ENVIRONMENTAL POLICY ACT, 42 U.S.C. §§ 4321–4370h

NEPA requires federal agencies to document and analyze the environmental effects of proposed federal actions, thereby taking a "hard look" at the "environmental consequences." *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 350 (1989). Federal agencies must prepare an Environmental Impact Statement ("EIS") for any "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), or an Environmental Assessment ("EA") if projects do "not have a reasonably foreseeable significant effect" or "if the

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS  - Page 3**

significance of such effect is unknown[.]" *Id.* § 4336(b)(2). Public disclosure and participation are key aspects of NEPA; agencies must publish drafts of these environmental documents for public review and comment. *See id.* §§ 4332, 4336a(c).

NEPA's obligations are triggered when an agency has jurisdiction over a proposal for a major federal action with a known objective and is weighing which way to accomplish it. *Id.* §§ 4332(C), 4336e(12); *Scientists' Inst. For Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1094 (D.C. Cir. 1973); *Sierra Club v. Peterson,* 717 F.2d 1409, 1414 (D.C. Cir. 1983). Whether an agency has failed to initiate NEPA, and thus failed to act, is a legal question. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180–81 (2025); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392–94 (2024). When an agency concludes "that NEPA is wholly inapplicable to its actions," that threshold determination is not entitled to deference and is reviewed *de novo*. *Sierra Club v. U.S. Dep't of Agric.*, 777 F.Supp.2d 44, 54 (D.D.C. 2011) (quoting *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150–51 (D.C. Cir. 2001)).

### III.  THE NATIONAL HISTORIC PRESERVATION ACT, 54 U.S.C. §§ 300101–307108

NHPA imposes mandatory, non-discretionary duties on all federal agencies to act as responsible trustees for the Nation's heritage. *See* 54 U.S.C. § 300101. Just like NEPA, Section 106 of NHPA requires federal agencies to "take into account the effect of [an] undertaking on any historic property" *prior* to project approval, the expenditure of federal funds, or the issuance of a federal license. 54 U.S.C. § 306108; *see also id.* § 300320; 36 C.F.R. § 800.16(y). An undertaking is "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval." 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y). Section 106 also requires federal agencies to engage

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 4**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

in consultation and afford the Advisory Council on Historic Preservation ("AHCP") a reasonable opportunity to comment. 54 U.S.C. § 306108.

Agencies must give special consideration to National Historic Landmarks ("NHL"), and Section 110(f) of NHPA imposes a heightened duty when an undertaking may directly and adversely affect an NHL. *Id.* § 306107. In such circumstances, the responsible agency must, "to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm" *prior* to approval and must afford the ACHP an opportunity to comment. 36 C.F.R. § 800.10.

Section 107 of NHPA exempts "the White House and its grounds" from agencies' NHPA obligations, but the EEOB is not exempt from NHPA review under Section 107 or any other law. The statutory language of Section 107 does not list the building as subject to exemption, as it explicitly does with other buildings and historic properties in Washington, D.C., and case law affirms the EEOB does not fall within other statutory definitions of the White House and its grounds. 54 U.S.C. § 307104; *See United States v. Jabr*, 2019 WL 13110682, at *19 (D.D.C. May 16, 2019), *aff'd*, 4 F.4th 97, 102 (D.C. Cir. 2021). The EEOB is therefore subject to both the requirements of the Section 106 review process, as well as the heightened review requirements afforded NHLs under Section 110(f) of NHPA.

## IV. THE TAKE CARE CLAUSE OF THE CONSTITUTION

The Take Care Clause requires the President to ensure the faithful execution of federal laws. U.S. Const. art. 2, § 3. Pursuant to the Clause, the President has the authority to enforce federal law and oversee the execution of the law by subordinate figures, but the Clause does not permit the President to create, suspend, or repeal law. U.S. Const. art 1, § 8, cl. 18; *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 587 (1952). Thus, the President does not have unilateral

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page 5**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

authority to override statutory mandates. *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 604–05 (D.C. Cir. 1974). Nor can the President seize the law-making power of Congress or issue orders that bypass statutory limitations. *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir. 2024).

## FACTUAL BACKGROUND

For nearly eight months, President Trump has stridently and repeatedly discussed his intention to beautify the EEOB, aiming to paint the NHL's granite and slate exterior—which has never before been painted—a stark white. On August 7, 2025, President Trump posted renderings on Truth Social showing the EEOB painted white. ECF Nos. 7-3 ¶ 8; 7-4. That same month, the Executive Office of the President ("EOP") reached out to GSA to obtain cost estimates to paint the exterior of the EEOB. *See* Fifth Declaration of Andrew Heller ("5th Heller Decl."), ECF No. 27-4 ¶ 8, Attach. B at 23–24. GSA sent a rough order of magnitude ("ROM") for the Project to EOP on August 21, 2025. *Id.,* Attach. B at 23–24. GSA obtained estimates from multiple vendors by giving vendors certain details about the Project such as the size of the building, the type of stone the building is composed of, and the number of coats of paint needed. *Id.* GSA simultaneously prepared internal cost estimates for the same Project. *Id.* ¶ 8.

GSA continued to engage in concrete planning activities for the Project before President Trump's November 10, 2025, interview on The Ingraham Angle, including: gathering additional cost estimates/ROMs for painting; gathering cost estimates for cleaning; involving professional historic preservation staff; engaging onsite contractors to assist with Project estimates; and discussing the involvement of Acquisitions for the bidding process and funding sources. *See id.* Attach. B at 19–22. By mid-October 2025, GSA understood the Project was larger than EOP or GSA had originally anticipated. *Id.* Attach. B at 20–21 ("this is trending toward a small or capital

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 6**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

project…since it's shaping up to be a larger effort, we'll want to develop a more detailed scope and loop in Acquisitions for the bidding process").

President Trump's November 10, 2025, appearance on *The Ingraham Angle* reflected these concrete planning activities. During the interview, he displayed renderings of the EEOB painted white and boasted that he was "getting bids right now from painters."[3] The President's statements aligned with GSA's discussion of both painting and cleaning estimates: "It's cleaning, and pointing, and painting. It needs other work too." *Id.* Only two days after the interview, on November 12, 2025, GSA continued to evaluate costs, comparing the Project to other large-scale restoration projects, and discussing which type of paint and how many coats it would apply. ECF No. 27-4, Attach. B at 19 ("I think this estimate is too low. For comparison, each phase of the Capitol restoration was between 20-30M. And there were 5 phases. This is not a building that we are going to power wash."). Nowhere in this planning process did NEPA or NHPA review occur.

Following months of concrete planning and procurement activities for the Project, on January 29, 2026, GSA executed a Memorandum of Understanding ("MOU") purporting to delegate its authority over the Project to OA at the President's direction. *Id.* at Attach. A at 7–8. OA has already begun carrying out the authority it claims to hold pursuant to the MOU. It has "engaged a contractor to begin work on an environmental assessment," and "intends to submit the initial application for the Project" to CFA on April 2, 2026, and to NCPC on April 3, 2026. ECF No. 38-2 ¶¶ 5, 10, 8. OA has also planned a series of review meetings with CFA and NCPC through the end of June 2026. *Id.* ¶¶ 10, 8.

---

[3] *See The Ingraham Angle,* "Seen and Unseen," Fox News, https://perma.cc/5KPJ-8GK6 (hereinafter "*Ingraham*").

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 7**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

Outside of the Project, President Trump has led a series of controversial and allegedly illegal projects and actions in Washington, D.C., as a part of a greater goal of "beautification." He first set his eyes on the East Wing of the White House, expressing an intention to build a ballroom but providing assurances that the ballroom "won't interfere with the current building," would not be "touching it," and would pay "total respect to the existing building, which [he was] the biggest fan of."[4] Yet starting on October 20, 2025, while GSA was developing cost estimates for cleaning and painting the EEOB, contractors at the White House began demolishing the East Wing, completing the work within only four days.[5] When reporters pressed the President on why the scope of the ballroom project had expanded so dramatically beyond what he had previously described, he downplayed the contradiction, saying: "We determined that after really a tremendous amount of study with some of the best architects in the world… in order to do it properly, we had to take down the existing structure."[6] The sufficiency of that "tremendous amount of study" is currently being challenged in federal court. *See* Am. Compl. for Declaratory & Injunctive Relief, *Nat'l Tr. For Hist. Pres. v. Nat'l Park Serv.*, Civil Action No. 25-4316 (D.D.C. Dec. 29, 2025), Dkt. No. 19.

At the John F. Kennedy Center for the Performing Arts, President Trump has installed himself as the Center's board chairman, replaced the entire board's leadership, painted the building's columns, and added his name to the memorial's façade.[7] On February 1, 2026, the

---

[4] Gabe Gutierrez, et al., *White House's entire East Wing to be demolished 'within days,' officials say*, NBC NEWS (Oct. 22, 2025), https://perma.cc/A9ZB-XJU2.

[5] Ben Dreith, *Everything you need to know about Trump's White House plans*, DEZEEN (Feb. 20, 2026), https://perma.cc/T3VG-LSTZ.

[6] Karen Travers, et. al., *Entire East Wing expected to be demolished as soon as this weekend, sources say*, ABC NEWS (Oct. 22, 2025), https://perma.cc/53QB-TDVL.

[7] Betsy Klein, *Top architectural and historic preservation groups sue Trump over Kennedy Center plans*, CNN (Mar. 23, 2026), https://perma.cc/PAK5-5ATV; Gary Grumbach & Dareh Gregorian,

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 8**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

President announced plans to shutter the Kennedy Center for two years to permit "Construction, Revitalization, and Complete Rebuilding" of a "new and spectacular Entertainment Complex" and a "new and beautiful landmark"—shifting between a project that would result in a "highly improved" version of the existing facility and a project that would produce a "new" building.[8] This project is also being challenged for failures to follow NEPA and NHPA in federal court. Compl. for Declaratory and Injunctive Relief, *DC Pres. League v. Bd. of Trustees of the John F. Kennedy Ctr. for the Performing Arts*, Civil Action No. 1:26-cv-00981-CRC (D.D.C. Mar. 23, 2026), Dkt. No. 1.

In chorus, roughly 30,000 cubic yards of dirt, debris, and construction waste from the East Wing demolition were deposited onto the East Potomac Golf Course, prompting a lawsuit in February 2026 accusing the administration of violating environmental laws and polluting a park on the National Register of Historic Places.[9] Pls.' Compl. for Declaratory and Injunctive Relief, *DC Pres. League v. U.S. Dep't of the Interior*, Case No. 1:26-cv-00477 (D.D.C. Feb. 13, 2026), Dkt. No. 1.

Most recently, last weekend, a thirteen-foot statue of Christopher Columbus—a replica of one toppled in Baltimore in 2020, during the racial justice protests where many controversial

---

*Conservation groups sue to block Trump efforts to 'hastily gut' the Kennedy Center*, NBC NEWS (Mar. 23, 2026), https://perma.cc/DXS3-BVAW.

[8] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 1, 2026, 6:21 PM), https://truthsocial.com/@realDonaldTrump/posts/115997939705121174; Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 13, 2026, 1:43 PM), https://truthsocial.com/@realDonaldTrump/posts/116223100937937927

[9] Joel Beall, *They rescued D.C.'s munys. Then Trump took over. Inside the fight between the president and public golf,* GOLF DIGEST (Feb. 25, 2026), https://perma.cc/44ZR-VT7W; Safiyah Riddle, *Golfers sue over Trump's overhaul of 100-year-old public course so it doesn't become 'another private playground for the privileged and powerful,'* FORTUNE (Feb. 14, 2026), https://perma.cc/9RLA-4272.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 9**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

statues were removed—was erected outside of the EEOB,[10] apparently without following the process required by the Commemorative Works Act, 40 U.S.C. §§ 8901, 8903.

President Trump follows a familiar pattern. He conceives of a project that he believes will improve a nationally beloved and historically significant resource. He directs those around him to execute his vision as quickly as possible. He disregards the strict federal standards Congress established to protect national, environmental, cultural, and historic resources. He misleads the public about both the harm his project will cause and the laws he is circumventing. And he rushes forward, irreparably damaging resources that do not belong to him.

## LEGAL STANDARD

A motion to dismiss must be denied if the complaint contains "'sufficient factual matter, accepted as true,' to support an inference of standing" and states a claim for relief "'that is plausible on its face.'" *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A court must accept all well-pled factual allegations in a complaint as true and must draw all reasonable inferences in the plaintiff's favor. *Ashcroft*, 556 U.S. at 678. When deciding on a motion to dismiss, a court may consider certain materials outside of the pleadings. *Nat'l Harbor GP, LLC v. Gov't of D.C.*, 121 F.Supp.3d 11, 17 (D.D.C. 2015); *Boritz v. United States*, 685 F.Supp.2d 113, 117 (D.D.C. 2010) (the court "may consider a complaint 'supplemented by undisputed facts evidenced in the record'").

## ARGUMENT

Defendants' arguments fail across the board. First, Defendants have violated the APA through the execution of the MOU, because GSA does not have the authority to delegate Project

---

[10] *Christopher Columbus statue Trump added near White House is replica of one downed by protesters*, CBS NEWS (Mar. 23, 2026), https://perma.cc/G8TA-RKPT.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 10**

authority to OA, OA does not have independent authority over the Project, and Defendants continuously fail to conduct legally mandated NEPA and NHPA review—all of which are viable causes of actions that are ripe for review and for which this Court can provide relief. Second, on the merits, the Project has already triggered Agency Defendants' NEPA and NHPA obligations, including the need to develop an EIS, engage in consultation, and minimize harm to an NHL. Third, Plaintiffs have Article III standing because their injuries are concrete, particularized, and imminent, traceable to Defendants, and can be redressed by judicial relief. Fourth, Defendants cannot avoid their NHPA obligations, because Section 107 does not exempt the EEOB from Section 106 and Section 110(f) review. Fifth, the President's direction of the Project, without regard to duly enacted federal statutes, violates the Take Care Clause of the U.S. Constitution. Finally, OA's inadequate, voluntary "compliance" measures are not legally enforceable and thus do not moot this case, as they do not satisfy the heavy burden of the voluntary cessation doctrine.

## I. DEFENDANTS REPEATEDLY AND CONTINUOUSLY VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.

The MOU marks the consummation of GSA's decision to transfer control of the Project to OA and is an unlawful final agency action, because GSA does not have the statutory authority to delegate authority to OA since OA is not a federal agency. OA also does not have independent statutory authority to implement the Project despite Defendants' repeated misrepresentations about the scope of the MOU. The MOU cannot proclaim that OA has independent statutory authority under Section 590 when any use of the Section 590 gift fund is subject to disapproval by GSA. Furthermore, even before signing the MOU, Defendants had already taken sufficient steps to trigger NEPA and NHPA review. By proceeding with Project activities beyond the point of commitment, and by failing to complete legally-mandated environmental and historic reviews for a Project that will adversely affect a historic property, Defendants acted in violation of the APA in

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page 11**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

multiple, independent respects: (1) GSA's delegation to OA exceeds its statutory authority, in violation of 5 U.S.C. § 706(2)(C) and is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A); (2) Defendants have unlawfully withheld and unreasonably delayed required agency action, in violation of 5 U.S.C. § 706(1); and (3) Defendants have acted without observing the procedures required by NEPA and NHPA, in violation of 5 U.S.C. § 706(2)(D).

### a.   The MOU Is a Final Agency Action That Is Ripe for Judicial Review.

Defendants attempt to avoid judicial review by asserting that no final agency action has occurred, because no agency is involved in any of the actions that have and will take place. ECF No. 38-1 at 32–33. Defendants are wrong. By signing an MOU that delegates authority from GSA to OA to plan, manage, and implement the Project, GSA has taken a final agency action that is squarely subject to judicial review. ECF No. 27-4, Attach. A at 7–8. The APA makes final agency action subject to judicial review, 5 U.S.C. § 704, and an action is "final" where it "mark[s] the 'consummation' of the agency's decisionmaking process," and "'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations omitted).

The MOU formally assigns operational authority for the Project from GSA to OA, establishes a framework for future delegation of "any and all necessary authority," and was executed by the heads of both GSA and OA. ECF No. 27-4, Attach. A. at 7–8. These are not the hallmarks of a tentative or interlocutory step. There is no next step following GSA's signature on the MOU; it is the final decision, the decision that GSA will not oversee the Project, nor be involved in the NEPA or NHPA processes. The MOU is the consummation of GSA's decisionmaking process for the Project, and it meets the first part of the standard set forth in *Bennett*. 520 U.S. at 177–78.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 12**

Further, the MOU determines "rights or obligations" and produces "legal consequences," because it allocates Project authority from GSA to OA and establishes which entity will bear responsibility for the Project and its expenses. *See Ciba-Geigy Corp. v. Env't Prot. Agency*, 801 F.2d 430, 435–37 (D.C. Cir. 1986) (finding a final agency action because "[o]nce the agency publicly articulates an unequivocal position…and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review"). This allocation has immediate practical consequences: it determines which entity the public must look to for the procedural protections Congress mandated. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598–99 (2016) ("[T]he definitive nature of [the agency action] also gives rise to 'direct and appreciable legal consequences.'"); *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1030 (D.C. Cir. 2016) (agency action is final when it imposes an obligation or produces legal consequences). Thus, the MOU meets the second part of the standard set forth in *Bennett*.

Defendants contend that the MOU is merely an "internal and conditional" document and thus does not constitute final agency action. ECF No. 38-1 at 35–37. But this argument does not insulate the MOU from judicial review. A delegation purporting to transfer authority that the delegating agency may not lawfully convey has immediate, legal consequences, regardless of whether the underlying project ultimately proceeds. *See Anacostia Watershed Soc'y v. Babbitt*, 871 F.Supp. 475, 478, 483 (D.D.C. 1994) (finding that a transfer of agency jurisdiction for a potential—but not definite—future possible project, was a final agency action). Defendants' reliance on *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), is misplaced. ECF No. 38-1 at 37. In *Centro*, the MOU at issue restated and clarified duties that already existed by operation of statute, it created no new rights or obligations. 167 F.4th at 1236.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page 13**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

Here, the MOU does the opposite: it actively transfers operational authority or the Project from GSA to OA, creates a framework for delegating "any and all necessary authority," and establishes which entity bears financial and programmatic responsibility going forward. ECF No. 27-4, Attach. A. at 7–8. That is the creation of new rights and obligations, which is precisely what *Bennett* requires. OA's actions demonstrate the immediate practical and legal consequences stemming from the MOU's execution. Defendants now admit that OA has initiated NEPA and NHPA procedures, ECF Nos. 38-1 at 20; 38-2 ¶¶ 4–5, 10, which OA would not have done if it did not believe it had the delegated authority to do so. Defendants cannot argue that nothing will occur until or if the President says so. Even if that were true, it would confirm rather than cure the violation. NEPA and NHPA do not vest decisionmaking authority over federal undertakings and major federal actions in the President. They impose mandatory procedural duties on GSA and NPS as the responsible federal agencies, and those duties cannot be discharged by OA acting under a presidential directive that Congress never authorized. Defendants are not merely planning to bypass the required processes; they are actively doing so. That ongoing conduct is itself the injury.

> **b. The MOU Is *Ultra Vires* Because GSA Lacks Statutory Authority to Delegate Project Control to a Non-Agency Entity.**

GSA's decision to delegate authority to OA is unlawful, because it is "in excess of [its] statutory jurisdiction, authority, or limitations," and this Court should therefore "hold unlawful and set aside" the MOU. 5 U.S.C. § 706(2)(C).

> i. <u>GSA Lacks Statutory Authority to Delegate to OA Because OA Is Not a Federal Agency Within the Meaning of 40 U.S.C. § 121(d)(1).</u>

Congress imposed a specific limitation on GSA's delegation authority—GSA may only delegate to "another federal agency." 40 U.S.C. § 121(d)(1). ("The [GSA] Administrator may delegate authority…to an official in the [GSA] or to the head of another federal agency"). Because

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 14**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

OA does not meet the definition of a "federal agency," GSA cannot delegate Project authority to it, because GSA cannot delegate beyond the congressionally set limits. Statutory delegation provisions must be read according to their limiting terms. *Halverson v. Slater*, 129 F.3d 180, 187–88 (D.C. Cir. 1997). Where Congress imposes specific limitations on delegation, a broader delegation theory cannot be used to "expand the specific delegation" permitted by the statute. *Id.* at 188.

A "federal agency" is "an executive agency or an establishment in the legislative or judicial branch of the Government." 40 U.S.C. § 102(5). An "executive agency" includes executive departments, independent establishments, and wholly owned government corporations. *Id.* § 102(4). OA is not an executive agency because it is not an executive department, independent establishment, or a wholly owned government corporation. *Matter of Argus Secure Tech.*, LLC, B-419422, B-419422.2, 2021 CPD ¶ 84 (Comp. Gen. Feb. 22, 2021). Nor is OA "an establishment in the legislative or judicial branch of the Government" because it is an entity in the executive branch of the Government. 40 U.S.C. § 102(5).

OA was established by Executive Order to consolidate administrative functions within the EOP. Exec. Order No. 12,028, 42 Fed. Reg. 62895 (Dec. 12, 1977). It is merely an entity within the EOP—not its own federal agency. In the Freedom of Information Act ("FOIA") context, this Circuit has held that entities within the EOP are not agencies unless they exercise "substantial independent authority." *Citizens for Resp. & Ethics in D.C. ("CREW") v. Off. of Admin.*, 566 F.3d 219, 223–24 (D.C. Cir. 2009). OA does not exercise such independent authority; it merely performs tasks that are "entirely operational and administrative in nature." *Id.* at 224; *see also Soucie v. David*, 448 F.2d 1067, 1073–74 (D.C. Cir. 1971) (explaining that an executive entity within the EOP does not qualify as an agency if it cannot act on independent authority).

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 15**

In fact, Defendants themselves agree that OA is not an agency, citing to *CREW* to bolster their position. *See* ECF No. 38-1 at 32, 34–35. Defendants cannot assert that OA is not an agency where it serves their arguments—specifically, that this Court cannot review OA's actions because OA is not an agency within the meaning of the APA—without applying that same analysis to the statutory boundaries of GSA's delegation authority. To hold otherwise would create a loophole and allow agencies to avoid judicial review by simply delegating to entities exempt from the APA.

Defendants also argue that GSA has not delegated authority to OA, because the MOU is conditional—any delegation would occur only if or when the President decides to move forward with the Project. ECF No. 38-1 at 49. But as Plaintiffs explained above, the MOU is a final agency action. GSA's commitment to delegate is final—there is no flexibility in the MOU for GSA to reconsider or refuse to delegate at a later date. Further, the Project is not hypothetical. There is no question "if" the Project will move forward, as the detailed schedule in the Second Martin Declaration outlines. ECF No. 38-2 ¶¶ 4, 8, 10.

Defendants also argue that the MOU does not delegate authority to OA, because OA has separate and independent statutory authority over the Project. ECF No. 38-1 at 37, 49–50. But the MOU explicitly states that GSA will "delegate any and all necessary authority for the Project to OA." ECF No. 27-4, Attach. A at 8. Courts interpret agreements as a whole, presuming no provision is superfluous. Restatement (Second) of Contracts § 203. Defendants cannot now interpret the MOU to exclude the very language they intentionally included.

5 U.S.C. § 706(2)(C) prohibits actions that are "in excess of statutory jurisdiction, authority, or limitations." GSA's delegation to OA exceeds its statutory authority because OA is not another federal agency, and therefore the delegation is *ultra vires*.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 16**

ii.   Section 590 Does Not Give OA Independent Authority Over the Project, and the Legislative History Confirms That Congress Withheld That Authority Deliberately.

The Project, as advanced by GSA and OA through the MOU, is also *ultra vires* of their authority under Section 590. GSA has explicit approval authority over OA's use of funds, and GSA may not opt out of those responsibilities. Insofar as GSA uses the MOU to attempt to imbue OA with independent authority not provided by the language of Section 590, such action is *ultra vires*.

Section 590 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1989 ("Section 590") authorizes the Director of OA to "accept and utilize voluntary and uncompensated services" and "gifts and bequests of property"[11] to aid work on the EEOB. Pub. L. No. 100-461, 102 Stat. 2268 § 590(a) (Oct. 1, 1988). This authority, however, is not independent. Defendants themselves acknowledge as much by citing legislative history showing that OA sought authority over the White House complex "in lieu of GSA." ECF No. 38-1 at 40 n.19 (citing 133 Cong. Rec. 36,572). The Court need not look far to see why this helps Plaintiffs, not Defendants. OA asked Congress for independent authority. Congress said no. What Congress enacted was Section 590(c), which expressly conditions OA's use of donated property on the approval of the Administrator of General Services. *Id.* ("[a]ny use or sale of property accepted pursuant to this section, and any use of proceeds from such sale, *shall be subject to the*

---

[11] Section 590 allows OA to use the gift fund for "aiding, benefitting, or facilitating the work of preservation, restoration, renovation, rehabilitation, or historic furnishing" of the EEOB. A preliminary question exists whether a project to paint the entirety of the EEOB's exterior falls within any of those categories. "Preservation" and "restoration" connote maintaining or returning a property to its historic condition; "renovation" and "rehabilitation" connote improving existing fabric. Painting the EEOB in a color scheme preferred by the President does not obviously fit within any of those purposes. The Project's stated objective is to change the building's appearance, not to steward it. This Court need not resolve that question to grant the relief Plaintiffs seek, but it bears on whether Section 590 provides any legitimate basis for the Project at all.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 17**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

*disapproval of the Administrator of General Services* within 30 days after the Administrator receives notice of such use or sale.") (emphasis added).

If the legislative history proves anything, it is that Congress considered giving OA the very independence Defendants claim it has and chose not to. Legislative history documenting a request Congress declined to grant is not evidence of authority; it is evidence of its absence. *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011); *see also Nat'l Small Shipment Traffic Conf., Inc. v. Civ. Aeronautics Bd.*, 618 F.2d 819, 828 (D.C. Cir. 1980) (the plain language of a statute controls, including for understanding agency authority). The Court should not permit Defendants to accomplish through an MOU what OA could not obtain through the legislative process. Because OA's use of the gift fund is subject to GSA's approval, OA does not have independent authority to "handle project management for the Project." *See* ECF No. 27-4, Attach. A at 7. Instead, OA only performs tasks that are "entirely operational and administrative in nature." *CREW*, 566 F.3d at 224. The MOU itself acknowledges OA's limitation by separately providing that "GSA would delegate any and all necessary authority for the Project to OA." ECF No. 27-4, Attach. A at 8.

Furthermore, Section 590 does not confer authority on OA to assume responsibility for compliance with NEPA and NHPA, duties that Congress intentionally assigned to federal agencies and made reviewable under the APA. No prior instance exists where GSA delegated its statutory authority over the EEOB to OA, or where OA independently exercised authority over projects of this scope under Section 590.

This Court is empowered to provide equitable relief for these *ultra vires* actions, as they are "unauthorized by any law and…in violation of the rights of the individual." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 680 (2025) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)). Equitable relief is available when agency action is "made in excess of

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page 18**

its delegated powers and contrary to a specific prohibition in the Act." *Leedom v. Kyne*, 358 U.S. 184, 188 (1958). Because Section 590(c) explicitly calls for GSA approval of OA's use of funds, any attempt to imbue OA with independent authority not provided by the language of Section 590 is *ultra vires*.

### c. Even If the MOU Were Permissible, GSA Was Required to Complete NEPA and NHPA Review Before Executing It.

*Arguendo*, if the MOU is a permissible exercise of GSA's authority, then GSA's obligations under NEPA and NHPA remain in effect, and GSA was required to comply with NEPA and NHPA before it executed the MOU. By Defendants' own representations, subsequent Project implementation decisions will be made solely by OA, an entity whose actions are not reviewable under the APA. ECF No. 27-1 at 30-31. Therefore, the time for GSA's compliance with NEPA and NHPA was at the time of the MOU's execution.

When an agency takes an action that transfers jurisdiction or commits the agency to a course of action that will not later have a meaningful opportunity for environmental and historic review, then NEPA and NHPA compliance are required at the time of the transfer or commitment to a course of action. *Anacostia*, 871 F.Supp. at 478, 480. In *Anacostia*, NPS entered into a memorandum of agreement with the District of Columbia, transferring jurisdiction over portions of Anacostia National Park to the District for the development of a children's recreational facility. *Id.* at 478–79. Despite the fact that NPS owned and managed Anacostia Park, NPS did not complete an EIS or EA to analyze the environmental effects of transferring jurisdiction to the District. *Id.* at 478–79, 481. Instead, NPS relied on conditions in the memorandum that purported to permit only limited development, required NCPC and CFA review and approval of any development, and required the District, "'as the sponsoring agency,' comply with NEPA." *Id.* at 479. The court held that NPS "was required to comply with NEPA before making its decision to

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 19**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

transfer jurisdiction," and should have completed an EIS or EA prior to signing the memorandum. *Id.* at 483 ("Because there will be no subsequent Park Service decision for future NEPA analysis to inform, the time for the Park Service to have advised itself and the public of the environmental effects of and alternatives to its decision to transfer jurisdiction was at the time of transfer."); *see also Scientists' Inst.,* 481 F.2d at 1088–89 (explaining that major federal action includes situations where "the agency made a decision which permitted some other party—private or governmental— to take action affecting the environment"); *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020) ("if an agency's indication of an intent to reconsider an interim (or other) action sufficed to render the action non-final, agencies could evade judicial review of their actions even if they impose substantial obligations on regulated parties over a considerable period of time.").

Just as NPS was required to comply with NEPA before transferring jurisdiction to the District of Columbia in *Anacostia*, GSA was required to comply with NEPA and NHPA before executing the MOU. The reasoning is identical: once GSA delegates authority to OA, GSA will have no further role in ensuring that those reviews occur or that their findings shape Project decisions. *Anacostia,* 871 F.Supp. at 482–83. The time for GSA to fulfill its statutory obligations was before it signed away its authority to do so. GSA failed to do that, and that failure is independently actionable under 5 U.S.C. §§ 706(1) and 706(2)(D). Defendants' NEPA and NHPA obligations had in fact matured well before the MOU was signed, providing an independent and alternative basis for relief.

> **d. Defendants Triggered NEPA and NHPA Obligations Months Before the MOU Was Signed.**

Prior to signing the MOU, Defendants had already taken sufficient steps to trigger NEPA and NHPA review, and thus this matter is ripe for judicial review. Agencies have a nondiscretionary duty to initiate NEPA and NHPA review early in the planning process for major federal actions and

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page 20**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

undertakings. Agencies cannot segment or postpone review until after decisions are functionally made. For the Project, Defendants have—at the very least—conducted cost estimating, contractor coordination, and procurement preparation.[12] By proceeding with Project activities beyond the point of commitment while failing to complete required analysis, documentation, public review, consultation, and mitigation, Defendants have unlawfully withheld and unreasonably delayed required agency action in violation of 5 U.S.C. § 706(1), and have acted without observing procedures required by NEPA and NHPA, in violation of 5 U.S.C. § 706(2)(D).

iii. The Project Is a NEPA Proposal, Because Defendants Have a Defined Goal, Are Actively Pursuing the Means of Achieving It, and Can Meaningfully Evaluate Its Effects.

Defendants have triggered NEPA, because the Project is a proposal for a major federal action, and thus Defendants are required to prepare an EIS. *See* 42 U.S.C. §§ 4332(C), 4336e(12). Yet, Defendants have not prepared an EIS; have not documented reliance on a categorical exclusion; have not taken a hard look at the Project's effects, including effects on historic properties, viewsheds, President's Park, or Lafayette Square NHLD; have not evaluated a reasonable range of alternatives; and have not provided public notice or opportunity for comment, violating their procedural obligations under NEPA.

The term "proposal" means "a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal,

---

[12] Judicial review under the APA is based on the administrative record whether a plaintiff challenges agency action or agency inaction. *See Dall. Safari Club v. Bernhardt*, 518 F.Supp.3d 535, 539–40 (D.D.C. 2021). Defendants have not yet produced an administrative record in this case. On November 20, 2025, DCPL submitted a FOIA request to GSA seeking records related to planning for alterations to the EEOB exterior. GSA has failed to determine whether to grant DCPL's request for expedited processing and failed to promptly disclose responsive records. DCPL has filed a separate action seeking relief for those FOIA violations. Compl., *DC Pres. League v. Gen. Servs. Admin.*, No. 1:26-cv-00032-JDB (D.D.C. Jan. 7, 2026), Dkt. No. 1.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS  - Page 21**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

and can meaningfully evaluate its effects." *Id.* § 4336e(12). The Project meets all three components of this definition.

First, there is no doubt that Defendants have a goal: changing the appearance of the EEOB to better match President Trump's preferences. President Trump began calling the EEOB "ugly"[13] in August 7, 2025, and GSA has been researching and planning for a painting and cleaning project since at least that same month. ECF. No. 27-4 ¶ 8.

Second, Defendants are actively preparing to make a decision on how to accomplish that goal. Defendants' own emails show months of concrete planning and procurement activities beginning in August 2025. ECF No. 27-4 ¶ 8, Attach. B at 23–24. Defendants aim to paint and clean the EEOB, activities that will accomplish the changed appearance President Trump seeks, and GSA has contacted and coordinated with contractors, obtained cost estimates, defined Project scope, identified methods and materials, coordinated with historic preservation staff, and completed other steps in procurement preparation—all with the goal of implementing a project it equates to other large-scale restoration projects. *See id.* Attach. B at 10–23.

Defendants all but ignore the contents of their own emails and instead argue that NEPA is not triggered until there is an "'irreversible and irretrievable commitments of resources.'" ECF No. 38-1 at 48. But Defendants misconstrue the role that "irreversible and irretrievable commitments of resources" play in NEPA. Defendants point to *Center for Biological Diversity v. Department of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009), to argue that an agency's "NEPA obligations mature only once it reaches a critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment." ECF No. 38-1 at 48 (excerpt omitting internal quotation marks). But Defendants conveniently omit the

---

[13] *Ingraham.*

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS  - Page 22**

surrounding context. The court did not hold that NEPA claims are ripe only at the point of irreversible and irretrievable commitments of resources for *all* major federal actions. Instead, the court expressly stated that "*[i]n the context of multiple-stage leasing programs*, we ultimately held that 'the point of irreversible and irretrievable commitment of resources and the concomitant obligation to fully comply with NEPA do not mature until leases are issued.'" *Cent. for Biological Diversity*, 563 F.3d at 480 (emphasis added). The court's analysis was limited only to multi-stage leasing projects, *see id.*, which the Project at issue in this case decidedly is not.[14]

Third, Defendants can meaningfully evaluate the effects of the Project; there is nothing "hypothetical or undefined" about it. *See* ECF No. 38-1 at 49. The "basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and thus those effects fully known." *Scientists' Inst.*, 481 F.2d at 1092 Defendants cannot rely on the fact that President Trump has not decided whether to proceed with the Project to avoid their immediate NEPA obligations. Agencies may not evade NEPA by insisting on perfect specificity; they must analyze environmental consequences and reasonable alternatives "with appropriate allowances for the inexactness of all predictive ventures." *Kleppe v. Sierra Club*, 427 U.S. 390, 402 n.14 (1976). Agencies must develop an EIS "early enough so that whatever

---

[14] NEPA itself only requires an EIS to include an analysis and discussion of "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action *should it be implemented*" so that the agency and the public can take those commitments into account when conducting environmental review. 42 U.S.C. § 4332(C)(v) (emphasis added). Courts have used "irreversible and irretrievable commitments of resources" as a factor to determine whether an agency action was final, and thus required an EIS or EA; however, these decisions stress that "the appropriate time for preparing an EIS [or EA] is *prior* to a decision, when the decisionmaker retains a maximum range of options." *Sierra Club*, 717 F.2d at 1414 (D.C. Cir. 1983) (emphasis in original); *see also Anacostia*, 871 F.Supp. at 487 (summarizing *Sierra Club* and stating "an agency may delay preparation of" an EIS or EA "only where it reserves" the authority to "preclude" and "prevent" activities "if the environmental consequences are unacceptable").

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 23**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

information is contained can practically serve as an input into the decisionmaking process."

*Scientists' Inst.*, 481 F.2d at 1094. Thus "some degree of judicial scrutiny of an agency's decision

that the time is not yet ripe for a NEPA statement is necessary in order to ensure that the policies

of the Act are not being frustrated or ignored." *Id.*

> iv. The Project Is a Federal Undertaking, and Defendants Must Complete Section 106 and Section 110(f) Review Before Any Further Project Action.

The Project is a federal undertaking subject to NHPA, and Defendants must complete the

review processes required by NHPA before additional Project actions occur. Yet Defendants have

not defined an area of potential effects, identified affected historic properties, or made any

determination of effects for the EEOB, the Lafayette Square NHLD, or other nearby listed and

contributing resources, violation Section 106 of NHPA. Nor have Defendants engaged in the

heightened planning required for an NHL to minimize harm to the historic value of the EEOB and

the Lafayette Square NHLD or consulted with NPS regarding alternatives to the Project that would

avoid or reduce harm, thus violating Section 110(f) of NHPA.

Under Section 106, agencies must take into account how an undertaking affects any historic

property and must afford the ACHP a reasonable opportunity to comment. 54 U.S.C. § 306108.

When an undertaking may directly and adversely affect an NHL, agencies must, to the maximum

extent possible, undertake planning and actions necessary to minimize harm and must afford

ACHP an opportunity to comment. 54 U.S.C. § 306107; 36 C.F.R. § 800.10. Agencies must

complete the obligations imposed by Sections 106 and 110(f) "*prior* to the approval of the

expenditure of any Federal funds on the undertaking or *prior* to the issuance of any license." 36

C.F.R. § 800.1(c) (emphasis added). Just like NEPA, NHPA is conducted and completed early in

the planning process, before a decision is made. *See Nat'l Tr. For His. Pres. v. Blanck*, 938 F.Supp.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS  - Page 24**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

908, 919–24 (D.D.C. 1996); *Don't Tear It Down, Inc. v. Gen. Servs. Admin.*, 401 F.Supp. 1194, 1199 (D.D.C. 1975).

Defendants' actions on the Project trigger the NHPA "undertaking" threshold, because it will change the character of the EEOB, an NHL, and Defendants' actions advance and enable the implementation of that Project. 54 U.S.C. §§ 300320, 306108; s*ee also Blanck*, 938 F.Supp. at 919. As explained above, Defendants have engaged in concrete planning activities for months. ECF No. 27-4, Attach. B.

Defendants contend that while ACHP regulations require completion of the Section 106 process prior to approval of the expenditure of Federal funds, those regulations do not specify when the process must begin, and that timing is therefore left to the discretion of the responsible entity. That argument misreads the regulatory structure. A process that must be completed before a triggering event must begin with enough lead time to allow for meaningful compliance, "commencing at the early stages of project planning." 36 C.F.R. §§ 800.1(a), 800.1(c). Section 106 is not a formality to be satisfied at the last moment before funds are committed; it is a substantive consultation process designed to inform decisionmaking before those commitments are made. An agency that waits to begin Section 106 review until expenditure is imminent has already foreclosed the range of choices the process was designed to preserve. The regulations further provide that the "agency official shall ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." 36 C.F.R. § 800.1(c).

Moreover, the discretion Defendants invoke is not boundless. Agencies may not time their initiation of NHPA review to render it procedurally meaningless. *See Blanck*, 938 F.Supp. at 919–24. Here, Defendants have spent months planning, coordinating with contractors, and defining the

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 25**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

Project's scope. Each of those steps narrows the range of alternatives and makes it harder for any subsequent consultation to consider measures that would avoid or reduce harm to the EEOB and the Lafayette Square NHLD. Discretion over timing does not extend to timing that extinguishes the purpose of the process altogether.

## II. PLAINTIFFS HAVE ARTICLE III STANDING: THEIR INJURIES ARE CONCRETE, PARTICULARIZED, IMMINENT, TRACEABLE TO DEFENDANTS, AND FULLY REDRESSABLE.

Plaintiffs have Article III standing to seek relief against Defendants, because they have made a clear showing that they have suffered an injury-in-fact that is fairly traceable to Defendants' conduct and is redressable by the requested relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

### a. The Werkheisers, Ms. Miller, and Mr. Peck Have Suffered Concrete, Particularized Aesthetic and Professional Injuries That the Project Will Directly and Irreparably Harm.

Defendants' failure to comply with mandatory NEPA and NHPA processes for the executed MOU and Project activities impair Plaintiffs' concrete and particularized interests and deprive Plaintiffs of the procedural rights NEPA and NHPA confer. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009); *Massachusetts v. Env't Prot. Agency*, 549 U.S. 497, 517–18 (2007).

To establish injury-in-fact, Plaintiffs must show that they "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). An injury is particularized if it "affect[s] plaintiff in a personal and individual way." *Id.* An injury is concrete when it "actually exist[s,]" and is "real, not abstract." *Id.* at 340 (internal quotations omitted). "'Concrete' is not, however, necessarily synonymous with 'tangible'" and the Supreme Court has repeatedly found "that intangible injuries can nevertheless be concrete." *Id.*

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 26**

The declarations of Gregory Werkheiser (ECF Nos. 7-15, 16-2; Ex. 3), Marion Werkheiser (ECF Nos. 7-3, 16-1; Ex. 4), Rebecca Miller (ECF No. 7-16; R. Miller Suppl. Decl. (Ex. 1)), and Robert Peck (R. Peck Decl. (Ex. 2)), establish and substantially exceed the facts necessary to demonstrate concrete and particularized interests.

Gregory Werkheiser and Marion Werkheiser both work in the field of cultural heritage, historic preservation, and federal environmental review. ECF Nos. 16-1 ¶ 6; 16-2 ¶ 3. Similarly, Rebecca Miller and Robert Peck are members of DCPL, whose mission is to protect and enhance the built environment of Washington. D.C., including its historic buildings. ECF No. 7-16 ¶ 2; Ex. 2 ¶ 2. Each of them regularly visit and experience the White House complex, Lafayette Square NHLD, President's Park, and the EEOB area for aesthetic, recreational, professional, and educational purposes. They intend to continue such visits and have concrete plans to do so: the Werkheisers in March 2026, and Ms. Miller on at least March 25, 2026, and May 4, 2026, and Mr. Peck at least six (6) times over the next six (6) months.[15] ECF Nos. 16-1 ¶ 4; Ex. 3 ¶ 3; 16-2 ¶ 30; Ex. 4 ¶ 3; Ex. 1 ¶ 16; Ex. 2 ¶ 7. The Werkheisers', Ms. Miller's, and Mr. Peck's visits to the EEOB area are deliberate: the building and the aesthetic experience they derive from its exterior drives them to continuously make the EEOB the destination. ECF Nos. 7-3 ¶ 5; 7-15 ¶ 5–6; 7-16 ¶ 3; Ex. 2 ¶¶ 3, 7; Ex. 3; Ex. 4. If Defendants move forward with the Project and paint the exterior of the building, the Werkheisers', Ms. Miller's, and Mr. Peck's aesthetic interests would be directly diminished, as would their ability to visit and enjoy the EEOB area. *See Sierra Club v. Jewell*, 764

---

[15] The Werkheisers have more than "'some day' intentions" to visit the EEOB. *Lujan*, 504 U.S. at 564. Their declarations outline consistent past trips to the EEOB area, concrete plans to do so in the near future, and intentions to continue doing so for the foreseeable future. ECF Nos. 16-1 ¶ 4; 16-2 ¶ 30; *see also Sierra Club v. Fed. Energy Regul. Comm'n*, 827 F.3d 59, 67–68 (D.C. Cir. 2016) (clarifying that providing "a statement of definite dates" is not "necessary to establish Article III standing where [a plaintiff] lives an hour's drive from the affected area" and uses the area "frequently").

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 27**

F.3d 1, 5–6 (D.C. Cir. 2014). These are particularized interests, far beyond Defendants' characterization of "'mere incidental viewership'" and "'generalized grievances.'" ECF No. 38-1 at 22–23 (internal citations omitted); *see also Env't Def. Fund v. Fed. Energy Regul. Comm'n*, 2 F.4th 953, 968–69 (D.C. Cir. 2021).

Defendants also challenge the Werkheisers' professional interests, arguing they have provided no information on how they would suffer professional harm. ECF No. 38-1 at 25 n.7. That assertion is flatly contradicted by the record. Gregory Werkheiser and Marion Werkheiser are cultural heritage attorneys whose professional work depends on the faithful application of NEPA and NHPA to federal undertakings involving historic properties. ECF Nos. 16-1 ¶ 6; 16-2 ¶ 3. When federal agencies bypass those processes, the Werkheisers cannot advise their clients on rights, alternatives, or outcomes that the law was designed to preserve. The Project's unlawful circumvention of NEPA and NHPA review is not merely an aesthetic affront to the Werkheisers; it is a direct interference with their professional practice. Professional harm of this character is cognizable under Article III. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Defendants oddly assert that "[t]he Werkheisers have not shown that they use the EEOB in a way that is unique from the general public." ECF No. 38-1 at 23.[16] But Plaintiffs have no obligation to do so; this Circuit and the Supreme Court have repeatedly found standing for plaintiffs using public lands or properties they do not own for solely aesthetic purposes, regardless

---

[16] Defendants challenge DCPL's associational standing because Plaintiffs failed to submit a declaration for an "unnamed" member who can show individual standing. Plaintiffs note that the Amended Complaint clearly states that Rebecca Miller is a member of DCPL, ECF No. 34 at 8, and there is no requirement to submit standing declarations alongside complaints. Nevertheless, Ms. Miller's second declaration is attached to this Response as Exhibit 1. Robert Peck also submits a declaration as Exhibit 2. DCPL needs only to show Article III standing for one identified member to have associational standing. *Summers.*, 555 U.S. at 497–98; *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 28**

of the distance between those locations and where the plaintiffs lived. *Lujan*, 504 U.S. at 562–63 (citing to *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)); *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 182–83 (2000); *Jewell*, 764 F.3d at 5–6 (finding that plaintiffs who "view[ed] and enjoy[ed]" the affected area's "aesthetic features" and "observ[ed] it for purposes of [] appreciating its history" had established injury-in-fact). It is irrelevant if other members of the public walk around the EEOB and derive similar enjoyment (as well they should, as it is an NHL and piece of this Nation's history).

Perhaps most disingenuously of all, Defendants argue that "the Werkheisers can easily avoid any alleged aesthetic discomfort by not going to the White House complex to view the EEOB—they live almost a hundred miles away[.]" ECF No. 38-1 at 23. That argument has no support in law. Courts have never required plaintiffs to forgo visits to public spaces to avoid aesthetic harm inflicted by government action, and this Court should decline Defendants' invitation to impose that requirement now.

**b. Plaintiffs' Injuries Are Imminent: Defendants' Own Filings Confirm the Project Is on a Defined and Active Timeline.**

Plaintiffs explained how their injuries are sufficiently actual or imminent, especially because "[w]here, as here, a party alleges deprivation of its procedural rights, courts relax the normal standards of redressability and imminence." *Sierra Club,* 827 F.3d 59, 65 (D.C. Cir. 2016) (citing *Summers*, 555 U.S. at 496–97).

Defendants seem to assert that Plaintiffs must wait until the scaffolding has been erected before Plaintiffs' harm is imminent. ECF No. 38-1 at 25–26. But this assertion goes against the very processes set forth by NEPA and NHPA: public participation to inform decisionmaking during the Project planning process, and prior to any actual implementation. The example the Supreme

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 29**

Court provided in *Lujan* imparts the correct understanding of "imminence" where procedural harm is paired with cognizable injuries:

> one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

504 U.S. at 572 n.7.

The Second Martin Declaration, filed by Defendants themselves, eliminates any doubt about imminence. ECF No. 38-2. That declaration discloses that submissions to CFA and NCPC are scheduled for April 2026 and that the Environmental Assessment will be finalized no earlier than June 24, 2026. *Id.* at ¶¶ 4, 8, 10. This is not a speculative project awaiting a presidential decision. It is a project operating on a defined schedule. Defendants cannot simultaneously submit a declaration confirming an active project timeline and argue that Plaintiffs' injuries are too speculative to support standing.

That schedule, combined with months of documented pre-MOU planning activity, "establish[es] a substantial probability" that additional Project activities will occur. *Jewell*, 764 F.3d at 7–8 (finding that the existence of mining permits that had existed for over a decade created an imminent risk of harm, even though no mining had ever occurred on the land at issue). In fact, Defendants' own actions show both concrete planning and final decisionmaking that have already triggered NEPA and NHPA obligations. ECF Nos. 27-4, Attach. A; 38-1 at 14. There is nothing "abstract" about an MOU, the implementation of which has already begun. *See* ECF No. 38-1 at 25.

Moreover, OA's inadequate, voluntary commitments address only Section 106 processes and make no mention of the heightened planning obligations under Section 110(f), which apply

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page 30**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

specifically because the EEOB is an NHL. That gap ensures that Plaintiffs' injuries under Section 110(f) remain entirely unremedied, the controversy fully live, and the case ripe for judicial review. The issues are fit for decision on the current record, and withholding court consideration would cause concrete hardship to Plaintiffs by allowing Project activities to proceed without the full statutory review Congress required. Plaintiffs "need not wait for the sword to fall" before seeking relief. *Hale v. Exec. Off. of the President*, 784 F.Supp.3d 127, 147 (D.D.C. 2025).

### c. CHP and DCPL Have Organizational Standing Because Defendants' Conduct Has Injured Their Core Institutional Interests and Forced a Diversion of Resources.

CHP has organizational standing, and DCPL has organizational standing in addition to associational standing, because both can "point to a concrete and demonstrable injury to [their] activities" that is more than "a setback to [their] abstract social interests." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (internal quotation marks omitted); *Havens*, 455 U.S. at 379. To meet organizational standing, an organization must show two things: (1) "the agency's action or omission to act injured the organization's interest," and (2) "the organization used its resources to counteract that harm." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Just as an individual plaintiff can have standing for a noneconomic interest, so too can an organization. *Havens*, 455 U.S. at 379.

Under the first prong of the test, Defendants argue that organizational standing requires a showing that their conduct "directly affected and interfered" with CHP's "core business activities." ECF No. 38-1 at 28 (citing *Food & Drug Admin. ("FDA") v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024)). But Defendants read *FDA* too broadly. The Supreme Court did not hold that direct interference with core business activities is the only cognizable organizational injury. *See id.* To the contrary, this Circuit has found that an organization suffers injury when unlawful conduct hinders its ability to carry out its major activities, including informing the public. For example,

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 31**

this Circuit has found standing where unlawful conduct hindered an organization's ability to inform the public, as this was one of the organization's "major activities." *Action All. of Senior Citizens v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986); *see also Scientists' Inst.*, 481 F.2d at 1086 n.29 (holding that an organization had standing to challenge agency decision not to issue an EIS because the agency action limited the plaintiff's ability to carry out one of its major activities: informing the public).

Under the second prong of the test, Defendants argue that it is insufficient to allege a "diversion of resources to education and advocacy" or litigation to show injury-in-fact. ECF No. 38-1 at 28–29. It is true that an organization cannot "manufacture" standing "simply by expending money to gather information and advocate against the defendant's action." *FDA*, 602 U.S. at 394. Nor can an organization create standing by diverting "resources to litigation or investigation in anticipation of litigation[.]" *Equal Rights Ctr.*, 633 F.3d at 1140. But the D.C. Circuit has squarely held that voluntary resource diversion does not defeat standing so long as the diversion was "in response to, and to counteract, the effects of" the defendant's actions, "rather than in anticipation of litigation." *Id.* Indeed, this Circuit has found standing where an organization diverted resources to "increased education" to combat unlawful conduct or to "monitor and to counteract on an ongoing basis public impressions created" by unlawful conduct. *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 28–29 (D.C. Cir. 1990).

Both CHP and DCPL meet both prongs of the organizational standing test. CHP's interests are harmed because its unique and specialized work is centered on protecting cultural heritage and resources and ensuring the faithful execution of NEPA and NHPA review processes, and thus the rule of law. ECF Nos. 7-3 ¶ 3; 7-15 ¶ 3. *See Havens*, 455 U.S. at 379; *Vilsack*, 808 F.3d at 919–20. Defendants harm those interests through the execution of the MOU and unlawful denial of properly

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 32**

applied NEPA and NHPA; CHP depends on the lawful application of federal preservation laws to effectively provide its clients answers and advocate accordingly. DCPL's interests are harmed because its mission is "to preserve, protect, and enhance the historic and built environment of Washington, DC, through advocacy and education." Ex. 1 ¶ 3.

CHP has specifically diverted resources to counteract Defendants' unlawful actions, including staff time, client counseling, outreach, and emergency advocacy, that would not have been necessary absent Defendants' conduct. ECF Nos. 7-3; 7-15; 7-16; 16-1; 16-2. DCPL has also diverted resources to counteract Defendants' unlawful actions. Between November 2025 and the present, DCPL staff have spent approximately 85 hours monitoring developments, reviewing press reports and publicly available documents, coordinating with partner organizations, and planning its response to the Project. Ex. 1 ¶ 17. This time and effort have come at the expense of other DCPL priorities. For example, DCPL had planned to host a walking tour focused on the Women's Suffrage Movement, highlighting EEOB as a focal point of lobbying efforts of activists who targeted officials within the building to lobby for voting rights, but the tour is no longer feasible because of construction around President's Park. *Id*. ¶ 20. Further, DCPL has not been able to closely monitor and focus efforts to protect other unlawful projects, such as the demolitions at the St. Elizabeths West Campus. *Id.*

CHP and DCPL meet the standard for organizational standing based on the facts of the Amended Complaint and standing declarations, particularly at this stage of the case where the burden placed on plaintiffs "is not onerous." *Equal Rights Ctr*., 633 F.3d at 1141 n.3.

### d. Plaintiffs' Injuries Are Directly Traceable to Defendants' Conduct, and the Relief Plaintiffs Seek Will Fully Redress Those Injuries.

Defendants' actions pose a direct threat of harm to the EEOB's historic exterior. Providing the relief Plaintiffs seek will remedy the harm to the EEOB's exterior and associated harm incurred

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 33**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

by Plaintiffs. *See Jewell*, 764 F.3d at 8 (explaining that the causation and redressability inquiries are "two sides of a causation coin").

Both Agency Defendants are proper and mandatory parties in this action. GSA is properly included because it owns and manages the EEOB and is responsible for approving and overseeing alterations to the building's exterior. GSA cannot avoid its congressionally delegated responsibilities and bypass the required NEPA and NHPA processes by executing the MOU. GSA does not have the authority to delegate Project authority to a non-federal agency, OA has no independent authority over the EEOB, and even a lawful delegation would first require GSA to complete NEPA and NHPA review. Even prior to the MOU's execution, GSA had already triggered its NEPA and NHPA obligations through months of concrete planning and pre-approval steps including: cost estimating beginning in August 2025, contractor site visits, development of a ROM cost estimate, and procurement planning.

NPS has independent obligations to the EEOB as an NHL and location within the Lafayette Square NHLD, and Plaintiffs have, therefore, properly included the agency as a Defendant. It is irrelevant that NPS transferred "all functions with respect to the operation, maintenance, and custody" of the EEOB to GSA in 1950. Reorganization Plan No. 18 of 1950 § 2, 15 Fed. Reg. 3,177 (195), *reprinted in* 64 Stat. 1270. The Secretary of the Interior administers the National Historic Landmarks program through NPS. *See* 54 U.S.C. §§ 302101–302102; 36 C.F.R. pt. 65; 36 C.F.R. § 800.10. NPS's role here is mandatory on two independent grounds.

First, even where NPS is not the lead agency for a federal undertaking, § 800.10(c) requires that GSA, as the official conducting the undertaking, notify the Secretary of the Interior of any consultation involving an NHL. 36 C.F.R. § 800.10(c) ("The agency official shall notify the Secretary of any consultation involving a National Historic Landmark and invite the Secretary to

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 34**

participate in the consultation where there may be an adverse effect"). GSA has never provided that notice. That omission is a standalone statutory violation that independently supports NPS's inclusion as a Defendant.

Second, and independently, the Project will adversely affect President's Park, a property that NPS manages directly. Because NPS is the managing agency for an affected historic property, it has its own Section 106 obligations that arise regardless of its role in the EEOB undertaking. An agency that manages property within the area of potential effects is not a passive observer; it is a mandatory consulting party with duties to evaluate and address adverse effects to the resources under its stewardship. The number of designated NHLs nationwide is irrelevant, despite what Defendants argue. ECF No. 38-1 at 29. Congress charged NPS with protecting NHLs and the properties NPS manages, and NHPA enforces that role without exception.

Because Agency Defendants are proper and mandatory parties to this litigation, Plaintiffs properly seek relief against them under the APA. A declaration holding the MOU unlawful and an accompanying injunction halting any further Project activities until NEPA and NHPA are properly followed provide Plaintiffs with effective relief.

## III. DEFENDANTS CANNOT INVOKE THE NHPA SECTION 107 EXEMPTION BECAUSE THEY HAVE NOT CARRIED THEIR BURDEN OF PROOF FOR THAT EXCEPTION.

Section 107's exemption of certain properties from NHPA review does not apply to the EEOB, because the statute's language does not list the EEOB as one of the explicitly exempt properties. Section 107 of the NHPA states that: "Nothing in this division applies to *the White House and its grounds*, the Supreme Court building and its grounds, or the United States Capitol and its related buildings and grounds." 54 U.S.C. § 307104 (emphasis added). The statutory language is therefore clear on its face—the EEOB is not included. Moreover, the EEOB does not

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 35**

lie within "the White House and its grounds." Defendants admit that "[w]hile the White House and President's Park are an administrative unit within the National Park System, the EEOB is not part of that administrative unit." ECF No. 15 at 20. Additionally, Public Law 87-286 defines the White House and its grounds as the "eighteen and seven one-hundredths acres"—a parcel that does not include the EEOB. Pub. L. No. 87-286, 75 Stat. 586 (1961).

Defendants fail to meet the burden of proving the Section 107 exemption applies to the EEOB. Indeed, the burden of proving a statutory exemption rests on the party claiming it. *United States v. First City Nat'l Bank of Hou.*, 386 U.S. 361, 366 (1967) ("[t]hat is the general rule where one claims the benefits of an exception to the prohibition of a statute" (citing *Fed. Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948))). The Supreme Court has consistently applied this principle: the burden of proving an exception to a broadly applicable statutory prohibition rests with the party invoking it, not the party seeking the statute's protection. *See Nat'l Lab. Rels. Bd. v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001) (placing onus on party claiming supervisory exception to federal act's general employee protections). This principle applies with full force under NHPA: when a party claims that a statutory exception removes an undertaking from NHPA's requirements, that party bears the burden of establishing every element of the exception. *See Morton Salt*, 334 U.S. at 44–45 (articulating the general rule that the party invoking a statutory exception bears the burden of proving it). After *Loper Bright*, no judicial deference insulates that claim from this Court's independent review. Defendants have not carried that burden here.

The only judicial decision to define "White House and its grounds" limited the term to the roughly eighteen-acre NPS-administered parcel. *See Jabr*, 2019 WL 13110682 at *19. In *Jabr*, the court interpreted a criminal statute's reference to the "restricted area of the White House or its grounds" and concluded that the Treasury Building fell outside the definition of that phrase. The

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

underlying court decision found that the term "White House grounds" refers to an eighteen-acre area—as originally defined in the very statute that designated authority to NPS to administer the White House and its grounds—that does not include the EEOB. *Id.* at \*19 n.9. The court specified, "In that statute, Congress provided that the 'White House' was comprised of 'eighteen and seven one-hundredths acres.'… It would follow that the 'White House or its grounds' in Section 1752 refers to the same contained eighteen-acre area." *Id.* at \*19 (citing Act Concerning the White House and Providing for the Care and Preservation of its Historic and Artistic Contents, Pub. L. No. 87-287, 75 Stat. 586 (1961)). The EEOB flanks the White House on the west and stands in a parallel relationship to the mansion. Because the Treasury Building falls outside the eighteen-acre definition, and because the EEOB stands in the same geographic relationship to the White House as the Treasury, the same conclusion follows: the EEOB is not part of "the White House and its grounds" within the meaning of Section 107. As the court noted: "Where Congress uses the same term in the same way in two statutes with closely related goals, basic canons of statutory construction suggest a presumption that Congress intended the term to have the same meaning in both contexts." *Jabr*, 2019 WL 13110682 at \*18–19 (quoting *New Hampshire v. Ramsey*, 366 F.3d 1, 26 (1st Cir. 2004)).

Furthermore, while Congress expressly extended the exemption for the Capitol to include "its related buildings," it did not do so for the White House. When Congress includes particular language in one part of a statute and omits it in another, that omission is presumed intentional. *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)). The absence of "related buildings" language in the White House exemption thus cuts against reading Section 107 to include the EEOB.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page 37**

Agency practice confirms this statutory construction. NPS mapping and documentation distinguish the White House and its exempt grounds from the EEOB and Treasury. This Court may take judicial notice of these agency records, and Courts have long recognized official government maps and other agency records as proper subjects of judicial notice. *See Gov't of Canal Zone v. Burjan*, 596 F.2d 690, 693–94 (5th Cir. 1979) (taking judicial notice of official government boundary maps under Rule 201); *United States v. Lesh*, 107 F.4th 1239, 1243–44 (10th Cir. 2024) (affirming judicial notice of publicly available federal land-use maps to establish designations). Defendants themselves have relied on the same category of agency documents in support of their Motion. *See* Fed. R. Evid. 201(b); ECF No. 38-1 at 19, 44. A 2022 NPS amendment to the Lafayette Square NHLD boundary explicitly includes the EEOB and Treasury within the district while excluding the White House and White House grounds, "because they are legally exempt from listing…pursuant to Section 107." ECF No. 16-21 at 6. The EEOB Historic Condition Report likewise assumes that GSA actions affecting the building would undergo Section 106 review. ECF No. 16-18 at 49.

Defendants primarily rely on a 1994 Programmatic Agreement ("PA") to expand the Section 107 exemption. The 1994 PA, executed between ACHP, GSA, and the DC SHPO, is a contract implementing Section 106, not an Act of Congress. To the extent it suggests the EEOB is part of "the White House grounds," that reading conflicts with statutory text, judicial construction, and subsequent agency practice. *See* ECF No. 16-16 ¶¶ 4–6. Congress delegated regulatory authority to ACHP solely to interpret Section 106 of NHPA. 54 U.S.C. § 304108(a). Congress has not delegated authority to GSA or the DC SHPO to interpret NHPA or Section 107. All other NHPA provisions, including Section 107, are subject to the interpretive jurisdiction of the Secretary of

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 38**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

the Interior and the Director of NPS, not ACHP,[17] and neither the Secretary nor the Director of NPS are parties to the 1994 PA. In short, none of the parties to the 1994 PA have authority from Congress to interpret the application of Section 107's exemption.

The subsequent agency documents that Defendants cite conflate the terms "White House complex" and "White House and its grounds." ECF No. 38-1 at 44 n. 14, 15. Both the 2008 NCPC decision and 2013 submission by GSA to NCPC describe the EEOB as part of "the White House Complex." *Id.* This conflation of terms demonstrates that the agencies have not applied the statutory text with the precision necessary to warrant judicial reliance. Defendants' evidence, consisting of two projects, is unpersuasive. Neither project, nor the 1994 PA itself, involved painting the entire exterior of an NHL. Defendants have not carried their burden of showing that the Section 107 exemption applies here.

If the text of Section 107 is ambiguous as applied to the EEOB, then it is a question of statutory interpretation that this Court must resolve. Historical non-compliance does not establish legal correctness. The Supreme Court's recent decision in *Loper Bright* confirms that courts bear primary responsibility for resolving statutory ambiguity, completing "the basic judicial task of 'say[ing] what the law is.'" 603 U.S. at 410 (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). Courts need not "mechanically afford *binding* deference to agency interpretations." *Loper Bright*, 603 U.S. at 399 (emphasis in original). While a court may "respect" an Executive Branch interpretation; such an interpretation should only inform the court's analysis. *Id*. at 386. The D.C. Circuit's decision in *Jabr* confirms that the meaning of the "White House and its grounds" is a

---

[17] Although NHPA does authorize ACHP to issue exemptions, 54 U.S.C. § 304108(c), that process was not invoked or followed in this case. *See* 36 C.F.R. § 800.14(c).

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page 39**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

question of law and that it should be limited to its express terms. *Jabr*, 2019 WL 13110682 at \*19; *aff'd*, 4 F.4th at 102.

For all of the reasons set forth above, the EEOB does not fall within the narrow exemption provided by 54 U.S.C. § 307104 and Defendants have not carried their burden of proving otherwise. The EEOB is not part of the eighteen-acre "White House grounds," and any federal undertaking affecting the building is subject to NHPA's requirements.

## IV. THE PRESIDENT VIOLATES THE TAKE CARE CLAUSE BY DIRECTING FEDERAL OFFICIALS TO CARRY OUT THE PROJECT IN DEFIANCE OF STATUTES CONGRESS HAS DULY ENACTED.

The President has failed to take care that the laws be faithfully executed and has instead directed executive branch officials to act contrary to the law, substituting his personal aesthetic preferences for the congressional mandates that govern federal action affecting historic properties. Article II of the United States Constitution provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The laws include statutes enacted by Congress and duly promulgated regulations, including NEPA and NHPA. Through the MOU, the President has assumed sole authority to authorize the Project, commandeering powers that Congress granted to GSA. Rather than ensuring that NEPA and NHPA are faithfully executed, the President's directive and the actions of his subordinates taken to carry it out, including pre-approval planning beginning in August 2025 and the subsequent execution of the MOU, are designed to bypass and disregard those statutes' requirements.

Critically, the Take Care Clause does not permit the President to create, suspend, or repeal laws. The Constitution vests legislative power in Congress, not the Executive, and the President may not assume powers delegated by Congress to another agency. U.S. Const. art 1, § 8, cl. 18; *Youngstown*, 343 U.S. at 587–88. The D.C. Circuit, in *National Treasury Employees Union v.*

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 40**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

*Nixon*, held that the President does not have unilateral authority to override statutory mandates. 492 F.2d 587, 604–05 (D.C. Cir. 1974); *See also In re Aiken County,* 725 F.3d 255, 259 (D.D.C. 2013) (holding that the "President may not decline to follow a statutory mandate or prohibition simply because of policy objections"). And the Executive cannot cite the Take Care Clause for protection when acting outside of Executive powers. *Blassingame v. Trump*, 87 F.4th 1, 23–4 (D.C. Cir. 2023) (noting that conduct outside the scope of presidential authority does not receive constitutional protection). More specifically, in *Marin Audubon*, the D.C. Circuit held that the President cannot seize the law-making power of Congress or issue orders that bypass statutory limitations. 121 F.4th at 914.

Defendants jump from the premise that injunctions against a President are "extraordinary" to the conclusion that he must be dismissed. Defendants also contend that no implied constitutional cause of action exists, because Count VII is predicated on statutory violations. That argument misframes the claim. Plaintiffs do not need an implied constitutional cause of action: the APA already provides the cause of action against Agency Defendants, and Count VII identifies the constitutional violation that strips those agencies of any discretion to substitute the President's directive for their statutory obligations. The statute does not give the President authority to commandeer GSA's mandate; his directive to do so is the constitutional violation, and it renders the agencies' compliance with that directive independently unlawful under the APA. Plaintiffs do not bring APA claims against the President; those claims run only against GSA and NPS. Count VII instead alleges a narrow Take Care violation: the President may not direct subordinates to carry out the Project in defiance of NEPA and NHPA. The Take Care Clause imposes a duty to enforce these statutes, not a personal exemption from them. *See In re Aiken Cnty*., 725 F.3d at 259; *Kendall v. United States ex rel. Stoke*s, 37 U.S. 524, 613 (1838).

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 41**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

*Dalton v. Specter* and *Global Health Council v. Trump* likewise do not require dismissing Count VII. They hold that plaintiffs cannot manufacture a constitutional claim by relabeling a purely statutory dispute. 511 U.S. 462, 474 (1994); 153 F.4th 1, 16–17 (D.C. Cir. 2025). Plaintiffs have done the opposite: they pursue NEPA, NHPA, and APA claims against the agencies and use Count VII as a narrow backstop where the President personally initiates and drives a project in a way that threatens to override the agencies' statutory duties. Decisions noting that Take Care claims are "open to debate," do not hold them categorically non-justiciable. *See Citizens for Resp. & Ethics in D.C. v. Trump*, 302 F.Supp.3d 127, 130 (D.D.C. 2018). The case Defendants rely upon for that proposition, *Mississippi v. Johnson*, involved an attempt to enjoin the President from personally enforcing the entire Reconstruction legislative program, a direct intrusion on core executive and political discretion the Court properly declined. 71 U.S. 475 (1867). Plaintiffs seek nothing of the kind. They seek enforcement of discrete, congressionally imposed procedural duties assigned to federal agencies, which is precisely the relief *Kendall* and *In re Aiken County* authorize.

## V. OA'S UNENFORCEABLE VOLUNTARY PROMISES DO NOT SATISFY THE HEAVY BURDEN OF THE VOLUNTARY CESSATION DOCTRINE AND DO NOT MOOT THIS CASE.

Defendants misapply the voluntary cessation doctrine, arguing that OA's voluntary promise to conduct processes required by NEPA and NHPA moot the case. Plaintiffs challenge both the Agency Defendants' failure to initiate the NEPA and NHPA procedures *themselves* and the legality of the MOU that OA is using as its authority to plan, implement, and oversee the Project. Under *Laidlaw*, "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." 528 U.S. at 174. The case only becomes moot if it is "absolutely clear" that the challenged behavior cannot "reasonably be expected to recur," and the government bears a "heavy burden" to make that showing. *Id.* at 189.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - Page 42**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

OA's promises to complete NEPA and NHPA processes do not come close to meeting that burden. Defendants describe OA's commitment as an agreement to conduct Section 106 consultation and NEPA analysis. *See* ECF No. 27-2 ¶ 10. But that commitment leaves Section 110(f) entirely unaddressed. Section 110(f) imposes a substantive, heightened duty on federal agencies to minimize harm to NHLs, a duty that is independent of and not satisfied by Section 106 consultation. 54 U.S.C. § 306107. OA has made no promise to comply with Section 110(f), and Defendants do not contend otherwise. The voluntary cessation argument therefore fails on its face as to Plaintiffs' Section 110(f) claim. The Second Declaration of Heather Martin reveals that the commitments are not binding and provide no guarantees about OA's compliance with NEPA and NHPA. Plaintiffs note that OA is planning to submit an EA (ECF No. 38-2 ¶ 5)—but an EA is not sufficient. The Project is a major federal action that requires an EIS. Furthermore, if OA is permitted to carry out the Project oversight under the MOU, then no one will be able to challenge the adequacy of the processes or results of the review under NEPA and NHPA. OA's actions under the unlawful MOU constitute an ongoing statutory violation because OA does not have independent authority to manage the Project. Defendants invoke *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013), and *Public Citizen, Inc. v. FERC*, 92 F.4th 1124 (D.C. Cir. 2024), for the proposition that no effectual relief remains. But those cases address situations where the challenged conduct had genuinely stopped and the legal dispute had been resolved. Here, the MOU remains in effect, planning continues, and OA is proceeding without statutory authority—the alleged unlawful conduct is ongoing, not ceased.

There is still "effectual relief" for this Court to grant: declaring the MOU unlawful and setting it aside, ordering NEPA and NHPA compliance by the Agency Defendants, and preventing further Project implementation absent appropriate NEPA and NHPA review initiated by the correct

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 43**

federal agencies. Defendants suggest that the case is also unripe because the NEPA and NHPA processes are ongoing. ECF No. 38-1 at 20 n.4. That argument cuts against them. Plaintiffs do not challenge the adequacy of a completed review, they challenge the threshold failure to conduct any lawful review at all and the unlawful transfer of statutory authority through the MOU. Those are present, final, reviewable violations. The fact that Defendants have now belatedly set procedural wheels in motion under an instrument Plaintiffs contend is unlawful does not make the challenge unripe; it makes it more urgent. This case is not moot, nor is it premature. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287–88 (2000).

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss should be denied. Plaintiffs' claims are justiciable and Plaintiffs have standing. All named Defendants are properly included in the case.

The Plaintiffs request oral argument pursuant to Local Rule 7(f).

Respectfully submitted,

/s/ Gregory Alan Werkheiser
Bar No. VA210
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (703) 408-2002
Email: greg@culturalheritagepartners.com

/s/ Marion Forsyth Werkheiser
Bar No. 486465
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (202) 567-7594
Email: marion@culturalheritagepartners.com

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS  - Page 44**

/s/ Lydia Dexter
Bar No. OR0032
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (202) 567-7594
Email: lydia@culturalheritagepartners.com

/s/ Jessie Barrington
Bar No. VA224
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (202) 567-7594
Email: jessie@culturalheritagepartners.com

/s/ Caitlin McCurdy, Bar No. NH0004
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025,
Washington, DC 20006
Tel: (202) 567-7594
Email: caitlin@culturalheritagepartners.com

COUNSEL FOR PLAINTIFFS

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS  - Page 45**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served on

Defendants via CM/ECF electronic notice.


/s/ *Gregory Alan Werkheiser*____
*GREGORY ALAN WERKHEISER*
Attorney for Plaintiffs


**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS  - Page 46**

Cultural Heritage Partners, PLLC
1717 Pennsylvania Avenue NW,
Suite 1025
Washington, DC 20006
Office: 202-567-7594