UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CULTURAL HERITAGE PARTNERS,
PLLC, *et al.*,

     Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

     Defendants.

Case No. 1:25-cv-03969-DLF

**DEFENDANTS' REPLY MEMORANDUM
IN SUPPORT OF THEIR MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 2

    I.     Plaintiffs Lack Standing to Bring Their Claims. ...................................................... 2

    II.    Plaintiffs' Take Care Clause Claim is a Statutory Claim in Disguise. ................... 9

    III.   OA proceeding with its voluntary commitment to undertake the NHPA and NEPA processes provides Plaintiffs with the relief they seek and moots their claims.................................................................................................................. 11

    IV.   If the Court Finds OA's Voluntary Compliance with the NHPA Is Insufficient, It Should Find That the EEOB Is Exempt from the NHPA Under Section 107.................................................................................................... 14

    V.    Plaintiffs Have No Viable Claims Related to the MOU Executed by OA and GSA.......................................................................................................................... 15

         A.    The MOU did not delegate any authority. ................................................. 16

         B.    The MOU is Not a Final Agency Action. .................................................. 18

         C.    Because the MOU is not final agency action, the NHPA and NEPA processes were not required before its execution. ..................................... 21

    VI.   Plaintiffs have not pleaded an equitable *ultra vires* claim.................................... 23

CONCLUSION.................................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Gov't Emp., AFL-CIO v. Carmen*,
669 F.2d 815 (D.C. Cir. 1981) .................................................................................... 11

*Am. Forest Res. Council v. Hall*,
533 F. Supp. 2d 84 (D.D.C. 2008) ............................................................................... 21

*Am. Whitewater v. FERC*,
125 F.4th 1139 (D.C. Cir. 2025) .................................................................................. 13

*Anacostia Watershed Soc'y v. Babbitt*,
871 F. Supp. 475 (D.D.C. 1994) ............................................................................. 18, 19

*Arizona v. Mayorkas*,
600 F. Supp. 3d 994 (D. Ariz. 2022) ........................................................................... 10

*Bennett v. Spear*,
520 U.S. 154 (1997) ..................................................................................................... 20

*Centro de Trabajadores Unidos v. Bessent*,
("Centro"), 167 F.4th 1218 (D.C. Cir. 2026) .............................................................. 19

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ..................................................................................... 23

*Ciba-Geigy Corp. v. United States Environmental Protection Agency*,
801 F.2d 430 (D.C. Cir. 1986) ..................................................................................... 20

*City News & Novelty, Inc. v. City of Waukesha*,
531 U.S. 278 (2001) ..................................................................................................... 13

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
452 F.3d 798 (D.C. Cir. 2006) ..................................................................................... 19

*Dalton v. Specter*,
511 U.S. 462 (1994) ....................................................................................................... 9

*Envt'l Def. Fund v. FERC*,
("EDF"), 2 F.4th 953 (D.C. Cir. 2021) ........................................................... 2, 4, 5, 6

*Fed. Commc'ns Comm'n v. Consumers' Rsch.*,
606 U.S. 656 (2025) ................................................................................................. 17, 18

*Food & Drug Amin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ..................................................................................................... 6, 7

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ....................................................................................... 6

*Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ..................................................................................................... 13

*Glob. Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) ............................................................................................... 9

*Lee v. Thornburgh*,
   877 F.2d 1053 (D.C. Cir. 1989) ........................................................................................ 13

*Leedom v. Kyne*,
   358 U.S. 184 (1958) .......................................................................................................... 23

*Lujan v. Defs.' of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................................ 3, 6

*Mississippi v. Johnson*,
   71 U.S. 475 (1866) ......................................................................................................... 9, 10

*Myers v. United States*,
   272 U.S. 52 (1926) ............................................................................................................ 11

*Nat'l Fed'n of Fed. Emp., Loc. 1622 v. Brown*,
   645 F.2d 1017 (D.C. Cir. 1981) ........................................................................................ 11

*Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*,
   No. CV 25-4 316 (RJL), 2026 WL 533420 (D.D.C. Feb. 26, 2026) ................................... 23

*Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*,
   No. CV 25-4316 (RJL), 2026 WL 877779 (D.D.C. Mar. 31, 2026) .................................. 23

*Nat'l Tr. for Historic Pres. v. Blanck*,
   203 F.3d 53 (D.C. Cir. 1999) ............................................................................................ 14

*Nat'l Tr. for Historic Pres. v. Blanck*,
   938 F. Supp. 908 (D.D.C. 1996) ....................................................................................... 14

*Natural Resources Defense Council v. Wheeler*,
   ("NRDC"), 955 F.3d 68 (D.C. Cir. 2020) .......................................................................... 22

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ............................................................................................................ 14

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. 665 (2025) ..................................................................................................... 23, 24

*Pharm. Rsch. & Mfrs. Of Am. v. Dep't of Health & Hum. Servs.*,
   656 F. Supp. 3d 137 (D.D.C. 2023) .................................................................................... 7

*Pub. Citizen v. Off. of U.S. Trade Representatives*,
   970 F.2d 916 (D.C. Cir. 1992) ..................................................................................... 12, 21

*Pub. Citizen, Inc. v. FERC,*
   *("Pub*lic Citizen"), 92 F.4th 1124 (D.C. Cir. 2024) .......................................................... 13

*Rhea Lana, Inc. v. Department of Labor*,
   824 F.3d 1023 (D.C. Cir. 2016) ........................................................................................ 21

iii

*Serv. Emps. Int'l Union Loc. 32BJ v. Diversified Servs. Grp., Inc.*,
  958 F. Supp. 2d 166 (D.D.C. 2013) ....................................................................... 19

*Sherley v. Sebelius*,
  689 F.3d 776 (D.C. Cir. 2012) ............................................................................... 11

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ............................................................................................. 4, 6

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ......................................................................................... 3, 4, 6

*Tunica-Biloxi Tribe of La. v. United States*,
  577 F. Supp. 2d 382 (D.D.C. 2008) ....................................................................... 23

*United States Army Corps of Engineers v. Hawkes Co.*,
  578 U.S. 590 (2016) ............................................................................................... 20

*United States v. Jabr*,
  No. CR 18-0105 (PLF), 2019 WL 13110682 (D.D.C. May 16, 2019) .................... 15

*Washington v. Trump*,
  302 F. Supp. 127 (D.D.C. 2018) .............................................................................. 9

**Statutes**

18 U.S.C. § 1752(a)(1) ................................................................................................. 15

40 U.S.C. § 121(d)(1) .................................................................................................. 17

54 U.S.C. § 307104 ................................................................................................ 14, 15

**Regulations**

36 C.F.R. § 800.1(c) .................................................................................................... 12

**INTRODUCTION**

Defendants are voluntarily undergoing the very procedural processes that Plaintiffs seek in their Amended Complaint.[1] That should have ended this suit, but Plaintiffs press ahead, asking the Court to police the United States' compliance with those statutes and issue an advisory opinion ordering Defendants to do what they are already doing. Dkt. No 34, Amended Compl. Plaintiffs ask that the Court enjoin the President from proceeding with a presidential project to clean, repoint, and paint the EEOB ("the Project") until the NHPA and NEPA processes have been completed. Yet the NHPA and NEPA processes are already underway, Dkt. No. 38-2 ¶¶ 5–13 ("2nd Martin Decl."), and OA has committed not to authorize or implement the Project until the completion of those processes, if at all, Dkt. No. 27-2 ¶¶ 10–12 (Jan. 29, 2026) ("1st Martin Decl."). Plaintiffs opine that because these administrative processes have begun, their alleged injuries are imminent—yet it is these processes that they seek to compel in their Amended Complaint. Dkt. No. 34, Prayer for Relief ¶¶ F–I. As to the NHPA and NEPA, nothing remains for the Court to redress.

The problems with Plaintiffs' claims do not end there. The declarations submitted with their opposition do not establish that any Plaintiff will suffer an actual or imminent injury. Even if Plaintiffs had established sufficient injury, the decisionmaker here is the President, against whom Plaintiffs do not have a legally redressable claim. Plaintiffs' presidential action is not reviewable under the Take Care Clause. Rather than address the mootness of their claims head on, Plaintiffs argue that the voluntary-cessation-exception to mootness applies—it does not. Plaintiffs do not have any viable claim related to the MOU between OA and GSA because, despite Plaintiffs' continued assertions to the contrary, the MOU delegated no authority to OA or GSA; the MOU is not

---

[1]    This brief uses abbreviations for defined terms as set out in the memorandum of points and authorities supporting Defendant's Motion to Dismiss. *See generally* Dkt. 38-1.

a final agency action; and the NHPA and NEPA processes were not required prerequisites to the MOU's execution. The equitable *ultra vires* claim Plaintiffs raise for the first time in their opposition brief comes too late: Plaintiffs forfeited that claim by failing to raise it in their Amended Complaint. This Court should dismiss Plaintiffs' Amended Complaint.

## ARGUMENT

### I.    Plaintiffs Lack Standing to Bring Their Claims.

Plaintiffs lack standing because they failed to plausibly allege injury in fact, their alleged harms are not traceable to either of the federal agency Defendants, and the Court cannot redress their purported injuries, either through injunctive or declaratory relief against the President. *See* Dkt. No. 38-1, Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss at 21–32 ("Defs.' Mem."). Plaintiffs' opposition repeats the allegations in their complaint and does nothing to overcome their lack of standing. *See* Dkt. No. 39, Pls.' Resp. in Opp. to Defs.' Mot. to Dismiss at 26–35 ("Pls.' Opp."). Plaintiffs rely on five previously filed declarations, Dkt. Nos. 7-3, 7-15, 7-16, 16-1, 16-2, and four supplemental declarations to show standing, Dkt. Nos. 39-1–39-4. These declarations cumulatively fail to establish an injury to establish standing.

***Individual Standing – The Werkheisers.*** Because the Werkheisers allege aesthetic injuries from potential painting of the EEOB, they must show that their particular "use[] and enjoy[ment] [of] the" property in question extends beyond "mere incidental viewership," and that they will have to alter their behavior in response to the challenged action. *Envt'l Def. Fund v. FERC* ("*EDF*"), 2 F.4th 953, 969–70 (D.C. Cir. 2021). Even if the EEOB were painted without the administrative processes Defendants have committed to fulfill, the Werkheisers would not suffer a concrete injury. The Werkheisers' successive declarations—each designed to clean up deficiencies in the prior ones—betray their lack of standing.

2

The Werkheisers claimed in their initial declarations that they use the area around the EEOB for "aesthetic, recreational, professional, and educational purposes," including by leading visits there and highlighting the EEOB "as an illustrative example of the success of historic preservation." Dkt. No. 7-15 ¶ 6 (Decl. of Gregory Alan Werkheiser) (Nov. 17, 2025); Dkt. No. 7-3 ¶¶ 5–6 (Decl. of Marion Forsyth Werkheiser) (Nov. 17, 2025). And they stated that they "intend to continue doing so." Dkt. No. 7-15 ¶ 6; Dkt. No. 7-3 ¶ 5. But the Werkheisers' vague "profession of an intent to" do what they have done before "is simply not enough." *Lujan v. Defs.' of Wildlife*, 504 U.S. 555, 564 (1992) (cleaned up). "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of . . . actual or imminent injury." *Id.* (quotation marks omitted); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("This vague desire to return is insufficient to satisfy the requirement of imminent injury."). The supplemental declarations from the Werkheisers have not cured this problem. Dkt. Nos. 16-1, 16-2, 39-3, 39-4.

The Werkheisers' second round of declarations were almost equally vague, and the "plans" they outlined are now in the past. Marion Werkheiser's first supplemental declaration stated that she has made "at least 146 trips to D.C." over "the last fifteen years" and that she has "several planned trips" to return in "early 2026 during which [she] will walk through Lafayette Square and visit the area around the EEOB." Dkt. No. 16-1 ¶¶ 3–4 (Supp. Decl. of Marion Forsyth Werkheiser) (Dec. 2, 2025). Gregory Werkheiser stated in his first supplemental declaration that he has planned trips to D.C. in "January, February, and March 2026 . . . during which [he] will walk through Lafayette Square, visit the area around the EEOB, and show it to family members, friends, or colleagues." Dkt. No. 16-2 (Supp. Decl. of Gregory Alan Werkheiser) (Dec. 2, 2025).

3

The Werkheisers' latest round of declarations fares no better. Now that "early 2026" has come and gone with no changes to the EEOB, the Werkheisers have each filed a second supplemental declaration with their opposition, stating in vague terms that they have "continued [their] frequent visits to Washington, D.C., and continued enjoyment of the EEOB and surrounding areas," and they have "additional" unspecified "trips to Washington, D.C., planned in the coming weeks and months during which [they] will again visit [the EEOB] and the area around the EEOB." Dkt. No. 39-4 ¶ 3 (Decl. of Marion Werkheiser in Supp. of Pls.' Opp.) (Mar. 27, 2026); Dkt. No. 39-3 ¶ 3 (Decl. of Gregory Alan Werkheiser in Supp. of Pls.' Opp.) (Mar. 27, 2026). As with their previous declarations, such a "vague desire to return" is insufficient for standing. *Summers*, 555 U.S. at 496.

At most, the Werkheisers' latest declarations establish that they hope to return to D.C. soon and that they may see the EEOB during at least one of these trips. But even if they see the EEOB in the upcoming months, they will not suffer any injury because the building will not have been painted until after the NHPA and NEPA processes have been completed. 1st Martin Decl. ¶¶ 10–12; *see also* 2nd Martin Decl. ¶ 8 (indicating the NHPA process is scheduled to conclude no earlier than July 9, 2026). Moreover, the Werkheisers' supplemental declarations do not identify a "specific and concrete plan" to lead visits to the EEOB, *Summers*, 555 U.S. at 495, much less explain how any hypothetical painting of the EEOB would affect those visits, *see EDF*, 2 F.4th at 969 (finding no injury because the plaintiff failed to explain why "her planned uses of the land have been foreclosed by the construction"); *see also Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (holding that environmental group lacked standing because it failed to show that its members "use" the affected area in a "way that would be significantly affected by the proposed actions of the respondents"). In short, painting the EEOB would not require the Werkheisers to "alter[]

4

[their] behavior" in any way, such as by preventing them from visiting the area or educating others on historical preservation. *EDF*, 2 F.4th at 970.

Outside of their alleged aesthetic injuries, the Werkheisers focus on additional alleged professional injuries. Pls.' Opp. at 28 (citing Dkt. No 16-1 ¶ 6 and Dkt. No. 16-2 ¶ 3). Specifically, they claim they will be injured professionally because they "are cultural heritage attorneys whose professional work depends on the faithful application of NEPA and NHPA to federal undertakings involving historic properties" and the Project's "unlawful circumvention" of the NHPA and NEPA processes "is a direct interference with their professional practice." *Id.* This vague and conclusory assertion for standing is astonishing. If taken at face value, because the Werkheisers have worked on NHPA cases, they would personally have standing in any NHPA dispute, anywhere in the country. This is not—and cannot be—the rule for standing. Further, any interest they may have in the application of NEPA and NHPA is already vindicated, because those processes are already underway. 2nd Martin Decl. ¶¶ 5–13. The Werkheisers' fallback argument is that they have no obligation to show that they use the EEOB in a way that is unique from the general public. Pls.' Opp. at 28. That is simply untrue. *EDF*, 2 F.4th at 969–70 (holding that the "alleged aesthetic injuries reflect nothing more than generalized grievances, which cannot support standing"). The Werkheisers have not sufficiently demonstrated that they have standing to bring their claims.

***Associational Standing – DCPL.*** Plaintiffs address the Werkheisers' and DCPL's standing together in their opposition, highlighting that their alleged bases for standing are nearly identical. Pls.' Opp. at 26–29. Much for the same reasons that the Werkheisers have failed to demonstrate individual standing, DCPL has failed to establish associational standing. Plaintiffs rely on a past declaration from DCPL's Executive Director, Dkt. No. 7-1; a supplemental declaration from DCPL's Executive Director, Dkt. No. 39-1; and a newly obtained declaration from a DCPL

5

member, Dkt. No. 39-2. Outside of the fact that DCPL's Executive Director can identify with more specificity her plans for future visits to or around the EEOB— "at least six times in the next six months, including additional member tours DCPL has scheduled for May 4, 2026, and June 1, 2026," Dkt. No. 39-1 ¶ 16—the declarations do not otherwise provide more detail than the Werkheisers' declarations. And even considering DCPL's more specific plans, the EEOB will not have been painted prior to DCPL's planned member tours. 2nd Martin Decl. ¶ 8 (indicating the NHPA process is scheduled to conclude no earlier than July 9, 2026). DCPL's allegations fall far short of providing the information needed to establish imminent injury, *see Lujan*, 504 U.S. at 564; *Summers*, 555 U.S. at 495–96, and DCPL's associational injury is also too speculative for the same reasons given above in the analysis of the Werkheisers' claims of individual standing. Simply put, DCPL's Executive Director and its member have not shown how the proposed painting will significantly affect their stated interests, thereby defeating the claim to associational standing. *EDF*, 2 F.4th at 969; *Sierra Club*, 405 U.S. at 735.

***Organizational Standing – DCPL and CHP***. CHP relies on organizational standing and now—for the first time—DCPL claims it does as well. Pls.' Opp. at 31. Rather than add anything new in support of their organizational standing arguments, Plaintiffs argue that both CHP and DCPL have met both prongs of the organizational standing test with the information provided in the Amended Complaint and relevant declarations. *See id.* at 31–33. As Defendants argued in their motion, Defs.' Mem. at 17–19, a diversion of resources to education or advocacy is simply not enough to demonstrate organizational standing.[2] *Food & Drug Amin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C.

---

[2]    DCPL additionally claims that it was unable to conduct a walking tour, however, its reasoning for being unable to do so was "construction around President's Park." Pls.' Opp. at 33. But that construction is unrelated to the Project.

6

Cir. 2015). DCPL and CHP "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Hippocratic Med.*, 602 U.S. at 394.

*Imminence.* Plaintiffs' claimed injuries gloss over the fact that the NHPA and NEPA processes they seek to compel are already occurring. And the outcome of those processes is unknown. The President may decide to paint the EEOB, or he may not. Any potential improvements to the EEOB are not yet "certainly impending." *Pharm. Rsch. & Mfrs. Of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 150–51 (D.D.C. 2023). OA committed that it will not authorize or take any action to implement the Project unless and until two conditions are met: (1) the NHPA and NEPA processes have been completed, and (2) the President directs it to paint the EEOB. 1st Martin Decl. ¶¶ 11–12. Neither condition has been met. Given that no final decision has been made to paint the EEOB, the Werkheisers' alleged aesthetic and professional injuries thus remain too speculative to establish standing.

Recognizing this defect in their case, Plaintiffs seize on Defendants' NHPA and NEPA compliance to prove that the decision to paint the EEOB is a foregone conclusion. Even though Plaintiffs ask this Court to order Defendants to comply with NHPA and NHPA before deciding whether to paint the EEOB, *see* Am. Compl., Prayer for Relief ¶¶ F–I, they now claim that Defendants' initiation of voluntary compliance with those processes makes their alleged injuries "imminent," *see* Pls.' Opp. at 29–30. That is, Plaintiffs argue that that elements of the project cannot be "speculative," because it is operating on a "defined schedule," *id.* at 30, and they "need not wait for the sword to fall before seeking relief," *id.* at 31. But compliance with the NHPA and NEPA processes, which are laid out in the Second Martin Declaration, does not dictate the President's decision whether to paint the EEOB; it informs that decision. Am. Compl., Prayer for Relief ¶¶ F–

I. And if Plaintiffs are right that Defendants' voluntary compliance with NEPA and the NHPA shows that their injuries are "imminent," *see* Pls.' Opp. at 29–30, they are really saying that the relief they seek, *see* Am. Compl., Prayer for Relief ¶¶ F–I, will not redress their injuries but will instead *cause* them. This makes clear that Plaintiffs' goal is not compliance with NEPA and the NHPA, but instead, stopping the Project itself. But NEPA and the NHPA are procedural statutes; if Defendants undertake the required processes, as they are doing here, there can be no injury to Plaintiffs.

*Causation.* Plaintiffs' alleged injuries are not traceable to the agency defendants. *See* Defs.' Mem. at 19–20. Contrary to Plaintiffs' claims, GSA has not delegated any authority to OA, *see infra* Arg. § V.A., nor did it ever reach a commitment of resources such that NHPA or NEPA would have been triggered, *see infra* Arg. § V.B.–C. As to NPS, Plaintiffs continue to contend that they may pursue their claims against NPS because the EEOB is a National Historic Landmark and sits within a National Historic Landmark District ("NHLD"). Pls.' Opp. at 34–35. This is simply not true. *See* Defs.' Mem. at 19–20. Such an unprecedented claim would allow any litigant to assert a claim against NPS in any lawsuit involving an alleged adverse effect to any of the over 2,600 designated NHLs nationwide, a result plainly not supported by the NHPA or any of its implementing regulations.

*Redressability.* The President is the decisionmaker for the Project. The lack of a legally redressable claim against the President is fatal to Plaintiffs' standing. *See* Defs.' Mem. at 21–22. Plaintiffs do not argue otherwise. *See generally* Pls.' Opp. at 33–35. The Court should dismiss all Plaintiffs' claims for lack of standing.

## II.  Plaintiffs' Take Care Clause Claim is a Statutory Claim in Disguise.

Courts have uniformly "rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review." *Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025). Plaintiffs do not dispute this. *See* Pls.' Opp. at 42. Rather, Plaintiffs contend that they have only used the Take Care Clause as a "narrow backstop where the President personally initiates and drives a project in a way that threatens to override the agencies' statutory duties." *Id.* And here, Plaintiffs allege that the President has "commandeer[ed]" authority Congress delegated to GSA and has directed OA to "carry out the Project in defiance of NEPA and NHPA." *Id.* at 41. Stripped down, Plaintiffs argue that the President has taken actions that violate NEPA and NHPA, and that the Take Care Clause merely serves as a mechanism to enforce the President's duty to enforce those laws. *See id.* at 41–42. Yet Plaintiffs fail to grapple with *Dalton* or *Global Health Council*—which both expressly reject attempts, like this, to treat allegations that the President exceeded his statutory authority as constitutional violations, *see* Defs.' Mem. at 32–33—and instead claim that the issue is "open to debate" and that such claims are not "categorically non-justiciable." Pls.' Opp. at 42 (quoting *Citizens for Resp. & Ethics in Washington v. Trump*, 302 F. Supp. 127, 130 (D.D.C. 2018)). This Court should reject Plaintiffs' thinly veiled attempt to disguise their statutory claim against the President as a constitutional one. *See Dalton v. Specter*, 511 U.S. 462, 472–74 (1994).

Nor have Plaintiffs shown a single example of a court assuming authority to review the President's "purely executive and political" duty "to see that the laws are faithfully executed." *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866); *see also* Pls.' Opp. at 40–42. This should be no surprise. Given the unique nature of the President's Take Care Clause authority, such an attempt by "the judicial department . . . to enforce the performance of such duties by the President might

9

be justly characterized, in the language of Chief Justice Marshall, as 'an absurd and excessive extravagance.'" *Johnson*, 71 U.S. at 499. Since *Johnson*, "no court has ever held that the Take Care Clause provides a mechanism to obtain affirmative relief against the President or other executive branch officials." *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1011 (D. Ariz. 2022). Plaintiffs provide no reason to start now.

Plaintiffs' so-called constitutional claim also rests on a false premise—that the President is "direct[ing] executive branch officials to act contrary to the law." Pls.' Opp. at 40. The President is not doing so, as demonstrated by OA's averment that it will not approve the Project unless the President directs it do so *and* not until after the NEPA and NHPA processes are complete. *See* 1st Martin Decl. ¶¶ 11–12; *see also* Defs.' Mem. at 9 n.3 (courts may consider documents that Plaintiffs' reference in their amended complaint on a motion to dismiss). Rather than address these commitments, Plaintiffs again air their disagreement with the President's aesthetic preferences. But this does not generate a constitutional – or statutory – violation. Nor does it create a procedural one. Neither NEPA nor the NHPA guarantee substantive outcomes. Because Plaintiffs have no cause of action against the President under the APA, nor have they pleaded a viable constitutional claim against the President, Claim VII and the President must both be dismissed.

In any event, Plaintiffs' suggestion that the President's direction of the Project is improper offends longstanding separation-of-powers principles. Plaintiff's argument—that the President is "substituting his personal aesthetic preferences for the congressional mandates that govern federal action affecting historic properties," Pls.' Opp. at 40—runs from the premise that any direction by the President to a federal entity is per se unlawful, regardless of whether that entity complies with its own statutory mandates. Whether GSA or OA handles the Project, "[t]he ordinary duties of officers prescribed by statute come under the general administrative control of the President by

virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act." *Myers v. United States*, 272 U.S. 52, 135 (1926). The President's authority goes beyond supervision: "Within the range of choice allowed by statute, the President may direct his subordinates' choices." *Nat'l Fed'n of Fed. Emp., Loc. 1622 v. Brown*, 645 F.2d 1017, 1022 (D.C. Cir. 1981). An agency cannot disregard the President's direction, as Plaintiffs suggest GSA should. As the D.C. Circuit has explained, an agency "may not simply disregard an Executive Order. To the contrary, as an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). And Congress need not explicitly task the President with guiding the agency or initiating executive branch activities. *See Am. Fed'n of Gov't Emp., AFL-CIO v. Carmen*, 669 F.2d 815, 823 (D.C. Cir. 1981) ("[E]ven in the absence of a clear statutory provision establishing a governing role for the President, we would not conclude that Congress, simply by assigning a function to an executive agency, thereby intended to exclude initiating action by the President.").

### III.   OA proceeding with its voluntary commitment to undertake the NHPA and NEPA processes provides Plaintiffs with the relief they seek and moots their claims.

OA has committed, in a sworn declaration filed with the Court, that it will "comply with any statutory and regulatory processes that might apply to the Project if it did not involve the EEOB and if OA were not managing it, to include the National Environmental Policy Act and the National Historic Preservation Act." Dkt. No. 27-2 ¶ 5. Those processes are underway. Defs.' Mem. at 11; 2nd Martin Decl. ¶¶ 5–13. As of the date of filing, OA has submitted potential plans for the Project to the National Capital Planning Commission ("NCPC") and the United States Commission of Fine Arts ("CFA") and has initiated the drafting of an environmental assessment and NHPA Section 106 analysis. 2nd Martin Decl. ¶¶ 5–13. This is all the relief that Plaintiffs seek

11

in their complaint, yet Plaintiffs continue to complain that "Defendants continuously fail to conduct legally mandated NEPA and NHPA review." Pls.' Opp. at 11. The Court is not bound to take Plaintiffs' factual allegations—that such processes will not be completed before the Project begins—as true when such allegations are patently untrue based on the sworn declarations before the Court.

Plaintiffs' arguments as to NEPA timing make little sense. It is black-letter administrative law that NEPA analysis must be complete only by the time the action is taken, *see, e.g., Pub. Citizen v. Off. of U.S. Trade Representatives*, 970 F.2d 916, 919 (D.C. Cir. 1992) (courts should not intervene in NEPA processes before the final action)—in this case, the painting of the EEOB's exterior. But it is undisputed that Defendants have not yet modified the EEOB's exterior and a NEPA analysis is underway. At this point, an order directing Defendants to comply with NEPA— while NEPA analysis is already underway—is a needless advisory opinion. To the extent Plaintiffs say the NEPA process commenced too late, that too is a challenge that may be brought against the final agency action it supports, not in the abstract here while the process is actively underway.

For the same reasons, Defendants' ongoing NHPA process moots Plaintiffs' claims.[3] As Plaintiffs themselves concede, the NHPA only requires that historic preservation analysis be completed "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 36 C.F.R. § 800.1(c); Pls.' Opp. at 24 (quoting same). Plaintiffs do not allege that any expenditure of funds has been approved, or that any license has been issued. The NHPA analysis is underway and any NHPA challenge is premature until the analysis is completed.

---

[3]    Defendants' view is still that Section 107 of the NHPA applies to the EEOB. *See* Defs.' Mem. at 33–36. But OA is voluntarily complying with the NHPA's requirements as if they applied to the EEOB, 1st Martin Decl. ¶¶ 11–12, so the Court need not resolve Section 107's applicability.

Plaintiffs' voluntary-cessation-exception argument misses the mark. GSA was not required to do NEPA or NHPA review, and OA is doing those reviews to inform the President's eventual decision-making, not to evade the Court's jurisdiction. This falls squarely within the framework set forth in *Pub. Citizen, Inc. v. FERC* ("*Public Citizen*"), 92 F.4th 1124, 1128 (D.C. Cir. 2024). In *Public Citizen*, the D.C. Circuit held that "[t]he heightened voluntary-cessation standard is grounded in concerns that a party may be manipulating the judicial process through the false pretense of singlehandedly ending a dispute." *Id.* (citation and internal quotation marks omitted). It "does not apply automatically whenever the prospect of mootness is raised by a party's voluntary conduct" and the Court should "declin[e] to apply the doctrine when the facts do not suggest any 'arguable manipulation of our jurisdiction.'" *Id.* (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 (2001)). Once the Defendants have completed their voluntary NEPA and NHPA compliance—the very relief Plaintiffs seek—there is no way the challenged behavior (alleged NHPA and NEPA violations as to the Project) can be "reasonably expected to recur." *See Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000). Thus, Plaintiffs' claims seeking to compel NEPA and NHPA compliance should be dismissed as moot.

Plaintiffs' sole particularized complaints—that an EA is being prepared rather than an EIS, and that the First Martin Declaration does not mention NHPA Section 110(f)—are premature. While Plaintiffs say that an EIS is required, they acknowledge in their complaint that an EA could be sufficient. Am. Compl. ¶ 114. Production of an EA is how an agency determines whether an EIS is required. *See, e.g.*, *Am. Whitewater v. FERC*, 125 F.4th 1139, 1147 (D.C. Cir. 2025) (noting that an EA is necessary to determine whether an EIS is required to comply with NEPA). Similarly, Section 110(f) operates through the Section 106 process, rather than independently. *See, e.g.*, *Lee v. Thornburgh*, 877 F.2d 1053, 1057 (D.C. Cir. 1989) (stating Section 110 is "read[] in conjunction

13

with Section 106); *Nat'l Tr. for Historic Pres. v. Blanck*, 938 F. Supp. 908, 922 (D.D.C. 1996), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999) (stating Section 110 does not replace Section 106 as the "heart and soul of the NHPA").

Anything further would amount to the Court superintending Defendants' legal compliance. But courts should not police compliance with statutory obligations because otherwise "it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66–67 (2004). The relief Plaintiffs seek—a general order compelling compliance with the NHPA and NEPA—is beyond the Court's power.

## IV.    If the Court Finds OA's Voluntary Compliance with the NHPA Is Insufficient, It Should Find That the EEOB Is Exempt from the NHPA Under Section 107.

As discussed above, OA has committed to voluntarily complying with the NHPA and the NHPA process is already underway. *See supra* Section III. It is therefore unnecessary for the Court to reach the issue of whether the EEOB is exempt from the NHPA under Section 107. Nonetheless, should the Court reach this issue, Defendants reiterate that the EEOB is on White House grounds, and it is therefore exempt under Section 107 of the NHPA from the obligation to consult under Section 106. *See* 54 U.S.C. § 307104; *see also* Defs.' Mem. at 33–36. Plaintiffs cannot cite a single instance where Section 106 of the NHPA has applied to the EEOB, yet they complain that Defendants' examples of the building being explicitly exempted are insufficient. The entity responsible for implementing the statute—the Advisory Council on Historic Preservation—determined that that EEOB does fall within the White House and its grounds and is therefore exempt. Dkt. No. 15-2 at 3.

Lacking any evidence that the EEOB—adjacent to the White House, and housing White House staff—is excluded from the White House grounds, Plaintiffs rely on an unpublished

14

decision in a criminal case involving a different statute (18 U.S.C. § 1752(a)(1)) and a different building (the Treasury Building). Pls.' Opp. at 36–37 (citing *United States v. Jabr*, No. CR 18-0105 (PLF), 2019 WL 13110682, at *1 (D.D.C. May 16, 2019)). But *Jabr* does not dictate a different result. *Jabr* involved the application of a criminal statute concerned with securing "the White House or its grounds" from unlawful disturbances—not historic preservation. The district court found that the meaning of "White House or its grounds" for the purpose of that criminal statute did not include the Treasury Building. *Id*. at *7. But the Treasury Building's relationship to the White House is entirely different from the EEOB's. Accessing the White House from the Treasury Building or other locations outside the White House grounds involves security requirements that do not apply when accessing the White House from the EEOB. *See* 1st Martin Decl. ¶¶ 4–6. And the Treasury Building serves primarily to provide office space to employees of the Treasury Department, not to staffers of the President.

As part of "the White House and its grounds," the EEOB is exempt from the NHPA under Section 107 of the statute. 54 U.S.C. § 307104.

## V.    Plaintiffs Have No Viable Claims Related to the MOU Executed by OA and GSA.

The MOU between OA and GSA does not effectuate a delegation nor is it a final agency action. Plaintiffs attempt to recast the MOU as a regulatory document that both binds GSA and OA and affects private parties, but Plaintiffs ignore the document's plain text. The MOU has not delegated anything. Instead, in the MOU, GSA and OA simply acknowledge their respective, independent statutory authorizations, and agree that, if the Project proceeds, OA will utilize its authority to oversee it. In attacking the MOU, Plaintiffs disregard that the MOU clause addressing possible delegations is in the conditional future tense.

15

### A.    The MOU did not delegate any authority.

Nothing in the MOU delegates any authority from GSA to OA. The MOU has two components: prefatory 'whereas' clauses, and three 'understanding' clauses reflecting the understanding of OA and GSA. The 'whereas' clauses define the Project, identify the relevant sources of statutory authority, and describe the relationship of OA and GSA with respect to the operational needs of the President and the EEOB. The 'understanding' clauses—which by their terms are not binding but instead reflect the understanding of the agencies—indicate that, should the President move forward with the Project, (1) it would be managed by OA; (2) OA would pay for the Project; and (3) "GSA *would* delegate any and all necessary authority for the Project to OA." Dkt. No. 27-2, Attach. A at 8 (emphasis added). Plaintiffs describe this as "actively transfer[ing] operational authority or [sic] the Project from GSA to OA." Pls.' Opp. at 12. It does not.

The MOU reflects OA and GSA's understanding that they each have *independent* statutory authority to proceed with the Project. Plaintiffs mistake GSA's authority to engage in the Project with a statutory requirement that *only* GSA can engage in the Project. No such requirement exists, and GSA has not delegated any authority to OA to engage in the Project. While the MOU contemplates a possible future delegation of authority from GSA, should there be a need for it, the MOU does not make any current delegation, nor does it commit to any specific instance in which it would actually delegate authority or say what authorities would be delegated. Several conditions precedent must be met before any judicially reviewable delegation could occur, including: (1) the President must direct that the Project will move forward and (2) GSA must determine that a delegation is necessary for OA to complete the Project. Only then could a delegation occur. But it is without question that no delegation has occurred.

16

Plaintiffs spill much ink on GSA's delegation authority at 40 U.S.C. § 121(d)(1). But any analysis today of whether GSA could delegate authority to OA in the future is patently unripe, because no delegation has occurred. The Court should not take Plaintiffs' invitation to issue an advisory opinion, particularly where it would plunge the Court into another constitutional thicket: whether an Article II agency, which derives its authority from the President, can somehow delegate that authority back to the President. As Justice Kavanaugh recently noted, "delegations to executive officers and agencies, in my view, are not analytically distinct for present purposes from delegations to the President because the President controls, supervises, and directs those executive officers and agencies. Delegations to executive officers and agencies are thus de facto delegations to the President." *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, n.1 (2025) (Kavanaugh, J., concurring) (citation omitted). To the extent GSA eventually executes any delegation to OA—which may or may not ever occur—Plaintiffs could file a new lawsuit. To review such a claim now, without any factual development of the hypothetical delegation's scope and justification, is beyond this Court's power.

Furthermore, Plaintiffs' assertion that Congress conditioned GSA's authority "on the approval of the Administrator of General Services," Pls.' Opp. at 17, misstates the statutory authorities, and does not render the Project a GSA project. Congress gave OA clear statutory authority to (1) "accept, hold, administer, utilize and sell gifts and bequests of property, both real and personal, and loans of personal property other than money" and to (2) "accept and utilize voluntary and uncompensated services for the purpose of aiding, benefitting, or facilitating the work of preservation, restoration, renovation, rehabilitation, or historic furnishing of the [EEOB] and the grounds thereof." 102 Stat. 2268-52, Sec. 590(a)(1)–(2). Separately, "any use or sale of property accepted pursuant to this section, and any use of proceeds from such sale, shall be subject to the

disapproval of the Administrator of General Services within 30 days after the Administrator receives notice of such use or sale." *Id.*, § 590(c). The only statutory *requirement* is thus that the Administrator be notified regarding certain uses, not that the Administrator act on the notice. The provision granting the Administrator disapproval authority is not universal to all uses of OA's independent authority. It is narrowly cabined to the "use or sale of property" and "any use of proceeds from such sale." *Id.* (emphasis added). Congress did not grant the Administrator disapproval authority over OA's authority to "accept and utilize voluntary and uncompensated services for the purpose of" modifying the EEOB, which could occur without any role for GSA. *Id.* (emphasis added).

### B.    The MOU is Not a Final Agency Action.

Because the MOU is written in the future tense and no delegation has yet occurred, Plaintiffs seek to rescue their claims by describing the MOU as final agency action. But the MOU is not final agency action. It is merely an internal policy statement from which no legal consequences flow.

Plaintiffs argue in response that any delegation purporting to transfer authority that cannot be conveyed has immediate legal consequences, regardless of when the underlying project proceeds. Pls.' Opp. at 13. But this only highlights Plaintiffs' flawed reasoning. The so-called delegation in the MOU is not unripe because it is unknown whether the Project will occur, it is unripe because the delegation has not occurred—indeed, whether or not the Project occurs, the delegation may never occur. The sole case Plaintiffs cite supports Defendants' position. *See id.* In *Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 478, 483 (D.D.C. 1994), NPS conveyed jurisdiction over Anacostia Park in the vicinity of Washington, D.C. to the District of Columbia ("DC"). While NPS and DC signed a 'memorandum of agreement' in 1978, *id.* at 478, the court found that the

18

transfer was complete and reviewable when NPS signed a Record of Decision and finalized a lease and transfer of jurisdiction plat fourteen years later, in 1992 and 1993. *Id.* at 480. The court found that NEPA obligations were triggered when the relevant action—the finalization of the Record of Decision and transfer of jurisdiction plat—occurred, not when a preliminary memorandum which contemplated that outcome was signed. *Id.* at 482.

Even if Plaintiffs' reading of *Anacostia* were correct, here, there is no serious dispute that there has been no transfer of jurisdiction: both OA and GSA have been given authority by Congress to modify the EEOB. Accordingly, *Centro de Trabajadores Unidos v. Bessent* ("*Centro*"), 167 F.4th 1218 (D.C. Cir. 2026) is directly on point. As Plaintiffs note, the MOU in *Centro* "restated and clarified duties that already existed by operation of statute, it created no new rights or obligations." Pls.' Opp. at 13 (citing *Centro*, 167 F.4th at 1236). The same is true here. The MOU between OA and GSA restates and clarifies existing roles under existing statutory authorizations. This MOU, like that in *Centro,* "is a nonbinding, nonfinal policy statement that is not reviewable under the APA," and Defendants are not arguing that OA "relies on the MOU to justify its actions."[4] *Id.* Instead, the MOU simply reflects OA and GSA's internal understanding of their respective existing authorities. An MOU which reflects an agency's views of what the law "allows it to do . . . does not change the character of the agency document from a policy statement to a binding rule." *Id.* (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808 (D.C. Cir. 2006)) (cleaned up).

---

[4]    That it is a non-binding understanding, rather than a contractual agreement, further underlines that the MOU is not a final agency action under *Centro*. The party asserting the existence of a contract has the burden of proof, which Plaintiffs plainly cannot carry. *See Serv. Emps. Int'l Union Loc. 32BJ v. Diversified Servs. Grp., Inc.*, 958 F. Supp. 2d 166, 172 (D.D.C. 2013). This MOU reflects only the parties' understanding of their statutory authorities in relation to the Project as of January 29, 2026. It can be modified or withdrawn from at any time by the Parties and does not commit them to any particular action. This shows that the MOU is not a final agency action.

Nor does Plaintiffs' citation to *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) rescue their claims. No rights or obligations have been determined by the MOU, and no legal consequences flow from it. Instead, the final action will occur when there is a commitment to undergo (or pass on) the Project. This is analogous to *Anacostia*, where the memorandum of agreement was not final agency action, and instead the Record of Decision and actual transfer of administrative jurisdiction occurred.

Plaintiffs' other cases are similarly not on point. In *Ciba-Geigy Corp. v. United States Environmental Protection Agency*, 801 F.2d 430, 436 (D.C. Cir. 1986), the court reviewed an Environmental Protection Agency ("EPA") letter to the plaintiff, a regulated entity, which stated EPA's position on whether such entities were entitled to a hearing before EPA compelled them to change their labeling practices. *Id.* Cases regarding government regulation of private entities simply do not map onto an intra-government MOU. Plaintiffs' suggestion that the "legal consequences" under *Bennett* are that they must sue OA rather than GSA is not the legal consequence *Bennett* is concerned with. Pls.' Opp. at 13. It is undisputed that none of the Plaintiffs are regulated by OA or GSA, and neither OA nor GSA "expects [Plaintiffs] to alter their primary conduct to conform" to the MOU, as EPA did in *Ciba-Geigy Corp*. *Id.*

Plaintiffs' comparison to *United States Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 598 (2016) fares no better. In *Hawkes*, the Supreme Court held that an approved Army Corps of Engineers 'jurisdictional determination' as to whether a property contains waters of the United States gives rise to "'direct and appreciable legal consequences,' thereby satisfying" the test in *Bennett.* 578 U.S. at 591. A jurisdictional determination is a government determination as to a private property owner's property, which can limit or create liability in civil litigation. *Id.* The

MOU does not regulate the property of Plaintiffs; it bears no direct and appreciable legal conse-

quences as to their property.

Finally, in *Rhea Lana, Inc. v. Department of Labor*, 824 F.3d 1023, 1025 (D.C. Cir. 2016),

the plaintiffs had received a letter from the Department of Labor informing them "that the company

was in violation of its wage-and-hour obligations, the letter rendered knowing any infraction in

the face of such notice, and made Rhea Lana susceptible to willfulness penalties that would not

otherwise apply." The D.C. Circuit found that legal consequences flow from the letter because it

would render them subject to enhanced penalties for 'willful' violations in the future. *Rhea Lana*,

824 F.3d at 1028–30. This is easily distinguishable from Plaintiffs' relationship to the intra-gov-

ernment MOU, which does not regulate them. Plaintiffs must show that that the legal consequences

run directly against them—or at least run outside of government. The MOU has no legal conse-

quences, so the MOU is not a final agency action.

### C.    Because the MOU is not final agency action, the NHPA and NEPA processes were not required before its execution.

Analyses under the NHPA and NEPA were not required before GSA executed the MOU,

because it is not final agency action. Because the NHPA and NEPA have no independent causes

of action, "final agency action is a prerequisite to a NEPA suit against a federal agency." *Am.

Forest Res. Council v. Hall*, 533 F. Supp. 2d 84, 90 (D.D.C. 2008). In arguing that NHPA and

NEPA analyses were required, Plaintiffs again rest on *Anacostia.* Pls.' Opp. at 19. But "[t]he cases

plaintiffs cite on the importance of early guidance from an EIS do not suggest that courts may

enforce NEPA before the statement is due; all involved review of final agency action." *Public

Citizen*, 970 F.2d at 920.

As described *supra*, Plaintiffs misstate the ruling in *Anacostia*. They describe the court's

ruling that NPS was "required to comply with NEPA before making its decision to transfer

21

jurisdiction" as a finding that NEPA should have been conducted before NPS and DC entered into their 1978 memorandum of agreement. Pls.' Opp. at 19–20. But the court in *Anacostia* made no such finding. Instead, it found that a NEPA analysis should have been conducted before NPS entered the 1992 Record of Decision and 1993 lease to DC. Certainly, a Record of Decision accompanied by an executed lease is a final agency action. But the agency was required to engage in analyses under the NHPA or NEPA only before *that* action, not before it entered into a memorandum of agreement describing a possible future transfer fourteen years before the actual transfer of jurisdiction. Similarly, here, the MOU executes no transfer of jurisdiction. It describes the existing independent jurisdictional authorities, and contemplates a future, conditional delegation of authority. Nor was there any final agency action before the entry of the MOU; GSA's preliminary investigative steps did not ripen into a project to be conducted by GSA, let alone any irrevocable commitment of resources. Defs.' Mem. at 38–40.

Similarly, Plaintiffs' reliance on *Natural Resources Defense Council v. Wheeler* ("*NRDC*"), 955 F.3d 68, 78 (D.C. Cir. 2020), Pls.' Opp. at 20, misses the mark. In *NRDC*, the EPA published a rule in the Federal Register ("2018 Rule") which stopped applying certain restrictions on hydrofluorocarbons in response to a court order. The D.C. Circuit found that EPA's indication that the 2018 Rule was interim and could eventually be replaced did not render the 2018 Rule non-final. *NRDC*, 955 F.3d at 78. This scenario bears little resemblance to the present case. GSA has not published a rule, let alone a rule that regulates nationally. Nor has GSA stated that it intends to reconsider a final action. Instead, GSA has taken no action at all, so there was no requirement for GSA to conduct the NHPA and NEPA processes before entering the MOU with OA.

22

## VI.    Plaintiffs have not pleaded an equitable *ultra vires* claim.

As Defendants noted in their Motion, Defs.' Mem. at 31, Plaintiffs did not plead an equitable *ultra vires* claim. Instead, they plead APA claims. Yet, in their opposition, Plaintiffs seemingly attempt to raise an equitable *ultra vires* claim. *See, e.g.*, Pls.' Opp. at 18 ("This Court is empowered to provide *equitable* relief for these *ultra vires* actions, as they are 'unauthorized by any law and . . . in violation of the rights of the individual.'") (emphasis added) (citations omitted).

This is a new claim not found in Plaintiffs' complaint. "The traditional practice of this Court has been to disregard 'claim[s] asserted for the first time in a memorandum of law' because those claims "[were] not made in the [plaintiff's] original complaint or advanced in a motion to amend." *Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 411 (D.D.C. 2008). To the extent Plaintiffs now seek to raise a standalone equitable *ultra vires* claim, they must seek leave of the Court to amend their complaint and clearly plead it. *See Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.* ("*NTHP*"), No. CV 25-4316 (RJL), 2026 WL 533420, at *10, __ F. Supp.3d __ (D.D.C. Feb. 26, 2026).[5]

It is particularly inappropriate for Plaintiffs to do so with an *ultra vires* claim, given that the Supreme Court "has strictly limited nonstatutory ultra vires review to the 'painstakingly delineated procedural boundaries of [*Leedom v. Kyne*, 358 U.S. 184 (1958)].'" *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (describing "demanding" standard for successful ultra vires claims).

---

[5]    Nor does the Court's opinion in *NTHP* help Plaintiffs' claim. In *NTHP*, the Court held that the plaintiffs were likely to succeed on the merits of their claim that certain identified executive action is *ultra vires* and contrary to statute. *NTHP*, 2026 WL 8777779, at *10–12. The United States has appealed the Court's finding. *NTHP*, No. 26-5101 (D.C. Cir.). Regardless, in NHTP, it is not disputed that the challenged action is underway. Here, unlike in *NTHP*, Plaintiffs ask the Court to assume the existence of a delegation before one has occurred and deem it *ultra vires*. For the reasons discussed above, an *ultra vires* claim is unavailable in these circumstances.

23

Simply gesturing in the direction of *ultra vires* caselaw, without even including such a claim in the Complaint, does not come near meeting that demanding standard. Regardless, Plaintiffs invocation of *ultra vires* review—the "Hail Mary pass . . . [that] rarely succeeds"—does not succeed here. *Nuclear Regulatory Comm'n*, 605 U.S. at 681. That claim is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *Id.* Here, even if Plaintiffs had properly pleaded an *ultra vires* claim, the claim attempts to circumvent the statutory limitations on judicial review—*viz.*, the requirement of waiting for final agency action. To state an *ultra vires* claim, a plaintiff must identify an *action* that is *ultra vires*. As described above, there has been no such final action, further foreclosing Plaintiffs' *ultra vires* claim.

## CONCLUSION

Plaintiffs cannot overcome the numerous threshold defects in their claims—a lack of standing, mootness, the absence of final agency action, and the impossibility of stating a redressable claim against the President. Even if they could overcome these threshold defects, Plaintiffs' claims fail on the merits. For the foregoing reasons, and the reasons articulated in Defendants' motion, the Court should dismiss this case.

\* \* \*

24

Dated: April 8, 2026

Respectfully submitted,

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General

Marissa Piropato
Deputy Chief, Natural Resources Section

*/s/ Mark Widerschein*
Mark Widerschein
Michelle Nkeng
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Mark.Widerschein@usdoj.gov
Michelle.Nkeng@usdoj.gov

*Counsel for Defendants*

25