**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CULTURAL HERITAGE PARTNERS, PLLC, et al.**, | Civil Action No. 1:25-cv-03969-DLF |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED HEARING** |
| **DONALD J. TRUMP, et al.**, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED HEARING**

## TABLE OF CONTENTS

*TABLE OF AUTHORITIES*..................................................................................................................*iii*

*INTRODUCTION*........................................................................................................................... *1*

*PROCEDURAL BACKGROUND*.................................................................................................. *6*

   **I.**   **Events While the Delegation Issue Has Been Pending**.............................................**8**

   **II.**   **Current Posture** .............................................................................................................**10**

*LEGAL BACKGROUND*............................................................................................................ *10*

   **I.**   **The National Historic Preservation Act**..................................................................**10**

   **II.**   **The National Environmental Policy Act** .................................................................**12**

   **III.**   **The General Services Administration**......................................................................**13**

   **IV.**   **The White House Office of Administration**.............................................................**14**

   **V.**   **The Administrative Procedure Act** .........................................................................**15**

   **VI.**   **Ultra Vires Actions** ....................................................................................................**15**

*FACTUAL BACKGROUND* ....................................................................................................... *16*

*LEGAL STANDARD*.................................................................................................................. *19*

*ARGUMENT*............................................................................................................................... *21*

   **I.**   **PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF EMERGENCY PRELIMINARY RELIEF.**...............................................................**21**

      A.   GSA's Improper Delegation Denies Plaintiffs' Procedural Rights under NHPA and NEPA....................22

      B.   Plaintiffs Will Suffer Irreparable Harm if OA Paints the EEOB. ................................................23

   **II.**   **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**.......................................**24**

      A.   Plaintiffs Have Standing to Seek a Temporary Restraining Order and Preliminary Injunction. .............24

      B.   GSA Unlawfully Delegated Authority to OA to Oversee and Implement the Project............................27

      C.   Even If GSA Could Lawfully Delegate Its Authority to OA, Which It Cannot, GSA Was Required to Complete NEPA and NHPA Review Before Executing the MOU ...........................................30

      D.   OA's Purported Authority is Ultra Vires...............................................................................31

      E.   The Project Is a Major Federal Action and a Federal Undertaking, and Defendant GSA Must Complete NEPA and NHPA Section 106 and Section 110(f) Review Before Any Further Project Action.............32

   **III.**   **THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR.**.................................**38**

   **IV.**   **THE PUBLIC INTEREST SUPPORTS THE REQUESTED RELIEF.**..........................**39**

      A.   Compliance with NEPA and NHPA Is Itself a Powerful Public Interest. ..............................................40

      B.   Preserving the Status Quo to Require GSA to follow NHPA and NEPA Is Strongly in the Public Interest. ....................................................................................................................41

      C.   Once Historic Fabric Is Damaged, It Cannot Be Restored. .....................................................42

   **V.**   **ANY SECURITY BOND SHOULD BE WAIVED.**..................................................................**42**

**VI.  PLAINTIFFS SEEK AN EXPEDITED HEARING.** ...................................................................43

*CONCLUSION*............................................................................................................................. *44*

## TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................................................20

*American School of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902)......................................................................................................33

*Amoco Production Co. v. Village of Gambell*,
480 U.S. 531 (1987).....................................................................................................22

\* *Anacostia Watershed Society v. Babbitt*,
871 F. Supp. 475 (D.D.C. 1994)..................................................................................32

*Argus Secure Tech., LLC*,
B-419422, B-419422.2, 2021 CPD ¶ 84 (Comp. Gen. Feb. 22, 2021).............................44

*Armstrong v. Bush*,
807 F. Supp. 816 (D.D.C. 1992)...................................................................................44

*Association of Data Processing Service Organizations, Inc. v. Camp*,
397 U.S. 150 (1970).....................................................................................................25

\* *Bennett v. Spear*,
520 U.S. 154 (1997)................................................................................................30, 31

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009)..................................................................................43

*Center for Biological Diversity v. U.S. Department of Interior*,
563 F.3d 466 (D.C. Cir. 2009)......................................................................................23

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022).................................................................................16, 20

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010)............................................................................................20

*Citizens Against Rails-to-Trails v. Surface Transportation Board*,
267 F.3d 1144 (D.C. Cir. 2001).....................................................................................13

\* *Citizens for Responsibility & Ethics in Washington v. Office of Administration*,
566 F.3d 219 (D.C. Cir. 2009).................................................................................14, 33

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)................................................................................................28

*Davis v. Pension Benefit Guaranty Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009)...........................................................................20

*DCH Regional Medical Center v. Azar*,
    925 F.3d 503 (D.C. Cir. 2019).............................................................................16

*Don't Tear It Down, Inc. v. General Services Administration*,
    401 F. Supp. 1194 (D.D.C. 1975)........................................................................36

*Environmental Defense Fund v. Corps of Engineers of U.S. Army*,
    331 F. Supp. 925 (D.D.C. 1971)..........................................................................44

*Equal Rights Center v. Post Properties, Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011)...........................................................................27

*Federal Education Association v. Trump*,
    No. 25-5303, 2025 U.S. App. LEXIS 25013 (D.C. Cir. Sept. 25, 2025)............16

*Federal Prescription Service v. American Pharmaceutical Association*,
    636 F.2d 755 (D.C. Cir. 1980).............................................................................44

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015).............................................................................27

*Fox Television Stations, Inc. v. FilmOn X LLC*,
    966 F. Supp. 2d 30 (D.D.C. 2013).......................................................................44

*Fund for Animals, Inc. v. Espy*,
    814 F. Supp. 142 (D.D.C. 1993)..........................................................................41

*Government of Canal Zone v. Burjan*,
    596 F.2d 690 (5th Cir. 1979)...............................................................................39

* *Halverson v. Slater*,
    129 F.3d 180 (D.C. Cir. 1997).............................................................................28

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982).............................................................................................27

* *League of Women Voters of the United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016).................................................................19, 40, 41, 43

*Leedom v. Kyne,*
    358 U.S. 184 (1958)................................................................16, 33

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024)........................................................................13

*LULAC v. Executive Office of the President,*
    780 F. Supp. 3d 135 (D.D.C. 2025)...............................................44

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)........................................................................25

*Marin Audubon Society v. Federal Aviation Administration,*
    121 F.4th 902 (D.C. Cir. 2024).......................................................43

*Marsh v. Oregon Natural Resources Council,*
    490 U.S. 360 (1989)........................................................................12

*Massachusetts v. Environmental Protection Agency,*
    549 U.S. 497 (2007)........................................................................25

*Media Matters for America v. Paxton,*
    138 F.4th 563 (D.C. Cir. 2025).......................................................40

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023) ..........................................................20

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)........................................................................21

*Muckleshoot Indian Tribe v. U.S. Forest Service,*
    177 F.3d 800 (9th Cir. 1999) ....................................................41, 42

*Munaf v. Geren,*
    553 U.S. 674 (2008)........................................................................21

*National Association of Postal Supervisors v. U.S. Postal Service,*
    26 F.4th 960 (D.C. Cir. 2022).........................................................15

*National Trust for Historic Preservation v. Blanck,*
    938 F. Supp. 908 (D.D.C. 1996).....................................................36

*National Trust for Historic Preservation v. National Park Service,*
    No. 1:25-cv-04316-RJL (D.D.C. Feb. 26, 2026)............................33

*National Wildlife Federation v. Burford*,
    835 F.2d 305 (D.C. Cir. 1987) ............................................................................43

*New Hampshire v. Ramsey*,
    366 F.3d 1 (1st Cir. 2004) ...................................................................................38

*Newsom v. Albemarle County School Board*,
    354 F.3d 249 (4th Cir. 2003) ..............................................................................20

*Ninilchik Traditional Council v. Towarak*,
    No. 3:15-cv-00205, 2016 U.S. Dist. LEXIS 51370 (D. Alaska Apr. 17, 2016) ................31

*Nuclear Regulatory Commission v. Texas*,
    605 U.S. 665 (2025) .......................................................................................15, 33

*Oglala Sioux Tribe v. U.S. Nuclear Regulatory Commission*,
    896 F.3d 520 (D.C. Cir. 2018) ............................................................................43

\* *Presidio Historical Association v. Presidio Trust*,
    811 F.3d 1154 (9th Cir. 2016) .......................................................................36, 37

*Qualls v. Rumsfeld*,
    357 F. Supp. 2d 274 (D.D.C. 2005) .....................................................................20

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)............................................................................................12

*Rushforth v. Council of Economic Advisers*,
    762 F.2d 1038 (D.C. Cir. 1985)...........................................................................33

*Russello v. United States*,
    464 U.S. 16 (1983)..............................................................................................38

*Ryan v. Department of Justice*,
    617 F.2d 781 (D.C. Cir. 1980).............................................................................33

*Save the Courthouse Committee v. Lynn*,
    408 F. Supp. 1323 (S.D.N.Y. 1975).....................................................................43

*Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission*,
    481 F.2d 1079 (D.C. Cir. 1973)...........................................................................13

*Seven County Infrastructure Coalition v. Eagle County*,
    605 U.S. 168 (2025)............................................................................................13

*Sierra Club v. Jewell*,
764 F.3d 1 (D.C. Cir. 2014) ................................................................................25

*Sierra Club v. Peterson*,
717 F.2d 1409 (D.C. Cir. 1983) ..........................................................................13

*Sierra Club v. U.S. Army Corps of Engineers*,
645 F.3d 978 (8th Cir. 2011) ..............................................................................24

*Sierra Club v. U.S. Department of Agriculture*,
777 F. Supp. 2d 44 (D.D.C. 2011) .....................................................................13

*Soucie v. David*,
448 F.2d 1067 (D.C. Cir. 1971) ..........................................................................14

\* *Southwest Airlines Co. v. U.S. Department of Transportation*,
832 F.3d 270 (D.C. Cir. 2016) ............................................................................30

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009) ......................................................................................23, 25

*United States v. Jabr*,
4 F.4th 97 (D.C. Cir. 2021) ...........................................................................11, 12

\* *United States v. Jabr*,
No. 18-0105 (PLF), 2019 WL 13110682 (D.D.C. May 16, 2019) ...........11, 12, 38

*United States v. Lesh*,
107 F.4th 1239 (10th Cir. 2024) .........................................................................39

*United States v. Wong Kim Bo*,
472 F.2d 720 (5th Cir. 1972) ..............................................................................38

*University of Texas v. Camenisch*,
451 U.S. 390 (1981) ............................................................................................45

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) .......................................................................40, 45

*Washington v. Reno*,
35 F.3d 1093 (6th Cir. 1994) ..............................................................................42

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ............................................................................................39

\* *Winter v. Natural Resources Defense Council, Inc.*,

555 U.S. 7 (2008)..................................................................................... *passim*

*Wisconsin Gas Co. v. Federal Energy Regulatory Commission*,
    758 F.2d 669 (D.C. Cir. 1985) (per curiam) ..................................................21, 22

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..................................................................................42

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 701–706

5 U.S.C. § 702........................................................................................15

5 U.S.C. § 704........................................................................................15

5 U.S.C. § 706(1) .................................................................................15, 32

5 U.S.C. § 706(2)(A)..................................................................................15

5 U.S.C. § 706(2)(C)..................................................................................15

5 U.S.C. § 706(2)(D).............................................................................15, 32

Title 28, Judiciary and Judicial Procedure

28 U.S.C. § 1746......................................................................................44

Title 40, Public Buildings, Property, and Works

40 U.S.C. § 102(4) ....................................................................................13

40 U.S.C. § 102(5) ....................................................................................13

40 U.S.C. § 121(d) ......................................................................................6

* 40 U.S.C. § 121(d)(1) ...........................................................................*passim*

40 U.S.C. § 3175........................................................................................6

40 U.S.C. § 3305........................................................................................6

National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h

* 42 U.S.C. § 4321....................................................................................................................12

* 42 U.S.C. § 4332....................................................................................................................12

* 42 U.S.C. § 4332(C) ....................................................................................................12, 13, 34

* 42 U.S.C. § 4336(b)(2) .........................................................................................................12

* 42 U.S.C. § 4336e(12) ....................................................................................................13, 34

National Historic Preservation Act, 54 U.S.C. §§ 300101–307108

* 54 U.S.C. § 300101................................................................................................................10

* 54 U.S.C. § 300320..........................................................................................................10, 11

* 54 U.S.C. § 306107..............................................................................................11, 36, 37, 42

* 54 U.S.C. § 306108......................................................................................10, 11, 13, 36

* 54 U.S.C. § 307104..............................................................................................11, 37, 39

**Public Laws**

Act Concerning the White House and Providing for the Care and Preservation of Its Historic and Artistic Contents,
Pub. L. No. 87-286, 75 Stat. 586 (1961).................................................................................37, 38

Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989,
* Pub. L. No. 100-461, § 590, 102 Stat. 2268 (1988).........................................................14, 33, 42

National Historic Preservation Act of 1966,
Pub. L. No. 89-665, as amended by Pub. L. No. 96-515 ...............................................................41

Reorganization Plan No. 18 of 1950,
§ 2, 64 Stat. 1270 .....................................................................................................................13

**Regulations**

36 C.F.R. § 800.2(a)(2) ......................................................................................................13

36 C.F.R. § 800.6 ..............................................................................................................37

36 C.F.R. § 800.10 ......................................................................................................36, 37

36 C.F.R. § 800.16(y) ..................................................................................................10, 11

**Rules**

* Fed. R. Civ. P. 65(b) .......................................................................................................20

Fed. R. Civ. P. 65(c) ...................................................................................................43, 44

**Executive Orders**

Exec. Order No. 12,028, 42 Fed. Reg. 62,895 (Dec. 12, 1977).......................................14

**Miscellaneous**

Alex Henderson, *Documents Reveal Trump's Epic Fight with Preservationists over Historic Building*, AlterNet (May 29, 2026).................................................................................................9

Chloe Veltman, *Trump Touts Newly Released Plans for D.C. Triumphal Arch*, NPR (Apr. 11, 2026) ...................................................................................................................................17

Darlene Superville, *Trump's Plan to Paint Eisenhower Building White Could Cost at Least $7.5M, White House Says*, PBS (May 7, 2026) ...............................................................17

Elizabeth Blair, *"Fool me once…" Lawyers Argue Kennedy Center Should Not Meet Same Fate as the East Wing*, NPR (Apr. 30, 2026)........................................................................17

Katie Hawkinson, *Trump's Arch Would Block Lincoln Memorial, Arlington Cemetery View*, NPR (June 4, 2026)..........................................................................................................17

Katie Hawkinson, *Trump's Beloved Victory Arch Would Be So Tall It Could Pose a Danger to Flights into the DC Area*, Independent (Feb. 10, 2026) ..................................................17

Michelle Stoddart et al., *Trump Says Steel to Be 'Fully Exposed' in Kennedy Center Rebuild but 'Not Ripping It Down'*, ABC News (Feb. 2, 2026) ........................................................17

Nat'l Capital Planning Comm'n, Commission Action: Eisenhower Executive Office Building Exterior Beautification Project, NCPC File No. 8777 (May 7, 2026) .......................................9, 18

Nat'l Capital Planning Comm'n, Open Session Commission Meeting Transcript (May 7, 2026) .9

*National Historic Landmarks Program*, Nat'l Park Serv. (Dec. 16, 2024) ...................................11

Rachel Treisman, *The Many Ways Trump Wants to Change D.C., from Buildings to Statues to Parks*, NPR (May 4, 2026) .........................................................................................................16

U.S. Comm'n of Fine Arts, Letter re: Eisenhower Executive Office Building Exterior Improvements, CFA Project No. 16/APR/26-3 (Apr. 23, 2026) .....................................................18

*What is the National Register of Historic Places?*, Nat'l Park Serv. (Sept. 15, 2025)..................11

*Whistleblower Claims Kennedy Center "Rushed" Renovations to Please Trump*, Al Jazeera (July 11, 2026) ...........................................................................................................................17

**INTRODUCTION**

Plaintiffs Cultural Heritage Partners, PLLC ("CHP"), DC Preservation League ("DCPL"), Marion Forsyth Werkheiser, and Gregory Alan Werkheiser (collectively, "Plaintiffs") renew their Motion for a Temporary Restraining Order ("TRO"), Preliminary Injunction ("PI"), and Expedited Hearing against Defendant General Services Administration ("GSA") precisely because the circumstances the Court anticipated have now come to pass.

When Plaintiffs voluntarily withdrew[1] their first Motion for TRO, Preliminary Injunction, and Expedited Hearing[2] on December 12, 2025, they did so after GSA committed "to not issue solicitations for a contract, execute a contract, select a contractor, or draft design or construction drawings related to any power washing/cleaning, painting, and/or repointing of the exterior of the Eisenhower Executive Office Building prior to March 1, 2026." ECF No. 21-1 ¶ 16.

At the February 6, 2026, status conference held after GSA purported to delegate its authority to the Office of Administration ("OA"), the Court accepted the government's "word that the [OA] is not going to take any action until the processes under the National Historic Preservation Act and the National Environmental Policy Act have been completed," while making equally clear that if Plaintiffs later determined "that actions are happening" demonstrating that OA was moving forward with painting, cleaning, and repointing ("the Project") the Eisenhower Executive Office Building ("EEOB") without complying with those statutes, Plaintiffs should return to seek emergency relief. Ex. 1, Status Conf. Tr. at 9:5-12, Feb. 6, 2026.

That is exactly what has happened.

While the Court has been considering the threshold legal question of whether GSA may lawfully delegate its statutory responsibilities to OA, OA has proceeded as though that question

---

[1] *See* ECF No. 24.
[2] *See* ECF No. 7.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**    1

has already been answered in its favor. OA has presented the Project to the Commission of Fine Arts ("CFA") and the National Capital Planning Commission ("NCPC"). Most recently, on July 20, 2026, Defendants filed a Notice of Planned Testing, ECF No. 42, announcing that OA, not GSA, intends to begin a Façade Condition Assessment and Painting Feasibility Study ("the Study") on the EEOB as early as August 3, 2026. The Study is not an isolated technical exercise. It is the first physical and destructive step toward implementing the very Project whose legality remains before this Court.

The urgency of this Renewed Motion therefore extends beyond the Study itself. The Renewed Motion concerns not only who has authority to conduct damaging testing, but also who has legal authority to conduct the federal review process governing one of the Nation's most significant historic buildings. GSA contends that it no longer has a role in the Project, because GSA and OA signed a Memorandum of Understanding ("MOU") that will transfer GSA's responsibilities to OA "should the President decide to proceed" with the Project. *See* ECF No. 38-2 ¶ 4.[3] Plaintiffs have demonstrated that the delegation has happened (*i.e.*, it is not conditional) and that no such delegation is authorized by law. Until this Court resolves the threshold delegation questions, OA should not be permitted to continue to proceed as though it has already prevailed. The Study which includes painting portions of the EEOB, and its stated purpose is to determine whether and how the entire building can be painted. But that inquiry proceeds before the legally antecedent question—whether OA may manage the Study or Project at all—has been answered.

Even if the actions OA is currently taking were otherwise competent and consistent with governing law, that would not cure the fatal flaw in Defendants' position: OA does not have the authority to oversee and manage this Project—full stop. Worse still, OA's conduct has exacerbated

---

[3] Unless otherwise noted, all pincites to ECF-filed documents refer to the pagination generated by the ECF system's header, not the document's internal or original pagination.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**　　　　2

the concerns that prompted this litigation. Rather than undertaking the transparent, expert-informed, agency-led consultation required by Congress, and subject to accountability in the courts through the Administrative Procedure Act ("APA"), OA has embarked upon what it characterizes as "voluntary" compliance with the National Historic Preservation Act ("NHPA") and National Environmental Policy Act ("NEPA"), resulting in a haphazard process lacking almost all of the fundamental features that define lawful Section 106 review. There has been no GSA-led consultation, no opportunity for preservation experts to review proposed testing protocols, and no transparency concerning who will conduct the testing, how it will be performed, or how the resulting information will be used.

That lack of transparency is not merely procedural. The proposed testing contemplates invasive work on a National Historic Landmark ("NHL") whose granite façade has survived nearly 150 years. Once testing begins, the status quo cannot be restored. Nor can Plaintiffs or the public have confidence that the work will be conducted according to accepted preservation standards when the White House has declined to identify who will perform it, what protocols they will follow, or what expert review will occur before irreversible work begins. Indeed, expert analysis included in a declaration in support of this Motion identifies nearly fifty fundamental questions unanswered by the Study. *See generally* Ex. 2 (Decl. of Judith M. Jacob ("Jacob Decl.")). Those questions would be answered publicly and in advance, as a matter of course, if consultation were being managed by career professional preservation staff at GSA on behalf of the American people, as Congress required, instead of political staff at the White House on behalf of the President. Had GSA managed the process, judicial review of any failure to answer those questions would be available under the APA. On Defendants' own position, no such review is available so long as OA conducts the process. GSA, the agency Congress gave responsibility for the EEOB, must direct this effort.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**    3

This Court's intervention is therefore needed now, not because Plaintiffs seek to delay lawful review, but because there has been no lawful review. Plaintiffs ask the Court to preserve the status quo until it resolves the threshold legal questions already before it: whether that GSA may not lawfully delegate to OA and, therefore, whether OA may not assume Project authority. If OA lacks Project authority, the Study cannot proceed. If the Court concludes otherwise, then, at a minimum, the Study should not proceed until OA complies with the same transparent, expert-informed procedures that Congress requires of every federal agency undertaking work affecting historic properties.

Because Plaintiffs are likely to succeed on the merits, because irreversible harm to an NHL is imminent, because the balance of equities favors maintaining the status quo, and because the public has a compelling interest in ensuring that the proper agency designated by Congress follows the law before altering one of the Nation's most significant historic buildings, the Court should grant Plaintiffs' Renewed Motion.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining    4
Order, Preliminary Injunction, and Expedited Hearing**





The EEOB in unpainted granite in May 2026. Photo by Susan Eisenhower.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**    5

## PROCEDURAL BACKGROUND

On November 17, 2025, following Defendant Trump's public statements announcing plans to clean, repoint, and paint the historically unpainted granite exterior of the EEOB, an NHL, Plaintiffs filed a Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing. ECF No. 7.

On November 18, 2025, Defendant GSA represented that it was the agency with oversight and management responsibilities for the Project and that an injunction was unnecessary, because it would refrain from planning or implementing certain steps toward painting for a period of time sufficient to enable the Court to fully consider the merits of the initial pleadings.[4] Consequently, Plaintiffs voluntarily withdrew their Motion for Preliminary Injunction on December 12, 2025. ECF No. 24. GSA executed an additional sworn declaration on January 16, 2026, to the same effect but extending the date of its commitment.[5]

On January 29, 2026, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF Nos. 27, 27-1. Exhibits included a First Declaration of Heather Martin, ECF No. 27-2, and Fifth Declaration of Andrew Heller, ECF No. 27-4, both of which attached a MOU signed by GSA and OA under which GSA purports to delegate, and OA purports to assume, full authority over the Project, at the *direction of the President*. ECF No. 27-4 at Attach. A at 7–8. The First Martin Declaration further states that "[s]hould the President decide to proceed with the Project, OA voluntarily commits to comply with any statutory and regulatory processes

---

[4] "GSA has statutory authority pursuant to 40 U.S.C. § 3305 to paint the exterior of the [EEOB] if the exterior were to be painted. This authority includes any power washing/cleaning and/or repointing of the exterior."  ECF No. 11-1 ¶ 3. "GSA will not authorize or engage in the physical actions of power washing/cleaning, painting, or repointing the [EEOB] before December 31, 2025. Nor would GSA delegate its authority pursuant to 40 U.S.C. § 121(d), or authorize any use of its gift authority pursuant to 40 U.S.C. § 3175, to perform any such actions before December 31, 2025." *Id.* ¶ 4.

[5] "GSA commits to not issue solicitations for a contract, execute a contract, select a contractor, or draft design or construction drawings related to any power washing/cleaning, painting, and/or repointing of the exterior of the [EEOB] prior to March 15, 2026." ECF No. 26-1 ¶ 3.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**     6

that might apply to the Project … to include the National Environmental Policy Act and the National Historic Preservation Act." ECF No. 27-2 ¶ 10. The First Martin Declaration also states that "in the event the President decides to proceed with the Project, OA voluntarily commits to consult with, and participate in public processes established by, the Commission of Fine Arts, the Advisory Council on Historic Preservation, the National Capital Planning Commission, and the D.C. State Historic Preservation Office." ECF No. 27-2 ¶ 11. In the Motion to Dismiss, Defendants argue that the new MOU should prevent Plaintiffs' case from proceeding on the merits, since OA is not a federal agency and therefore not subject to review by any court for violations under the APA. ECF No. 27-1 at 18–19, 25–27, 29.

In a February 6, 2026, Status Conference, this Court stated:

> I am accepting the government at its word that the [OA] is not going to take any action until the processes under the [NHPA] and [NEPA] have been completed…So unless [Plaintiffs] determine that actions are happening that suggest that that's not in fact occurring, that the government has taken steps that trigger these statutory processes and the [OA] is not complying, then obviously, [Plaintiffs] should seek emergency relief, as [they] did initially.

Ex. 1 at 9:5-12.

On February 19, 2026, Plaintiffs filed a First Amended Complaint, which, among other issues, challenged the legality of the MOU. *See generally* ECF No. 34.

On March 13, 2026, Defendants renewed their Motion to Dismiss. *See generally* ECF No. 38, 38-1. Defendants asserted that OA would "voluntarily" provide a full consultation process under NHPA and NEPA as would have been required of GSA, while asserting that Plaintiffs would not have the right to contest, and the Court would have no jurisdiction to review, OA's failure to do so. ECF No. 38-1 at 11–13; ECF No. 38-2 ¶ 4. In their Opposition to the Motion to Dismiss, Plaintiffs asserted that voluntary, unreviewable compliance is not legal compliance. ECF No. 39 at 23, 54–56.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**    7

This Court has not yet ruled on Defendants' Motion to Dismiss or the threshold delegation issue. In the meantime, however, OA has unlawfully proceeded with steps toward implementing the Project.

## I.    Events While the Delegation Issue Has Been Pending

While the Court considers Defendants' Motion to Dismiss and the threshold question whether GSA may lawfully delegate management of the EEOB Project to OA, OA continues advancing the Project.

Rather than GSA initiating and conducting a transparent federal review process, OA has proceeded with a Frankenstein version of NHPA and NEPA review processes, involving only internal planning, a presentation before the CFA and NCPC, and the filing of a Notice announcing physical testing of the EEOB's granite façade. OA has not done the basics to comply with those statutes, even on a voluntary basis. It has not established a formal consultation process and has established no mechanism through which interested organizations or members of the public may request consulting party status or otherwise formally participate in the decision-making process. OA has failed to release any evaluation of alternatives that do not involve painting the building (despite NCPC's express request that it consider less intrusive options) and has either not developed or withheld the technical studies, consultant information, testing protocols, and underlying data that will inform future decisions. OA has not created a publicly available administrative record or otherwise implemented many of the procedures that ordinarily accompany federal review of a project of this magnitude. Taken together, these omissions demonstrate a wholesale failure to undertake the transparent, informed, and participatory review process that NHPA and NEPA require before federal agencies commit to actions affecting historic resources. OA's "voluntary" compliance does not look like a federal agency's compliance at all—OA has

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining**    8
**Order, Preliminary Injunction, and Expedited Hearing**

bypassed nearly every procedural step that ordinarily precedes a federal undertaking subject to review under NHPA and NEPA.

The only public proceedings conducted by OA have been presentations before CFA and NCPC, both commissions recently reconstituted with the President's political appointees. At the same time, those proceedings did not result in unqualified approval of the Project. Rather, commissioners questioned the legal authority under which OA was proceeding,[6] requested significant additional information,[7] suggested consideration of less intrusive alternatives,[8] and sought examples demonstrating that painting historic granite facades could be accomplished successfully. The D.C. SHPO likewise advised that "[p]ainting the granite facades of the EEOB in white would not be beautification but an act of architectural vandalism of the highest order."[9]

Despite those unresolved concerns, OA has continued advancing the Project outside of required processes. On July 20, 2026, "*Defendants*" filed a Notice of Planned Testing advising the Court that OA intends to commence a "Façade Condition Assessment and Painting Feasibility

---

[6] At the NCPC hearing, Commissioner Evan Cash stated: "And up until the last six months, this is the first time we've ever had the [OA] or the White House come and not GSA. So I guess I'm just wondering, why is OA leading this? Why isn't GSA leading this? We've talked a little bit about 106. GSA is the one that has all the expertise and all the preservationists and everything." Nat'l Capital Planning Comm'n, Open Session Commission Meeting Tr. at 40:6–18. (May 7, 2026) ("NCPC Tr."),
https://www.ncpc.gov/docs/open_gov_files/transcripts/2026/2026_05_07_NCPC.pdf.

[7] NCPC requested "the applicant provide, as part of the next submission, further information related to the proposed painting options" including: 1) "[e]valuation of potential visual or physical impacts of the project on the EEOB, and the Lafayette Square National Historic Landmark District which includes a number of historic resources"; 2) "[s]ummary of other measures considered to meet the project goals, including cleaning the building and/or lighting"; 3) "[i]nformation about the proposed paint to be used, including details regarding initial application, adhesion, water infiltration, long-term maintenance and upkeep, and ease of removal; along with examples of where paint has been successfully used on exterior granite facades in other projects" and 4) "[p]hoto-realistic visualizations of the EEOB for each paint option and existing condition from pedestrian level locations, including 17thStreet NW, F Street NW, and Pennsylvania Avenue, NW." Nat'l Capital Planning Comm'n, Commission Action: Eisenhower Executive Office Building Exterior Beautification Project, at 2, NCPC File, No. 8777 (May 7, 2026) ("NCPC Comm'n Action"),
https://www.ncpc.gov/docs/actions/2026May/8777_Eisenhower_Executive_Office_Building_Exterior_Beautification_Project_Commission_Action_May2026.pdf.

[8] NCPC recommended that OA "consider whether updated exterior lighting can be evaluated as a relatively quick and cost-effective option to help beautify the building." NCPC Comm'n Action.

[9] Alex Henderson, *Documents Reveal Trump's Epic Fight with Preservationists over Historic Building*, AlterNet (May 29, 2026), https://www.alternet.org/trump-eisenhower-building/.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining**    9
**Order, Preliminary Injunction, and Expedited Hearing**

Study" as early as August 3, 2026. ECF No. 42 at 1.[10] Defendants characterize the Notice as a courtesy to the Court while maintaining that the Court lacks authority to prevent the testing from proceeding. *Id.*

## II.      Current Posture

Plaintiffs file this Renewed Motion for a Temporary Restraining Order and Preliminary Injunction in accordance with the Court's February 6 instruction that Plaintiffs should seek emergency relief if they determined that OA had begun taking actions without complying with NEPA or NHPA. Plaintiffs' motion asks this Court to preserve the status quo through an order enjoining Defendant GSA from implementing or relying on the January 29, 2026, MOU between GSA and OA and enjoining Defendant GSA from allowing OA to assume GSA's federal compliance obligations with respect to the EEOB Project under the NHPA and NEPA, including conducting any testing. The order should remain in effect while the issue of OA's authority is still pending in court, and, if the Court determines that OA lacks authority, until GSA fulfills its obligations under the NHPA and NEPA, including full and proper consultation with the public, interested parties, and experts, and creating a formal administrative record subject to judicial review.

## **LEGAL BACKGROUND**

## I.      The National Historic Preservation Act

The NHPA imposes mandatory, non-discretionary duties on all federal agencies to act as responsible trustees for the Nation's heritage. *See* 54 U.S.C. § 300101. Section 106 of the NHPA requires federal agencies to "take into account the effect of [an] undertaking on any historic property" prior to project approval, the expenditure of federal funds, or the issuance of a federal

---

[10] Accompanying that Notice, Defendants submitted the Third Declaration of Heather Martin, Deputy Assistant to the President, which stated, in seeming contradiction to the Notice, that "[t]he Façade Condition Assessment and Painting Feasibility Study will begin earlier, on July 30, 2026[.]" ECF No. 42-1 ¶ 7.

license. *Id.* § 306108; *see also id.* § 300320; 36 C.F.R. § 800.16(y). An undertaking is "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including (1) those carried out by or on behalf of a Federal agency; (2) those carried out with Federal financial assistance; [and] (3) those requiring a Federal permit, license, or approval." 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y).

Section 106 further requires federal agencies to engage in consultation with the public, interested organizations, and experts and afford the Advisory Council on Historic Preservation ("ACHP") a reasonable opportunity to comment. 54 U.S.C. § 306108. Section 110(f) requires agencies to give special consideration to NHLs, the official designation given to exceptional places that shape the entire nation's history, culture, or architecture. *Id.* § 306107. There are just over 2,600 places that hold this high status,[11] compared to the 2 million contributing historic resources listed on the National Register of Historic Places.[12] NHPA imposes a heightened duty when an undertaking may directly and adversely affect an NHL. In such circumstances, the responsible agency must, "to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark" and must afford the ACHP an opportunity to comment. *Id.*

The EEOB is not exempt from NHPA review under Section 107 or any other law. The statutory language of Section 107 does not list the building as subject to exemption, as it explicitly does with other buildings and historic properties in Washington, D.C., and case law affirms the EEOB does not fall within other statutory definitions of the White House and its grounds. 54 U.S.C. § 307104; *see United States v. Jabr*, 2019 WL 13110682, at *19 (D.D.C. May 16, 2019), *aff'd*, 4

---

[11] *National Historic Landmarks Program*, Nat'l Park Serv. (Dec. 16, 2024), https://www.nps.gov/subjects/nationalhistoriclandmarks/index.htm.
[12] *What is the National Register of Historic Places?*, Nat'l Park Serv. (Sept. 15, 2025), https://www.nps.gov/subjects/nationalregister/what-is-the-national-register.htm.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining**     11
**Order, Preliminary Injunction, and Expedited Hearing**

F.4th 97, 102 (D.C. Cir. 2021). The EEOB is therefore subject to both the requirements of the Section 106 review process and the heightened review requirements afforded NHLs under Section 110(f).

## II.    The National Environmental Policy Act

NEPA requires federal agencies to document and analyze the environmental effects of proposed federal actions, thereby taking a "hard look" at the "environmental consequences." *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 350 (1989). NEPA holds federal agencies accountable, requiring them to prepare an Environmental Impact Statement ("EIS") in advance of any "major Federal actions significantly affecting the quality of the human environment," which includes not just the natural environment, but also historic and cultural resources, 42 U.S.C. § 4332(C), or an Environmental Assessment ("EA") if projects do "not have a reasonably foreseeable significant effect" or "if the significance of such effect is unknown[.]" *Id.* § 4336(b)(2).

Public participation and disclosure are key aspects of NEPA, meant to: (1) ensure that agencies have carefully and fully contemplated the environmental effects of their actions before they make decisions and (2) ensure that the public has sufficient information to review, comment on, and—if necessary—challenge these agency actions. *See* 42 U.S.C. §§ 4321, 4332. As the Supreme Court has explained, "the broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). NEPA ensures that "the larger audience that may also play a role in" developing and implementing the agency's decision understands those effects. *Robertson*, 490 U.S. at 350.

Further, NEPA's obligations are triggered when an agency has jurisdiction over a proposal for a major federal action with a known objective and is weighing which way to accomplish it. 42

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining     12
Order, Preliminary Injunction, and Expedited Hearing**

U.S.C. §§ 4332(C), 4336e(12); *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1094 (D.C. Cir. 1973); *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983).

Whether an agency fails to initiate NEPA, and thus failed to act, is a legal question. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180–81 (2025); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392–94 (2024). When an agency concludes "that NEPA is wholly inapplicable to its actions," that threshold determination is not entitled to deference and is reviewed de novo. *Sierra Club v. U.S. Dep't of Agric.*, 777 F.Supp.2d 44, 54 (D.D.C. 2011) (quoting *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150–51 (D.C. Cir. 2001)).

### III.    The General Services Administration

Congress granted GSA jurisdiction over "[a]ll functions with respect to the operation, maintenance, and custody of office buildings owned by the Government." Reorg. Plan No. 18 of 1950, § 2, 64 Stat. 1270, 1270-71. Construction and alteration projects for buildings under GSA's authority, including the EEOB, constitute "major federal actions" under NEPA and "undertakings" under NHPA. 42 U.S.C. § 4332(C); 54 U.S.C. § 306108. Because GSA serves as the acting agency for federal buildings under its statutory authority, it is the "lead agency" obligated to evaluate the project under NEPA and NHPA. *See* 42 U.S.C. § 4332(C); 36 C.F.R. § 800.2(a)(2).

The Administrator of GSA has the power to delegate authority, but only "to an official in the General Services Administration or to the head of another federal agency." 40 U.S.C. § 121(d)(1). A "federal agency" for purposes of that provision means "an executive agency or an establishment in the legislative or judicial branch of the Government," excluding specified entities. 40 U.S.C. § 102(5). An "executive agency" includes executive departments, independent establishments, and wholly owned Government corporations. 40 U.S.C. § 102(4).

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**    13

## IV.    The White House Office of Administration

President Jimmy Carter established OA in 1977 by Executive Order to consolidate administrative functions within the Executive Office of the President ("EOP"). OA's purpose is to provide professional, business, and operational support services to the EOP, handling the behind-the-scenes functions required to keep the White House running smoothly. Exec. Order No. 12,028, 42 Fed. Reg. 62895 (Dec. 12, 1977). As Defendants themselves assert, OA is a component of the EOP, not a federal agency. Congress creates federal agencies, which possess authority Congress grants them by statute.

Courts and administrative authorities applying the definitions of federal agency, executive agency, and independent establishment have found that OA does not qualify within the meaning of 40 U.S.C. § 102. *Argus Secure Tech., LLC*, B-419422, B-419422.2, 2021 CPD ¶ 84 at 4 (Comp. Gen. Feb 22, 2021). *See also Citizens for Resp. & Ethics in D.C. v. Off. of Admin. ("CREW")*, 566 F.3d 219, 224 (D.C. Cir. 2009) (finding the OA "lacks substantial independent authority" and does not meet the definition of agency under the Freedom of Information Act). OA therefore does not qualify as a "federal agency" to which GSA may delegate authority under 40 U.S.C. § 121(d)(1).

The D.C. Circuit has held that entities within the EOP are not agencies unless they exercise "substantial independent authority." *CREW*, 566 F.3d at 223–24. OA performs tasks that are "entirely operational functions and administrative in nature." *Id.* at 224; *see also Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971) (explaining that an executive entity within the EOP does not qualify as an agency if it cannot act on independent authority).

Section 590 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1989 ("Section 590") does not give OA independent power but merely authorizes the Director of the OA to "accept and utilize voluntary and uncompensated services," including "gifts and bequests of property" to aid work on the EEOB. Pub. L. No. 100-461, 102

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining**    14
**Order, Preliminary Injunction, and Expedited Hearing**

State. 2268 § 590(a) (Oct. 1, 1988). By its plain language, Section 590 provides that "[a]ny use or sale of property accepted pursuant to this section, and any use of proceeds from such sale, shall be subject to the disapproval of the Administrator of General Services within 30 days after the Administrator receives notice of such use or sale." *Id.* § 590(c).

## V.    The Administrative Procedure Act

The Administrative Procedure Act ("APA") authorizes "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," to seek federal court relief. 5 U.S.C. § 702. Under the APA, courts may review "final agency action for which there is no other adequate remedy in a court," *id.* § 704, and may also "compel agency action unlawfully withheld or unreasonably delayed[.]" *Id.* § 706(1). Courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" taken "without observance of procedure required by law[,]" or "in excess of statutory jurisdiction, authority, or limitations[.]" *Id.* §§ 706(2)(A), (C), (D).

## VI.   Ultra Vires Actions

An agency action is ultra vires when it contravenes a "clear and specific statutory mandate" or otherwise violates a "clear and mandatory" statutory provision in which courts generally have jurisdiction to grant relief. *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970–71 (D.C. Cir. 2022) (internal citations omitted). Ultra vires review is available under three conditions: when a statute clearly delineates a defendant's authority, when Congress has not "expressly precluded judicial review," and when no other statute provides for review. *Id.* at 971; *see Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 681–82 (2025).

For ultra vires review, the court must enjoin a challenged government action if it goes beyond "delegated powers." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining    15 Order, Preliminary Injunction, and Expedited Hearing**

2022) (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019)). Plaintiffs must show that the defendant government official or entity has either misconstrued a statute or has disregarded a clear statutory directive or command. 40 F.4th at 722. Ultra vires review is appropriate when "there is no other means to protect and enforce a statutory right." *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 U.S. App. LEXIS 25013, at *21 (D.C. Cir. Sep. 25, 2025) (Pan, J., concurring) (cleaned up) (quoting *Leedom v. Kyne*, 358 U.S. 184, 190 (1958)). The D.C. Circuit has recognized this review in dicta when plaintiffs have alleged ultra vires government conduct that is an "unexplained and obvious deviation[] from statutory text." *Fed. Educ. Ass'n*, 2025 U.S. App. LEXIS 25013, at *23 (Pan, J., concurring).

## **FACTUAL BACKGROUND**

The proposed painting of the EEOB is part of a broader series of officially announced initiatives by Defendant Trump to alter nationally significant historic resources in Washington, D.C.[13] Since taking office, the President has described these efforts as both part of a campaign to "beautify" the Nation's capital and a way to honor himself.[14] Examples include: the demolition of the historic East Wing of the White House to build a ballroom; the dumping of toxic debris from that demolition on the historic East Potomac Park golf course; the application of paint to the granite Lincoln Memorial Reflecting Pool (which is now peeling); and the covering of bronze public sculptures in gold leaf.[15] At the John F. Kennedy Center for the Performing Arts, he directed that his name be added to the historic exterior of the memorial, cut down weeping willows symbolic of the Nation's grief, painted over defining gold columns (which are now rusting),[16] and threatened

---

[13] *See* Rachel Treisman, *The many ways Trump wants to change D.C., from buildings to statues to parks*, NPR (May 4, 2026), https://www.npr.org/2026/05/04/nx-s1-5798651/trump-dc-construction-tracker-ballroom-arch.
[14] *Id.*
[15] *Id.*
[16] *Whistleblower claims Kennedy Center "rushed" renovations to please Trump*, Al Jazeera (July 11, 2026), https://www.aljazeera.com/news/2026/7/11/whistleblower-claims-kennedy-center-rushed-renovations-to-please-trump; Elizabeth Blair, *"Fool me once…" Lawyers argue Kennedy Center should not meet same fate as the East Wing,* NPR, (Apr. 30, 2026),

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining    16
Order, Preliminary Injunction, and Expedited Hearing**

to take the building down to "fully exposed"[17] steel before lawsuits caused him to backtrack. The so-called Arc de Trump (he stated its purpose is to honor himself)[18] is said to block historic viewsheds between the Lincoln Memorial and the graves of the fallen at Arlington National Cemetery, and it is to be so tall as to implicate concerns of flight interference.[19]

President Trump follows a familiar pattern. He conceives of a project that he announces will improve a nationally beloved and historically significant resource. He directs those around him to execute his vision as quickly as possible. He disregards the strict federal standards Congress established to protect national, environmental, cultural, and historic resources. He misleads the public about both the harm his project will cause and the laws he is circumventing. And he rushes forward, irreparably damaging resources that do not belong to him.

The EEOB Project is among the most significant of these initiatives, because it proposes permanently damaging the exterior appearance of one of the Nation's most recognizable NHLs.[20] Unlike most construction projects on historic federal buildings, however, the EEOB Project is not being managed by the agency Congress charged with protecting it. Instead, the President, through the OA, has taken full control of the Project from GSA while the legality of that arrangement remains pending before this Court. ECF No. 42.

---

https://www.npr.org/2026/04/30/nx-s1-5803003/fool-me-once-lawyers-argue-kennedy-center-should-not-meet-same-fate-as-the-east-wing.

[17] Michelle Stoddart, Emily Chang, Benjamin Siegel, and Leah Sarnoff, *Trump says steel to be 'fully exposed' in Kennedy Center rebuild but 'not ripping it down'*, ABC News (Feb. 2, 2026), https://abcnews.com/US/trump-kennedy-center-closing-2-years-complete-rebuilding/story?utm_source=facebook&utm_medium=social&utm_campaign=dhfacebook&utm_content=null&id=129764468.

[18] Chloe Veltman, *Trump touts newly released plans for D.C. triumphal arch*, NPR (Apr. 11, 2026), https://www.npr.org/2026/04/11/nx-s1-5782027/trump-triumphal-arch-plans-architecture.

[19] Katie Hawkinson, *Trump's arch would block Lincoln Memorial, Arlington Cemetery view,* NPR (June 4, 2026), https://www.npr.org/2026/06/04/nx-s1-5842970/trump-arch-dc-lincoln; Katie Hawkinson, *Trump's beloved victory arch would be so tall it could pose a danger to flights into the DC area*, Independent (Feb. 10, 2026), https://www.yahoo.com/news/articles/trump-beloved-victory-arch-tall-160610116.html.

[20] Darlene Superville, *Trump's plan to paint Eisenhower building white could cost at least $7.5M, White House says*, PBS (May 7, 2026), https://www.pbs.org/newshour/politics/watch-live-trumps-push-to-paint-eisenhower-building-white-reviewed-by-capitol-planning-commission.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining     17
Order, Preliminary Injunction, and Expedited Hearing**

OA is not merely planning for a possible future project. *Id.* It is presently managing the Project pursuant to the MOU. *Id.* Although Defendants argue that the MOU has not yet become operative, because the President has not made a final decision whether to proceed with the Project, Ex. 1 at 8:4–7,11–13, OA has already undertaken activities that the MOU assigns exclusively to the Project manager. ECF No. 42.

Among other things, OA has developed and presented the Project before CFA[21] and NCPC,[22] and according to its filings has retained unspecified consultants to develop testing protocols, conducted preliminary testing of mineral silicate coatings on granite without disclosing its results, and announced plans to conduct additional physical testing on the EEOB itself. ECF No. 42. GSA has not directed or supervised these activities. *Id.* Instead, OA has exercised the project management authority the MOU purports to transfer to it. *Id.*

On July 20, 2026, Defendants filed a Notice informing the Court that OA intends to begin the Study as early as August 3, 2026. *Id.* According to the Notice, OA proposes physically applying and then attempting to remove a mineral silicate coating from multiple areas of the EEOB's historic granite façade to determine whether the building can ultimately be painted. *Id.*

Defendants acknowledge in this Notice that there is "a dearth of published scientific evidence" concerning the effects of applying and removing mineral silicate coatings from historic granite. ECF No. 42-1 ¶ 4. The Study nevertheless proposes proceeding with physical testing. According to the Notice, the testing is intended to evaluate application techniques, removal methods, and the feasibility of painting the building's exterior. Defendants acknowledge that complete removal of the coating cannot be guaranteed. *Id.* ¶¶ 4, 10–13.

---

[21] U.S. Comm'n of Fine Arts, Letter re: Eisenhower Executive Office Building Exterior Improvements, CFA Project No. 16/APR/26-3 (Apr. 23, 2026), https://www.cfa.gov/records-research/project-search/cfa-16-apr-26-3.
[22] NCPC Comm'n Action.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining**    18
**Order, Preliminary Injunction, and Expedited Hearing**

OA pursues this risky testing scheme even as it keeps the public and the Court in the dark about how the testing will be conducted. Although Defendants state that OA contracted an environmental services contractor and a building consultant to develop the methodology, neither contractor is identified. ECF No. 42 at 2. Nor does the Notice identify the qualifications of the individuals conducting the work, the criteria for selecting testing locations, the detailed testing protocols, the analytical methods that will be employed, or the procedures through which the results will be evaluated and disclosed.

Judith Jacob, a recently retired Conservator from the National Park Service, explains that preservation professionals would ordinarily expect substantially more information before testing of this nature proceeds on an NHL. Her declaration identifies nearly fifty questions—including testing methodology, documentation procedures, qualifications of the professionals performing the work, long-term maintenance considerations, and evaluation criteria—that are absent from and unanswered by the Notice. Jacob Decl. ¶ 16.

Alarmingly, OA plans to apply paint to portions of the historic granite façade before this Court has even determined whether OA possesses lawful authority to manage the Project. The Notice states that the purpose of the Study is to determine whether application of a mineral silicate coating to the EEOB is feasible. ECF No. 42 at 1. If the coating cannot be fully removed, as Defendants acknowledge is possible, the Study itself will permanently alter a portion of an NHL.

## LEGAL STANDARD

TROs and PIs are "extraordinary remed[ies] never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain such relief, a plaintiff must establish four elements: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and

[4] that an injunction is in the public interest." *Id*. at 20; *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).

The D.C. Circuit has typically applied a "sliding scale" approach, meaning that if a plaintiff makes "an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). After *Winter*, however, this Circuit has been reluctant to apply the sliding scale, although many other circuits have. *Compare Changji Esquel Textile Co.*, 40 F.4th at 726, *with Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35–37, 38 n.8 (2d Cir. 2010); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (applying a "sliding scale" test to grant injunctions, there must be "serious questions" as to the merits, the balance of hardships must tip sharply in the movant's favor, and the other *Winter* factors must be satisfied); *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (applying a "sliding scale" test that takes each factor into consideration).

The same four-factor standard governs requests for a TRO and for a PI; what differentiates a TRO is the urgency and the need to preserve the status quo until a fuller hearing can be held. *See, e.g.*, Fed. R. Civ. P. 65(b). An expedited or "emergency" hearing on such a motion is appropriate where the record demonstrates that irreparable harm is imminent and that maintaining the status quo requires prompt judicial intervention—as is the case here, where Plaintiffs allege imminent, irreversible harm to an NHL and its NHLD.

Plaintiffs "bear the burdens of production and persuasion" on each of the four *Winter* factors. *Qualls v. Rumsfeld*, 357 F.Supp.2d 274, 281 (D.D.C. 2005). To meet those burdens at the preliminary-relief stage, plaintiffs may rely on "evidence that is less complete than in a trial on the merits," but the evidence they offer must nonetheless be credible. *Id*. at 281. In considering a motion for a TRO or PI, courts evaluate the record as it exists at the time of the motion—including

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining**    20
**Order, Preliminary Injunction, and Expedited Hearing**

sworn declarations, documentary exhibits, and other materials demonstrating likelihood of success and irreparable harm. *Newsom v. Albemarle City Sch. Bd.,* 354 F.3d 249, 255 (4th Cir. 2003). Courts must also consider whether the requested relief is tailored to preserve the status quo and ensure that any ultimate decision on the merits will not be rendered meaningless. *See Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *Winter*, 555 U.S. at 24.

## ARGUMENT

I.    **PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF EMERGENCY PRELIMINARY RELIEF.**

OA states that it will begin the Study as early as today.[23] ECF No. 42-1 ¶¶ 7, 14. GSA has denied Plaintiffs their procedural rights to participate in valid, legally compliant NHPA and NEPA processes, and if the Study moves forward the building will be painted. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–55 (2010). The facts demonstrate a "clear and present need for equitable relief[.]" *Wis. Gas Co. v. Fed. Energy Regul. Comm'n,* 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (internal quotations omitted). The imminent and permanent damage to Plaintiffs' rights under NEPA and NHPA, as well as the harm posed by planned testing to EEOB's historic materials and setting, meet every element of the irreparable-harm standard and warrant both a TRO and a PI.

To obtain a TRO or PI, the Plaintiffs' injury must be "both certain and great;" "actual and not theoretical[,]" "of such imminence that there is a clear and present need for equitable relief," and not adequately compensable in money damages. *Wis. Gas,* 758 F.2d at 674 (internal quotations omitted); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *Winter*, 555 U.S. at 22–23. First, Plaintiffs will suffer loss of procedural rights under NEPA and NHPA because of GSA's

---

[23] Plaintiffs note that there is a discrepancy between the start date in the Notice of Planned Testing, which provides August 3, 2026 as the start date (ECF No. 42 at 1), and the Third Martin Declaration (ECF No. 42-1), which provides July 30, 2026 as the start date.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining**   21
**Order, Preliminary Injunction, and Expedited Hearing**

unlawful delegation to OA. Second, Plaintiffs will suffer visual and aesthetic losses if paint is applied to the EEOB.

**A. GSA's Improper Delegation Denies Plaintiffs' Procedural Rights under NHPA and NEPA.**

NEPA and NHPA provide procedural rights designed to protect precisely the kinds of historic and aesthetic interests Plaintiffs seek to protect. These protections are only enforceable under the APA against federal agencies. GSA is avoiding its congressionally mandated duties by impermissibly handing authority to OA, a non-agency. GSA's execution of the challenged MOU and failure to initiate and complete review processes required by law cause direct, irreparable harm to Plaintiffs by denying their procedural rights. These injuries are not compensable in money damages, and they directly impair Plaintiffs' interests. When an irreversible action is imminent, a federal agency's failure to fulfill the requirements of NHPA and NEPA irreparably injures those who hold procedural rights under these laws. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009). Here, if OA begins destructive activities on the EEOB by implementing the Study, the window for meaningful NHPA participation will close, and Plaintiffs will lose the ability to protect their concrete interests through involvement in the Section 106 process. NHPA and NEPA require public participation to allow experts, consulting parties, and those impacted by activities undertaken by federal agencies to provide input *before* the irreparable harm occurs.

Only an order from this Court requiring GSA to comply with its statutory obligations under NEPA and NHPA and enjoining the MOU can restore Plaintiffs' opportunity participate in those processes and seek judicial relief if GSA acts improperly or fails to fulfill its duties. Absent a TRO and PI preserving the status quo, that opportunity will be foreclosed before Plaintiffs can exercise it, and the resulting harm to the EEOB and to Plaintiffs' procedural rights will be irreversible.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**    22

## B. **Plaintiffs Will Suffer Irreparable Harm if OA Paints the EEOB.**

If OA paints the EEOB, Plaintiffs will suffer a personal, concrete injury to their aesthetic and visual interests. See *infra* Section II.A. The risk that the planned testing cannot be undone is a classic form of irreparable harm. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995–96 (8th Cir. 2011).

OA proposes to alter the exterior of the EEOB by painting four sections white. The EEOB's exterior is nineteenth-century stone and historic finishes that have never been painted. Painting would not simply obscure its original character; it would require abrading or chemically treating the historic granite to make paint adhere, and any future paint removal would further degrade the stone. *See generally* ECF No. 7-14. Once those original surfaces are altered, historic fabric and patina are permanently lost.

Paint does not strengthen granite, repair internal flaws, prevent cracking, or improve durability; at best it is a surface coating that could be impossible to remove. OA concedes it may not be able to remove the paint without harming the EEOB. When describing the paint removal process, the Third Martin Declaration states that the "Building Consultant will start with pressure washing at relatively low pressure and work up in pressure until the coating is removed. OA will complete any repairs necessary to restore the stone to as close to the original condition as possible." ECF No. 42-1 ¶ 16. Defendants likewise admit that there is "*a dearth of published scientific evidence on* the potential effects of using a mineral silicate paint on a granite base *and the ability to remove it.*" *Id*. ¶ 4 (emphasis added). Defendants thus propose to experiment on the historic façade itself with no scientific basis to conclude the coating can be removed without permanent damage. The EEOB's dark gray stone façade is a defining visual element of both the building and the Lafayette Square NHLD. ECF No. 7-23 ¶ 21. This alteration would permanently harm the

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining**     23
**Order, Preliminary Injunction, and Expedited Hearing**

integrity of one of the Nation's most significant public buildings. Once historic material is lost or destroyed, it cannot be replaced.[24] The harm to the EEOB is certain, imminent, and irreparable.

The building's material integrity is central to its historic character. The permanent injuries caused by the planned testing are not compensable in money damages and will directly impair Plaintiffs' interests. The threat is imminent, not speculative.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    Plaintiffs Have Standing to Seek a Temporary Restraining Order and Preliminary Injunction.

Plaintiffs have standing because they can provide a clear showing of injury-in-fact that is concrete and particularized, and actual or imminent, fairly traceable to Defendants' conduct, and redressable by the relief requested. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs also assert procedural standing because NHPA and NEPA confer procedural rights whose unlawful denial increases the risk of harm to Plaintiffs' concrete interests in the EEOB and the Lafayette Square NHLD. *See Summers,* 555 U.S. at 496–97 (2009); *Massachusetts v. Env't Prot. Agency*, 549 U.S. 497, 517–18 (2007). Plaintiffs have procedural standing because their interests are within the "zone of interests to be protected or regulated by statute," which here includes both a geographic connection to the place of injury and an inability to enjoy the aesthetic and historical quality of a protectable site. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970); *Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014) (holding that procedural standing can be formed from a plaintiff's inability to enjoy aesthetic features or observe a site for its history).

The declarations of Gregory Werkheiser (ECF Nos. 7-15, 16-2, 39-3), Marion Werkheiser (ECF Nos. 7-3, 39-4), Rebecca Miller (ECF Nos. 7-16, 39-1), and Robert Peck (ECF No. 39-2)

---

[24] Pressure washing itself may harm the building; GSA's guidelines explicitly limit the pressure at which historic building materials can be washed. ECF No. 16-9 at 3.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining     24
Order, Preliminary Injunction, and Expedited Hearing**

establish and substantially exceed the facts necessary to demonstrate concrete and particularized interests. Mr. Werkheiser and Ms. Werkheiser both work in the field of cultural heritage, historic preservation, and federal environmental review. ECF Nos. 16-1 ¶¶ 2, 6; 16-2 ¶ 3. Similarly, Ms. Miller and Mr. Peck are members of DCPL, whose mission is to protect and enhance the built environment of Washington. D.C., including its historic buildings. ECF No. 7-16 ¶ 2; 39-2 ¶ 2. Each of them regularly visits and experiences the EEOB and Lafayette Square NHLD for aesthetic, recreational, professional, and educational purposes. They intend to continue such visits and have concrete plans to do so. ECF Nos. 16-1 ¶ 4; 16-2 ¶ 30; 39-1 ¶ 16; 39-2 ¶ 7; 39-3 ¶ 3; 39-4 ¶ 3. Plaintiffs' visits to the EEOB area are deliberate: the building and the aesthetic experience they derive from its exterior drives them to continuously make the EEOB the destination. ECF Nos. 7-3 ¶ 5; 7-15 ¶¶ 5–6; 7-16 ¶ 3; 39-2 ¶¶ 3, 7; 39-3; 39-4.

If OA moves forward with the planned testing to paint sections of the exterior of the building, Mr. Werkheiser's, Ms. Werkheiser's, Ms. Miller's, and Mr. Peck's aesthetic interests would be directly diminished, as would their ability to visit and enjoy the EEOB area. Defendant GSA's failures to follow the NHPA process deprive Plaintiffs of procedural rights and information necessary to protect their aesthetic, recreational, professional, economic, educational, and organizational interests. And OA's promise to comply "voluntarily" with NEPA deprives Plaintiffs of the guaranteed procedural process and backstop of judicial review that would otherwise be available to Plaintiffs if GSA were managing the Project.

Further, CHP and DCPL have organizational standing, and DCPL also has associational standing, because both can "point to a concrete and demonstrable injury to [their] activities" that is more than "a setback to [their] abstract social interests[.]" *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (internal quotation marks omitted); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). To meet organizational standing, an organization must show

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining     25
Order, Preliminary Injunction, and Expedited Hearing**

two things: (1) "the agency's action or omission to act injured the organization's interest[,]" and (2) "the organization used its resources to counteract that harm." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation modified). Just as an individual plaintiff can have standing for a noneconomic interest, so too can an organization. *Havens*, 455 U.S. at 379.

CHP and DCPL meet both prongs of the organizational standing test. CHP's interests are harmed because its unique and specialized work is centered on protecting cultural heritage and resources and ensuring the faithful execution of NHPA and NEPA review processes, and thus the rule of law. ECF Nos. 7-3 ¶ 3; 7-15 ¶ 3. *See Havens*, 455 U.S. at 379; *Vilsack*, 808 F.3d at 919–20. Defendant GSA harmed those interests through the execution of the MOU and unlawful denial of properly applied NHPA and NEPA processes; CHP depends on the lawful application of federal preservation and environmental protection laws to provide its clients answers and advocate accordingly. DCPL's interests are harmed because its mission is "to preserve, protect, and enhance the historic and built environment of Washington, DC, through advocacy and education." ECF No. 39-1 ¶ 3 (internal quotations omitted).

CHP has specifically diverted resources to counteract Defendants' unlawful actions, including staff time, client counseling, outreach, and emergency advocacy, that would not have been necessary absent Defendants' conduct. ECF Nos. 7-3; 7-15; 7-16; 16-1; 16-2. DCPL has also diverted resources to counteract Defendants' unlawful actions. ECF No. 39-1 ¶ 17. This time and effort have come at the expense of other DCPL priorities. *Id.* ¶ 20.

For prospective relief, Plaintiffs must show a real and immediate threat of injury. *See City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983). Plaintiffs have done so: Defendants filed a Notice of Planned Testing, creating a substantial risk of imminent, irreversible harm to the EEOB's exterior if work proceeds. A TRO followed by a PI will preserve the status quo and protect the EEOB—

precisely the kind of forward-looking remedy Article III permits. Accordingly, Plaintiffs have standing to pursue both a TRO and PI.

### B. GSA Unlawfully Delegated Authority to OA to Oversee and Implement the Project.

#### 1. GSA Does Not Have Statutory Authority to Delegate to OA.

Congress granted specific statutory authority for the GSA Administrator to delegate his authority only to another official in the GSA or to the head of another federal agency. 40 U.S.C. § 121(d)(1). This delegation of authority is expressly limited, and thus, GSA does not have the statutory authority to delegate the Project to OA. *Id.*; *Halverson v. Slater*, 129 F.3d 180, 187–88 (D.C. Cir. 1997) (discussing the plain meaning of granted authority that does not permit one to "expand the specific delegation" permitted by statute).

In the MOU, GSA purports to transfer authority over the Project to OA, which is neither a federal agency nor run by an individual within GSA. These facts alone disqualify OA from being able to manage and operate the Project, including the Study proposed in Defendants' July 20 Notice. In fact, Defendants explicitly agree that OA is not a federal agency within the meaning of the APA. *See, e.g.*, ECF Nos. 38-1 at 20; 38-2 ¶ 4; 40 at 15–19.  Defendants rely on this very assertion to contend that this Court is powerless to grant relief to Plaintiffs, because the APA applies only to federal agencies. Defendants cannot assert that OA is not an agency where it serves their arguments without applying that same analysis to the statutory boundaries of GSA's delegation authority. To hold otherwise would create a loophole and allow agencies to avoid judicial review by simply delegating entire projects to entities exempt from the APA.

#### 2. GSA's Delegation to OA Is Complete and Constitutes Final Agency Action.

GSA's unlawful delegation of authority to OA is complete and constitutes final agency action subject to judicial review by this Court under the APA. Defendant GSA insists that it has

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**                    27

not yet delegated authority to OA under the MOU because any delegation is conditional upon the President's decision "to move forward with the Project." ECF No. 38-1 at 49. As a preliminary matter, GSA's commitment to delegate is final; there is no flexibility in the MOU for GSA to reconsider or refuse to delegate at a later date. There is no next step following GSA's signature on the MOU; it is the final decision, the decision that GSA will not oversee the Project, nor be involved in the NEPA or NHPA processes. As such, GSA's final agency action has agreed to abandon its statutorily required duties.

But even were the Court to accept Defendant GSA's position that the MOU's delegation provision is conditional, the relevant condition precedent—the President's decision to "move forward with the Project"—has been satisfied and delegation therefore effected. Defendants have not explained precisely what step in the President's decisionmaking process would constitute a decision to "move forward" for purposes of triggering the delegation provision. But there can be no doubt at this point that the President has decided to "move forward" far enough to trigger delegation under the MOU. The MOU provides that "*should* the President decide to move forward with the Project[,]" OA *would* "handle project management for the Project," including having full control of the Project. But the future tense is no longer accurate. ECF No. 27-4 at 7–8. OA is acting as though it handles project management and holds full control over the Project. Namely, the Notice states that the Study will "assist the President and the [OA] *in determining how to proceed* with beautifying the exterior of the EEOB." ECF No. 42 at 1 (emphasis added). Defendants admit that "OA engaged the services of an environmental services contractor" and "contracted with a subject matter specialist in civil engineering and applied sciences" to develop the Study. *Id*. at 2. Indeed, the Deputy Director of the OA confirmed to this Court that "[s]hould the President decide to proceed with the Project," OA will "voluntarily" comply with NHPA, NEPA, and other unenumerated "statutory and regulatory processes[.]" ECF No. 38-2 at ¶ 4. Belying the conditional

phrasing of her declaration, in the very next paragraph, Ms. Martin confirmed that "OA *has engaged* a contractor to being work on an environmental assessment ('EA') under [NEPA]." *Id.* ¶ 5. The fact that OA is currently conducting what it characterizes as NHPA and NEPA review—albeit not in accordance with those statutes—is conclusive evidence the MOU's condition precedent has been met. OA would not proceed with concrete Project activities in this manner, without the involvement or approval from GSA, if OA did not accept that GSA had delegated it the authority to do so. The President has decided to move forward with the Project, thus satisfying the MOU's condition precedent and completing GSA's unlawful delegation of authority to OA.

This completed unlawful delegation constitutes final agency action. An action is "final" where it (1) "marks the consummation of the agency's decisionmaking process," and (2) determines "rights or obligations" or produces "legal consequences[.]" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations omitted). The delegation of authority from GSA to OA satisfies the first prong of *Bennett* because it is neither tentative nor interlocutory. "In assessing whether a particular agency action qualifies as final for purposes of judicial review," courts "have looked to the way in which the agency subsequently treats the challenged action[.]" *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016). Both GSA and OA are treating the delegation as final. GSA has made clear that once delegation occurs, "GSA would not be"—and now *is not*—"responsible or otherwise involved in any future decision to move forward with the Project[.]" ECF No. 38-1 at 30. And OA's actions, discussed above, demonstrate that it is moving forward on the assumption that it is exercising full control over the Project. There is no indication that either agency intends to revisit or reconsider the delegation of authority.

The delegation also satisfies the second *Bennett* prong because it is an action "from which legal consequences will flow." 520 U.S. at 178. When GSA purported to delegate its authority, it treated OA as having "obtained the legal right" to take certain actions (*i.e.*, those actions GSA was

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining    29
Order, Preliminary Injunction, and Expedited Hearing**

authorized and obligated to take, including review of the Project under NEPA and NHPA). *See Ninilchik Traditional Council v. Towarak*, No. 3:15-cv-00205, 2016 U.S. Dist. LEXIS 51370, at *21–22 (D. Alaska Apr. 17, 2016) (holding that challenged delegation constitutes final agency action). GSA's abandonment of its congressionally delegated authority, and OA's assumption of oversight and management of the Project in reliance on that abandonment, constitute tremendous legal consequences of the purported delegation. Those consequences are all the more acute because, on Defendants' own position, OA is not a federal agency and its actions lie beyond the reach of APA review.

Thus, contrary to Defendants' efforts to evade judicial review of GSA's improper delegation of authority to OA, that delegation is complete and subject to this Court's review.

### C. Even If GSA Could Lawfully Delegate Its Authority to OA, Which It Cannot, GSA Was Required to Complete NEPA and NHPA Review Before Executing the MOU

Even if the Court were to find that the MOU reflects a permissible delegation of GSA's authority, GSA was required to comply with NEPA and NHPA *before* it executed the MOU. By Defendants' own admission, it intends for subsequent Project implementation decisions to be made solely by OA, an entity whose actions are not reviewable under the APA. ECF No. 27-1 at 29–30. Therefore, the time for GSA's NEPA and NHPA compliance was prior to the MOU's execution.

When an agency takes an action that transfers jurisdiction or commits the agency to a course of action that will not later have a meaningful opportunity for environmental and historic review, then NEPA and NHPA compliance are required at the time of the transfer or commitment to a course of action. *Anacostia Watershed Soc'y v. Babbitt*, 871 F.Supp. 475, 478 (D.D.C. 1994). In *Anacostia*, the court held that NPS "was required to comply with NEPA before making its decision to transfer jurisdiction[,]" and should have completed an EIS or EA prior to signing the memorandum. *Id.* at 483 ("Because there will be no subsequent Park Service decision for future

NEPA analysis to inform, the time for the Park Service to have advised itself and the public of the environmental effects of and alternatives to its decision to transfer jurisdiction was at the time of transfer."). The time for GSA to fulfill its statutory obligations was before it signed away its authority to do so. GSA failed to do that, and that failure is independently actionable under 5 U.S.C. §§ 706(1) and 706(2)(D).

### D. OA's Purported Authority is Ultra Vires.

OA does not have—and never had—lawful authority to manage and oversee an entire painting Project at the EEOB. Thus, OA's attempt to now use the Notice to argue that "the Court's permission is not required" is incorrect. Because Section 590(c) explicitly empowers GSA's disapproval of OA's use of funds, any attempt to imbue OA with independent authority is *ultra vires*.

This Court is empowered to provide equitable relief for *ultra vires* actions, as they are "unauthorized by any law and…in violation of the rights of the individual." *Nuclear Regul. Comm'n*, 605 U.S. at 680 (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)). Equitable relief is available when agency action is "made in excess of its delegated powers and contrary to a specific prohibition in the Act." *Leedom v. Kyne*, 358 U.S. 184, 188 (1958).

Defendant GSA wrongly contends that OA has independent authority arising under Section 590, as reflected in the MOU. Pub. L. No. 100-461, § 590, 102 Stat. 2268 (Oct. 1, 1988). But Section 590(c) expressly conditions OA's use of donated property on the approval of the Administrator of General Services. *Id.* ("[a]ny use or sale of property accepted pursuant to this section, and any use of proceeds from such sale, *shall be subject to the disapproval of the Administrator of General Services* within 30 days after the Administrator receives notice of such use or sale." (emphasis added)). Because OA's use of the gift fund is subject to GSA's approval, OA does not have independent authority to "handle project management for the Project." *See* ECF

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining**    31
**Order, Preliminary Injunction, and Expedited Hearing**

No. 27-4, Attach. A at 7.  Instead, OA only performs tasks that are "entirely operational and administrative in nature." *CREW*, 566 F.3d at 224.[25] The MOU itself acknowledges OA's limitation by separately providing that "GSA would delegate any and all necessary authority for the Project to OA." ECF No. 27-4 at 8.

Furthermore, Section 590 does not confer authority on OA to assume responsibility for compliance with NEPA and NHPA, duties that Congress specifically assigned to federal agencies and made reviewable under the APA. Indeed, no prior instance exists where GSA delegated its statutory authority over the EEOB to OA, or where OA independently exercised authority over projects of this scope under Section 590.

    **E.  <u>The Project Is a Major Federal Action and a Federal Undertaking, and Defendant GSA Must Complete NEPA and NHPA Section 106 and Section 110(f) Review Before Any Further Project Action.</u>**

The Study cannot go forward. Defendant GSA has a nondiscretionary duty to initiate NEPA and NHPA review early in the planning process for major federal actions and undertakings. The Project is a proposal for major federal action, GSA is the agency responsible for it, and GSA has produced none of the environmental documentation NEPA requires nor the historic preservation documentation NHPA requires. Both NEPA and NHPA obligate GSA to complete that review before the Project takes another step. Until GSA does what the statutes require, every further Project action is unlawful.

---

[25] Judge Leon in the East Wing Ballroom case notes that "[w]hether an entity that has been determined to be a 'non-agency' can subsequently become an agency by taking on agency responsibilities has not been resolved by our Circuit." *Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*, No. 1:25-cv-04316-RJL, Mem Op. at 14 (D.D.C. Feb. 26, 2026) (comparing *Ryan v. Dep't of Just.,* 617 F.2d 781, 788 (D.C. Cir. 1980) ("Once a unit is found to be an agency, this determination will not vary according to its specific function in each individual case."), with *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042 n.5 (D.C. Cir. 1985) (suggesting that "[i]f the President adds duties to an entity which bring it outside the sole-function test, Congress would want the entity to be covered" by FOIA). If this Court finds that OA does have independent authority, Plaintiffs will interplead it as a party subject to the APA.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining**     32
**Order, Preliminary Injunction, and Expedited Hearing**

### 1. *Defendant GSA Failed to Complete NEPA.*

The Project is a major federal action. NEPA directs that every federal agency prepare a detailed environmental statement for "proposals for…major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). A "proposal" exists at the stage when "an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." *Id.* § 4336e(12). The obligation therefore attaches at the planning stage, not at the moment of execution: NEPA's purpose is to inform the decision before it is made, and review conducted after the agency has committed to a course of action is no review at all. The duty runs to the agency. It is a statutory obligation Congress imposed on federal agencies, and it is not discharged by an entity that is not one.

The Project satisfies every element of the statutory definition. First, there is a defined goal: to change the appearance of the EEOB by applying paint to its exterior. Second, GSA is actively preparing to decide among the means of accomplishing that goal. GSA committed to hand off Project authority by executing the MOU, and for months work has proceeded under its purported authorization: planning, coordination with contractors, presentations to CFA and NCPC, definition of the Project's scope, and now the Study itself. An agency that has already papered the delegation, watched the scope be fixed, and permitted physical testing to be scheduled is well past the point at which NEPA's duty attaches. Third, the effects of the Project can be meaningfully evaluated now. Its scope is defined, its methods are known, and the historic fabric it would alter is identified.

Against this, GSA offers only that OA intends to complete an environmental review "voluntarily." That does not answer the statute. NEPA imposes its obligations on the responsible federal agency, and a review that OA designs for itself carries none of the statutory requirements, none of the procedural safeguards, and none of the accountability that bind GSA. It cannot be

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining**   33
**Order, Preliminary Injunction, and Expedited Hearing**

enforced, it cannot be reviewed on an administrative record, and it can be abandoned at will. The record confirms the point: Plaintiffs have still not seen the Environmental Assessment that OA said would be finalized "no earlier than June 24, 2026." ECF No. 38-2 ¶ 5. A lawful NEPA process affords the public sufficient time to review a fair depiction of the Project and its alternatives. Plaintiffs have received neither the time nor the depiction.

Because GSA has stepped aside from a review NEPA requires it to perform, and because the Study threatens irreversible damage to the EEOB's historic exterior, the harm is imminent and the violation is complete. The Court should enjoin further Project action, including the Study, until GSA completes the NEPA review Congress requires of it.

### 2. Defendant GSA Failed to Complete NHPA.

The Project is a federal undertaking subject to NHPA, and Defendant GSA must complete the review processes required by the Act before any additional Project actions occur. *See* 36 C.F.R. §§ 800.16(y). Yet, Defendant GSA has not defined an area of potential effects, identified affected historic properties, or made any determination of effects for the EEOB, the Lafayette Square NHLD, or other nearby listed and contributing resources, violating Section 106 of NHPA.[26] Defendant GSA has also not undertaken the minimization-of-harm planning required by Section 110(f). GSA has neither "identified and evaluated alternatives," nor given them "full and reasoned consideration" as courts require, nor documented any measures to minimize harm "to the maximum extent possible," as the statute demands. 54 U.S.C. § 306107; *Presidio Hist. Ass'n v. Presidio Tr.*, 811 F.3d 1154, 1170–71 (9th Cir. 2016). Defendant GSA has not reported publicly any measures to minimize harm, as required by 36 C.F.R. § 800.10. No such planning or

---

[26] In a typical Section 106 process, federal agencies would consult with stakeholders before submitting project proposals to CFA and NCPC.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining    34**
**Order, Preliminary Injunction, and Expedited Hearing**

consultation has occurred here. The Project violates both the baseline procedural requirements of Section 106 and the heightened procedural mandates of Section 110(f) of the NHPA.

Agencies must complete the obligations imposed by Sections 106 and 110(f) "*prior* to the approval of the expenditure of any Federal funds on the undertaking or *prior* to the issuance of any license" and *prior* to the approval of any Federal undertaking. 54 U.S.C. § 306108 (emphasis added). NHPA is conducted and completed early in the planning process, before a decision is made. *See Nat'l Tr. For His. Pres. v. Blanck*, 938 F.Supp. 908, 919–24 (D.D.C. 1996); *Don't Tear It Down, Inc. v. Gen. Servs. Admin.*, 401 F.Supp. 1194, 1199 (D.D.C. 1975). Here, GSA has stood aside while months of planning, coordination with contractors, and definition of the Project's scope have proceeded under its purported authorization with an insistence that the EEOB must be painted. Each of those steps narrows the range of alternatives and makes it harder for any subsequent consultation to give genuine consideration to measures that would avoid or reduce harm to the EEOB and the Lafayette Square NHLD.

GSA has abdicated its role as a steward of the EEOB. Section 110(f) is a non-discretionary provision and mandates that federal agencies "to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark" and afford the ACHP a reasonable opportunity to comment. 54 U.S.C. § 306107. The regulations further require consultation and development of alternatives to avoid, minimize, or mitigate harm. 36 C.F.R. §§ 800.6, 800.10. This heightened standard of care applies not only to the EEOB but to all of the NHLs located in the Lafayette Park NHLD that might be adversely affected, including by visual impact, on account of the Defendants' alteration of the EEOB. The Ninth Circuit has held that Section 110(f) "builds on the general consultation process set out in Section 106" but requires agencies to "thoroughly consider—rather than simply identify and catalog—prudent and feasible alternatives" to minimize harm. *Presidio Hist. Ass'n*, 811 F.3d at 1169–70.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**    35

### 3. The Section 107 Exemption Does Not Apply to the EEOB.

Section 107's exemption of certain properties from NHPA review does not apply to the EEOB, because the statute does not identify the EEOB as one of the explicitly exempt properties. Section 107 of the NHPA states that: "Nothing in this division applies to the White House and its grounds, the Supreme Court building and its grounds, or the United States Capitol and its related buildings and grounds." 54 U.S.C. § 307104. The statutory language is clear on its face—the EEOB is not included. Moreover, the EEOB does not lie within "the White House and its grounds." Defendants admit that "[w]hile the White House and President's Park are an administrative unit within the National Park System, the EEOB is not part of that administrative unit." ECF No. 15 at 20. Additionally, Public Law 87-286 defines the White House and its grounds as the "eighteen and seven one-hundredths acres"—a parcel that does not include the EEOB. Pub. L. No. 87-286, 75 Stat. 586 (1961).

The only judicial decision to define "White House and its grounds" limited the term to the roughly eighteen-acre NPS-administered parcel. *See Jabr*, 2019 WL 13110682 at *19. In *Jabr*, the court interpreted a criminal statute's reference to the "restricted area of the White House or its grounds" and concluded that the Treasury Building fell outside the definition of that phrase. The underlying court decision found that the term "White House grounds" refers to an eighteen-acre area—as originally defined in the very statute that designated authority to NPS to administer the White House and its grounds. *Id.* at *19 n.9. The EEOB flanks the White House on the west and stands in a parallel relationship to the mansion. Because the Treasury Building falls outside the eighteen-acre definition, and because the EEOB stands in the same geographic relationship to the White House as the Treasury, the EEOB is not part of "the White House and its grounds" within the meaning of Section 107. As the Court noted: "Where Congress uses the same term in the same way in two statutes with closely related goals, basic canons of statutory construction suggest a

presumption that Congress intended the term to have the same meaning in both contexts." *Id.* at *18–19 (quoting *New Hampshire v. Ramsey*, 366 F.3d 1, 26 (1st Cir. 2004)).

Furthermore, while Congress expressly extended the exemption for the Capitol to include "its related buildings," it did not do so for the White House. When Congress includes particular language in one part of a statute and omits it in another, that omission is presumed to be intentional. *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)). The absence of "related buildings" language in the White House exemption thus cuts against reading Section 107 to include the EEOB.

Agency practice confirms this statutory construction. NPS mapping and documentation distinguish the White House and its exempt grounds from the EEOB and Treasury. This Court may take judicial notice of these agency records, and Courts have long recognized official government maps and other agency records as proper subjects of judicial notice. *See Gov't of Canal Zone v. Burjan*, 596 F.2d 690, 693–94 (5th Cir. 1979) (taking judicial notice of official government boundary maps under Rule 201); *United States v. Lesh*, 107 F.4th 1239, 1243–44 (10th Cir. 2024) (affirming judicial notice of publicly available federal land-use maps to establish designations). A 2022 NPS amendment to the Lafayette Square NHLD boundary explicitly includes the EEOB and Treasury within the district while excluding the White House and White House grounds, "because they are legally exempt from listing…pursuant to Section 107." ECF No. 16-21 at 6. The EEOB Historic Condition Report likewise assumes that GSA actions affecting the building would undergo Section 106 review. ECF No. 16-18 at 49.

Defendants primarily rely on a 1994 Programmatic Agreement ("PA") to expand the Section 107 exemption. The 1994 PA, executed between ACHP, GSA, and the DC SHPO, is a contract implementing Section 106, not an Act of Congress. To the extent it suggests the EEOB is

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining    37 Order, Preliminary Injunction, and Expedited Hearing**

part of "the White House grounds," that reading conflicts with statutory text, judicial construction, and subsequent agency practice. *See* ECF No. 16-16 ¶¶ 4–6.

For all of the reasons set forth above, the EEOB does not fall within the narrow exemption provided by 54 U.S.C. § 307104, and Defendants have not carried their burden of proving otherwise. The EEOB is not part of the eighteen-acre "White House grounds," and any federal undertaking affecting the building is subject to NHPA's requirements.

## III.     THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR.

In weighing the balance of equities, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotation omitted); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Where the Government is a defendant, "[i]t is well settled that the balance of equities and public interest factors merge" because the Government's interest is the public interest. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025).

This inquiry is especially significant where, as here, Plaintiffs seek to prevent irreparable harm to an NHL, its NHLD setting, and the public's ability to experience those historic resources and participate meaningfully in the NHPA process. Protecting historic properties, ensuring lawful federal decision making, and maintaining public confidence that the government complies with Congress's mandates are all strong public interests that weigh heavily in favor of a TRO and PI.

Plaintiffs' harms far outweigh any burden on Defendants. As explained above, the planned testing will permanently damage the EEOB's historic granite and mortar and irreversibly alter an NHL within an NHLD. By contrast, the only harm Defendants can assert from a TRO and PI is delay in carrying out a discretionary testing plan for a painting project initiated at the President's personal preference. That imbalance in the gravity of harms weighs decisively in Plaintiffs' favor. *See Winter*, 555 U.S. at 24–26.

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining     38
Order, Preliminary Injunction, and Expedited Hearing**

Preserving the status quo causes no legally cognizable injury to Defendants; it simply keeps conditions as they are today. The EEOB has stood for more than a century with its gray, unpainted stone exterior. ECF No. 7-8. Courts in this Circuit give particular weight to preserving the status quo where, as here, the requested injunction is merely designed "to maintain the status quo pending a final determination on the merits." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).

To the extent Defendants contend they will suffer harm because OA has already begun to implement the planned testing, any such harm is "self-inflicted" and carries little equitable weight. *See, e.g.*, *League of Women Voters*, 838 F.3d at 12–13 (agency cannot bootstrap harm from its own unlawful actions to defeat injunctive relief). GSA chose to sign an unlawful MOU purporting to delegate authority to OA and is abdicating its role as the lead agency for a major exterior project on an NHL without first undertaking the procedures Congress mandates. GSA cannot now rely on the costs of that premature decision to outweigh Plaintiffs' concrete and irreparable harms. Nor can it claim institutional injury from being required to follow NHPA and NEPA; enforcing the statutory requirements respects, rather than undermines, the separation of powers.

In sum, Plaintiffs face permanent loss of historic fabric, setting, and statutory procedural protections; Defendant GSA faces, at most, a temporary delay in implementing the Study. The balance of equities strongly favors granting both a TRO and a PI.

## IV.   THE PUBLIC INTEREST SUPPORTS THE REQUESTED RELIEF.

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. Preserving the status quo so that Congress' procedures can run is in the public interest. Courts consistently recognize that preserving historic resources, ensuring lawful and transparent federal decision-making, and maintaining the integrity of federal

environmental review statutes are profound public interests and favor a TRO and PI preventing OA from undertaking irreversible alterations to the EEOB through the planned testing.

### A.  Compliance with NEPA and NHPA Is Itself a Powerful Public Interest.

Courts recognize the strong public interest in the government's "meticulous compliance" with the law. *See Fund for Animals, Inc. v. Espy*, 814 F.Supp. 142, 152 (D.D.C. 1993). Congress has declared that "the preservation of this irreplaceable heritage is in the public interest." Pub. L. No. 89-665, as amended by Pub. L. No. 96-515. NHPA embodies that determination by requiring agencies to identify and consider effects on historic properties, including through certain consultations. *See, e.g.*, *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 805 (9th Cir. 1999). In other words, agencies must "stop, look, and listen" before proceeding with actions that may harm historic resources. *See id.* Following required NHPA procedure is even more crucial, as the EEOB is an NHL, the highest designation available under federal law. Section 110(f) imposes a heightened duty on agencies to "minimize harm" to NHLs "to the maximum extent possible." 54 U.S.C. § 306107.

The D.C. Circuit has recognized that by complying with NHPA requirements, agencies serve the public interest. *See e.g.*, *Muckleshoot Indian Tribe*, 177 F.3d at 814 (NHPA procedures direct agencies to explore actions that are not "inconsistent with [NHPA's] basic policy objectives.") (internal citations omitted).

Further, improperly delegating authority to an entity outside of NHPA's ambit, for instance, effectively circumvents the statutory frameworks that serve the public interest, especially when any actions then taken by the entity are unreviewable under the APA. 40 U.S.C. § 121(d)(1); Pub. L. No. 100-461, § 590; ECF No. 27-1 at 30–31. Defendant GSA handing authority to OA as represented in the MOU does just that.

Nor is there a legitimate public interest in allowing an agency or official to avoid well-established statutory procedures. "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (citing *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). The public interest lies in orderly administration of the law and in ensuring that GSA appropriately adheres to and abides by statutes like NHPA.

The President's personal aesthetic preferences do not outweigh congressionally mandated procedures. In other words, the President is free to request that an agency pursue certain aesthetic changes to a historical building, but such direction does not displace the statutory obligations that govern the execution of that Executive request. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 636–38 (1952) (Jackson, J., concurring).

**B. Preserving the Status Quo to Require GSA to follow NHPA and NEPA Is Strongly in the Public Interest.**

Courts routinely hold that preserving the status quo pending the outcome of litigation is in the public interest where, as here, failure to do so risks irreparable environmental or cultural harm. *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F.Supp.2d 1, 24–25 (D.D.C. 2009). The D.C. Circuit also rejects the notion that mere delay to complete required procedures harms the public, emphasizing that agencies have no rightful interest in acting contrary to federal statutes. *See generally, Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912–13 (D.C. Cir. 2024); *see also League of Women Voters*, 838 F.3d at 12. That principle applies squarely here. A TRO and PI preventing the planned testing are plainly in the public interest. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 536 (D.C. Cir. 2018).

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining    41 Order, Preliminary Injunction, and Expedited Hearing**

### C. <u>Once Historic Fabric Is Damaged, It Cannot Be Restored.</u>

Damage to historic properties constitutes a uniquely weighty public harm because historic resources, once destroyed or altered, cannot be replaced. *See, e.g.*, *Save the Courthouse Comm. v. Lynn*, 408 F.Supp. 1323, 1343 (D. N.Y. 1975) ("the act of demolition is irrevocable").

Because painting the EEOB's unpainted masonry would irreversibly damage historic materials and permanently alter the character of an NHL, the public interest overwhelmingly favors preventing any exterior surface preparation, cleaning, repointing, priming, or painting unless and until Defendant GSA completes the NEPA and NHPA processes Congress requires. *Id.*; *see also Nat'l Wildlife Fed. v. Burford,* 835 F.2d 305, 326 (D.C. Cir. 1987).

### V.    ANY SECURITY BOND SHOULD BE WAIVED.

Plaintiffs request that the Court waive any security bond requirement. Federal Rules of Civil Procedures 65(c) instructs that, when issuing a TRO or PI, a court should order a security bond that covers the costs and damages for a wrongfully enjoined party. But the Rule grants district courts "wide discretion" in whether to require a bond, and, if so, in what amount. *See, e.g.*, *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F.Supp.2d 30, 52 (D.D.C. 2013); *LULAC v. Exec. Off. of the President*, 780 F.Supp.3d 135, 224 (D.C. Cir. 2025). This Circuit has previously imposed only nominal bonds in cases where the public interest strongly favors injunctive relief, where a substantial bond would effectively bar access to effective relief or where there is a lack of material or monetary harm that would follow injunctive relief. *See, e.g.*, *Env't Def. Fund v. Corps of Eng'rs of U.S. Army*, 331 F.Supp. 925, 927 (D.D.C. 1971); *Armstrong v. Bush*, 807 F.Supp. 816 (D.D.C. 1992); *Fed. Prescription Serv. v. Am. Pharmaceutical Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980).

Here, Plaintiffs seek a TRO and a PI against GSA, and requiring a bond would forestall Plaintiff's right to judicial review. DCPL is a nonprofit organization that is litigating this case

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining    42
Order, Preliminary Injunction, and Expedited Hearing**

because the Study threatens the foundational purpose of the organization. Given the strong public interest in preventing unlawful and irreversible damage to irreparable historic resources and in ensuring compliance with NHPA, NEPA, and the APA, Plaintiffs respectfully submit that the Court should waive the Rule 65(c) bond requirement or impose a minimal bond.

### VI.  PLAINTIFFS SEEK AN EXPEDITED HEARING.

The ordinary schedule for a PI motion cannot protect the EEOB, which is why Plaintiffs also seek an immediate TRO. Under Local Civil Rule 65.1(c), Defendants' opposition is not due until seven days after service, and under Local Civil Rule 65.1(d), a hearing need not be set until twenty-one days after filing. Both periods run past the date Defendants have identified for the Study to begin, and Defendants' own filings do not agree on that date. The Third Martin Declaration states that the Study "will begin on July 30, 2026." ECF No. 42-1 ¶ 7. The Notice states that OA will begin testing "no earlier than August 3, 2026," and cites a paragraph of that declaration containing only the declarant's certification under 28 U.S.C. § 1746. ECF No. 42 at 1; ECF No. 42-1 ¶ 20. On either date, the Study will be underway before this Motion is fully briefed under the default schedule.

That timing is what makes expedition necessary. A TRO, like a PI, exists "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Once the Building Consultant extracts thirteen core samples from the façade, applies mineral silicate coatings to four panels of original granite, and pressure washes those panels "up in pressure until the coating is removed," ECF No. 42-1 ¶¶ 10, 14, 16, there is no status quo left to preserve. Relief that arrives after that work is finished is not relief.

Where threatened harm is imminent and irreversible, this Circuit recognizes that interim relief is appropriate to prevent action that would moot the litigation or destroy the interests a plaintiff seeks to protect. *See Wash. Metro. Area Transit Comm'n,* 559 F.2d at 844. That principle

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**          43

governs here. Defendant GSA has permitted OA to move forward with physical work on a National Historic Landmark while the lawfulness of the delegation that supposedly authorizes that work remains undecided. If the Study proceeds on schedule, this Court's eventual ruling on the delegation question will be an academic exercise conducted over an altered building.

Plaintiffs therefore respectfully request that the Court set a hearing on this Motion on or before August 3, 2026. Should the Court be unable to hear the Motion by that date, Plaintiffs request that the Court enter an order preserving the status quo until a hearing can be held.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Plaintiffs respectfully request this Court grant their Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing.

Dated: July 30, 2026

Respectfully submitted,

/s/ Gregory Alan Werkheiser, Bar No. VA210
Marion Forsyth Werkheiser, Bar No. 486465
Charles N. Curlett, Jr., Bar No. 497920
Lydia Dexter, Bar No. OR0032
Jessie Barrington, Bar No. VA244
Caitlin Grace McCurdy, Bar No. NH0004
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (703) 408-2002
Emails:
greg@culturalheritagepartners.com
marion@culturalheritagepartners.com
charles@culturalheritagepartners.com
lydia@culturalheritagepartners.com
jessie@culturalheritagepartners.com
caitlin@culturalheritagepartners.com

COUNSEL FOR PLAINTIFFS

**Plaintiffs' Memorandum in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing**    44

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on Defendants via CM/ECF electronic notice.

/s/ *Gregory Alan Werkheiser*
GREGORY ALAN WERKHEISER
Attorney for Plaintiffs