# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CULTURAL HERITAGE PARTNERS, PLLC, et al.**,

Plaintiffs,

v.

**DONALD J. TRUMP, et al.**,

Defendants.

Civil Action No. 1:25-cv-03969-DLF

**DECLARATION OF JUDITH M. JACOB**

**DECLARATION OF JUDITH M. JACOB, Senior Conservator, National Park Service, retired**

I, Judith M. Jacob, under 28 U.S.C. § 1746 hereby declare:

1. My name is Judith M. Jacob. I am over the age of 18 and competent to testify. I have personal knowledge of the matters stated herein and could and would testify competently thereto if called as a witness.
2. I am a Conservator with over 40 years of professional experience in the preservation of historic masonry buildings and monuments. I am a Professional Associate of the American Institute for Conservation. I hold a Bachelors of Arts in Art History (Middlebury College, 1978) and a Master of Science in Historic Preservation with a concentration in conservation (Columbia University, 1989). I had two post-graduate fellowships with the International Centre for the Study of the Preservation and Restoration of Cultural Property: stone conservation (Venice, 1991) and mural paintings conservation (Rome, 1994).

3. I recently retired as a Senior Conservator from the National Park Service where I worked on the restoration and stabilization of numerous National Monuments, Memorials, and Sites.
4. I was hired by the National Park Service in 1986. During my 39-year history with the agency, I provided support services for the preservation of monuments, memorials, and sites; I administered conservation projects, executed research for projects, executed conservation treatments, and provided training and guidance to other National Park Service employees and student interns. I have also written articles on conservation and presented my work to numerous audiences.
5. My initial position at the National Park Service was as an Architectural Technician. In that position I was responsible for researching the construction histories of nineteenth-century buildings and executing and reviewing materials analyses for these buildings.
6. I spent my career evaluating the condition of historic masonry, developing treatment recommendations consistent with the Secretary of the Interior's ("SOI") Standards for Rehabilitation, and executing and overseeing restoration work. I have also spent the last twenty years focusing on surface conditions of stone and studying their relationships to weathering, erosion, salts, pollution, chemical and mechanical treatments, and the microorganisms that inhabit them.
7. I submit this declaration at the request of Plaintiffs to explain why painting or otherwise coating the Eisenhower Executive Office Building (the "EEOB") would irreparably damage its historic fabric and setting and why the documents provided by Defendants on July 20, 2026, fail to meet the expected standards for rehabilitation of the historic

masonry of a National Historic Landmark. The opinions expressed herein are based on my expertise and on my review of publicly available documents cited below.

8. To my knowledge, the granite exterior of the EEOB has never been painted. Granite was selected for this building based on its appearance, durability, and resistance to deterioration from weathering. It has performed well for more than 150 years.

9. Based on the Office of Administration's submissions to the Commission of Fine Arts (CFA 16/APR/26-3) and the National Capitol Planning Commission (NCPC File Number 8777) as well as Defendants' own filings (ECF Nos. 42–42-1), I understand that the Executive Office of the President is proposing to paint the currently un-painted granite façade white, repaint cast iron elements, replace sealant, and conduct stone repairs. For this Declaration, I am using "paint" to refer to any liquid-applied pigmented coating.

10. Cleaning, pointing, installing sealants, and painting buildings are major interventions that require a complete evaluation of building conditions prior to their consideration. Condition surveys confirm sound material and identify deficiencies. At the conclusion of a condition survey, performance and appearance of deficiencies are evaluated with the evaluation enabling the creation of an intervention plan. The plan, complete with options, is used to determine the full extent of interventions, how best to perform work, and future maintenance needs. For the EEOB, a condition survey would include an investigation of granite, mortar joints, sealant joints, and also windows, metal elements, roof, and water-removal systems.

11. Cleaning is a process that can be damaging to stone, as well as metal elements, glass, and synthetic materials. Abrasive cleaning methods will etch and scar surfaces and remove the fine textures and chisel marks left by stone cutters. Chemical cleaning agents can be



Doc ID: 5a332f623822c7361009477691530002d6920dc33

difficult to remove entirely, leaving reactive surfaces that can produce stains and prevent paint, mortar, and sealants from adhering properly.

12. Repointing masonry requires removal of existing mortar and no matter how well the task is performed, the process always damages stone, namely in the chipping of edges and cut-marks made through surfaces.
13. Granite is a poor substrate for paint as its density prevents full adherence, and even roughened surfaces are poor substrates for paint. Salts in the stone (Washington, D.C. is a marine environment) will prevent good adhesion. Film-forming paint failure manifests in flaking and bubbling. Uniform adhesion of silicate coatings cannot be guaranteed. The building will require frequent re-painting campaigns to maintain a visually uniform surface.
14. Mortar, being a porous material, allows for moisture within a building's fabric to evaporate out. Covering mortar with paint will prevent natural evaporation and can contribute to moisture-related problems. In addition, new mortar must be fully cured before the application of paint to ensure good adhesion. Full cure is dependent on type of mortar, thickness of mortar, temperature, and humidity. Without waiting for a full cure, paint will fail on joints.
15. Once the building is painted, identifying and addressing problems that manifest themselves on surfaces—primarily water infiltration and the development of microcracks—will be difficult. Also, painted mortar will make future re-pointing campaigns difficult to execute.
16. I have reviewed the Notice of Planned Testing as well as Heather Martin's Third Declaration ("the documents"). Critical to evaluating proposals to conduct work on



Doc ID: 5a332f623822c736100947769153002d6920dc33

historic buildings is addressing a company's qualifications—and the individuals in the company—and experience. Qualifications include work on National Historic Landmarks, work on exterior envelopes of masonry buildings and especially those of granite, and a working knowledge of material-testing and analyses protocols. The lack of disclosure of contractor identity and their work plan makes it impossible to confirm that the work meets the Secretary of Interior standards, or any other standards of good workmanship. Furthermore, there is a significant number of details missing from the document regarding the perceived condition of the EEOB and the planned interventions, including its painting, which would be essential to assess any proposal. Based on my professional expertise and experience working in masonry conservation, I have the following specific observations and concerns:

a. Based on the images provided, and aside from a few areas with stains, the EEOB does not appear to be any more soiled than other buildings in Washington, D.C. I see no images of flaking-disaggregating granite that suggest a problem any greater than that on a few stones.

b. The documents do not explain the specifics of observed stone deficiencies and how these deficiencies will be evaluated. Information is needed on the following:

    i. Rough percentage of areas of deficiencies for disaggregation, flaking, spalling, cracking, and staining;

    ii. Why deficiencies are considered minor enough not to require a full stone-by-stone survey of the building;

    iii. Whether "existing areas of degradation" are stable or active;

iv. How rusted iron elements are being addressed, given that the iron-oxide stains and cracks suggest iron elements within the masonry mass;

v. Whether cracks are stable or active;

vi. How crack activity will be determined;

vii. Whether areas with visible salts are increasing in size;

viii. Whether areas with stains are stable or active;

ix. Whether disaggregated grains and flakes are surface conditions or evidence of deeper problems, and how these conditions will be assessed and addressed;

x. The extent to which mortar is considered deficient. How are mortar deficiencies being defined?

xi. The extent to which sealant is being installed. Is sealant being used to replace mortar?

c. The documents seem to seek two things at once: restore the exterior (*i.e.*, maintain granite) and preserve the exterior (*i.e.*, cover granite to prevent deterioration), but as the SOI Standards for the Treatment of Historic Properties confirm, painting the building to change its appearance is neither restoration nor preservation. Also, paint does not stabilize deteriorating granite.

i. The SOI's Standards for the Treatment of Historic Properties: Restoration as a Treatment and Standards for Restoration[1] states:

---

[1] Nat'l Park Serv., *The Secretary of the Interior's Standards for the Treatment of Historic Properties: Restoration as a Treatment and Standards for Restoration*, https://www.nps.gov/articles/000/treatment-standards-restoration.htm (last visited July 29, 2026).

Restoration is defined as the act or process of accurately depicting the form, features, and character of a property as it appeared at a particular period of time by means of the removal of features from other periods in its history and reconstruction of missing features from the restoration period. The limited and sensitive upgrading of mechanical, electrical, and plumbing systems and other code-required work to make properties functional is appropriate within a restoration project.

ii. The SOI's Standards for the Treatment of Historic Properties: Preservation as a Treatment and Standards for Preservation[2] states:

Preservation is defined as the act or process of applying measures necessary to sustain the existing form, integrity, and materials of an historic property. Work, including preliminary measures to protect and stabilize the property, generally focuses upon the ongoing maintenance and repair of historic materials and features rather than extensive replacement and new construction. New exterior additions are not within the scope of this treatment; however, the limited and sensitive upgrading of mechanical, electrical, and plumbing systems and other code-required work to make properties functional is appropriate within a preservation project.

---

[2] Nat'l Park Serv., *The Secretary of the Interior's Standards for the Treatment of Historic Properties: Preservation as a Treatment and Standards for Preservation*, https://www.nps.gov/articles/000/treatment-standards-preservation.htm (last visited July 29, 2026).

d. I infer that a condition survey will be of representative areas only. I have the following additional questions:

    i. How will these representative areas be selected?

    ii. Are stone conditions at the top of the building expected to mirror those at the bottom?

    iii. If sounding is desired to locate stone with internal failure planes, shouldn't every single stone be sounded?

    iv. What is meant by "visual" and "hands on"?

e. The documents are unclear to what is meant by "petrographic analysis," and I have the following additional questions:

    i. How will core samples will be selected?

    ii. Will samples of flaking and disaggregation be taken?

    iii. What type of analysis is being proposed?

    iv. What questions are being asked that will be answered by a petrographic analysis?

    v. How will cores be used to reflect the condition of the entire building?

f. How has information on past condition surveys and past interventions been incorporated into this survey and testing plan? What is known about the mineral and chemical composition of the granite, its weathering, existing deficiencies, and historical treatments, that is being built upon in this current testing regime?

g. The documents state the need to understand "the potential effects of applying and removing a mineral silicate coating to the exterior of the EEOB." ECF No. 42 at 1; *See also* ECF No. 42-1 ¶ 4. A full evaluation of this coating includes a

determination of its longevity and future maintenance needs. To fully evaluate a coating, the following information needed:

i. Published technical data and the Safety Data Sheet;

ii. The manufacturer's recommended conditions for application and recommended substrates;

iii. A statement from the manufacturer recommending its application to the EEOB; and

iv. Years of warranted good condition provided by the manufacturer for the EEOB.

h. Additional questions left unanswered by the documents:

i. How were paint tests executed on sample granite slabs and what were the results?

ii. How will the coating be applied?

iii. What preparation work is required prior to coating application?

iv. How will the longevity of the coating be determined?

v. If there are masonry repairs, including pointing and sealant installation, how long will these repairs be given to fully set and cure before coating application?

vi. How will the appearance of the coating be evaluated?

vii. How will efficacy of the coating be evaluated?

viii. How will durability of the coating be evaluated?

ix. If there is a desire to provide a protective function to the granite, how will this be evaluated?



Doc ID: 5a332f623822c7361009477691530002d6920dc33

x. How long will samples be in place to observe weathering and adhesion?

xi. How long will the coating be in place before removal tests?

xii. If pressure washing does not remove the coating, what other methods will be tried?

xiii. How will "least damaging" be evaluated and how is damage defined?

xiv. Why is "no damage" not a goal?

xv. Are the Environmental Services Contractor and their subcontractors experienced in the examination and evaluation of material performance of historic masonry buildings? Are they experienced in preparing treatment options and providing advantages and disadvantages of options regarding the safeguarding of materials? Are they experienced in producing maintenance plans for buildings?

xvi. How will the third-party reviewer be selected? Will they have the necessary experience for the review?

xvii. How will deficiencies in stone be addressed?

xviii. How long is work expected to last? How long will the building be encased in scaffolding?

I declare under penalty of perjury that the foregoing is true and correct. Executed on 29 July 2026 in Brooklyn, New York.

Judith M. Jacob

---

Judith M. Jacob, Senior Conservator, National Park Service, retired