UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CULTURAL HERITAGE PARTNERS, PLLC, *et al.*,<br><br>  Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>  Defendants. | Case No. 1:25-cv-03969-DLF |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED HEARING**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND..................................................................... 2

LEGAL BACKGROUND .............................................................................................................. 4

    I.       National Historic Preservation Act ................................................................. 4

    II.      National Environmental Policy Act .......................................................................... 6

    III.     Administrative Procedure Act.................................................................................... 6

    IV.    OA's Independent Statutory Authority at the EEOB................................................. 7

LEGAL STANDARD...................................................................................................................... 8

ARGUMENT................................................................................................................................... 9

    I.       Plaintiffs failed to demonstrate a likelihood of imminent irreparable harm ......... 10

    II.      Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims........................................................................................................ 13

          A.      Plaintiffs lack standing to bring any of their claims ................................. 13

                 1.      Plaintiffs' asserted injuries are insufficient to demonstrate standing ....................................................................................... 14

                 2.      Plaintiffs' alleged injuries are not traceable to GSA .................... 18

                 3.      Plaintiffs' alleged injuries are not redressable ............................. 18

          B.      Plaintiffs have not pleaded a common-law *ultra vires* claim ................... 19

          C.      Plaintiffs have not identified a final agency action................................. 21

          D.      Plaintiffs' NEPA and NHPA Claims Impermissibly Seek to Have this Court Oversee Ongoing Administrative Processes ........................... 24

    III.     The balance of harms and the public interest weigh against injunctive relief...... 26

    IV.    If an injunction is granted, Plaintiffs should be required to post a bond .............. 27

CONCLUSION.............................................................................................................................. 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adair v. England*,
    193 F. Supp. 2d 196 (D.D.C. 2002) ........................................................................ 19

*Am. First Legal Found. v. Greer*,
    153 F.4th 1311 (D.C. Cir. 2025) ............................................................................ 18

*Am.'s Bldg. Trades Unions v. Dep't of Def.*,
    783 F. Supp. 3d 290 (D.D.C. 2025) ........................................................................ 27

*Aminjavaheri v. Biden*,
    No. 1:21-CV-2246-RCL, 2021 WL 4399690 (D.D.C. Sept. 27, 2021) ............................. 19, 20

*Anacostia Watershed Soc'y v. Babbitt*,
    871 F. Supp. 475 (D.D.C. 1994) ............................................................................ 23

*Animal Legal Def. Fund, Inc. v. Glickman*,
    154 F.3d 426 (D.C. Cir. 1998) .............................................................................. 16

*Blue Ridge Env't Def. League v. Nuclear Regul. Comm'n*,
    716 F.3d 183 (D.C. Cir. 2013) .............................................................................. 11

*Centro de Trabajadores Unidos v. Bessent*,
    167 F.4th 1218 (D.C. Cir. 2026) ............................................................................ 22

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) .............................................................................. 12

*City of Alexandria. v. Slater*,
    198 F.3d 862 (D.C. Cir. 1999) ............................................................................... 4

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) ............................................................................... 10

*Climate United Fund v. Citibank, N.A.*,
    154 F.4th 809 (D.C. Cir. 2025) ............................................................................. 27

*Ctr. for Biological Diversity v. FAA*,
    804 F. Supp. 3d 86 (D.D.C. 2025) ........................................................................... 6

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009) .............................................................................. 25

*Ctr. for Taxpayer Rts. v. I.R.S.*,
    815 F. Supp. 3d 1 (D.D.C. 2025) ......................................................................... 13, 14

*Dearth v. Holder*,
    641 F.3d 499 (D.C. Cir. 2011) .............................................................................. 13

*Del. Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.*,
106 F.4th 1195 (D.C. Cir. 2024) ............................................................................. 22

*Earthworks v. U.S. Dep't of the Interior*,
105 F.4th 449 (D.C. Cir. 2024) ............................................................................... 11

*Earthworks v. U.S. Dep't of the Interior*,
496 F. Supp. 3d 472 (D.D.C. 2020) ........................................................................ 11

*Ellipso, Inc. v. Mann*,
460 F. Supp. 2d 99 (D.D.C. 2006) ............................................................................ 9

*Envtl Def. Fund v. FERC ("EDF")*,
2 F.4th 953 (D.C. Cir. 2021) ........................................................................... 14, 17

*Fisheries Survival Fund v. Jewell*,
236 F. Supp. 3d 332 (D.D.C. 2017) ........................................................................ 10

*Food & Drug Amin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................................................ 17

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ..................................................................... 12, 13, 17

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ................................................................................................ 19

*Freedom Republicans, Inc. v. Fed. Election Comm'n*,
108 F.4th 836 (D.C. Cir. 2024) ............................................................................... 18

*Freedom Republicans, Inc. v. Fed. Election Comm'n*,
13 F.3d 412 (D.C. Cir. 1994) .................................................................................. 18

*Greater New Orleans Fair Hous. Action Ctr. v. Dep't of Hous. & Urban Dev.*,
639 F.3d 1078 (D.C. Cir. 2011) ................................................................................ 9

*Harris Cnty. v. Kennedy*,
786 F. Supp. 3d 194 (D.D.C. 2025) .......................................................................... 8

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
235 F.3d 588 (D.C. Cir. 2001) ......................................................................... 21, 22

*Ipsen Biopharmaceuticals, Inc. v. Becerra*,
678 F. Supp. 3d 20 (D.D.C. 2023) ............................................................... 18, 20, 24

*Karst Env't. Educ. & Prot., Inc. v. EPA*,
475 F.3d 1291 (D.C. Cir. 2007) ................................................................................ 6

*Katz v. Georgetown Univ.*,
246 F.3d 685 (D.C. Cir. 2001) .................................................................................. 8

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) .......................................................................... 8

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)............................................................................................................ 17

*Marsh v. Or. Natl Res. Council*,
  490 U.S. 360 (1989).............................................................................................................. 6

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997).............................................................................................................. 8

*McMillan Park Comm. v. Nat'l Cap. Plan. Comm'n*,
  968 F.2d 1283 (D.C. Cir. 1992)............................................................................................ 4

*Mississippi v. Johnson*,
  71 U.S. 475 (1866).............................................................................................................. 19

*Munaf v. Geren*,
  553 U.S. 674 (2008).............................................................................................................. 8

*Nat'l Ass'n for Fixed Annuities v. Perez*,
  219 F. Supp. 3d 10 (D.D.C. 2016)..................................................................................... 9, 11

*Nat'l Ass'n of Home Builders v. Norton*,
  415 F.3d 8 (D.C. Cir. 2005)................................................................................................ 21

*Nat'l Parks Conservation Assn v. Semonite*,
  916 F.3d 1075 (D.C. Cir. 2019)............................................................................................ 5

*Nat'l Parks Conservation Assn v. Semonite*,
  925 F.3d 500 (D.C. Cir. 2019).............................................................................................. 5

*Nat'l Tr. for Historic Pres. v. Blanck*,
  203 F.3d 53 (Table) (D.C. Cir. 1999).................................................................................... 5

*Nat'l Tr. for Historic Pres. v. Blanck*,
  938 F. Supp. 908 (D.D.C. 1996)........................................................................................ 5, 26

*New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv.*,
  208 F. Supp. 3d 142 (D.D.C. 2016)..................................................................................... 16

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010)........................................................................................... 19

*Nken v. Holder*,
  556 U.S. 418 (2009).............................................................................................................. 8

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004)............................................................................................................... 26

*Nuclear Regul. Comm'n v. Texas ("NRC")*,
  605 U.S. 665 (2025)......................................................................................................... 20, 24

*Nucor Steel-Arkansas v. Pruitt*,
  246 F. Supp. 3d 288 (D.D.C. 2017).................................................................................... 15

*Obama v. Klayman*,
   800 F.3d 559 (D.C. Cir. 2015) .................................................................................... 13

*Pub. Citizen v. Off. of U.S. Trade Representatives*,
   970 F.2d 916 (D.C. Cir. 1992) ................................................................................... 25

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
   831 F.3d 500 (D.C. Cir. 2016) ................................................................................... 27

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
   605 U.S. 168 (2025) ..................................................................................................... 6

*Sierra Club v. FERC*,
   153 F.4th 1295 (D.C. Cir. 2025) .................................................................................. 6

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) ................................................................................................... 17

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................................ 14, 15, 17

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) ..................................................................................... 6

*Voinche v. Obama*,
   428 F. App'x 2 (D.C. Cir. 2011) ........................................................................... 19, 22

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
   559 F.2d 841 (D.C. Cir. 1977) ..................................................................................... 8

*Washington v. Off. of Admin.*,
   566 F.3d 219 (D.C. Cir. 2009) ................................................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................. 8, 12, 27

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ................................................................................... 10

**Statutes**

40 U.S.C. § 121(d) ............................................................................................................. 23

42 U.S.C. § 4332(2)(C) ........................................................................................................ 6

42 U.S.C. § 4336a(g)(1)(b) ................................................................................................ 25

5 U.S.C. § 704 .................................................................................................................... 21

5 U.S.C. § 706(1) ................................................................................................................. 6

5 U.S.C. §§ 706(2)(A) ....................................................................................................... 20

5 U.S.C. §§ 706(2)(C) ....................................................................................................... 20

v

54 U.S.C. § 300320.................................................................................................................. 4

54 U.S.C. § 307104............................................................................................................ 5, 26

Pub. L. No. 100-461, 102 Stat. 2268 (1998)....................................................................... 7, 21

**Rules**

Fed. R. Civ. P. 65(c) ............................................................................................................ 27

**Regulations**

36 C.F.R. § 800.1(c)................................................................................................... 12, 25, 26

36 C.F.R. § 800.3(e)............................................................................................................ 12

36 C.F.R. § 800.4(b)(1)..................................................................................................... 5, 12

**Other Authorities**

133 Cong. Rec. 36572 (Dec. 19, 1987)................................................................................ 7

Exec. Order No. 12028,
  42 Fed. Reg. 62895 (Dec. 12, 1977)............................................................................... 7

Exec. Order No. 12122,
  44 Fed. Reg. 11197 (Feb. 26, 1979) ............................................................................... 7

H.R. Rep. No. 1457 (1980)................................................................................................. 5

**INTRODUCTION**

Plaintiffs seek to place Defendants in a Kafkaesque trap: having sued Defendants on the grounds that Defendants supposedly failed to comply with the National Historic Preservation Act ("NHPA") and National Environmental Protection Act ("NEPA"), Plaintiffs now seek a temporary restraining order and preliminary injunction to stop Defendants from a modest evaluation of the potential impacts on the resource at issue, the façade of the Eisenhower Executive Office Building ("EEOB"). As relevant here, Defendants are attempting to study how different restoration treatments will affect the EEOB façade—the proposed Façade Condition Assessment and Painting Feasibility Study ("Study"). Defs. Notice of Planned Testing at 2–3, Dkt. No. 42. This Study will involve taking no more than thirteen two-inch samples of the EEOB exterior and testing mineral coating on four two-foot by two-foot panels, on parts of the building that are not visible from public rights of way. This is a miniscule part of the surface area of the EEOB, a city-block-sized building. This Study will inform the ongoing NEPA and NHPA processes that *Plaintiffs* believe must be conducted before the EEOB is painted. Yet now Plaintiffs come to argue that the Study should be enjoined—after which they will, no doubt, return to say that the overall project cannot go forward because its effects have not been sufficiently studied.

Indeed, Plaintiffs barely try to hide the game they are playing. Plaintiffs assert that NEPA and NHPA reviews must be conducted before Defendants can conduct this limited Study to inform the NEPA and NHPA reviews and decision-making process for the potential larger project of considering of ways to beautify the exterior of the EEOB ("Project"). This would create an unending procedural loop. The law does not require such a paradoxical result, so Plaintiffs have failed to establish any likelihood of success on the merits. Moreover, to the extent that Plaintiffs argue that this Court should stop the NEPA and NHPA reviews altogether until this Court rules on Plaintiffs' merits arguments, that would result in the Court impermissibly refereeing the ongoing

1

environmental review processes. This too fails to show a likelihood of success. This tiny impact plainly cannot cause irreparable harm to Plaintiffs.

Finally, as explained in Defendants' fully briefed Motion to Dismiss, Dkt. No. 38, Plaintiffs' claims fail at the threshold. Plaintiffs lack standing, as they have not demonstrated any injury from the Study or that any such injury may be redressed by the Court. Nor do they have a cause of action, as there is no final agency action to support the Court's jurisdiction under the Administrative Procedure Act. Plaintiffs attempt to shoehorn a new common-law *ultra vires* claim into their motion, but this is improper and would fail in any event.

The Court should deny Plaintiffs' motion.

## FACTUAL AND PROCEDURAL BACKGROUND

The EEOB is adjacent to the White House and many Executive Branch employees who assist and advise the President in the execution of his constitutional duties. The Executive Office of the President's Office of Administration ("OA") is the lead tenant. *See* 1st Decl. of Heather Martin, Deputy Assistant to the President ("1st Martin Decl."), Dkt. No. 27-2 ¶ 3 (Jan. 29, 2026). After the President stated in a television interview that he might paint the EEOB, Plaintiffs filed this action. They primarily sought an order requiring Defendants to "to initiate, conduct, and complete all legally required NEPA and NHPA processes" for any project to clean, repoint, and repaint the exterior of EEOB ("Project"). Compl., Prayer for Relief ¶ C, Dkt. No. 1. Plaintiffs also sought a Temporary Restraining Order and Preliminary Injunction in association with the original Complaint. Dkt. No. 7. They withdrew that motion after Defendants made commitments not to take certain actions related to the EEOB before March 1, 2026. Dkt. No. 24. The Court then set expedited briefing for a consolidated motion to dismiss and motion for summary judgment. Minute Order (Dec. 12, 2025). Defendants filed their consolidated motion on January 29, 2026. Dkt.

No. 27. In response to the consolidated motion, Plaintiffs sought and were granted leave to amend their Complaint. Dkt. No. 34. The Court again set an expedited schedule for briefing a motion to dismiss or for summary judgment, Minute Order (Feb. 20, 2026), and on March 13, 2026, Defendants filed their Motion to Dismiss, Dkt. No. 38.

Alongside the substantive briefing, Defendants have regularly provided declarations updating the Court on the Project. In the First Declaration of Heather Martin, OA voluntarily committed to "comply with any statutory and regulatory processes that might apply to the Project if it did not involve the EEOB and if OA were not managing it," including NEPA and the NHPA. 1st Martin Decl. ¶ 10. OA also committed to the public processes before the National Capital Planning Commission ("NCPC"), the Commission for Fine Arts ("CFA"), the Advisory Council on Historic Preservation ("ACHP"), and the District of Columbia State Historic Preservation Office ("DC SHPO"). *Id.* ¶ 11. OA attached a Memorandum of Understanding ("MOU") between it and GSA in which the two entities recognized that OA and GSA have independent statutory authorities regarding the EEOB, that OA would manage any Project, and that, if necessary, "GSA would delegate any and all necessary authority for the Project to OA." *Id.*, Attach. A at 2. The Second Declaration of Heather Martin reaffirmed those commitments and provided updates on the status of the NEPA environmental assessment and the submissions to the NCPC, CFA, ACHP, and DC SHPO. 2d Decl. of Heather Martin, Deputy Assistant to the President ("2d Martin Decl."), Dkt. No. 38-2 ¶¶ 5, 9–13 (Mar. 13, 2026). The Third Declaration of Heather Martin again re-affirmed those commitments, and provided notice of intent to pursue the Study to "provide real-world data that will identify appropriate methodologies to address existing areas of degradation and inform the underlying decisionmaking process regarding whether and how to paint the

EEOB." 3d Decl. of Heather Martin, Deputy Assistant to the President ("3d Martin Decl."), Dkt. No. 42-1 ¶¶ 7 (July 20, 2026).

In the attached Fourth Declaration of Heather Martin, Ms. Martin explains that both the NCPC and CFA requested additional testing that would examine how the paint would affect the EEOB's granite surface. Decl. of Heather Martin, Deputy Assistant to the President ("4th Martin Decl.") ¶¶ 11–15 (attached as Exhibit A). Ms. Martin identified Simpson Gumpertz & Heger ("SGH"), an experienced historical restoration firm, as the entity conducting the testing. *Id.* ¶ 5. SGH has completed similar projects involving the Pentagon and the U.S. Chamber of Commerce. *Id.*; *see also* 4th Martin Decl., Attach A. Further, Ms. Martin explains that the Study may inform OA's NEPA and NHPA analyses, including helping identify the preferred alternative under NEPA. *Id.* ¶ 16.

## LEGAL BACKGROUND

### I.    National Historic Preservation Act

Section 106 of the NHPA is "essentially a procedural statute" that does not impose substantive standards but "requires that agencies 'take into account the effect of an undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register of Historic Places.'" *City of Alexandria. v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999) (alterations omitted) (citing 16 U.S.C. § 470(f) (1999), *recodified at* 54 U.S.C. § 306108 (2014)). The NHPA defines an undertaking as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency." 54 U.S.C. § 300320; *see also McMillan Park Comm. v. Nat'l Cap. Plan. Comm'n*, 968 F.2d 1283, 1284–85 (D.C. Cir. 1992) (describing consultation requirements). The NHPA implementing regulations specifically

4

contemplate "sample field investigation" and "field survey" in the Section 106 process. 36 C.F.R. § 800.4(b)(1).

Section 107 of the NHPA exempts certain federal buildings, including the White House and its grounds, from operation of the statute, including Section 106. *See* 54 U.S.C. § 307104. In a 1994 Programmatic Agreement between GSA, ACHP, and the DC SHPO regarding historic preservation in GSA's National Capital Region, ACHP "recognize[d] the Old Executive Office Building as part of 'the White House and its grounds' pursuant to Section 107 of the [NHPA]." Dkt. No. 15-2 at 3.

Section 110(f) of the NHPA "provides that for any project 'directly and adversely affecting any National Historic Landmark,' the agency must 'to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark.'" *Nat'l Parks Conservation Assn v. Semonite*, 916 F.3d 1075, 1088 (D.C. Cir. 2019) (alteration omitted) (quoting 54 U.S.C. § 306107), *amended on reh'g in part*, 925 F.3d 500 (D.C. Cir. 2019). As with Section 106, courts have held that this provision is not a substantive mandate and instead sets a heightened procedural standard for potential impacts on National Historic Landmarks. *See Nat'l Tr. for Historic Pres. v. Blanck*, 938 F. Supp. 908, 922 (D.D.C. 1996) (finding Section 110 "cannot be read to create new substantive preservationist obligations separate and apart from the overwhelmingly procedural thrust of the NHPA"), *aff'd*, 203 F.3d 53 (Table) (D.C. Cir. 1999) (per curiam). When a building is listed, an agency has "a higher standard of care . . . when considering undertakings that may directly and adversely affect National Historic Landmarks." *Id.* at 921 (citing H.R. Rep. No. 1457 at 36–38 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378, 6399–6401).

## II.    National Environmental Policy Act

NEPA is a purely procedural statute which ensures that "agencies are fully informed of the environmental consequences of their decisions." *Ctr. for Biological Diversity v. FAA*, 804 F. Supp. 3d 86, 92 (D.D.C. 2025). To comply with NEPA, an agency prepares a document assessing the environmental impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under NEPA, the "role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one. The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 185 (2025) (citation modified). NEPA "does not require an agency to make the decision that the reviewing judges 'would have reached had they been members of the decisionmaking unit of the agency.'" *Sierra Club v. FERC*, 153 F.4th 1295, 1305 (D.C. Cir. 2025) (citation omitted).

## III.    Administrative Procedure Act

Because the NHPA and NEPA do not provide a private right of action, Plaintiffs rely on the APA for their statutory claims. *Karst Env't. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007). The APA supplies a "limited cause of action for parties adversely affected by agency action[,]" *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006), and authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside" final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law[,]" 5 U.S.C. § 706(1), (2)(A), (2)(D); *Marsh v. Or. Natl Res. Council*, 490 U.S. 360, 378 (1989).

6

**IV.**     **OA's Independent Statutory Authority at the EEOB**

In 1977, President Carter established OA in Executive Order 12028.  Among other things, this empowered OA to provide "common administrative support and services to all units within the Executive Office of the President" ("EOP"), including any such support or service which "will achieve financial savings and increase efficiency through centralization of the supporting service." Exec. Order No. 12028, 42 Fed. Reg. 62895 (Dec. 12, 1977), *amended in part*, Exec. Order No. 12122, 44 Fed. Reg. 11197 (Feb. 26, 1979). One such service has been facilities management. This historical role is consistent with OA's current relationship with GSA. OA is the lead tenant and administratively controls the EEOB. 1st Martin Decl. ¶ 3.

Congress confirmed OA's independent authority to modify the EEOB and to accept gifts to do so in 1998. *See* Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989, Pub. L. No. 100-461, § 590, 102 Stat. 2268, 2268-52 (Oct. 1, 1998) ("Section 590"). Section 590 authorizes OA to:

> (1) accept, hold, administer, utilize and sell gifts and bequests of property, both real and personal, and loans of personal property other than money; and (2) accept and utilize voluntary and uncompensated services; for the purpose of aiding, benefiting, or facilitating the work of preservation, restoration, renovation, rehabilitation, or historic furnishing of the Old Executive Office Building and the grounds thereof.

*Id.* This authority is "subject to the disapproval of the Administrator of General Services within 30 days after the Administrator receives notice of such use or sale." *Id.*

The independent statutory authority regarding modifications to the EEOB was created by Congress in response to a request from OA for authority to renovate the EEOB in lieu of GSA. *See, e.g.*, 133 Cong. Rec. 36572 (Dec. 19, 1987) (letter from OA Director to Sen. Stevens, seeking authority "for this and future Administrations to receive gifts from the public in order to renovate and refurbish the [EEOB]" and discussing why "custody of the gifts should reside with the Director

of [OA]" because "it is important that we not separate the management responsibility from the authority to accept gifts [] and [w]e believe it would be efficient to have the maintenance and restoration functions reside with one individual").

## LEGAL STANDARD

A "preliminary injunction is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). An injunction should be entered only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20; *see also Katz v. Georgetown Univ.*, 246 F.3d 685, 687–88 (D.C. Cir. 2001). The same substantive standards apply for both temporary restraining orders and preliminary injunctions. *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977), *abrogated on other grounds, Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). "The last two factors merge when the government is a party." *Harris Cnty. v. Kennedy*, 786 F. Supp. 3d 194, 203 (D.D.C. 2025), citing *Nken v. Holder*, 556 U.S. 418, 435 (2009). A movant "has the burden to show that all four [*Winter*] factors, taken together, weigh in favor of the injunction." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 169 (D.D.C. 2025) (citation modified), *judgment entered,* No. 25-CV-946, 2026 WL 880056 (D.D.C. Mar. 31, 2026), *aff'd,* No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026)).

Preliminary injunctive relief "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation

8

omitted). Plaintiffs must satisfy each requirement, and the D.C. Circuit has indicated that "a likelihood of success is an independent, freestanding requirement for a preliminary injunction." *Nat'l Ass'n for Fixed Annuities v. Perez*, 219 F. Supp. 3d 10, 13 (D.D.C. 2016) (citation omitted). "[W]hen a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors" required for a preliminary injunction. *Greater New Orleans Fair Hous. Action Ctr. v. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).

## ARGUMENT

There is a straightforward reason to deny this motion: Plaintiffs have not established irreparable harm from this Study. OA will take *thirteen two-inch* samples of the EEOB exterior for testing and will apply mineral coating on *four two-foot by two-foot inconspicuous panels*. Dkt. No. 42 at 3–4. The sampling and mineral coating will be done on parts of the building that are not visible from public rights of way. These modest testing actions do not irreparably harm Plaintiffs—they will not even be able to see these very modest tests or their physical effects.

And the point of this testing is to better inform OA's NEPA and NHPA analysis. This is what Plaintiffs say they want—they want OA to analyze and assess potential impacts, and that is exactly what OA is doing. Nothing in NEPA or the NHPA blocks OA from doing this modest testing as part of its NEPA and NHPA analysis.

As explained below, the motion should be denied because Plaintiffs lack standing (*infra* Section I), Plaintiffs have not established irreparable harm (*infra* Section II), Plaintiffs have not established a likelihood of success on the merits (*infra* Section III), and the balance of equities and the public interest weigh against a preliminary injunction (*infra* Section IV).[1]

---

[1]    This Court should also deny Plaintiffs' motion for the independent reason that Plaintiffs failed to confer with the United States on their motion for emergency relief. Plaintiffs' failure to comply with the Court's rules is sufficient basis to deny this motion. *Ellipso, Inc. v. Mann*, 460 F.

## I.     Plaintiffs failed to demonstrate a likelihood of imminent irreparable harm.

Plaintiffs cannot meet the high standard for irreparable harm in the D.C. Circuit because their injuries are based on false assumptions about the testing and its scope. *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017). If a party makes no showing of imminent irreparable injury, the Court may deny the motion for injunctive relief without considering the other factors. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 673–74 (D.C. Cir. 1985) (per curiam).

The Study does not harm Plaintiffs at all, let alone cause irreparable harm. The Study will take place on parts of the building that are not visible from public rights of way. And even in those inconspicuous areas, the effect is modest: the Study proposes to modify approximately sixteen square feet façade of the city-block sized EEOB: eight square feet on the exterior façade but not visible from the public right of way, and eight square feet on interior courtyards. 4th Martin Decl. ¶ 18. Specifically, OA is going to test two different mineral silicate paints for adhesion and removal on four two-foot by two-foot panels and remove thirteen two-inch by two-inch core samples of

---

Supp. 2d 99, 102 (D.D.C. 2006) (noting that "[i]f a party files a nondispositive motion without certifying its compliance with Rule 7(m), the motion *will be denied*") (emphasis added). Plaintiffs filed their motion ten full days after Defendants filed a notice and sworn declaration with the Court to inform the Court and Plaintiffs about the Study. During that time, Plaintiffs' counsel conducted interviews with multiple media organizations. Plaintiffs went so far as to share copies of their filing with CNN and People Magazine, both of which quoted extensively from Plaintiffs' eventual brief as it was filed. *See* Sunlen Serfaty, The Trump admin wants to test paint patches on an iconic DC building this week. Preservationists are trying to stop it, CNN (July 29, 2026 at 10:05am ET) *https://www.cnn.com/2026/07/29/politics/trump-eisenhower-executive-office-building-paint-test* (describing "the injunction request, shared exclusively with CNN"); Angelique Brenes, *Preservationists Move to Stop Trump from Testing New Paint on Iconic 1800s Landmark He Called 'Ugly' (Exclusive),* People Magazine (July 30, 2026 at 12:32AM EDT) (describing "a statement shared exclusively with PEOPLE ahead of the filing" and quoting from the brief). Surely during this media tour there was sufficient time for Plaintiffs to comply with their duties under the local rules and meaningfully confer regarding the intended motion.

granite for testing. 3d Martin Decl. ¶¶ 10, 14, 15. This limited testing in areas that Plaintiffs cannot even see does not cause irreparable harm to Plaintiffs.

Plaintiffs' theory of harm is based on the false premise that OA will be painting four sections of the EEOB irrespective of size and location. Building on this false narrative, Plaintiffs speculate that the Study would cause "historic fabric and patina [to be] permanently lost." Br. at 23, Dkt. No. 43-1. But this is not what is happening. This is no broadbrush experiment. It is targeted testing aimed at parts of the building that are not visible from public rights of way. But even if this Court were to credit Plaintiffs' false narrative, neither their alleged procedural injuries from the NEPA and NHPA processes nor substantive injuries from posited harm to the EEOB satisfies this Court's high bar. *Id.* at 23–24.

First, Plaintiffs argue that the purported delegation from GSA to OA "cause[s] direct, irreparable harm to Plaintiffs by denying their procedural rights." *Id.* at 22. As an initial matter, no such delegation has occurred. *See infra* at § C. But even if there were such a delegation, the purported procedural rights that Plaintiffs identify are not, in fact, rights. Plaintiffs state, without a single citation, that "NHPA and NEPA require public participation to allow experts, consulting parties, and those impacted by activities undertaken by federal agencies to provide input *before* the irreparable harm occurs." Br. at 22. This is incorrect. As to NEPA, there is no requirement for public participation when an environmental assessment is prepared, only when an Environmental Impact Statement is prepared. *See Blue Ridge Env't Def. League v. Nuclear Regul. Comm'n,* 716 F.3d 183, 189 (D.C. Cir. 2013); *see also Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp. 3d 472, 498 (D.D.C. 2020) (rejecting argument that agency "violated NEPA by not giving the public an opportunity to comment on the EA"), *aff'd* 105 F.4th 449 (D.C. Cir. 2024), *reh'g denied*, No. 20-5382, 2024 WL 4993605 (D.C. Cir. Dec. 5, 2024). Plaintiffs cannot be harmed by losing a

11

right they never had. Moreover, OA has voluntarily committed to providing a public comment period of at least 30 days. 2d Martin Decl. ¶ 5.

As to the NHPA, public comment is required pursuant to 36 C.F.R. § 800.3(e). But it has no temporal requirement. So long as public involvement is eventually offered before the Project begins, Plaintiffs have lost no procedural rights. The NHPA regulations explicitly contemplate "conducting or authorizing nondestructive project planning activities before completing compliance with section 106," 36 C.F.R. § 800.1(c), and authorize "sample field investigation[] and field survey" for identifying historic properties. 36 C.F.R. § 800.4(b)(1). Because the requirement for a completed NHPA analysis has not yet accrued, no procedural harm has accrued.

As to substantive harms, Plaintiffs miss the boat entirely. They speak extensively of harm to the EEOB—"[t]he harm to the EEOB is certain, imminent, and irreparable," Brief at 24—but the standard is not harm to the building but to the Plaintiffs.[2] *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015). Because they have not even attempted to show harm to themselves, Plaintiffs have failed to meet this Circuit's "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006), *abrogated on other grounds*, *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008).

---

[2]    Plaintiffs' focus on harms to historic districts and the public likewise fails to show harm to Plaintiffs. *See* Br. at 38 (describing an effort to "to prevent irreparable harm *to an NHL, its NHLD setting, and the public's ability to experience those historic resources* and participate meaningfully in the NHPA process") (emphasis added).

**II.    Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims.**

    **A.    Plaintiffs lack standing to bring any of their claims.**

Plaintiffs lack standing because they have not alleged, much less established, injury in fact; their alleged harms are not traceable to GSA;[3] and the Court cannot redress their purported injuries by injunctive or declaratory relief against the President. Dkt. No. 38-1 at 11–22. At this stage, "a party who seeks a preliminary injunction must show a substantial likelihood of standing." *Food & Water Watch, Inc.*, 808 F.3d at 913 (quoting *Obama v. Klayman*, 800 F.3d 559, 568 (D.C. Cir. 2015). Further, "a plaintiff seeking a preliminary injunction cannot rely on past injuries alone to establish standing; they must show that they are either 'suffering an ongoing injury' or facing 'an immediate threat of injury.'" *Ctr. for Taxpayer Rts. v. I.R.S.*, 815 F. Supp. 3d 1, 26–27 (D.D.C. 2025) (quoting *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011)).

Plaintiffs now seem to concede that they do not have standing to seek injunctive or declaratory relief against the President or OA acting on behalf of the President, as their motion is tailored towards relief against GSA. *See* Dkt. No. 43 at 2–3. Nonetheless, for the reasons identified in Defendants' Motion to Dismiss, Dkt. No. 38-1 at 11–22, Plaintiffs cannot meet the higher bar for standing on the merits. Nor, however, can they meet the lower bar at the injunctive relief stage. Accordingly, "an inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction." *Food & Water Watch, Inc.*, 808 F.3d at 913.

---

[3]    Plaintiffs' Amended Complaint is also brought against the National Park Service ("NPS"), Dkt. No. 34 ¶ 18, but their motion for injunctive relief targets only GSA, *see generally* Dkt. No. 43. The harms Plaintiffs allege are also not traceable to NPS. Dkt. No. 38-1 at 19–20.

### 1.      Plaintiffs' asserted injuries are insufficient to demonstrate standing.

Plaintiffs' motion alleges the same aesthetic and procedural injuries already addressed in the pending motion to dismiss briefing, even citing back to the same previously-filed declarations. *See* Br. at 24–27. Standalone procedural injuries are insufficient to confer Article III standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Rather, Plaintiffs' alleged procedural injuries, stemming from an alleged failure to comply with NEPA and the NHPA, *see* Br. at 24–25, must be tied to concrete interests. Here, those alleged interests are alleged aesthetic harms, so Plaintiffs' alleged procedural harms rise and fall with their alleged aesthetic harms.[4] Plaintiffs must therefore show that their particular "use[] and enjoy[ment] [of] the" property in question extends beyond "mere incidental viewership," and that they will have to alter their behavior in response to the challenged action. *Envtl Def. Fund v. FERC* ("*EDF*"), 2 F.4th 953, 969–70 (D.C. Cir. 2021). The Werkheisers' successive declarations—each designed to clean up deficiencies in the prior ones—betray their lack of standing.

Beyond the insurmountable barriers identified in the Motion to Dismiss, Plaintiffs' assertion of standing fails for two further reasons unique to their motion. First, the highly circumscribed work contemplated in the Study will be in areas that are not visible from any public right-of-way. 4th Martin Decl. ¶ 18. The proposed work will only affect sixteen square feet of surface; and only eight on the exterior, in inconspicuous locations. *Id.* Accordingly, Plaintiffs'

---

[4]      To the extent Plaintiffs allege procedural harms such as not being able to participate in the NHPA process due to GSA's purported delegation of authority to OA, Br. at 25, again, there has been no delegation. Dkt. No. 38-1 at 39–40. Rather, OA is exercising its independent statutory authority to modify the EEOB. *See id.* at 40 n.19. But regardless, Plaintiffs are not being deprived of the procedure they seek: it is uncontested that Defendants are actively pursuing NEPA and NHPA analyses and public process before the NCPC and CFA. Indeed, Plaintiffs provided public testimony before the NCPC. They simply don't like the result.

14

assertion that their "aesthetic interests would be directly diminished" if "planned testing to paint sections of the exterior of the building" occurs strains credulity. Br. at 25. Second, no declarant has expressed a concrete plan to visit the EEOB. Plaintiffs rest on the prior "declarations of Gregory Werkheiser (ECF Nos. 7-15, 16-2, 39-3), Marion Werkheiser (ECF Nos. 7-3, 39-4), Rebecca Miller (ECF Nos. 7-16, 39-1), and Robert Peck (ECF No. 39-2)." Br. at 24. But none of those documents express sufficient continued intent to visit the EEOB to support standing, let alone explain how they will view parts of the building that are not visible from public rights of way where the Study will take place. 4th Martin Decl. ¶ 18.

***Individual Standing***. Starting with the individual plaintiffs, and declarants, the Werkheisers lack a concrete injury, and several rounds of briefing have not illuminated why their alleged aesthetic and procedural injuries demonstrate standing. Mr. Werkheiser bases his standing on his aesthetic, professional and educational interests and his planned trips to Washington, D.C. in January, February, and March 2026 and other unspecified future visits to the area around the EEOB. Dkt. No. 16-2 ¶ 30 (signed in December 2025); Dkt. No. 39-3 ¶ 3 (signed in March 2026). Ms. Werkheiser made nearly identical allegations in her previous declarations about her interests and planned trips. Dkt. No. 7-3 ¶ 5 (signed in November 2025); Dkt. No. 39-4 ¶ 3 (signed in March 2026).

Plaintiffs' vague—and now stale—assertions of future plans are simply insufficient to support standing. Plaintiffs must show, *inter alia*, "imminent future injury that is sought to be enjoined." *Summers*, 555 U.S. at 495. Where standing is alleged to exist based on future plans, "courts examine whether the injury is imminent from two angles: the firmness of the plaintiff's future plans, and the likelihood that the challenged government action will implicate those plans." *Nucor Steel-Arkansas v. Pruitt*, 246 F. Supp. 3d 288, 304 (D.D.C. 2017). Plaintiffs' plans are not

15

sufficiently firm, and neither the Project nor the Study would implicate those plans. As to the Werkheisers, months have passed since their last stated intention of visiting the EEOB in March 2026, and it is unclear if they have even visited since those declarations.

Moreover, at this stage, the Court should consider only the aesthetic impact of the Study, not of potentially painting the EEOB. It is axiomatic that to injure the aesthetic sensibilities of a plaintiff, they must be able to physically see the aesthetic change. *See, e.g.*, *Animal Legal Def. Fund, Inc. v. Glickman,* 154 F.3d 426, 433 (D.C. Cir. 1998) (stating "the key requirement . . . is that the plaintiff have suffered his injury in a personal and individual way—for instance, by seeing with his own eyes the particular animals whose condition caused him aesthetic injury"); *New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 170 (D.D.C. 2016) (no aesthetic injury based on knowledge of a change that can't be seen). Here, the Study will take place entirely on parts of the building that are not visible from public rights of way. 4th Martin Decl. ¶ 18. Thus, even if the declarants were to visit the EEOB again soon, they could not suffer aesthetic harm from the results of the Study.

***Associational Standing – D.C. Preservation League ("DCPL").*** For much the same reasons that the Werkheisers have failed to demonstrate individual standing, DCPL has failed to establish associational standing. Robert Peck, a member of the D.C. Preservation League, stated in his declaration that he will visit the EEOB and Lafayette Square area, including regular lunches at nearby restaurants. Dkt. No. 39-2 ¶ 7 (signed in March 2026). Rebecca Miller, the Executive Director of D.C. Preservation League, stated that she visits Lafayette Square, President's Park, and the area around the EEOB, and that her son's interest in the American Revolution and Marquis de Lafayette will spur future visits to the area to see the statute of Marquis de Lafayette. Dkt. No. 7-16 ¶ 3 (signed in November 2025); Dkt. No. 39-1 ¶ 13 (signed in March 2026). These declarations do

16

not otherwise provide more detail than the Werkheisers' declarations. DCPL's allegations fall far short of providing the information needed to establish imminent injury, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992); *Summers*, 555 U.S. at 495–96, and DCPL's associational injury is also too speculative for the same reasons given above in the analysis of the Werkheisers' claims of individual standing. The testing procedures have no bearing at all on Mr. Peck's and Ms. Miller's respective intentions to, at some point, go to lunch six times in the District of Columbia or facilitate Ms. Miller's son seeing a statue of Marquis de Lafayette.[5] Simply put, DCPL's Executive Director and its member have not shown how the Study will significantly affect their stated interests, thereby defeating the claim to associational standing. *EDF*, 2 F.4th at 969; *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972).

 ***Organizational Standing – DCPL and Cultural Heritage Partners ("CHP")***. Rather than add anything new in support of their organizational standing arguments, Plaintiffs argue that both CHP and DCPL have met both prongs of the organizational standing test because the organizations have diverted resources. Br. at 26. As Defendants argued in their motion to dismiss, Dkt. No. 38-1 at 17–19, a diversion of resources to education or advocacy is simply not enough to demonstrate organizational standing. *Food & Drug Amin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). DCPL and CHP "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Hippocratic Med.*, 602 U.S. at 394.

 Because Plaintiffs have not demonstrated sufficient harm to warrant a preliminary injunction, the Court may deny the motion for that reason alone. But even if Plaintiffs had

---

[5] Neither the Study not the broader potential Project in any way implicates the statute of the Marquis de Lafayette in Lafayette Park. To the extent this desired single visit has not yet occurred, Ms. Miller will continue to be able to take her son to see the statue, unchanged.

demonstrated harm rising to the level required for injunctive relief, such harm is neither traceable to agency defendant GSA nor redressable by an order enjoining GSA.

### 2.    Plaintiffs' alleged injuries are not traceable to GSA.

As Defendants explained in their motion to dismiss, Dkt. No. 38-1 at 19–20, Plaintiffs also suffer a traceability problem with respect to the agency defendants. To meet the traceability requirement, a plaintiff must show a "causal nexus between the agency action and the asserted injury." *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 678 F. Supp. 3d 20, 30 (D.D.C. 2023) (quoting *Freedom Republicans, Inc. v. Fed. Election Comm'n*, 13 F.3d 412, 418 (D.C. Cir. 1994)), *aff'd*, 108 F.4th 836 (D.C. Cir. 2024). The order that Plaintiffs seek is targeted specifically at Defendant GSA: "enjoining Defendant GSA, and its officers, agents, employees, contractors, and all other persons in active concert or participation with it, from initiating, undertaking, authorizing, funding, or permitting the Study." Dkt. No. 43 at 2, ¶ A. Here, all actions related to the Study and the Project are being taken by OA under its independent authority to modify the EEOB. GSA has not taken any action towards modifying the EEOB and has not delegated any of its own authority to OA. *See, e.g.*, Dkt. No. 27-4 ¶ 15 (Fifth Decl. of Andrew Heller, Acting Commissioner of the Public Buildings Service). Any alleged harms of either the Study or the Project are traceable to OA, not GSA. Plaintiffs therefore have not—and cannot—establish the necessary nexus between their injuries and agency defendant GSA. *See Am. First Legal Found. v. Greer*, 153 F.4th 1311, 1315 (D.C. Cir. 2025) (noting fatal traceability problem because any injury was "plainly traceable" to another entity and not the defendant).

### 3.    Plaintiffs' alleged injuries are not redressable.

The alleged injuries that Plaintiffs complain of, if they exist, are being caused by OA on behalf of the President. GSA has not been involved in the Project and has not delegated any of its

authority to OA. An order enjoining GSA would have no effect at all on the Study or the Project. OA is exercising its independent authority to modify the EEOB on behalf of the President, and it is well-established that OA is not an agency subject to the APA. *See Citizens for Resp. & Ethics in Washington v. Off. of Admin*., 566 F.3d 219, 224 (D.C. Cir. 2009); *accord Voinche v. Obama*, 428 F. App'x 2, 3 (D.C. Cir. 2011) (per curiam). As Defendants explained in their motion to dismiss, Dkt. No. 38-1 at 21–22, the Court lacks jurisdiction to "enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (same); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him.").

## B.   Plaintiffs have not pleaded a common-law *ultra vires* claim.

In their motion, Plaintiffs impermissibly raise a new claim not found in their complaint: a common-law *ultra vires* claim that OA lacks independent authority to carry out the Project. While Plaintiffs are incorrect on the merits, the Court lacks jurisdiction to hear it at all because it was not pled in the operative Amended Complaint. Where "a motion for a preliminary injunction is predicated on a complaint, if the motion raises issues different from those presented in the complaint, the court has no jurisdiction over the motion." *Adair v. England*, 193 F. Supp. 2d 196, 200 (D.D.C. 2002); *see also Aminjavaheri v. Biden*, No. 1:21-CV-2246-RCL, 2021 WL 4399690, at *5 (D.D.C. Sept. 27, 2021) (holding that "a plaintiff's request for preliminary injunctive relief must mirror the allegations and relief sought in the complaint").

Here, as the Defendants noted in their brief in support of their motion to dismiss, Plaintiffs' purported *ultra vires* claim is incontestably a traditional APA claim aimed at GSA. Dkt. No. 38-1 at 31. In the operative Amended Complaint, Count V is titled "**APA** Ultra Vires (Unlawful

19

Delegation)." Dkt. No. 34 at 40 (emphasis added). It cites the familiar APA standard—that the "APA provides a remedy" when an agency acts "in excess of statutory jurisdiction, authority, or limitations,'" or 'without observance of procedure required by law.'" *Id.* (quoting 5 U.S.C. §§ 706(2)(C), (D)). It attacks GSA's purported delegation, describing it as a "final agency action," and it concludes by alleging that the purported delegation is "in violation of 5 U.S.C. §§ 706(2)(A), (C). *Id.* at 41.

Yet, in their motion, when they raise *ultra vires* issues, Plaintiffs rely not on APA case law governing unlawful action, and do not attack *GSA's* purported delegation, but instead, ask the Court to grant an injunction regarding *OA's* authority using *ultra vires* principles. *See* Br. at 31–32. This is improper twice over: it attacks a different entity than the one against which the Amended Complaint brings claims, and it uses a different legal basis. Simply put, if Plaintiffs wanted to raise an *ultra vires* claim, they could have in their Amended Complaint. They chose not to. Plaintiffs cannot now rescue their own litigation decisions—which prevent relief against OA— by laundering a new claim into their motion. Because the Court lacks jurisdiction over a claim that OA is acting *ultra vires*, a preliminary injunction is not warranted.

Even if the Court had jurisdiction over this claim, Plaintiffs are incorrect that they can sustain an *ultra vires* claim. An ultra vires claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n v. Texas* ("*NRC*"), 605 U.S. 665, 681–82 (2025) (citation omitted). Plaintiffs have not established that implementation of the Project by OA would be "contrary to a specific prohibition in a statute," as required to pursue an ultra vires claim. *Id*. at 681 (citation modified). Plaintiffs argue that Defendants "wrongly contend[] that OA has independent authority arising under Section 590, as reflected in the MOU." Br. at 31. But critically, Plaintiffs point to no "specific prohibition" of the Project in that statute, and none exists.

20

Instead, what they point to is a provision that gives the GSA Administrator the opportunity to disapprove "[a]ny use or sale of property accepted pursuant to this section, and any use of proceeds from such sale." Pub. L. No. 100-461, § 590(C), 102 Stat. 2268 (Oct. 1, 1988). Plaintiffs certainly do not explain how this would amount to a prohibition, and they couldn't: Section 590 expressly authorizes OA both to "accept" and to "utilize" gifts for the "renovation" of the EEOB, and it imposes no limit on how EEOB may exercise this statutory authority.[6] Pub. L. No. 100-461, § 590. An *ultra vires* claim requires an extraordinarily high showing. Plaintiffs cannot meet it.

### C.    Plaintiffs have not identified a final agency action.

This case, and Plaintiffs' motion, are brought primarily pursuant to the APA. However, the Court lacks jurisdiction over Plaintiffs' APA claims, as no final agency action or compellable failure to act has occurred. *See* 5 U.S.C. § 704. "The APA authorizes judicial review of agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005) (citation modified). Accordingly, "an agency action must be final in order to be judicially reviewable." *Id.* This bar is jurisdictional. *See Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 594 (D.C. Cir. 2001).

It is uncontested that there has been no final agency action in the form of a decision to implement the Project. Indeed, as the Third Declaration of Heather Martin stated, the Study is explicitly designed to guide eventual decision-making on whether to proceed with the Project, and if so, in what form. 3d Martin Decl. ¶¶ 3, 5, 18. And the Study is temporary. The paint will be removed, and the core samples will be repaired. 3d Martin Decl. ¶ 16. Instead, in the motion,

---

[6]    At most, Plaintiffs could argue that the Project would be *ultra vires* if the GSA Administrator had disapproved and OA proceeded anyway. But he has not; nor could he have, as no decision has been made on whether or how to pursue it.

Plaintiffs point solely to the MOU between OA and GSA as the final agency action which provides jurisdiction. *See* Br. at 27–30. But the MOU is not final agency action. It does not transfer any authority from GSA to OA, as Plaintiffs allege. *Id*. Rather, it is simply an intra-government recognition that both OA and GSA have independent authority to paint the EEOB, and a reflection of those entities' understanding that, if the Project moves forward, it will be under OA's authority. The MOU is internal and conditional in nature, and no legal consequences flow from GSA's acknowledgement of authority that OA has independent of the MOU. As the D.C. Circuit has recently held, an MOU between agencies is not a final agency action where it "merely clarifies . . . existing duties' under a statute." *Centro de Trabajadores Unidos v. Bessent,* 167 F.4th 1218, 1236 (D.C. Cir. 2026) (quoting *Del. Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.*, 106 F.4th 1195, 1204 (D.C. Cir. 2024)). This conclusion carries all the more force where no decision has been made to paint the EEOB. Because the MOU merely documents the parties' understanding that OA would undertake the Project under its existing authority if it proceeds, and no future-facing provision has been triggered, the MOU is by definition not final agency action.

Plaintiffs now argue that "even were the Court to accept Defendant GSA's position that the MOU's delegation provision is conditional, the relevant condition precedent—the President's decision to 'move forward with the Project'—has been satisfied and delegation therefore effected." Br. at 28. This materially misrepresents both the text of the MOU, and Defendants' argument. Curiously, in framing the MOU, Plaintiffs cite not to the MOU's text, but to a snippet of quotation from a declaration. *See id.* at 2 ("GSA contends that it no longer has a role in the Project, because GSA and OA signed a [MOU] that will transfer GSA's responsibilities to OA 'should the President decide to proceed' with the Project." (citing ECF No. 38-2 ¶ 4). Contrary to Plaintiff's assertion, the MOU does not automatically transfer GSA's responsibilities to OA should the President decide

to proceed.[7] Instead, it describes a conditional future step: "*should* the President decide to move forward with the Project . . . GSA *would* delegate any and all necessary authority for the Project to OA." MOU at 1–2 (emphasis added).[8] This language is conditional in two senses. First, it only contemplates the delegation of whatever authority is necessary; it does not conclude that any authority is inherently necessary to delegate. If no authority is necessary, no delegation would be needed. Second, and most critically, it clearly describes a future action. It does not state, for example, that 'should the President decide to move forward, GSA hereby transfers any and all necessary authority for the Project to OA.' Disregarding this plain language, Plaintiffs choose a different reading, that "[t]here is no next step following GSA's signature on the MOU; it is the final decision." Br. at 28. This is simply not accurate, and the Court need not accept Plaintiffs' representations when it can read the plain text. As the parties themselves have previously briefed, GSA has statutory provisions for delegating authority, *see, e.g.*, 40 U.S.C. § 121(d); Dkt. No. 38-1 at 39–40. To the extent a delegation occurs, it would require separate future action by GSA,

---

[7]     Nor does Dkt. No. 38-2 ¶ 4 state as such. Where the quoted text appears in the Declaration, Heather Martin was re-affirming that OA would "comply with any statutory and regulatory processes that might apply to the Project if it did not involve the EEOB and if OA were not managing it."

[8]     For this reason, Plaintiffs' argument that GSA needed to complete NEPA and NHPA analyses before entering the MOU is meritless. The sole case Plaintiffs cite supports Defendants' position. In *Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475 (D.D.C. 1994), NPS conveyed jurisdiction over Anacostia Park in the vicinity of Washington, D.C. to the District of Columbia ("DC"). While NPS and DC signed a "memorandum of agreement" in 1978, *id.* at 478, the court found that the transfer was complete and reviewable when NPS signed a Record of Decision and finalized a lease and transfer of jurisdiction plat fourteen years later, in 1992 and 1993. *Id*. at 480. Even if Plaintiffs' reading of Anacostia were correct, here, there is no serious dispute that there has been no transfer of jurisdiction: both OA and GSA have been given authority by Congress to modify the EEOB. To the extent Plaintiffs' argument has any force, it would again only apply when the delegation was completed, not today.

pursuant to GSA's Delegations of Authority Manual.[9] And as Defendants previously noted, such a delegation from GSA would be subject to an APA challenge if it did occur. Dkt. No. 38-1 at 31.[10] Plaintiffs ask the Court to assume—contrary to the textual evidence—that GSA is breaking the law. There is no basis for doing so.

> **D.**    **Plaintiffs' NEPA and NHPA Claims Impermissibly Seek to Have this Court Oversee Ongoing Administrative Processes.**

Plaintiffs cannot show a likelihood of success on their argument that GSA must complete the NEPA and NHPA analyses before any further Project planning occurs. As an initial matter, GSA is not an action agency here. There is no GSA action for this Court to enjoin. Plaintiffs cite no authority to support their proposition that GSA has an obligation to undergo a NEPA review and NHPA process even while OA is doing so. Br. at 34–35. Rather, Plaintiffs make the extraordinary argument that this Court must require GSA to complete the NEPA review and the NHPA process while those processes are still underway. Br. at 34. Plaintiffs' requested relief is not only extraordinary but also beyond the power of this Court.

As to NEPA, Plaintiffs reason that the Project should be enjoined "until GSA completes the NEPA review Congress requires of it." *Id.* at 34. But this argument borders on the absurd: Defendants have committed to complying with NEPA in multiple sworn declarations, *see* 1st and 2d Martin Decls., and specifically stated that they plan to publish an EA after public comment, *see* 2d Martin Decl. ¶ 5. Plaintiffs entirely decline to engage with the required timelines for producing

---

[9]    Accessible    at    https://www.gsa.gov/directives-library/gsa-delegations-of-authority-manual.

[10]    This further forecloses the availability of *ultra vires* review. As the Supreme Court recently re-affirmed, "[u]ltra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review.'" *NRC*, 605 U.S. at 681 (citation omitted).

24

a NEPA document. If courts enjoined planning on every federal government project that didn't yet have a completed NEPA document, they would find themselves overseeing every minute detail of government operations.[11]

To the extent Plaintiffs argue that the Study is a major federal action requiring an independent NEPA review, that too borders on absurd. For an agency to incur a duty under NEPA, it must first make an irretrievable commitment of resources. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) ("[A]n agency's NEPA obligations mature only once it reaches a critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment.'" (citation modified)). Here, no commitment of resources has been made at all to paint the EEOB—the entire point of the Study here is to assess potential impacts if OA were to move forward with the Project. Rather than irretrievably committing resources to painting the EEOB, preliminary information gathering activities, such as the Study, preserve full discretion for a future decision on whether or not to paint. *See Pub. Citizen v. Off. of U.S. Trade Representatives*, 970 F.2d 916, 919–21 (D.C. Cir. 1992) ("[T]he Supreme Court has clearly stated that judicial intervention is not proper just because the time to start work preparing an EIS has arrived . . . [C]ourts routinely dismiss NEPA claims in cases where agencies are merely contemplating a particular course of action but have not actually taken any final action at the time of suit.").

As to the NHPA, the ACHP regulations implementing Section 106 contemplate this very type of "nondestructive project planning activities" before compliance with Section 106 must be completed. 36 C.F.R. § 800.1(c). The only limitation is that OA must "complete the section 106

---

[11]    There is a statutory deadline of one year, as established by Congress in 2023. 42 U.S.C. § 4336a(g)(1)(b). But this will not run until 2027, and is not presently implicated.

process 'prior to the approval of the expenditure of any Federal funds on the undertaking.'" *Id.* But no expenditure of federal funds on the Project has been approved. As described in the Fourth Martin Declaration, the Study is part of determining *whether to proceed with the Project*, and has independent utility for preservation efforts at the EEOB. 4th Martin Decl. ¶17.[12]

Plaintiffs yet again ask the Court to superintend Defendants' legal compliance. But courts should not police compliance with statutory obligations because otherwise "it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66–67 (2004). The relief Plaintiffs seek—a general order compelling GSA's compliance with the NHPA and NEPA—is beyond the Court's power.[13]

## III.    The balance of harms and the public interest weigh against injunctive relief.

Because Plaintiffs have not established irreparable harm or shown a likelihood of success on the merits, this Court need not consider the balance of harms and the public interest in issuance of an injunction. And the balance of harms and public interest also weigh against injunctive relief—this modest Study will inform OA's analysis and guide decision-making on whether to proceed with the Project, and if so, in what form. Informed decision-making is plainly in the public interest.

---

[12]    OA has committed to voluntarily complying with the NHPA and the NHPA process is already underway. It is therefore unnecessary for the Court to reach the issue of whether the EEOB is exempt from the NHPA under Section 107. Nonetheless, as previously briefed to this Court, should the Court reach this issue, Defendants reiterate that the EEOB is on White House grounds, and it is therefore exempt under Section 107 of the NHPA from the obligation to consult under Section 106. *See* 54 U.S.C. § 307104; *see also* Dkt. No. 38-1 at 4–5.

[13]    For the same reasons, Plaintiffs' Section 110(f) claim fails. Section 106 and 110(f) claims are reviewed under the same procedural standards. *See Nat'l Tr. for Historic Pres.*, 938 F. Supp. at 921.

In assessing these factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Where a "movant seeks to enjoin the government, the final two factors merge 'because the government's interest *is* the public interest.'" *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 314 (D.D.C. 2025), quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). Here, because Plaintiffs' sole alleged non-procedural injury is aesthetic and nonexistent because they cannot even see the Study area, and OA is undertaking the exact NEPA and NHPA processes that Plaintiffs seek to be completed, there is presently no harm to the Plaintiffs to balance.

It is additionally in the public interest to enforce jurisdictional limits on courts, including the doctrines of standing and ripeness, and uphold the separation of powers under the Constitution, which precludes improper infringement on presidential authority. As the D.C. Circuit has noted, "[t]he public interest favors limiting federal courts to the jurisdiction and remedies provided by Congress." *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 830 (D.C. Cir. 2025), *on rehearing en banc,* 2026 WL 2235002. For these reasons, the balance of the harms and the public interest also weigh against preliminary injunctive relief.

## IV.     If an injunction is granted, Plaintiffs should be required to post a bond.

Before a court may award preliminary injunctive relief, a plaintiff must post a compensatory security bond. Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). If the Court concludes that injunctive relief is warranted, the

Court should require Plaintiffs to post a security in an amount that the Court considers proper to reflect potential litigation costs.

## CONCLUSION

Plaintiffs have failed to satisfy the standard for preliminary injunctive relief. The Study is modest and does not cause irreparable harm to Plaintiffs. They lack standing, GSA has taken no final agency action that could be challenged under the APA, and there is no potential NEPA or NHPA violation from the Study. The public interest is furthered by studying the potential impacts of the Project. For the foregoing reasons, the Court should deny Plaintiffs' motion.

Dated: August 6, 2026                    Respectfully submitted,

                                         Adam R.F. Gustafson
                                         Principal Deputy Assistant Attorney General

                                         Marissa Piropato
                                         Deputy Chief, Natural Resources Section

                                         <u>*/s/ Michelle Nkeng*</u>
                                         Michelle Nkeng
                                         Mark Widerschein
                                         Natural Resources Section
                                         Energy & Natural Resources Division
                                         United States Department of Justice
                                         P.O. Box 7611
                                         Washington, D.C. 20044-7611
                                         Michelle.Nkeng@usdoj.gov
                                         Mark.Widerschein@usdoj.gov

                                         *Counsel for Defendants*

28