**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **CULTURAL HERITAGE PARTNERS, PLLC, et al.**, | Civil Action No. 1:25-cv-03969-DLF |
| Plaintiffs, | |
| v. | **PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED HEARING** |
| **DONALD J. TRUMP, et al.**, | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING
ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED HEARING**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................................................i

TABLE OF AUTHORITIES.....................................................................................................ii

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................4

    I.    **Plaintiffs are likely to succeed on the merits.**..............................................4

        A.  Plaintiffs Have Standing.........................................................................4

        B.  The MOU Constitutes Final Agency Action Because GSA Definitively Relinquished Project Responsibility, and OA Is Now Exercising That Authority. ............................7

        C.  GSA's Actions—and Inaction—are *Ultra Vires* Because It Cannot Delegate Project Responsibility To OA, And OA Does Not Have Independent Authority to Implement the Project. ......................................9

    II.    **ABSENT EMERGENCY RELIEF, PLAINTIFFS WILL SUFFER IRREPARABLE HARM FROM BOTH THE LOSS OF MEANINGFUL PRE-ACTION PARTICIPATION AND IRREVERSIBLE ALTERATION OF THE EEOB.**..........12

        A.  Proceeding Outside a Lawful and Accountable Review Process Irreparably Harms Plaintiffs. ...................................................13

        B.  Plaintiffs Will Suffer Irreparable Harm if the EEOB is Physically Damaged. ...........19

    III.  THE BALANCE OF EQUITIES FAVOR PRESERVING THE STATUS QUO.....22

    IV.  THE PUBLIC INTEREST SUPPORTS THE REQUESTED RELIEF. ...................24

    V.    THE COURT SHOULD WAIVE THE BOND REQUIREMENT..........................24

CONCLUSION.....................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Anacostia Watershed Society v. Babbitt*,
 871 F. Supp. 475 (D.D.C. 1994) ........................................................................................17

*Animal Legal Defense Fund, Inc. v. Glickman*,
 154 F.3d 426 (D.C. Cir. 1998) ...........................................................................................6

*Armstrong v. Bush*,
 807 F. Supp. 816 (D.D.C. 1992) ........................................................................................25

* *Bennett v. Spear*,
 520 U.S. 154 (1997) ...........................................................................................................7

*BWX Elecs., Inc. v. Control Data Corp.*,
 929 F.2d 707 (D.C. Cir. 1991) .........................................................................................11

*Center for Biological Diversity v. U.S. Department of Interior*,
 563 F.3d 466 (D.C. Cir. 2009) .........................................................................................13

*Centro de Trabajadores Unidos v. Bessent*,
 167 F.4th 1218 (D.C. Cir. 2026) ........................................................................................8

*Cultural Heritage Partners, PLLC v. Trump*,
 Case 1:25-cv-03969-DLF (D.D.C. Dec. 8, 2025) ...............................................................5

*Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army*,
 331 F. Supp. 925 (D.D.C. 1971) ........................................................................................25

*Federal Prescription Service v. American Pharmaceutical Association*,
 636 F.2d 755 (D.C. Cir. 1980) .........................................................................................25

*Fort Sumter Tours, Inc. v. Babbitt*,
 202 F.3d 349 (D.C. Cir. 2000) .........................................................................................11

*Halverson v. Slater*,
 129 F.3d 180 (D.C. Cir. 1997) .........................................................................................10

*Indiana v. Haaland*,
 No. 24-1665 (RBW), 2024 WL 5213401 (D.D.C. Dec. 24, 2024) ......................................4

* *League of Women Voters of the United States v. Newby*,
 838 F.3d 1 (D.C. Cir. 2016) .............................................................................................24

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................5

*Mannina v. District of Columbia*,
    437 F. Supp. 3d 1 (D.D.C. 2020) ..........................................................4

\* *Marsh v. Oregon Natural Resources Council*,
    490 U.S. 360 (1989) ..............................................................................13

\* *Massachusetts v. Environmental Protection Agency*,
    549 U.S. 497 (2007) ................................................................................5

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995) ................................................................................11

*Media Matters for America v. Paxton*,
    138 F.4th 563 (D.C. Cir. 2025) ............................................................22

*Milner v. Department of Navy*,
    562 U.S. 562 (2011) ..............................................................................12

*Muckleshoot Indian Tribe v. U.S. Forest Service*,
    177 F.3d 800 (9th Cir. 1999)................................................................24

*National Small Shipment Traffic Conference, Inc. v. Civil Aeronautics Board*,
    618 F.2d 819 (D.C. Cir. 1980) .............................................................12

\* *National Trust for Historic Preservation v. Blanck*,
    938 F. Supp. 908 (D.D.C. 1996) ..........................................................13

\* *National Trust for Historic Preservation v. National Park Service*,
    No. 26-5123, 2026 U.S. App. LEXIS 23770 (D.C. Cir. Aug. 7, 2026) ........................*passim*

*New England Anti-Vivisection Society v. U.S. Fish & Wildlife Service*,
    208 F. Supp. 3d 142 (D.D.C. 2016) ......................................................6

*Oceana, Inc. v. Pritzker*,
    217 F. Supp. 3d 310 (D.D.C. 2016) ....................................................15

*Save the Courthouse Committee v. Lynn*,
    408 F. Supp. 1323 (S.D.N.Y. 1975).....................................................19

*Segar v. Mukasey*,
    508 F.3d 16 (D.C. Cir. 2007) ...............................................................11

***Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing***
    iii

*Sierra Club v. Adams*,
578 F.2d 389 (D.C. Cir. 1978) ................................................................6

\* *Summers v. Earth Island Institute*,
555 U.S. 488 (2009) ........................................................................5, 13

\* *WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013) ..............................................................6

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 701–706

5 U.S.C. § 551(13)...................................................................................7

\* 5 U.S.C. § 704 .......................................................................................7

\* 5 U.S.C. § 706 .....................................................................................15

\* 5 U.S.C. § 706(2)(C) ...........................................................................10

National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h

\* 42 U.S.C. § 4332(C)............................................................................13

42 U.S.C. § 4336(b)(1)...........................................................................13

42 U.S.C. § 4336(b)(2)...........................................................................13

National Historic Preservation Act, 54 U.S.C. §§ 300101–307108

54 U.S.C. § 306107 ...............................................................................15

Title 40, Public Buildings, Property, and Works

\* 40 U.S.C. § 121(d)(1).....................................................................10, 11

**Public Laws and Reorganization Plans**

\* Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989,
Pub. L. No. 100-461, § 590, 102 Stat. 2268 (1988) ................................*passim*

\* National Historic Preservation Act of 1966, Pub. L. No. 89-665, 80 Stat. 915 (1966),
amended by Pub. L. No. 96-515, 94 Stat. 2987 (1980)................................24

**Regulations**

36 C.F.R. § 800.1(c) ...................................................................................................................... 13

36 C.F.R. § 800.2(a) ...................................................................................................................... 14

36 C.F.R. § 800.2(c) ...................................................................................................................... 14

36 C.F.R. § 800.2(d) .................................................................................................................. 14, 15

36 C.F.R. § 800.3(e) ...................................................................................................................... 14

36 C.F.R. § 800.3(f) ...................................................................................................................... 14

36 C.F.R. § 800.4(a) ...................................................................................................................... 15

36 C.F.R. § 800.5(d) ...................................................................................................................... 15

36 C.F.R. § 800.10(a) .................................................................................................................... 13

36 C.F.R. § 800.11(a) .................................................................................................................... 15

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 65(c) ...................................................................................................................... 24

**Local Rules of Civil Procedure**

Local R. Civ. P. 7(m) ...................................................................................................................... 4

**Miscellaneous**

133 Cong. Rec. 36572 (Dec. 19, 1987) ........................................................................................ 12

Letter from Thomas E. Luebke, Sec'y, U.S. Comm'n of Fine Arts, to Joshua Fisher, Dir., Office of
Mgmt. & Admin., Exec. Office of the President (Apr. 23, 2026) (Project No. CFA 16/APR/26-3),
https://www.cfa.gov/records-research/project-search/cfa-16-apr-26-3 ........................................... 18

Nat'l Capital Planning Comm'n, Commission Action: Eisenhower Executive Office Building
Exterior Beautification Project NCPC File No. 8777 (May 7, 2026),
https://www.ncpc.gov/docs/actions/2026May/8777_Eisenhower_Executive_Office_Building_Exte
rior_Beautification_Project_Commission_Action_May2026.pdf ...................................... 15, 16, 18

Nat'l Capital Planning Comm'n, Open Session Commission Meeting Tr. at 19:6–12. (May 7,
2026),
 https://www.ncpc.gov/docs/open_gov_files/transcripts/2026/2026_05_07_NCPC.pdf ........... 16, 21

Restatement (Second) of Contracts § 203 ........................................................................ 10

U.S. Dep't of the Interior – N.P.S., *The Secretary of the Interior's Stds for Rehab. & Illustrated Guidelines on Sustainability for Rehab. Historic Buildings* (2011).................................................. 21

**INTRODUCTION**

> Defendants' argument, in other words, simply brushes off the signification, emotion, meaning, and particularized value to individuals of witnessing certain places where their history happened, looking upon architectural marvels, reveling in sweeping landscapes, and viewing buildings, memorials, and monuments that tell the American story.

> *Hon. Patricia A. Millett and Hon. Bradley N. Garcia*[1]

Defendants' claim that Plaintiffs seek a "Kafkaesque" procedural loop rests on a false premise. Plaintiffs do not contend that no one may study the Eisenhower Executive Office Building's ("EEOB") historic granite or conduct appropriate testing as part of a lawful preservation review. But before the Office of Administration ("OA") irreversibly alters a National Historic Landmark ("NHL"), the legally responsible federal agency must complete statutorily required reviews where appropriate consulting parties can meaningfully inform whether and how invasive testing should occur. Testing may occur *within* the lawful, accountable review process; not before.

Defendants say that OA must drill, core, paint, and pressure-wash portions of the EEOB because the resulting Study may inform its ongoing National Historic Preservation Act ("NHPA") and National Environmental Policy Act ("NEPA") analyses. ECF No. 44 at 8–9, 26–27. Indeed, OA now states that it may use the Study to determine both the "preferred alternative" for purposes of NEPA and the "proposed undertaking" for purposes of NHPA. ECF No. 44-1 ¶ 16. But that contention does not answer Plaintiffs' Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing ("Renewed Motion"). It underscores the problem. OA should not be doing anything at all, let alone proposing to alter the façade of a historic resource to potentially generate information for a statutory review that the legally responsible federal

---

[1] *Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*, No. 26-5123, 2026 U.S. App. LEXIS 23770, at *53 (D.C. Cir. Aug. 7, 2026).

***Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing***                                    1

agency has not itself undertaken, and before the consultation integral to that review has had any meaningful opportunity to inform whether and how that alteration should occur.

At the heart of this case lies a question of historic importance. Can a federal agency abdicate its statutory obligation to comply with federal law and unlawfully transfer its authority and responsibility to a non-federal agency to place the actions of that non-federal agency beyond the reach of a federal court's jurisdiction? The answer can only be no. Yet that is precisely what Defendant General Services Administration ("GSA") has done. GSA has unlawfully delegated painting, cleaning, and repointing of the EEOB ("the Project") responsibility to OA, a non-federal entity under direct control of the President. GSA's actions are in violation of federal law.

The dispute therefore is about who has authority to carry out the Project and in what order the law requires that authority to be exercised. GSA possesses statutory authority over work on the EEOB, yet the Memorandum of Understanding ("MOU") provides that GSA will relinquish Project responsibility to OA and will "not take any executive action on the Project." ECF No. 27-4 ¶¶ 4–5, 15; *id.* at 8. Simultaneously, Defendants maintain that OA is not an agency subject to the statutes and judicial review that Plaintiffs invoke, and that its compliance with the NHPA and NEPA is voluntary. ECF No. 27-2 ¶¶ 10–11.

Defendants' description of the President's decisionmaking illustrates why judicial intervention is necessary now. OA originally represented that, "in the event the President decides to proceed with the Project," it would voluntarily participate in processes before the Commission of Fine Arts ("CFA"), Advisory Council on Historic Preservation ("ACHP"), National Capital Planning Commission ("NCPC"), and D.C. State Historic Preservation Office ("SHPO"). ECF No. 27-2 ¶ 11. OA subsequently began those very processes. Yet Defendants now maintain that the President has not decided whether to proceed and that the Study itself will help determine whether

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing*                                                    2

and how the Project moves forward. *See* ECF Nos. 44 at 26–27; 44-1 ¶¶ 19–20. Whatever the status of the President's ultimate decision, OA is no longer merely considering a hypothetical project. It is exercising Project authority, commissioning studies, appearing before reviewing bodies, undertaking statutory analyses, and proposing imminent physical alterations to the EEOB.

Nor does the limited size of the proposed test areas answer Plaintiffs' Renewed Motion. Defendants repeatedly characterize the Study as "modest." ECF No. 44 at 8. But they confuse the magnitude of the threatened alteration with its irreversibility. A small permanent alteration is still permanent. Core samples cannot be returned to nineteenth-century granite after they are removed. Paint cannot be applied and then removed with a guarantee that the historic stone beneath it will remain unchanged; OA's own plan contemplates subsequent repairs necessary to restore the stone only "as close to the original condition as possible." *See* ECF No. 42-1 ¶ 16. The very uncertainty that Defendants say makes testing necessary demonstrates why testing must occur, if at all, within a lawful process rather than ahead of it.

OA's flawed testing protocol could produce unreliable results that it then uses to justify painting the building. Because OA is neither required to consult with Plaintiffs in developing that protocol nor, under Defendants' theory, subject to APA review, Plaintiffs would lose both protections that lawful agency review provides: the opportunity to improve the information-gathering process before it occurs and the opportunity to challenge an ultimate decision that rests on arbitrary or unreliable evidence. Plaintiffs do not ask this Court to referee the substance of an ongoing administrative review. They ask the Court to decide the antecedent legal questions that Defendants' Opposition never resolve: whether GSA may relinquish statutory responsibility for this federal undertaking to OA and permit OA to alter the EEOB while treating compliance with NHPA and NEPA as voluntary. These legal questions are squarely before the Court. Preserving

the status quo while the Court answers that question does not obstruct the statutory process; it prevents Defendants from putting that process beyond effective judicial review.

Plaintiffs satisfy each requirement for preliminary relief. Plaintiffs are likely to succeed on the merits because they have standing based on their concrete and procedural interests in the EEOB; the MOU constitutes final agency action by GSA and exceeds GSA's statutory delegation authority; and Section 590 supplies OA no independent authority to assume Project control. Plaintiffs face irreparable harm both from the loss of meaningful participation in a lawful and accountable review process and from permanent alteration of historic fabric. The balance of equities and public interest strongly favor maintaining a century-old status quo while the Court determines who may lawfully alter this NHL. The Court should grant Plaintiffs' Renewed Motion.

## ARGUMENT[2]

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs have demonstrated a substantial likelihood of success on the merits because (1) Plaintiffs have standing, (2) GSA has unlawfully imbued OA with Project responsibility, and (3) GSA has unlawfully abdicated its own Project responsibility.

#### A. Plaintiffs Have Standing.

Plaintiffs have standing because GSA's execution of the MOU and failure to itself engage in the legally required NEPA and NHPA processes threatens Plaintiffs' concrete aesthetic,

---

[2] Defendants assert Plaintiffs violated Local Rule 7(m) by failing to meet and confer with Defendants prior to filing their Renewed Motion. ECF No. 44 at 16 n.1. However, Rule 7(m) only applies to nondispositive motions, and the D.C. Circuit has not directly resolved whether preliminary injunctions are categorically dispositive or nondispositive. *Indiana v. Haaland*, No. 24-1665 (RBW), 2024 WL 5213401, at *5 n.7 (D.D.C. Dec. 24, 2024). Additionally, Defendants elevate form over substance. Before Plaintiffs filed, the Parties' counsel discussed a version of the proposed testing. Plaintiffs responded in writing, identified concerns with this manner of invasive testing, requested the testing protocols and related materials necessary to evaluate the proposal, and expressly warned that proceeding without that information "may require us to revive our request for a preliminary injunction." Ex. A. Defendants did not respond. Defendants therefore knew Plaintiffs' specific objections to the proposed testing and the relief Plaintiffs would seek if those objections went unanswered. Courts decline to enforce Rule 7(m) where conferral would be futile or the opposing party has suffered no prejudice, particularly where doing otherwise would merely require the movant to refile the same motion. *Mannina v. District of Columbia*, 437 F. Supp. 3d 1, 7 (D.D.C. 2020) (holding that plaintiff's failure to confer did not prejudice defendant where defendant had acknowledged awareness of plaintiff's concerns).

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order,*    4
*Preliminary Injunction, and Expedited Hearing*

recreational, professional, and educational interests, and deprives them of procedural protections designed to safeguard those interests. *See, e.g.*, ECF Nos. 7-3, 7-15, 7-16, 16-2, 39-1, 39-2, 39-3, 39-4. GSA's execution of the MOU and relinquishment of "control of all aspects of the day-to-day execution of the Project," ECF No. 27-2 at 7, leaves OA—an entity Defendants maintain is not subject to the APA, NHPA, or NEPA—to exercise Project authority and physically alter the EEOB without the NHPA or NEPA review that would otherwise apply. Because GSA never lost the statutory authority it purported to transfer, an order directing GSA to resume Project responsibility and complete the legally required consultation and review before any physical alteration redress those injuries.[3] *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009); *Massachusetts v. Env't Prot. Agency*, 549 U.S. 497, 517–18 (2007); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

### 1. The Project Threatens Plaintiffs' Concrete Aesthetic, Recreational, Professional, And Educational Interests and Related Procedural Interests.

Plaintiffs' interests are concrete and particularized, not a generalized interest in seeing Defendants follow the law. Marion Werkheiser, Gregory Werkheiser, Rebecca Miller, and Robert Peck regularly visit and experience the EEOB and its surroundings for aesthetic, recreational, professional, and educational purposes, and intend to continue doing so. ECF Nos. 16-1 ¶ 4; 16-2 ¶ 30; 39-1 ¶ 16; 39-3 ¶ 3; 39-4 ¶ 3; 39-2 ¶ 7. Their visits are deliberate: the EEOB and the aesthetic experience they derive from its historic exterior are themselves reasons for those visits. ECF Nos.

---

[3] Requiring GSA to discharge its statutory responsibilities rather than transfer them to OA is not a matter of bureaucratic formality. GSA employs professionals with decades of experience conducting the very NHPA and NEPA reviews implicated by this Project. To Plaintiffs' knowledge, OA employs no comparable historic-preservation or environmental-review professionals—or, at minimum, has identified none and presented none to CFA or NCPC in connection with the Project. Instead, OA's participation in this litigation has been represented by DOJ counsel who candidly acknowledged to this Court that they are not historic-preservation lawyers and were unfamiliar with aspects of the preservation-review process. Transcript of Oral Argument at 51:1–4, *Cultural Heritage Partners, PLLC v. Trump*, Case 1:25-cv-03969-DLF (D.D.C. Dec. 8, 2025). The identity of the responsible agency thus has practical consequences: it determines not only whether the decisionmaker is legally accountable, but whether the Project benefits from the institutional expertise Congress expected the responsible federal agency to bring to the review.

7-3 ¶ 5; 7-15 ¶¶ 5–6; 7-16 ¶ 3; 39-2 ¶¶ 3, 7; 39-3; 39-4. The Project and Study threatens those concrete interests by physically altering the historic fabric Plaintiffs value.

As the D.C. Circuit recently recognized "[t]he whole point of preserving historic buildings and sites, monuments, and memorials is for the members of the public to be able to visit them, view them, and appreciate them." *Nat'l Tr.,* 2026 U.S. App. LEXIS 23770, at *51. Nor should the Court isolate the Study from the Project of which it is a part, as Defendants urge. ECF No. 44 at 28. That would "slice[] the salami too thin." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 307–08 (D.C. Cir. 2013) (plaintiffs suffering aesthetic injury from challenged action had standing to assert procedural defects concerning the action); *see also Sierra Club v. Adams*, 578 F.2d 389, 392 (D.C. Cir. 1978). Defendants' authorities are not to the contrary. *See Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 431–38 (D.C. Cir. 1998) (recognizing standing based on regular visits and concrete aesthetic injury); *New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 172–75 (D.D.C. 2016) (finding the alleged injury insufficiently likely to occur). Neither holds that standing must be assessed by artificially separating the most imminent component of a challenged action from the larger action it advances.

Here, OA has announced concrete plans to conduct the Study on the very historic resource Plaintiffs regularly visit and value. The Study will physically alter that resource and advance the larger Project. Plaintiffs therefore have concrete interests threatened by both, together with related procedural injuries arising from the process GSA and OA are pursuing under the challenged MOU.

**2. Plaintiff's Injuries Are Traceable to GSA And Redressable By the Court.**

Plaintiffs' injuries are traceable to GSA because the MOU is the mechanism by which GSA relinquished Project responsibility to OA while abdicating its role under the statutory processes that otherwise govern GSA's actions. GSA owns and manages the EEOB, acknowledges its authority over work on the building, and agreed, through the MOU, that OA would manage and

implement the Project while GSA "would not take any executive action on the Project," ECF No. 27-4 at 8, and "GSA will not be the entity charged with power-washing/cleaning, repointing, and painting as part of the Project at the EEOB." ECF No. 27-4 at 5, ¶ 15.

The injuries are likewise redressable. An order enjoining the MOU, preventing GSA from unlawfully transferring Project authority to OA, and preserving the status quo while the Court determines who may lawfully exercise that authority, would prevent the imminent physical alterations from the Study and restore the opportunity for the responsible federal agency to conduct the legally required review. That is sufficient for standing.

> **B. The MOU Constitutes Final Agency Action Because GSA Definitively Relinquished Project Responsibility, and OA Is Now Exercising That Authority.**

By signing an MOU that removes future management and implementation responsibilities over the Project to a non-agency entity that is not subject to judicial review, GSA has taken a final agency action that is subject to judicial review under the APA. *See* 5 U.S.C. § 704. Agency action is final where it (1) marks the consummation of the agency's decisionmaking process and (2) determines rights or obligations or produces legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Both requirements are satisfied here.

The MOU constitutes a final agency action because it reflects the consummation of GSA's decision to transfer Project authority and otherwise remove itself from Project responsibility via the legally required NHPA and NEPA processes. 5 U.S.C. § 551(13); *Bennett*, 520 U.S. at 177–78. GSA cannot hide behind OA's actions that actively advance Project design, scope, and planning, to further the President's goal of permanently altering an NHL.

The MOU reflects the consummation of GSA's decision about who will manage and implement the Project. GSA expressly acknowledges its statutory authority over work at the EEOB but states that, if the Project proceeds, "it would be handled by the Office of Administration[,]"

and that GSA "would delegate any and all necessary authority for the Project to OA," while taking no executive action on the Project. ECF No. 27-4 ¶¶ 4–5, 15; *see also id.* 27-4 at 8. The MOU identifies no further decision for GSA to make about which entity will control the Project and gives GSA no continuing role in its management or implementation.

Defendants emphasize the conditional words "should" and "would," arguing that the MOU becomes operative only if the President directs the Project to proceed. ECF No. 44 at 29–30. But the relevant question is whether GSA has consummated its decision to relinquish responsibility to OA. The MOU answers that question. Unlike the MOU at issue in *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1236 (D.C. Cir. 2026), the MOU between GSA and OA does far more than restate and clarify duties that already existed by operation of statute. Here, the MOU actively transfers operational Project authority to OA. There is no next step following GSA's signature, which is apparent from GSA's and OA's actions.

In fact, OA stated "in the event the President decides to proceed with the Project, OA voluntarily committed to consult with, and participate in public processes established by, the [CFA], [ACHP], [NCPC], and the [D.C. SHPO]." ECF No. 38-2 ¶ 4. Thus, it appears as if the President has "decide[d] to proceed with the Project," because OA—not GSA—engaged the environmental services contractor and subject-matter specialist responsible for developing the Study. ECF No. 42 at 2. OA—not GSA—has presented the Project to CFA and NCPC. ECF No. 44 at 10. OA is purporting to conduct the NEPA and NHPA analyses that Defendants say will inform whether and how the Project proceeds. ECF No. 44 at 33. And OA—not GSA—proposes to drill into, extract samples from, and apply paint to portions of the EEOB pursuant to the Study. ECF 44 at 16–17.

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing*                                                    8

Defendants nevertheless maintain that the President has not yet decided whether to proceed and that the Study itself will inform whether and how the Project moves forward. *See* ECF No. 44 at 33 ("[T]he Study is part of determining *whether to proceed with the Project*, and has independent utility for preservation efforts at the EEOB." (emphasis added)) (citing 4th Decl. H. Martin, ECF No. 44-1 ¶ 17)). But Ms. Martin's declaration says nothing of the Study being used to help determine "whether to proceed." The record is devoid of any affirmative statement that the Study is being relied upon in making that decision. Whether the President has directed the painting to occur or not, it is clear that GSA and OA are acting as though OA currently—not at some future point subject to the satisfaction of any condition—has sole responsibility for the Project and Study.

For the first time, Defendants argue that "[t]o the extent a delegation occurs, it would require separate future actions by GSA, pursuant to GSA's Delegations of Authority Manual." ECF No. 44 at 30–31.[4] Defendants' new reliance on unspecified future actions under GSA's Delegations of Authority Manual does not change the present reality: OA is already exercising the Project authority the MOU purported to transfer from GSA. ECF No. 44 at 30–31. Whatever additional internal steps the Manual may include, they do not alter the delegation already being implemented. Plainly, GSA has abdicated its role in the Project through the MOU, and by doing so, has completed a final agency action subject to this Court's review.

### C. GSA's Actions—and Inaction—are *Ultra Vires* Because It Cannot Delegate Project Responsibility To OA, And OA Does Not Have Independent Authority to Implement the Project.

GSA does not have the authority to delegate Project responsibility to OA, nor does Section 590 provide OA with independent authority to oversee major alterations to the EEOB or to assume

---

[4] But Defendants provide no further context as to what the Manual requires. Indeed, while the link to the Manual cited in Defendants' Opposition leads to a table of contents for the Manual, many of the links to individual chapters are dead-ends, including the link to the chapter concerning OA, and are thus inaccessible. The Court and Plaintiffs have no way to verify Defendants' assertion.

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing*

9

compliance responsibilities under NEPA and NHPA. The APA, 5 U.S.C. § 706(2)(C), prohibits agencies from performing actions that are "in excess of statutory jurisdiction, authority, or limitations[.]*"* Thus, any attempt to delegate authority to OA or to imbue OA with independent authority not provided by the language of Section 590 is *ultra vires*.[5]

### 1. GSA lacks the statutory authority to delegate Project responsibility to OA.

The MOU is unlawful for a straightforward reason: Congress has not authorized GSA to delegate Project authority to OA. GSA's delegation authority is expressly limited by statute. Under 40 U.S.C. § 121(d)(1), GSA may delegate covered authority to "another Federal agency." OA is not a federal agency—a point Defendants themselves repeatedly emphasize in arguing that OA is not subject to the APA, NHPA, or NEPA. *See* ECF Nos. 38-1 at 32, 34–35; 44 at 10, 19, 26. GSA therefore cannot delegate Project authority to it. GSA's statutory delegation must be read according to the limited terms set forth in its enabling statute. *Halverson v. Slater*, 129 F.3d 180, 187–88 (D.C. Cir. 1997). Where Congress imposes specific limitations on delegation, a broader delegation theory cannot be used to "expand the specific delegation" permitted by statute. *Id.* at 188. Defendants cannot rely on OA's non-agency status to shield its actions from review while disregarding that same status when GSA needs an eligible recipient for its delegated authority.

The MOU specifically states that "GSA would delegate any and all necessary authority for the Project to OA, but would not take any executive action on the Project[.]" ECF No. 27-4 at 8. As Plaintiffs have previously noted, courts interpret agreements as a whole, presuming no provision is superfluous. Restatement (Second) of Contracts § 203; ECF No. 39 at 28. Courts in this Circuit have specifically rejected agency interpretations of agreements that ignored portions

---

[5]Count V of Plaintiffs' First Amended Complaint is a claim against Agency Defendants for unlawful delegation, which is an *ultra vires* action. ECF No. 34 ¶¶ 148–56. Contrary to Defendants' assertion, Plaintiffs do not argue a "common-law *ultra vires* claim that OA lacks independent authority to carry out the Project." ECF No. 44 at 26. Rather, Plaintiffs argue that Defendant GSA's purported delegation in the MOU is not in accordance with law and exceeds its statutory authority.

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order,*      10
*Preliminary Injunction, and Expedited Hearing*

of text within those agreements, stating that "a document should be read to give effect to *all* its provisions and to render them consistent with each other." *Segar v. Mukasey*, 508 F.3d 16, 22–24 (D.C. Cir. 2007) (emphasis added) (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)); *see also Fort Sumter Tours, Inc. v. Babbitt*, 202 F.3d 349, 358 (D.C. Cir. 2000), *BWX Elecs., Inc. v. Control Data Corp.*, 929 F.2d 707, 711 (D.C. Cir. 1991).

Defendants' position thus depends on an irreconcilable pair of propositions: OA is sufficiently separate from a federal agency that it is not bound by the statutory regimes and judicial review applicable to federal agencies, but sufficiently equivalent to a federal agency that GSA may transfer to it "any and all necessary authority" over the Project. Section 121(d)(1) does not permit that result.

### 2. Section 590 Does Not Independently Authorize OA to Manage and Implement the Project.

To avoid the problem with GSA's delegation authority, Defendant GSA attempts to imbue OA with independent authority over the EEOB under Section 590. Defendant GSA then relies on this novel, purported recognition of independent authority to justify abdicating its congressionally mandated responsibilities under NEPA and NHPA. But Section 590 does not provide the authority that GSA claims it does.

Section 590 authorizes the Director of OA to "accept and utilize voluntary and uncompensated services" and to accept "gifts and bequests of property" for purposes related to the EEOB. Pub. L. No. 100-461, § 590(a), 102 Stat. 2268. It does not grant OA general authority to manage and implement alterations to the building, much less authority to assume GSA's statutory responsibilities for the Project. Congress expressly preserved a role for GSA. Section 590(c) provides that "[a]ny use or sale of property accepted pursuant to this section, and any use of proceeds from such sale, shall be subject to the disapproval of the Administrator of General

Services within 30 days after the Administrator receives notice of such use or sale." That provision cannot be reconciled with Defendants' contention that Congress gave OA independent authority to undertake work at the EEOB free from GSA supervision. Congress expressly placed OA's use of the property it accepts under the continuing authority of GSA.

The legislative history Defendants invoke reinforces that conclusion. OA expressly asked Congress to consolidate responsibility, arguing that "it would be efficient to have the maintenance and restoration functions reside with one individual." ECF No. 44 at 14 (quoting 133 Cong. Rec. 36572 (Dec. 19, 1987)). But Defendants omit Congress's response: Congress said no. Instead, Congress enacted Section 590(c), which expressly conditions OA's use of donated property on GSA's approval. Thus, the legislative history documents that Congress considered giving OA independent authority and ultimately chose not to grant the very independence Defendants now claim OA has. *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011); *see also Nat'l Small Shipment Traffic Conf., Inc. v. Civ. Aeronautics Bd.*, 618 F.2d 819, 828 (D.C. Cir. 1980) (stating that the plain language of a statute controls, including for understanding agency authority). Defendants cannot now invoke the statute Congress enacted as authority for precisely the consolidation Congress declined to provide. The Court should not permit Defendants to accomplish through an MOU what OA could not obtain through the legislative process.

## II. ABSENT EMERGENCY RELIEF, PLAINTIFFS WILL SUFFER IRREPARABLE HARM FROM BOTH THE LOSS OF MEANINGFUL PRE-ACTION PARTICIPATION AND IRREVERSIBLE ALTERATION OF THE EEOB.

Plaintiffs face two related injuries that cannot be repaired once the Study portion of the Project occurs. First, if Defendants physically alter the EEOB without a lawful and accountable review process, Plaintiffs can never recover the opportunity to inform that decision, and the review will never effectively inform government decisionmaking that affects Plaintiffs' substantive interests. Second, once original nineteenth-century granite is removed or altered, Plaintiffs'

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing*            12

concrete aesthetic, historic, and visual interests are irreparably harmed, and no judicial order can later restore the historic fabric to its original condition or remedy Plaintiffs' harm. Both injuries are imminent because OA has announced its intention to proceed with the Study without GSA involvement or oversight.

### A. Proceeding Outside a Lawful and Accountable Review Process Irreparably Harms Plaintiffs.

NEPA[6] and NHPA[7] provide procedural protections designed to safeguard precisely the historic and aesthetic interests Plaintiffs seek to protect. When an irreversible action is imminent, the loss of an opportunity to participate in a statutorily required decisionmaking process cannot be remedied after the fact. *See Summers*, 555 U.S. at 496; *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009). These protections matter because the steps serve substantive purposes: they bring relevant information and expertise into the decisionmaking process before action occurs, provide meaningful opportunities for public and consulting-party participation, require consideration and documentation of effects and alternatives, and produce a record against which the resulting agency decision can be reviewed.

Defendants artificially narrow Plaintiffs' procedural injuries under NEPA and NHPA to public participation, but Plaintiffs' injuries go further. When review is not conducted in accordance with law, it cannot effectively inform government decisionmaking. Alternatives that would avoid

---

[6] Defendants deny that NEPA and NHPA require public participation to occur before irreparable harm occurs. ECF No. 44 at 18. But—as Plaintiffs have repeatedly stated—in both Environmental Assessments and in Environmental Impact Statements, agencies must take a hard look at the impacts of a proposed action, including environmental impacts, *before* issuing a decision that will allow the action to occur. *See* 42 U.S.C. §§ 4332(C), 4336(b)(1)–(2). Further, public participation and disclosure are central features of NEPA, meant to: (1) ensure that agencies have carefully and fully contemplated the environmental effects of their actions before they make decisions, and (2) ensure that the public has sufficient information to review, comment on, and—if necessary—challenge these agency actions. *See id.*; *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

[7] Similarly to NEPA, Section 106 consultation must occur early in the planning process, *before* a project begins. 36 C.F.R. § 800.1(c); *Nat'l Tr. for Hist. Pres. v. Blanck*, 938 F. Supp. 908, 919–24 (D.D.C. 1996). Compliance with Section 110(f) also calls for early and careful consideration of alternatives and mitigation measures, and public reporting of efforts to minimize harm. 36 C.F.R. § 800.10(a).

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing*    13

or mitigate harm may not be adequately considered, increasing the likelihood of injury to Plaintiffs' concrete aesthetic, historic, and visual interests. That risk is immediate here: lawful review now would affect whether invasive testing of the EEOB's historic granite is necessary at all and, if so, how it is designed and conducted to avoid or minimize harm.

### 1. OA's Distorted "Voluntary" Process

Defendants insist that all is well because OA has voluntarily committed to undertake NEPA and NHPA analyses and to participate in processes before CFA, NCPC, ACHP, and the D.C. SHPO. ECF No. 44-1 ¶ 4. But voluntary approximation by OA, which is not a federal agency, of a federal agency's review process carries none of the safeguards of an accountable one. OA may decide for itself which procedures to follow, when to follow them, what participation to permit, and what documentation to create all while Defendants simultaneously maintain that OA's actions are not subject to APA review. These differences have practical consequences for this Project:

| Steps in the Section 106 Process[8] | Purpose | OA's Process To Date |
|---|---|---|
| Responsible agency initiates review and identifies consulting parties (36 C.F.R. §§ 800.2(a), (c), 800.3(f)) | Establishes who is accountable for the review and brings SHPO and other parties with relevant expertise or demonstrated interests into the process. | OA treats its participation as voluntary. DCPL, the National Trust for Historic Preservation, and dozens of other interested organizations have not been invited to participate as Section 106 consulting parties. ECF Nos. 39-1 ¶ 24, 39-2 ¶ 10, 39-3 ¶ 5, 39-4 ¶ 5. |
| Public notice and meaningful opportunity to participate (36 C.F.R. §§ 800.2(d), 800.3(e), (f)) | Alerts the public to the agency process and provides a defined means to submit information and concerns before decisions are made. | No agency has issued a public notice establishing a Section 106 consultation process or explaining how interested members of the public may participate. Comments submitted in separate CFA and NCPC proceedings are not a substitute for participation in the responsible agency's NHPA process. |

---

[8] This chart is a summary of the Section 106 Process under NHPA. It does not include the heightened steps in Section 110(f) review, required here because of the EEOB's status as an NHL, or NEPA review, and it is illustrative, not exhaustive.

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing*                                    14

| Identification and evaluation of effects and alternatives (36 C.F.R. § 800.4(a), 54 U.S.C. § 306107) | Forces the decisionmaker to consider potential harm and ways to avoid, minimize, or mitigate it before committing to an outcome. | No formal Section 106 analysis of adverse effects or process for resolving them has been completed. NCPC itself requested consideration of additional information and alternatives, which Defendants have failed to provide.[9] |
|---|---|---|
| Disclosure of technical information and informed consultation (36 C.F.R. §§ 800.2(d), 800.11(a)) | Allows relevant expertise to improve the information-gathering process itself, including the need for, design of, and safeguards governing invasive testing. | Plaintiffs requested the testing protocols and related materials and received no response. Their expert subsequently identified more than forty material technical questions left unanswered by OA's description of the Study. *See generally* ECF No. 43-4. |
| Agency consideration and documentation of comments (36 C.F.R. §§ 800.2(d), 800.5(d)) | Creates accountability by requiring the agency to confront significant information and concerns rather than merely receive them. | No documented process has been identified through which OA must respond to concerns raised by Plaintiffs, preservation experts, or the public. |

The identity of the entity conducting the review matters because legal accountability changes the process and the product of decisionmaking. When the Section 106 process is conducted by a federal agency, the agency's decision is reviewable under the APA. *See* 5 U.S.C. § 706. Based on the administrative record, a court can determine whether the agency responsible considered the relevant factors and acted within the law rather than arbitrarily or capriciously. *See Oceana, Inc. v. Pritzker*, 217 F. Supp. 3d 310, 316 (D.D.C. 2016). Defendants maintain that OA is not an agency subject to APA review.

A responsible federal agency cannot simply promise to approximate the parts of procedures it finds useful. It must conduct the review the law requires, allow the participation the law protects, document its decisionmaking, and ultimately defend that decision on the record it created. OA's voluntary process provides no equivalent guarantee and insulates the Project from judicial review.

---

[9] Nat'l Capital Planning Comm'n, Commission Action: Eisenhower Executive Office Building Exterior Beautification Project, at 2, NCPC File No. 8777 (May 7, 2026) ("NCPC Comm'n Action"), https://www.ncpc.gov/docs/actions/2026May/8777_Eisenhower_Executive_Office_Building_Exterior_Beautificatio n_Project_Commission_Action_May2026.pdf.

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing*          15

### 2.  OA's Ill-Conceived Study

Plaintiffs do not contend that every aspect of NEPA and NHPA review must be completed before any technical investigation may occur. Nor do Plaintiffs contend that appropriate testing of the EEOB can never be undertaken. Testing may have a legitimate place within a lawful review process. But where invasive testing itself may alter original NHL fabric, an accountable process requires consultation to inform whether testing is necessary, what information it should seek, how it should be performed, and what safeguards are appropriate before the testing occurs. Here, because painting will alter the façade of an NHL, participation must occur prior to that.

A lawful and accountable Section 106 process would first require OA to confront the overwhelming existing evidence bearing on whether painting the EEOB's historic granite is appropriate at all, and, consequently, whether testing paint on that granite serves any legitimate preservation purpose.[10] NCPC specifically asked OA to identify examples in which comparable historic granite buildings have been successfully painted.[11] OA has identified none. Yet OA turns that axiom of generations of expert and common knowledge that one does not paint historic granite on its head, asserting a "dearth of published scientific evidence" concerning paint on granite as justification for experimenting on the EEOB itself. ECF No. 42-1 ¶ 4. At a minimum, an actual Section 106 process would require the responsible federal agency to confront the existing federal guidance and expert advice never to paint historic granite, the absence of successful precedents, and thousands of comments opposing painting historic granite, and to explain why that evidence

---

[10] The Project started as a beautification effort at the President's behest. ECF No. 27-2 ¶ 7. Now, in a pretextual attempt to justify painting, OA is saying that the EEOB needs to be rehabilitated and preserved. ECF No. 44-1 ¶ 3. The EEOB is not falling apart at the seams, and it does not require paint to hold it up. It has stood unpainted for at least 130 years. It has also under gone recent cleaning and preservation treatments, notably with GSA serving as the responsible federal agency. Nat'l Capital Planning Comm'n, Open Session Commission Meeting Tr. at 19:6–12. (May 7, 2026) ("NCPC Tr."), https://www.ncpc.gov/docs/open_gov_files/transcripts/2026/2026_05_07_NCPC.pdf ("From 2004 to 2012, GSA refurbished parts of the [EEOB], bolstering its structural integrity, replacing windows, and improving its electrical, ventilation, and telecommunication systems. And the GSA project also included a comprehensive cleaning of the building exterior as well[.]").
[11] NCPC Comm'n Action at 2.

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order,*     16
*Preliminary Injunction, and Expedited Hearing*

should be disregarded before proceeding. OA should not be doing anything, let alone reversing that sequence and calling what it is doing preservation review.

### 3.    Outstanding Questions OA Refuses to Address

Judith M. Jacob, a conservator with more than 40 years of experience preserving historic masonry and 39 years of service with the National Park Service, reviewed OA's Notice and testing description. ECF No. 43-4 ¶¶ 2–7. She concluded that significant information essential to evaluating the proposed work was missing and identified more than 40 specific questions left unanswered by the materials Defendants disclosed. *Id.* ¶ 16. Those questions are neither trivial nor obstructionist. Defendants must answer them as part of their obligations to conduct all possible planning to avoid and minimize harm to an NHL under Section 110(f). Among other things, the disclosed plan did not explain how core-sample locations would be chosen; what questions the petrographic analysis was intended to answer; or how a limited number of cores could reliably characterize conditions across the building. *Id.* ¶ 16(d)–(f).

With respect to the proposed mineral-silicate coating, the materials did not provide information Jacob considered basic to its evaluation, including published technical data and a Safety Data Sheet, manufacturer-recommended application conditions and substrates, a manufacturer recommendation for use on the EEOB, or the expected longevity of the coating. *Id.* ¶ 16(g). Nor did the materials answer fundamental questions about how the testing itself would work: how the painting areas will be selected;[12] how the coating would be applied; what surface

---

[12] Heather Martin's Third Declaration stated that the testing area would be "at an inconspicuous location." ECF No. 42-1 ¶ 14. But then, Heather Martin's Fourth Declaration states, for the first time, that "[a]ll test painting and core sampling performed as part of the Study will take place on part of the building that are not visible from public rights of way." ECF No. 44-1 ¶ 18. There is no attempt to answer Jacob's questions about whether these areas are representative of the exterior granite or appropriate to truly test weathering. The change between declarations is yet another example of OA changing its mind in response to a perceived weakness. OA cannot cure these issues with *post hoc* rationalizations. *See Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 486 (D.D.C. 1994) ("The Park Service's action 'must be upheld, if at all, on the basis articulated by the agency itself' at the time of decision, not *post hoc* rationalizations.").

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order,* 17
*Preliminary Injunction, and Expedited Hearing*

preparation would occur; how long it would remain in place before its durability, weathering, and adhesion could be evaluated; how long it would remain before removal testing; what methods would be used if pressure washing failed; how "least damaging" would be defined; or why "no damage" was not the stated objective. *Id.* ¶ 16(h).

The reviewing bodies themselves recognize the value of additional scrutiny. NCPC requested detailed information about the proposed paint, including application, adhesion, water infiltration, long-term maintenance, and removal, as well as examples of successful use on exterior granite façades.[13] CFA directed that any testing avoid permanent damage to the granite.[14] And, as the CFA record further reflects, Commission members

> requested that the experts raising concerns about the proposal be invited to participate in this evaluation. If the painting of the stone is determined to be technically infeasible, they recommended cleaning and repointing the stone; they also expressed support for the general use of illumination to highlight the building's presence and detailing.[15]

That is the opposite of a process in which OA unilaterally designs the test, announces that it will proceed, and invites interested parties to assess the results afterward.

OA's own description of the Study underscores why pre-testing participation matters. Heather Martin states that the Study may help determine both OA's "preferred alternative" under NEPA and its "proposed undertaking" under NHPA. ECF No. 44-1 ¶ 16. If the Study will help shape the very alternatives and undertaking that OA later proposes to review, public and expert participation after the Study is completed cannot be a substitute for pre-participation that would inform how the Study itself is designed and conducted.

---

[13] NCPC Comm'n Action at 2.
[14] Letter from Thomas E. Luebke, Sec'y, U.S. Comm'n of Fine Arts, to Joshua Fisher, Dir., Office of Mgmt. & Admin., Exec. Office of the President (Apr. 23, 2026) (Project No. CFA 16/APR/26-3), https://www.cfa.gov/records-research/project-search/cfa-16-apr-26-3.
[15] *Id.*

The injunction Plaintiffs seek would restore the accountability that gives NEPA and NHPA review meaning. If Defendants are allowed to proceed before the threshold legal questions are answered, Plaintiffs will permanently lose the opportunity to have information and expertise shape whether and how invasive testing occurs. And if OA ultimately makes the Project decision Defendants say is beyond APA review, no later-created collection of comments submitted to other bodies can substitute for the administrative record of an accountable federal decisionmaker. Once those opportunities are lost, they cannot be restored by a later judgment.

### B.  Plaintiffs Will Suffer Irreparable Harm if the EEOB is Physically Damaged.

The Study is an integral and inseparable component of the Project.[16] The Project, including the Study, will physically harm the historic granite of the EEOB. Damage to historic properties constitutes a uniquely weighty harm because historic resources, once destroyed or altered, cannot simply be replaced. *See, e.g.*, *Save the Courthouse Comm. v. Lynn*, 408 F. Supp. 1323, 1343 (S.D.N.Y. 1975). Irreparable harm to the EEOB is indisputably irreparable harm to Plaintiffs. The harm Plaintiffs will suffer because of the Project is indistinguishable from that wrought by the ballroom project, which the D.C. Circuit determined last week constitutes irreparable harm. *Nat'l Tr.*, 2026 U.S. App. LEXIS 23770, at *105–11. Like Plaintiffs here, Professor Hoagland regularly walks through Lafayette Square "'to enjoy the historic buildings' in the area, the *carefully preserved architecture*, and 'the beauty of the L'Enfant Plan,'" *id.* at *38–39 (emphasis added). In finding irreparable harm, the Court explained that Hoagland "delineated specific ways" in which the ballroom construction would "irreparably and harmfully alter her use, experience, and

---

[16] Heather Martin's Fourth Declaration states, "I am overseeing an investigation into the feasibility of various measures that would improve and preserve the [EEOB] granite façade ('Project')…*As part of this investigation*, I am analyzing the best methods for cleaning and preserving the stone masonry of the EEOB and evaluating potential effects associated with painting its granite façade ('Study')." ECF No. 44-1 ¶ 3 (emphasis added). Notwithstanding the fact that this is a novel attempt to define the scope of the Project, and in direct contraction to how the Project is defined in the MOU (ECF No. 27-2 at 7), it confirms that the Study is part and parcel of the Project.

enjoyment of the archaeological, historical, visual, and aesthetic appearance of the White House" by overshadowing and thus diminishing it. *Id.* at *106–07. Painting the EEOB white would have a comparable effect. *See* ECF No. 34 ¶ 6, 11–14. The EEOB's dark grace stone façade is a defining visual element and painting it would fundamentally change the contrast between the EEOB and the White House and alter the character of every view in which the EEOB appears. ECF Nos. 7-23 ¶ 12; 7-11; 7-3 ¶ 15; 7-14. The EEOB will thus cause the same kind of "[c]oncrete and extensive architectural, historic-preservation, professional, and visual injuries" that the D.C. Circuit concluded demonstrate irreparable harm in the ballroom case. *Nat'l Tr.,* 2026 U.S. App. LEXIS 23770, at *106. The outcome here must therefore be the same; this Court should find that Plaintiffs will suffer irreparable harm from the Project and issue preliminary injunctive relief to pause the Project, including the planned Study, to protect Plaintiffs' interests in the EEOB.

The historic fabric of the EEOB is not a laboratory specimen. The proposed testing will occur on the actual nineteenth-century building. Core samples will be extracted from original granite. Coating will be applied directly to portions of the historic façade. And Defendants propose subsequently to remove that coating through progressively more aggressive pressure washing. Once original material is drilled, cored, painted, or otherwise altered, its original condition cannot be recreated. The fact that an alteration may be small does not make it reversible.

OA's own removal protocol confirms the risk. Martin states that the Building Consultant will begin pressure washing at relatively low pressure and "work up in pressure until the coating is removed[,]" after which OA will undertake repairs necessary to restore the stone only "as close to the original condition as possible." ECF No. 42-1 ¶ 16. GSA's own preservation guidance recognizes that excessive pressure can damage historic building materials. ECF No. 16-9 at 3. And Jacob explains that cleaning itself can damage stone, including by etching and scarring surfaces

and removing fine textures and historic stone-cutting marks. ECF No. 43-4 ¶ 11. OA's protocol thus does not promise reversibility.[17] It acknowledges the possibility that removal will require progressively greater pressure, followed by repairs whose stated objective is to return the stone only "as close to the original condition as possible." ECF No. 42-1 ¶ 16. OA proposes to experiment on the historic façade of an NHL. That is irreparable harm by Defendants' description, and NHPA Section 110(f) requires GSA to conduct all possible planning to minimize harm.

Furthermore, as Judith Jacob explains, granite is a poor substrate for paint, uniform adhesion of silicate coatings cannot be guaranteed, and coating mortar can interfere with moisture evaporation and contribute to moisture-related problems. ECF No. 43-4 ¶¶ 13–15. Those concerns establish why applying paint directly on original NHL fabric without first resolving basic questions about methodology, materials, safeguards, and removal presents a risk that cannot be cured after the fact. And as Plaintiffs have consistently shown, painting the EEOB will cause irreparable harm. Under the Secretary of the Interior ("SOI") Standards, repairs and alterations must not damage or destroy materials that define a building's historic character. U.S. Dep't of the Interior – N.P.S., *The Secretary of the Interior's Stds for Rehab. & Illustrated Guidelines on Sustainability for Rehab. Historic Buildings* vii (2011). The SOI Standards specifically warn against improper masonry cleaning, repointing, and changes to exterior finishes. *Id.* The EEOB's unpainted granite exterior is one of its defining historic characteristics qualifying it as an NHL. ECF No. 16-7 at 3.[18] Therefore, painting the EEOB's historic granite is inconsistent with the SOI guidance and the Project will cause irreparable harm to the EEOB.

---

[17] And yet, reversibility is exactly what OA promised to the NCPC Commissioners and testing on the actual façade of the EEOB was expressly disclaimed. NCPC Tr. at 34:16–21 ("So the reversibility, we currently have not touched the EEOB. We do not have permission to engage in testing on the EEOB. But we have been able to find some samples from a quarry in Maine, the Vinalhaven Quarry, and do our own preliminary testing on that.").

[18] "[T]he National Register nomination describes the building as a paradigm of post-Civil War architecture, and one of the three grandest structures in the United States for its style." NCPC Tr. at 18:17–20.

***Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing***
21

Plaintiffs' concrete aesthetic, historic, and visual interests depend upon the preservation of the historic character and integrity of the EEOB. Defendants cite no authority for the proposition that an injury to a historic property somehow ceases to be an injury to Plaintiffs merely because the injury is small or characterized as testing. Once original granite is removed or altered, neither money damages nor a later injunction can restore that historic fabric to its original condition. The Court can preserve that condition now. The threatened physical injury to the EEOB constitutes imminent, concrete, and irreparable harm to Plaintiffs, warranting preliminary relief.

## III.  THE BALANCE OF EQUITIES FAVOR PRESERVING THE STATUS QUO.

The balance of equities strongly favors preliminary injunctive relief.[19] The Court must therefore compare the harm Plaintiffs face if the Project, including the Study, proceeds with the governmental interests purportedly implicated by temporarily preserving the status quo. Plaintiffs' interests in protecting a historic property from irreversible damage, requiring federal agencies to comply with the procedures Congress prescribed, and ensuring that those procedures are meaningful rather than merely post hoc exercises are significant interests that outweigh Defendants' asserted interest in having OA proceed immediately with an ill-conceived testing plan for which it has no authority.

If the Project proceeds, Plaintiffs will permanently lose the opportunity for meaningful participation before invasive testing alters the EEOB, and original nineteenth-century granite will be drilled, cored, painted, and pressure-washed, causing harm that may not be undone. Defendants, by contrast, identify no comparable harm from temporarily delaying the Study while the Court

---

[19] Historically, when the government is the defendant, the balance of equities and public interest factors merge because the Government's interest is considered the public interest. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). That understanding is based on a presumption of regularity that does not exist here.

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order,*     22
*Preliminary Injunction, and Expedited Hearing*

resolves the threshold question of who possesses lawful authority over the Project and what process must govern its exercise.[20]

Defendants principally invoke the public interest in informed decisionmaking, arguing that the Study may generate information useful to OA's NEPA and NHPA analyses. ECF No. 44 at 33–34. Plaintiffs do not dispute the value of informed decisionmaking undertaken by an agency with statutory authority following legally mandated processes. But informed decisionmaking is not advanced by allowing invasive testing to proceed outside the legally accountable process that exists to inform it. As discussed above, professional consultation before testing can determine whether testing is necessary, how samples are selected, what materials are used, how performance and damage are measured, and what safeguards are imposed. And Defendants themselves acknowledge that the Study may help determine both the "preferred alternative" under NEPA and the "proposed undertaking" under NHPA. ECF No. 44-1 ¶ 16. The more consequential the Study is to those later decisions, the stronger—not weaker—the public interest in ensuring that it occurs within a lawful and accountable process.

Nor does the limited physical scale of the proposed testing alter the balance. Defendants repeatedly characterize the affected area as "modest," but scale is not relevant to reversibility. The Study is part of the Project, which is anything but a modest endeavor. Further, even a small permanent alteration is permanent. The relevant comparison is therefore between, on one hand, a temporary delay in testing for a Project that is by no means urgent and, on the other hand, permanent injuries that cannot be repaired once testing occurs. The injunction Plaintiffs seek is narrow. It preserves the EEOB from invasive physical alteration while the Court determines who may lawfully authorize that alteration and under what process. A temporary delay for that purpose

---

[20] And even if Defendants did allege more concrete harm from the delay, it would be unsuccessful as it is "a problem of the Defendants' own creation." *Nat'l Tr.*, 2026 U.S. App. LEXIS 23770, at *116.

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing*                    23

imposes no equitable harm comparable to the permanent injuries Plaintiffs face if the Study proceeds. The balance of equities therefore favors preliminary relief.

## IV. THE PUBLIC INTEREST SUPPORTS THE REQUESTED RELIEF.

Preserving the status quo also serves the public interest in lawful government decisionmaking. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Congress likewise declared preservation of the Nation's irreplaceable historic heritage a public interest. *See* Pub. L. No. 89-665, as amended by Pub. L. No. 96-515; *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999). Preserving historic resources, ensuring lawful and transparent federal decisionmaking, and maintaining the integrity of NEPA and NHPA review statutes are profound public interests. Those interests are especially significant here because Defendants' theory would substitute OA's voluntary procedures for review conducted by an accountable agency with congressionally delegated authority and would leave OA's ultimate decision beyond judicial review under the APA. Maintaining the EEOB in its existing condition while the Court determines the threshold legal issues protects the public interest in informed, transparent, and reviewable federal decisionmaking. The public interest overwhelmingly favors a TRO and PI preventing OA from undertaking irreversible alterations to the EEOB.

Finally, the public interest in the protection of historic properties nationwide faces potentially profound consequences if a federal agency may evade congressionally mandated preservation review simply by transferring a Presidentially favored project to a White House office purportedly beyond the reach of judicial review.

## V. THE COURT SHOULD WAIVE THE BOND REQUIREMENT.

The Court should waive the security requirement under Federal Rule of Civil Procedure 65(c) or require only a nominal bond. This Circuit has previously imposed nominal or no security

where injunctive relief serves an important public interest, a substantial bond would impede access to effective relief, or the enjoined party identifies no meaningful monetary harm. *See, e.g.*, *Env't Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 331 F. Supp. 925, 927 (D.D.C. 1971); *Armstrong v. Bush*, 807 F. Supp. 816 (D.D.C. 1992); *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980). Those considerations apply here. Defendants' Opposition refers only to "potential litigation costs." ECF No. 44 at 35. Those costs provide no basis for imposing substantial security against Plaintiffs seeking to prevent irreversible alteration of an NHL while the Court resolves the legality of the challenged governmental action. Additionally, the public interest strongly favors injunctive relief, and a substantial bond would bar Plaintiff's access to that relief. The Court should therefore waive the bond requirement or require only nominal security.

## **CONCLUSION**

Plaintiffs seek to preserve the status quo while the Court resolves the legal questions at the heart of this case: Who has lawful authority to alter this National Historic Landmark, and through what accountable process may that authority be exercised? The answers cannot be supplied after OA has already exercised the disputed authority and original historic fabric has been irreversibly altered. Plaintiffs therefore respectfully request that the Court grant their Renewed Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing.

Dated: August 13, 2026

Respectfully submitted,

/s/ Gregory Alan Werkheiser, Bar No. VA210
Marion Forsyth Werkheiser, Bar No. 486465
Charles N. Curlett, Jr., Bar No. 497920
Jessie Barrington, Bar No. VA244
Lydia Dexter, Bar No. OR0032
Caitlin Grace McCurdy, Bar No. NH0004
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (703) 408-2002
Emails:
greg@culturalheritagepartners.com
marion@culturalheritagepartners.com
charles@culturalheritagepartners.com
jessie@culturalheritagepartners.com
lydia@culturalheritagepartners.com
caitlin@culturalheritagepartners.com


COUNSEL FOR PLAINTIFFS

*Plaintiffs' Reply in Support of Renewed Motion for Temporary Restraining Order,*     26
*Preliminary Injunction, and Expedited Hearing*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served on

Defendants via CM/ECF electronic notice.

/s/ *Gregory Alan Werkheiser*
GREGORY ALAN WERKHEISER
Attorney for Plaintiffs