# Plaintiffs' Exhibit 1

November 16, 2026

Ms. Heather Martin
Deputy Assistant to the President
Deputy Director and Chief Financial Officer
Executive Office of the President
Office of Administration
Washington, D.C. 20503
**via upload to regulations.gov**

RE: Docket Number OA-2026-0001

Dear Ms. Martin:

## I. INTRODUCTION

DC Preservation League ("DCPL") is a nonprofit, tax-exempt § 501(c)(3) membership organization headquartered in Washington, D.C. Its mission is to preserve, protect, and enhance the historic and built environment of Washington, D.C., through advocacy and education. DCPL's members live, work, and recreate throughout the District, including in and around the White House complex, Lafayette Square National Historic Landmark District, President's Park, and the Eisenhower Executive Office Building ("EEOB"). Multiple DCPL members, including Executive Director Rebecca Miller and former president of Don't Tear It Down Robert Allan Peck, regularly use and enjoy the EEOB and its surrounding historic districts, and they intend to continue doing so. DCPL members would directly experience the aesthetic and historic harm caused by permanently painting the EEOB's distinctive granite exterior.

DCPL strongly opposes the painting of the EEOB (the "Project") as advanced by the Office of Administration ("OA") in the October 2026 Environmental Assessment ("EA"). DCPL has opposed the Project since November 2025, when it filed suit challenging the government's efforts to proceed without complying with applicable environmental and historic preservation laws. *See* Complaint, *Cultural Heritage Partners et al. v. Trump et al.*, No. 1:25-cv-03969-DLF (D.D.C. Nov. 14, 2025), ECF No. 1 ("*DCPL v. Trump*"); *see also* Amended Complaint, *DCPL v. Trump*, No. 1:25-cv-03969-DLF (D.D.C. Feb. 19, 2026), ECF No. 34.

The EEOB is a National Historic Landmark ("NHL") owned and operated by the General Services Administration ("GSA"). Accordingly, GSA must fulfill its independent obligations under the National Environmental Policy Act ("NEPA") and the National Historic Preservation Act ("NHPA") before proceeding with a federal action that may significantly or adversely affect the EEOB. Those statutory responsibilities belong to the responsible federal agencies, which must remain accountable for their decisions through the judicial review provisions of the Administrative Procedure Act ("APA"). OA is not a federal agency and cannot assume or displace GSA's statutory responsibilities. DCPL submits these comments without waiving its objections to OA's asserted authority over the Project or its position that the responsible federal agencies

1328 Florida Avenue NW | Washington, DC 20009 | T: 202.783.5144 | dcpreservation.org
FAY ARMSTRONG, *PRESIDENT* | GRETA FULLER, VICE *PRESIDENT* | HOWARD S. BERGER, *TREASURER* | MELISSA COHEN, AIA, LEED AP, *SECRETARY* | JOHN DEFERRARI, *AT LARGE*
JILL S. CAVANAUGH, AIA, AICP | SCOTT DEMARTINO, ESQ. | KATIE IRWIN, AIA, IIDA, LEED AP BD+C | ROB MCCLENNAN, AIA | D. PETER SEFTON
JAMES SHEPHERD, AIA, LEED | JOSEPH E. TAYLOR, AIA | BENJAMIN L. WILLIAMS, ESQ., LEED AP | JULIET ZUCKER

must independently fulfill their obligations under NEPA and the NHPA. If the Project remains under consideration, GSA must conduct the required environmental and historic preservation reviews.

Independently of these procedural defects, the EA is substantively inadequate under NEPA and the NHPA and cannot support the Finding of No Significant Impact ("FONSI"). This Project cannot proceed until GSA prepares an Environmental Impact Statement ("EIS"), follows the Section 106 process pursuant to the NHPA, and gives further consideration to the mandate to minimize harm to National Historic Landmarks ("NHL") imposed by Section 110(f) of the NHPA. The EA suffers from four fundamental defects: it relies on an illegitimate purpose and need, presents a flawed alternatives analysis, omits critical information and analysis, and substantially understates the severity of the Project's significant and adverse effects.

First, the Project's stated purpose and need is driven by the President's personal aesthetic preferences, rather than a legitimate federal objective. That impermissible premise twists the entire alternatives analysis, skewing the evaluation in favor of the Preferred Alternative and improperly treating the EEOB as though it were interchangeable with the White House. Second, the EA excludes essential information necessary to evaluate the Project and its alternatives, including testing results, cost estimates, implementation timelines, and recurring maintenance and upkeep requirements. Third, the EA minimizes the severity of the Project's adverse effects while overstating the benefits of painting. Indeed, even under this incomplete and biased analysis, OA acknowledges that painting the EEOB would have adverse effects. Proceeding with the Preferred Alternative despite these acknowledged effects would be fundamentally inconsistent with the NHPA's mandate under Section 110(f) to minimize harm to NHLs.

Nevertheless, OA proposes to proceed with the Preferred Alternative, which would irreversibly damage an NHL. But the draft EA and the process that OA has and will continue to follow are fundamentally flawed. A legitimate process, led by GSA as the proper federal agency, would result in an EA or Environmental Impact Statement ("EIS") that finds that the Cleaning and Lighting Alternative is the Preferred Alternative. This Project cannot move forward until GSA regains control of the Project, completes lawful NEPA and NHPA analyses, fully discloses all testing results, and selects the Cleaning and Lighting Alternative.

## II. THERE IS NO LEGITIMATE PURPOSE AND NEED TO PAINT THE EEOB WHITE.

OA defines the Project's purpose as "improv[ing] the public experience of the EEOB, and by extension the White House and surrounding public areas," by bringing the EEOB into "visual alignment" with the White House. EA at 1–2. This purpose and need relies on subjective aesthetic preferences rather than clearly defined project objectives. By framing the need for the Project around 'visually aligning' the EEOB with the White House—which apparently can only be achieved if both buildings are white— OA has predetermined that painting the building white is the only acceptable outcome. But the Project's statement of purpose and need is pretextual, thus improperly excluding reasonable alternatives that would make the building more aesthetically pleasing by gently cleaning the building while preserving the historic granite in its original state.

Federal agencies bear the responsibility for defining their project objectives at the outset, which form the basis for a project's purpose and need. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). Agencies must then use the purpose and need to evaluate reasonable alternatives that would fulfill the project objectives in good faith. *See* 42 U.S.C. § 4332(C)(iii). Agencies cannot define their objectives so narrowly that only the preferred alternative can satisfy them. 938 F.2d at 196; *N.J. Conservation Found. v. Fed. Energy Regul. Comm'n*, 111 F.4th 42, 57–58 (D.C. Cir. 2024). NEPA requires agencies to define legitimate project objectives and evaluate reasonable alternatives for achieving those objectives. *See* 42 U.S.C. § 4332(C).

Here, the Project objectives are not clearly defined. The EA never explains what "visual alignment" and "restor[ing] and enhanc[ing] the visual character of the EEOB" mean, how painting will improve the public's experience, or what objective criteria support those aesthetic judgments. *See* EA at 1–2.

The historic setting and arrangement of the White House and the EEOB were intentional choices. The EEOB and Treasury Building are similarly scaled, monumental, unpainted stone buildings that flank the smaller

White House. As OA notes, the buildings' contrasting materials and colors establish a visual hierarchy that emphasizes the White House's distinctive position. EA at 15–16, 24. Painting the EEOB white would undermine that historic composition and diminish the White House's visual distinction.

Further, public response to the Project overwhelmingly opposes the Preferred Alternative, and thus the purpose of "improv[ing] the public experience of the EEOB" cannot be met except by choosing the Cleaning and Lighting or No Action Alternatives. Since November 2025, when President Trump first announced his intention to paint the EEOB white, there has been widespread public opposition to the Project. When OA presented the Project to the Commission of Fine Arts ("CFA") on April 16, 2026, CFA received "approximately 900 comments…all in opposition."[1] When OA presented the Project to the National Capitol Planning Commission ("NCPC") on May 7, 2026, NCPC received "over 2,000 written comments."[2] Even as of the time that DCPL submits this comment, 84 comments on the EA have been submitted; of those, 71 have been published on the docket with 68 opposing the Preferred Alternative and the other three requesting additional information without taking a clear position.

Nor does Executive Order ("EO") 14344 support selection of the Preferred Alternative. Exec. Order No. 14344, Making Federal Architecture Beautiful Again, 90 Fed. Reg. 42685–89 (Aug. 28, 2025). As a preliminary matter, "an Executive Order is not 'law' within the meaning of the Constitution or the APA," *California v. Env't Prot. Agency*, 72 F.4th 308, 318 (D.C. Cir. 2023), and it cannot override the federal government's responsibilities to comply with federal law, including NEPA and the NHPA. Even to the extent EO 14344 bears on the analysis, it does not support painting the EEOB white. The EA wrongly states that the "current state of the EEOB is inconsistent with EO 14344," and thus concludes that the Project is necessary "to meet federal policy objectives for civic architecture[.]" EA at 2. However, OA's recommendation is inconsistent with EO 14344 because painting the EEOB would not preserve traditional architecture, is not economical, and would not use materials, methods, and equipment of proven dependability.

First, the EO endorses preserving traditional architecture, which it expressly defines as including "historic humanistic architecture such as …Second Empire[.]" Exec. Order No. 14344, 90 Fed. Reg. at 42686. "The EEOB is widely recognized as one of the most prominent examples of French Second Empire style architecture in the United States." EA at 20. As OA clearly notes, the EEOB is an acclaimed example of French Second Empire architecture, and thus the EO directs that it should remain in its original form. *See* EA at 20.

Second, the Preferred Alternative is not economical. The EO stipulates that the "potential expense" of any redesign "should be examined" and further emphasizes low ongoing maintenance costs by stating that "[b]uildings shall be economical to build, operate, and maintain[.]" Exec. Order No. 14344, 90 Fed. Reg. at 42686–87. Importantly, the EO states that renovation and redesign of a "building's exterior" should only be given "substantial consideration" where "feasible and economical." *Id.* at 42686. In other words, the EO requires an agency considering painting a building's exterior to conduct an economic analysis first. OA has done no such thing. The EA does not include a discussion of cost for any of the alternatives, but it does acknowledge that the Preferred Alternative will be *more costly* than the other alternatives. *See* EA at 9. Because of the enormous size of the EEOB and the acknowledged need for recurring upkeep and maintenance, the Preferred Alternative is neither feasible nor economical.

Third, the EO stipulates that designs "shall adhere to sound construction practice and utilize materials, methods, and equipment of proven dependability." Exec. Order No. 14344, 90 Fed. Reg. at 42687. For the reasons explained in greater detail in section III.B. below, OA fails to establish that painting granite meets any of these requirements. The EA does not confirm that the proposed coating can be safely applied, maintained, or removed from the EEOB's historic granite exterior. OA should not select a preferred coating and advanced the Project while critical questions about its effects on the building remain unanswered.

---

[1] Thomas Luebke, Meeting Minutes, Comm'n of Fine Arts (Apr. 16, 2026), https://www.cfa.gov/records-research/record-cfa-actions/2026/04/cfa-meeting/minutes.

[2] Nat'l Capital Planning Comm'n, Open Session Commission Meeting Tr. at 23:19–22 (May 7, 2026), https://www.ncpc.gov/docs/open_gov_files/transcripts/2026/2026_05_07_NCPC.pdf.

Thus, the purpose and need statement rests on the President's aesthetic preferences alone: to match the White House and the EEOB. This preference is not supported by the EO, predetermines the outcome, undermines the analysis of alternatives, and makes the selection of the Preferred Alternative arbitrary and capricious.

## III. THE ALTERNATIVES ANALYSIS IS HOPELESSLY FLAWED.

The EA's alternatives analysis improperly precludes all alternatives except the Preferred Alternative. OA inaccurately equates the EEOB and the White House, excludes crucial information and analysis, minimizes the severity of some adverse effects, and overstates the benefit of others.

### A. The White House is not an appropriate model for the EEOB.

The fact that the White House is painted does not establish that painting the EEOB is technically sound or historically appropriate. The buildings are significantly and intrinsically different: the White House is smaller and constructed of much weaker and more porous sandstone, while the EEOB is a massive granite building whose gray and pink-hued exterior was deliberately selected by its architect. EA, Appendix C at 10–12 (noting that the Aquia Creek Sandstone used for the White House, Treasury Building, and Capitol Building was of poor quality and needed to be painted, capped with other stones, or replaced). The sandstone of the White House was painted upon its initial construction in 1798, in order to protect the much more fragile exterior from freezing.[3] Moreover, sandstone is a material that is known to bond to mineral silicate paint, unlike granite.

Nor is it relevant that OA frames the EEOB as "a functional extension of the White House." EA at 5. The design of each building was a deliberate choice, reflective of the time periods and contexts during which each building was constructed. The White House was conceived as a deliberately restrained residence, constructed of local Stafford County sandstone, and was intended to avoid the ostentatious displays of European monarchies.[4] In contrast, the EEOB was designed by Alfred B. Mullett as an exuberant Second Empire composition. Exhibit 12 to Plaintiffs' Reply in Support of Motion for Preliminary Injunction, *CHP v. Trump*, No. 1:25-cv-03969-DLF (D.D.C. Dec. 2, 2025), ECF No. 16-12 at 6 (booklet published by the Executive Office of the President ("EOP") titled, "Eisenhower Executive Office Building: Modernization and Restoration"). When it was first constructed, the EEOB was named the State, War, and Navy Building, as it was built to bring these rapidly growing military and diplomatic departments under a single roof. Exhibit 6 to Plaintiffs' Reply in Support of Motion for Preliminary Injunction, *CHP v. Trump*, No. 1:25-cv-03969-DLF (D.D.C. Dec. 2, 2025), ECF No.16-6 at 6 (EOP publication titled, "The Old Executive Office Building: A Victorian Masterpiece"). The EEOB was built as a fireproof granite edifice set on a high platform, with column-enriched entrance pavilions and statuary. *Id.* at 28. The result was a monument to national ambition and engineering capacity: a massive structure that was the largest office building in the world when completed. *Id.* at 48 n.1.

### B. The EA excludes crucial information that impacts its alternatives analysis.

The EA's analysis is fundamentally deficient because OA has failed to establish that mineral silicate paint can be safely applied, maintained, or removed from the EEOB's historic granite exterior. Rather than basing its decision on complete testing results, reliable scientific methods, and established preservation standards, OA has selected the Preferred Alternative and advanced the Project while critical questions about the effects of the selected paint on the building remain unanswered. The EA omits essential testing information, fails to evaluate the potentially irreversible consequences of eventual paint removal, relies on questionable testing and repair methodologies without explaining their applicability to granite, and misapplies preservation

---

[3] *Why is the White House White?*, THE WHITE HOUSE HIST. ASS'N, https://www.whitehousehistory.org/questions/why-is-the-white-house-white (last visited Nov. 16, 2026).

[4] Pamela Scott & Anoinette Lee, *White House*, SOC'Y OF ARCHITECTURAL HIST., https://sah-archipedia.org/buildings/DC-01-WH03 (last visited Nov. 16, 2026).

standards while disregarding those standards' opposition to painting granite. These are not minor omissions. They go to the heart of whether the Project is appropriate, whether its impacts have been adequately evaluated, and whether the public has been given a meaningful opportunity to participate in the process.

**1. No testing information has been disclosed.**

It is antithetical to the process to select and champion a Preferred Alternative while essential scientific analysis is still ongoing. The EA discloses only a select amount of information about testing and stipulates that "additional testing is planned." EA at 6. If those tests are necessary to establish whether the coating is suitable, then there is not sufficient information available to make an informed decision and the public is not able to meaningfully comment. *See Pub. Emp. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1082 (2016) (holding that "agencies must take a hard look at [the] environmental consequences of their actions and provide for broad dissemination of relevant environmental information" (cleaned up)). The EA's analysis of both the alternatives and adverse effects improperly excludes testing results.

The preliminary adhesion and removal testing indicates that pressure washing may remove the paint but also leave some minimal visible surface changes. EA at 6, 22. "Minimal visible surface changes" are not the same as *no* visible surface changes. Additionally, the EA fails to disclose the underlying protocols, complete results, contractor reports, or other information sufficient to evaluate the reliability of those findings. To comply with the law, the federal agency must disclose:

- The identity and qualifications of the testing contractor;
- The specific paint formulations tested;
- The duration and environmental conditions of the tests;
- The pressure, distance, and water volume used during removal;
- The effects on stone surfaces, mortar joints, texture, and color;
- The quality and appearance of the façade post-removal, including any incomplete removal; and
- Any independent laboratory analysis or expert review.

The EA has been prepared and published prematurely. The EA expressly contemplates additional testing including adhesion, accelerated weathering, field-panel, and removal testing before work begins. EA at 6. An EA is supposed to determine whether a proposed federal or regulated project will significantly affect the human and physical environment and then solicit feedback from consulting parties and the public. When an EA fails to disclose the details of the preliminary testing and is published before the planned additional testing is complete, it frustrates and undermines the very purpose of the review process. The government must fully disclose all testing results and explain how those results support its decision making.

**2. The EA fails to evaluate the consequences of eventual paint removal.**

Because the Project's purpose and need is to satisfy the particular aesthetics of the sitting President, the EA fails to consider the consequences of removing mineral silicate paint. The EA must evaluate the reasonably foreseeable consequences of removal, including pressure washing, chemical treatments, and other interventions that would damage the historic stone or mortar. It must also consider the possibility that the coating will become effectively permanent.

The EA states that paint removal is not anticipated but proposes further testing to determine whether removal can be accomplished safely. EA at 6, 22–23. This answer is not adequate. The EA cannot conclude that painting the EEOB presents no significant risk while acknowledging that the long-term consequences and safe removal of the coating remain uncertain. The possibility that removal will damage the granite, or potentially prove impossible, goes directly to whether painting should occur in the first place. In fact, among experts in the field of conservation, reversibility is a valued goal, including for activities thought of as neutral or even

beneficial.[5] Experts recognize that technology changes, and what once may have been seen as best practice may no longer be an appropriate method or treatment.

### 3. The EA relies on inappropriate methods.

The EA relies on methods that are inappropriate for unpainted granite without explaining why those methods were selected. Under NEPA, federal agencies must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document[.]" 42 U.S.C. § 4332(D). Agencies must also "make use of reliable data and resources[.]" *Id.* § 4332(E).

The Secretary of the Interior's ("SOI") Standards for the Treatment of Historic Properties are located at 36 C.F.R. Part 68. These regulations set forth standards for the treatment of historic properties containing standards for preservation, rehabilitation, restoration and reconstruction. Promulgated by NPS, the SOI Standards are widely employed across the Federal government to characterize best practices for historic properties and to evaluate when an activity may constitute an adverse effect to a historic property under Section 106 of the NHPA. SOI Standards explicitly recommend against painting or applying coats to previously unpainted or uncoated historic buildings, as "these buildings have successfully survived thus far without surface treatment." EA, Appendix C at 22. The SOI Standards further state that painting a building to change its appearance "is neither restoration nor preservation." Declaration of Judith M. Jacob, *CHP v. Trump*, No. 1:25-cv-03969-DLF (D.D.C. July 30, 2026), ECF No. 43-4 ¶ 16 ("Jacob Decl."). Any work inconsistent with the SOI Standards is an adverse effect under the NHPA. 36 C.F.R. § 800.5(a)(2)(ii). OA does not explain why it intends to use mineral silicate paint on previously unpainted granite in direct contradiction of the SOI Standards.

Similarly, the EA provides no explanation for why repointing would occur "in accordance with Brick Industry Association Guidelines" when the building is comprised primarily of granite. EA at 7. In related litigation, the government stated "coating adhesion testing" was performed on the EEOB "in general accordance with ASTM D7234-22 – Standard Test Method for Pull-Off Strength of Coatings on Concrete Using Portable Pull-Off Adhesion Testers." Joint Status Report, *CHP v. Trump*, No. 1:25-cv-03969-DLF (D.D.C. Sept. 22, 2026), ECF No. 53. Neither of these methods should be used on granite, these errors underscore the fundamental issues with this process and demonstrate that, in addition to having no statutory authority to manage the Project, OA also lacks the professional expertise and qualifications to plan and manage the Project.

### 4. The EA does not adequately address preservation standards.

Federal agencies should follow the SOI Standards in work on an NHL. The EA states that masonry repairs will follow the SOI Standards—but these Standards do not support painting the unpainted exterior of the EEOB white. EA at 7. The EA cannot invoke preservation standards to support ancillary repairs while disregarding their relevance to the fundamental alteration proposed.

Even where the EA claims it will follow the SOI Standards, it does not provide all relevant information to show that it will in fact follow appropriate preservation standards. For example, professional practice requires that a condition survey first be conducted before the development of an intervention plan with options. Jacob Decl., ECF No. 43-4 ¶ 10. Here, OA chooses the coating—mineral silicate paint—before disclosing a survey, as "specifications have not yet been finalized." EA, Appendix C at 21. This is the wrong order of events. As another example, OA proposes "new silicone sealant at all applicable joints," but does not say which joints or whether this sealant will replace mortar. EA at 7. These are important details and distinctions, as repointing always damages stone edges, and new mortar must fully cure before any coating can be applied. Jacob Decl., ECF No. 43-4 ¶¶ 12, 14. The EA also fails to identify the anticipated extent of Dutchman repairs and

---

[5] *See generally* Barbara Appelbaum, *Criteria for Treatment: Reversibility*, 26 J. AM. INST. FOR CONSERVATION 65, 65–73 (1987), *available at* https://cool.culturalheritage.org/jaic/articles/jaic26-02-001.html.

stone replacement. The EA should identify affected areas, quantify anticipated loss of historic fabric, and evaluate those activities as part of the Project.

## IV. THE EA IMPROPERLY MINIMIZES ADVERSE EFFECTS AND OVERSTATES PURPORTED BENEFICIAL EFFECTS.

The EA acknowledges adverse effects to at least three nationally significant historic properties but concludes that the visual change will be aesthetically beneficial, and that because OA plans to "mitigate" the adverse effects through documentation and public education, the end result will be less-than-significant adverse effects to each of the three nationally significant historic properties. Documentation and public education will not preserve the EEOB's historic granite or prevent the permanent alteration of its character-defining features. Historic preservation is fundamentally about protecting what cannot be replaced. Once a historic resource is irreversibly altered, it is gone forever—this loss should be weighted heavily in comparison to subjective visual characteristics.

### A. The EA significantly understates the Project's reasonably foreseeable long-term environmental consequences.

The EA understates the duration and frequency of construction and maintenance activities and fails to adequately evaluate their recurring environmental effects. These omissions prevent the government from reaching the inevitable conclusion that the Preferred Alternative's impacts will be significant. NEPA requires agencies to evaluate the reasonably foreseeable environmental consequences of proposed actions, including their duration, extent, and recurring effects. *See* 42 U.S.C. § 4332(C).

OA wrongly characterizes the effects of annual "soft" washing with a 2,800-psi pressure washer, spot painting, and scaffolding to access the building's façade as temporary, failing to evaluate their recurrence over the life of the Project. EA at 8. The EA does not explain how frequently scaffolding will be installed, how long it will remain, how much spot painting will be required, whether full repainting will eventually be necessary, or how repeated cleaning and pressure washing will affect the granite and coating over time. Further, power washing at 2,800 psi is far higher than recommended by standard preservation practices,[6] which raises concern should it occur on an annual basis. Similarly, scaffolding application and removal on a building as ornamental and unique as the EEOB will also have its own potential to damage the building's historic fabric, exaggerated all the more if done annually.

The EA ignores that activities like scaffolding, surface preparation, cleaning, repairs, and painting will obscure the EEOB's façade on an annual basis and alter views from surrounding public areas. Because painting and other maintenance activities are temperature dependent and may be interrupted during extreme winter and summer conditions, EA at 9, the EA should have acknowledged the likelihood that work will perpetually continue around the building, which changes the scope of the Project and requires a different analysis of the environmental consequences.

### B. The EA minimizes and excludes complete analysis of adverse effects under the NHPA.

The conclusions that the Preferred Alternative "would have *long-term, beneficial impacts* on visual resources and aesthetics" and that there would be "*long-term less-than-significant adverse effects*" to the EEOB as a cultural resource directly contradict the EA's analysis of the Project's environmental consequences to visual and aesthetic resources as well as cultural resources. EA at 17, 24 (emphasis in original).

Section 106 of the NHPA requires federal agencies to consider the effects of their undertakings on historic properties. 54 U.S.C. § 306108. An adverse effect occurs when an undertaking diminishes characteristics

---

[6] Robert Mack & Anne Grimmer, *Assessing Cleaning and Water-Repellent Treatments for Historic Masonry Buildings*, 1 NAT'L PARK SERV. PRES. BR. 1, 4 (2000), *available at* https://www.nps.gov/orgs/1739/upload/preservation-brief-01-cleaning-masonry.pdf.

qualifying a property for inclusion in the National Register, including integrity of design, setting, materials, workmanship, feeling, or association. 36 C.F.R. § 800.5(a)(1). Additionally, Section 110(f) of the NHPA imposes heightened obligations where an undertaking may directly and adversely affect an NHL. Agencies must, to the maximum extent possible, undertake planning and actions necessary to minimize harm. 54 U.S.C. § 306107. The EA fails to demonstrate compliance with NHPA's requirements, including the heightened obligations applicable to NHLs under Section 110(f).

The EA recognizes that architect Alfred B. Mullett deliberately selected the EEOB's gray and pink-hued granite, which is central to the building's historic design and character. EA at 20, 23. The EA concludes that painting would fundamentally alter the building's historic materials, diminish its integrity, impair its historic continuity, and diminish its value as an exemplar of French Second Empire architecture. EA at 22–23. These are not minor effects. These effects damage the historic characteristics that make the EEOB eligible for listing on the National Register of Historic Places and constitute an adverse effect under the NHPA.

The EEOB is individually designated as an NHL and as a contributing resource to the Lafayette Square National Historic Landmark District. The Preferred Alternative does not meet the mandate of Section 110(f) to minimize harm to an NHL to the "maximum extent possible." 54 U.S.C. § 306107. Rather, it is the Alternative that the EA acknowledges would cause the most harm to the EEOB.

Additionally, the EA's analysis of cultural resources is based on a flawed designation of the area of effects. The EEOB is not an isolated building, but a prominent component of the Nation's monumental core, visible from Lafayette Square, the Ellipse, Pennsylvania Avenue, and other important public vantage points. The visual relationship between the EEOB, Treasury Building, and White House is central to the historic character of the area. OA acknowledges this relationship but simultaneously sets a "Region of Influence" ("ROI") for the Project that is meant to include "viewsheds from which the EEOB is potentially visible." EA at 15. ROI is not a term defined by either NEPA or NHPA, and as such, it is difficult to understand how OA uses the ROI to influence its finding of effects for visual and cultural resources. OA does not provide a viewshed analysis supporting the ROI determination. Nor does it define what a "distant view" of the EEOB would be or provide any evidence supporting its assertion that buildings that have "distant views" of the EEOB include only a view of the roof, which would not be painted. EA at 19. The EA does not provide any images to contextualize how "distant" the view of the EEOB is.

Due to the issues with the ROI, the EA defines an Area of Potential Effects ("APE") that is too small, and thus the APE improperly excludes an assessment of effects for multiple properties that experience significant views of the EEOB. For example, properties outside of the APE, that DCPL thinks should be included are the Hay-Adams Hotel, Hotel Washington (the W), Washington Monument, and the Old Post Office Building. Each of these buildings have significant views of the EEOB's historic façade. For several of these buildings, their viewsheds continue to be a significant draw for visitors and are potentially character-defining elements of their historic significance. The EA also fails to mention the First Division Monument, which is located directly in front of the EEOB, and is a contributing element to the President's Park South District. The First Division Monument was constructed in 1924 and is individually listed on the National Register. Painting the EEOB façade white will cause a startling change to its setting and feeling. Yet the EA does not include any references to the First Division Monument and none of its references to President's Park South address whether that historic property might be adversely affected by the alternatives considered in the EA. The EA must explain why the APE captures all reasonably foreseeable visual effects, particularly given its own recognition that the Project will alter important viewsheds. The APE should not exclude locations where the Project's visual effects are reasonably foreseeable.

### C. The EA improperly omits effects on certain environmental resources.

The effects the Project will have on environmental resources such as recreation and socioeconomics are greater than OA admits, and the EA should not have excluded recreational and socioeconomic resources from detailed analysis. EA at 13–14. Impacts to recreation are not limited solely to access. OA acknowledges as much: one of the Project's central objectives is to improve the public's experience of the EEOB and surrounding areas. EA at 1–2. Yet, the EA states that the Project "would not alter access to or availability of recreational

resources or facilities surrounding the EEOB" and thus dismisses recreational resources from further analysis. EA at 13. The EA cannot shift the scope of recreation and public enjoyment from the purpose and need statement to the analysis of the affected environment and environmental consequences. The analysis should address effects on the public's experience of Lafayette Square, President's Park, the Ellipse, and other important viewing locations, including both construction-related obstructions and the permanent alteration of historic views. These omissions must be rectified.

Additionally, the EA cannot exclude detailed analysis of socioeconomic resources by limiting the scope of the Project's impacts to only "the number of personnel employed at the EEOB[,]" "temporary benefits from increased expenditures for materials and labor[,]" and "changes to population, demographics, income, community services and facilities, [and] housing[.]" EA at 14. It is only because of this limited scope that the EA concludes that "[t]here is no potential for significant economic effects." EA at 14. Because OA relies on EO 14344 as part of the Project's purpose and need—which emphasizes economical construction, operation, and maintenance—it should have provided a meaningful comparison of initial project costs, alternative costs, or recurring maintenance expenses.

**D. The EA overstates the benefits of its purported mitigation.**

The EA proposes digital scanning, updated preservation plans and National Register documentation, public exhibits, interpretive materials, and oral histories to "mitigate" the adverse effects. EA at 23–24. The EA frames the mitigation measures as a complete list, but the Assessment of Effects Report states that additional mitigation measures may be necessary to resolve adverse effects. EA, Appendix C at 26. And understandably so. Photographs of the original appearance do not preserve the granite. *See* EA at 23. An exhibit explaining that the EEOB once had an unpainted façade cannot restore its historic materials or architectural integrity. *See* EA at 24. These measures document and explain the loss rather than prevent it. The appropriate response to recognizing the significance of the historic granite is to preserve it, not to paint it. Documentation and interpretation cannot substitute for preservation.

**E. The EA inadequately evaluates sensitive receptors, air quality, noise, and waste.**

The EA fails to address effects to staff and children attending a daycare facility across the street caused by recurring maintenance and potential exposure associated with cleaning, painting, equipment operation, and lead-paint abatement. EA at 14. Instead, the EA dismisses potential effects based on physical separation and the temporary nature of construction, failing to consider the ongoing maintenance activities that the EA acknowledges will happen on an ongoing basis.

Similarly, the EA estimates annual maintenance emissions, including 0.465 tons of VOCs and 3.781 tons of NOx, but characterizes the effects as temporary and localized. EA at 28. It does not adequately explain the assumptions underlying those estimates or compare the recurring emissions with those of the Cleaning and Lighting Alternative.

The noise analysis likewise fails to account for repeated scaffolding installation, pressure washing, and maintenance activities affecting nearby sensitive receptors, including educational facilities and public spaces. EA at 31–33. The appropriate federal agency must evaluate the full duration and recurring nature of the Project, including scaffolding, cleaning, spot painting, emissions, noise, waste, and public-health effects. The current analysis does not support the finding that these impacts are insignificant.

**F. The EA does not adequately document consultation and agency participation.**

The EA states that OA voluntarily provided the Assessment of Effects Report to DC SHPO and consulting parties, but it does not clearly identify all consulting parties or provide a complete accounting of the consultation process. EA at 3. The EA must identify all consulting parties, disclose relevant correspondence and comments, explain how those comments were considered, and clarify the roles of GSA, NPS, DC SHPO, Department of the Interior, NCPC, and the Advisory Council on Historic Preservation. DCPL maintains its

objections that OA's voluntary preparation of an EA and Assessment of Effects Report is not a substitute for compliance with NEPA and NHPA obligations by the appropriate federal agency.

Due to the significant omissions, the EA does not establish that the required preservation and environmental processes have been meaningfully undertaken or that the irreversible harm to the EEOB's historic fabric has been adequately considered or mitigated.

## V. THE EA DOES NOT SUPPORT A FINDING OF NO SIGNIFICANT IMPACT.

The proposed FONSI is unsupported by the EA's own findings. The acknowledged adverse effects to nationally significant historic properties, unresolved scientific testing, and inadequately evaluated long-term environmental consequences preclude a reasoned selection of the Preferred Alternative and a finding that it will not significantly affect the human environment.

NEPA requires preparation of an EIS when a proposed action may significantly affect the quality of the human environment. 42 U.S.C. § 4332(C). An EA and FONSI cannot substitute for an EIS where the record fails to establish that there are no significant impacts. The EA expressly acknowledges that painting the EEOB would fundamentally alter its historic granite, diminish its integrity, impair its architectural character, alter historic viewsheds, and adversely affect the Lafayette Square NHL District and Treasury Building. EA at 22–24.

The EA nevertheless characterizes these effects as less than significant because the building's overall style and massing will remain unchanged and because documentation and interpretation will mitigate the effects. EA at 24. That reasoning ignores the importance of historic materials, color, and architectural character. A building does not retain its historic integrity simply because its basic shape remains intact after its historic exterior materials are coated and irreparably damaged.

The EA's acknowledged scientific uncertainty further undermines the FONSI. The EA has not established whether the coating can be removed safely, whether it will affect moisture movement through the granite, or whether long-term deterioration may result. If the coating cannot be removed without damaging the granite, then the Project would permanently alter an NHL.

Finally, OA has not adequately explained why the Cleaning and Lighting Alternative is insufficient. That alternative would improve the building while avoiding adverse effects to historic properties. The EA's own findings, unresolved scientific questions, and incomplete analysis of long-term effects require a more rigorous environmental review. A legitimate process, managed by GSA, would result in the selection of the Cleaning and Lighting Alternative as the Preferred Alternative.

## VI. REQUIRED ACTION

The Cleaning and Lighting Alternative is the best choice. The EA acknowledges that the Cleaning and Lighting Alternative would remove soiling, stains, and biological growth and improve the appearance of the EEOB while preserving its character defining features. EA at 10, 17–18, 25–26. It further concludes that this Alternative would have no adverse effect on the EEOB and no effect on other historic properties. EA at 25–26.

Yet, OA rejects this Alternative based on a superficial analysis and an insistence on a pretextual purpose to make the EEOB look the same as the White House. OA's selection of the Preferred Alternative is arbitrary and capricious. If the government wishes to proceed forward with painting, then GSA must serve as the lead federal agency, and GSA must finish the testing and disclose the results and associated technical information, including protocols, results, contractor reports, and expert opinions concerning adhesion, weathering, compatibility, durability, and removal. GSA must also evaluate the full life-cycle consequences and costs of painting the EEOB, including annual cleaning, scaffolding, spot painting, repainting, and paint removal. After completing this required testing, GSA would need to prepare an EIS, which would include analysis of historic resources, visual effects, maintenance, air quality, noise, public health, and eventual paint removal. The

government cannot make a final decision on the Preferred Alternative until the proper federal agency is managing the process and only after all the testing and evaluations are complete.

## VII. CONCLUSION

The EEOB is not a blank canvas. Its gray and pink granite, monumental scale, and distinctive French Second Empire architecture are defining characteristics of the NHL. Together with the Treasury Building, the EEOB has framed the White House for more than a century, creating a visual composition central to the historic character of the Nation's capital. The EA acknowledges that painting the EEOB would fundamentally alter its historic façade and adversely affect at least three nationally significant historic properties. Yet OA, which should not be handling any aspect of this Project, proposes to proceed on the basis of incomplete testing, an artificially narrow purpose and need statement, and mitigation measures that document the loss rather than prevent it. If the government wants to move forward with the Project, then GSA must plan and manage this process as the lead federal agency and conduct proper NEPA and NHPA reviews, which would result in the selection of the Cleaning and Lighting Alternative to ensure the preservation of the EEOB's historic granite.

Sincerely,

Rebecca Miller
Executive Director
rebecca@dcpreservation.org